UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

JIMMY ANTHONY                                                                              PLAINTIFF

V.                                                  CIVIL ACTION NO. 3:23-CV-132-KHJ-MTP

JONATHON WELKER, et al.                                                          DEFENDANTS

ORDER

Before the Court are 13 motions in limine. *See* Pl.'s Mots. in Limine [106]; Defs.' Mots. in Limine [108]. The Court grants some and denies others.

I.   Background

This case arises from alleged police brutality. It presents three questions. First, did Defendants Jonathon Welker and Jacob Lang use unlawful force against Plaintiff Jimmy Anthony? Second, if so, what damages did they cause? And third, if they caused compensatory damages, are punitive damages also warranted?

The parties dispute all three questions. The Court outlines the parties' competing positions, which frame many of the Court's in limine rulings.

A.   Unlawful Force

The parties dispute whether Welker and Lang used unlawful force.

The Court starts with Anthony's version of events. According to Anthony, the City of Pearl Police Department responded about 25 times to his romantic partner's domestic-violence calls. *See* Anthony Dep. [114-1] at 10–11. Each time, Anthony left the woman's house, so he was never there by the time police arrived. *Id.* at 11–12.

That pattern continued in April 2022. *See id.* at 5, 18. One day, Anthony was at a park when he got a call from his neighbor. *Id.* at 5. When Anthony answered, an officer—responding to yet another domestic-violence call against Anthony—was on the line. *See id.* at 5–6. The officer asked where Anthony was; Anthony refused to say. *Id.* at 6. The officer allegedly responded, "Well, if you don't come now, it's going to be worse later." *Id.* Anthony hung up the phone. *Id.*

The next day, Anthony was at the alleged victim's house, in violation of a no-contact order. *See id.* at 18; Pl.'s Mem. Supp. Mot. [110] at 2. Police arrested him. [110] at 2. When they got to the station, "Lang grabbed and pulled [Anthony's] hair and proceeded to scream and curse directly in [his] face." *Id.* (citing Booking Video [106-1] at 1:53–2:58).[1] Right after that, Welker told Anthony to follow him down a hallway, where the station's video and audio were not working. *Id.* (citing [106-1] at 2:58–3:10); *see also* City of Pearl Discovery Resps. [99-2] at 2. In his deposition, Anthony gave his account of what happened next:

> So I went back . . . and he said, "Stand right there."
> And so I stood there and Officer Lang come down the hallway. I guess it wasn't long after he walked off, Officer Welker walked off, Officer Lang come by and put his hand in my face and slammed my head into the brick wall. And I did not respond to it. I just—because I know I can't win. You know, I just took it.
> And he—then Officer Welker came back and took me in the bathroom and he told me, he said, "Mr. Anthony," he said, "When you get out, don't go back to [the alleged victim's home]. . . . But you will

---

[1] During the portion of the clip that Anthony cited, Lang yelled: "Let me tell you one goddam thing! I gave you a fuckin' opportunity yesterday. Did I not talk to you on the fuckin' phone for ten goddam minutes? Giving you a fuckin' chance, and you didn't fuckin' take it. Not once. I gave you the chance to come talk to me, but you didn't. The fuck did I tell you was gonna happen? What did I tell you? I wanna know. What did I tell you? What was gonna happen? And I was gonna fuckin' find you. Did I not? You're a dumb motherfucker! Now call your fuckin' lawyer on this one." [106-1] at 2:02–2:57.

> because I know you love her. . . . Now I'm going to hit you. . . . Are you going to take it like a man or like a bitch?"
> 
> And I didn't say nothing. He put his hands on my shoulders and turn me to where I would be, like, sideways. And he commenced to hitting me over my heart front and back until he was out of breath. And I just stood there and took it. I'm sure I made little noises or whatever.
> 
> But, anyhow, then after—when he was out of breath, shortly after—it wasn't long—a couple of the officers, an officer with a beard—I don't recall their names, but he came in and he says—he says, "I'm not a police officer right now." He says, "Hit me and then you'll see what it feels like to hit a real man."
> 
> I said, "No, sir."
> 
> And then they walked me back out to the booking area and—and sat me down and it wasn't but about probably—I'm—I'm just guessing now—it was a couple of minutes, I had the sharp pain in my chest. And I grabbed my heart, felt like needles sticking in my heart.

[114-1] at 13–14. Anthony "was not given any medical treatment and was instead mocked by Welker and several officers in the booking area." [110] at 2–3 (citing [106-1] at 25:08–35:03).[2] Anthony then went to the Rankin County Detention Center, where he passed out about an hour later. *Id.* at 3 (citing [106-1] at 45:44–48:11).[3] Officials took him to get medical attention, and he "was diagnosed with broken ribs, a left lung hematoma, a hemothorax, and a scalp contusion." *Id.*

The Court turns to Defendants' version of events. At the house, according to Defendants, "Anthony resisted arrest and had to be taken to the ground." Defs.'

---

[2] During the portion of the video that Anthony cited, one officer sang a song about Anthony while four other officers listened and Anthony clutched his ribs. [106-1] at 31:43–33:17. Its lyrics included: "But he got beat / 'Cause he runs from the police / . . . Yes, he runs . . . / He said he loves [the alleged victim], but he beats her all the time / Yes, he does / Yes, he does." *Id.* at 31:53–32:22.

[3] During the portion of the video that Anthony cited, Welker said to Anthony: "Look at me in my eyes. Jimmy! . . . Stop with your actions. I don't give a fuck. Do you understand? Hey, please back off, dude. I don't give a fuck. If you think that hurt earlier, shut the fuck up." [106-1] at 46:23–46:48.

Resp. Mem. [115] at 4. And in his deposition, Welker gave his account of what happened at the station:

> So he goes to the bathroom, and I'm trying to give him some privacy. He's an old man going to the bathroom. So I turn my hip away, I turn my body away from—it was a really dumb mistake for me. He's—I'm right handed, like you said. My pistol was exposed. And, man, I turned around—and so I see him in my peripherals. . . .
> And so as I'm positioned around, he gets up. I tell him hey, man—he—his pants are still below. Hey, man, turn your pants up, put your hands back on the wall. At that time you've got to realize the proximity between us. When he stood up and he was walking back over, I told him to put his hands back on the wall, put your hands back on the wall. And he lunged. And when he did that, I pulled back, because my gun was exposed, and reared back and I hit him with my hand. I hit him in the rib here and pushed him up into the wall. My left hand came up because I didn't know—I could see fast movement, but I couldn't see what was going on. So anyways, a hand comes up, hit him on the wall. And then, I ain't going to lie to you, I cussed at him. I told him he was being a, you know, freaking knucklehead about it. He was too damn old to be doing this shit. And then I backed up, talked to him, kind of lectured him. I was, like, telling him you're too old for this shit. Stop, you know, you know better. You're my Papaw's age, for God sake. I went back in there.

Welker Dep. [114-2] at 5–6. For his part, Lang denies slamming Anthony's head into a wall. Lang Dep. [96-6] at 2 (Q: "Did you do that?" A: "No, sir."); *see also* Defs.' Mem. Supp. Mot. [109] at 4 ("Lang does not agree with Anthony's version of events . . . .").

B. Damages

The parties also dispute what caused Anthony's damages.

Anthony says that the alleged police brutality caused (1) medical expenses and (2) noneconomic damages. Pl.'s Third Suppl. Initial Disclosures [108-1] at 4; *see also* Pl.'s Discovery Resps. [108-2] at 13–14.

4

Defendants say that other circumstances may have caused at least some of Anthony's injuries. *See* [115] at 4–5, 8–9. That is, (1) "the circumstances regarding his fleeing and resisting" may have caused his medical expenses, and (2) his "continued drug use and struggle with sobriety" and "prior run-ins with police" may have caused his alleged emotional distress. *Id.*

C. Punitive Damages

Last, the parties dispute whether Defendants' alleged actions warrant punitive damages. *See* [109] at 2–3, 3 n.2; [113] at 4–5. But Defendants never moved for summary judgment on that issue. *See* City of Pearl Mem. Supp. Mot. [97] at 1 ("[T]here are factual disputes that do not lend themselves to summary judgment on behalf of the individuals.").[4]

II. Standard

In limine rulings have "developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). The main purpose of a motion in limine is to preclude opposing counsel from "mentioning the existence of, alluding to, or offering evidence on matters so highly prejudicial to the moving party that a timely motion to strike or an instruction by the court to the jury to disregard the offending matter cannot overcome its prejudicial influence on the jurors' minds." *Parker v. Tyson Foods, Inc.*, 499 F. Supp.

---

[4] The Court granted the City of Pearl's unopposed [96] Motion for Summary Judgment, dismissing Anthony's *Monell* claim. Order [100] at 2–3.

3d 297, 299 (S.D. Miss. 2020) (quoting *O'Rear v. Fruehauf Corp.*, 554 F.2d 1304, 1306 n.1 (5th Cir. 1977)).

"Evidence should not be excluded in limine unless it is clearly inadmissible on all potential grounds." *White v. Dolgencorp, LLC*, No. 3:21-CV-738, 2023 WL 2703612, at *1 (S.D. Miss. Mar. 29, 2023) (cleaned up). "Accordingly, evidentiary rulings addressing broad classes of evidence should often be deferred until trial so that questions of foundation, relevancy, and potential prejudice can be resolved in proper context." *Id.* (cleaned up).

"An order granting a motion in limine does not preclude the losing party from revisiting the issue at trial, outside the jury's presence." *United States v. Bryan*, No. 3:21-CR-17, 2023 WL 8100552, at *1 (S.D. Miss. Nov. 21, 2023).

III.  Analysis

The Court first addresses Anthony's eight motions in limine. [106]. It then addresses Defendants' five. [108].

    A. Anthony's [106] Motions in Limine

        1.  Police Uniforms

First, Anthony moves to preclude officers from testifying in uniform. [110] at 3–4. Citing Rule 608, he argues that officers' "plain daily uniforms" or "dress uniforms" would unfairly bolster their credibility. *Id.*

The Court denies that motion for two reasons. First, uniforms are not "evidence of truthful character" under Rule 608(a). *See, e.g., Datsko v. City of*

6

*Philadelphia*, No. 93-CV-4746, 1995 WL 574364, at *1 (E.D. Pa. Sept. 26, 1995).[5] And second, although the Court has discretion to control the details of trial, Anthony "has come forward with no evidence that unfair prejudice would result from permitting the officers to dress as they please." *Id.* Given the nature of Anthony's claims, "any potential prejudice in allowing the officers to testify in uniform is inherent . . . and does not tip the scale in any meaningful way." *Swear v. Lawson*, No. 15-CV-6591, 2019 WL 8195240, at *4 (E.D. La. May 31, 2019). For those reasons, "[t]he Court will not involve itself in the reasonable dress of any party or witness." *Echavarria v. Roach*, No. 16-CV-11118, 2022 WL 606076, at *4 (D. Mass. Mar. 1, 2022).

    2.  Prior Crimes, Wrongs, or Acts

Anthony next moves to exclude evidence of his "alleged prior crimes, wrongs, or acts" under Rules 401, 403, and 404. [110] at 4–7. Namely, he moves to exclude: (1) more than 30 criminal charges; (2) one 2015 conviction for drug possession; (3) "prior arrests, prior calls, prior investigations, or the fact that [Anthony] was known to Pearl officers"; (4) specific bad acts before the two-day period at issue; and (5) specific bad acts during the two-day period at issue. *Id.*

The Court grants in part and denies in part that motion.

First, the Court grants the request to exclude specific criminal charges that did not result in a "conviction" under Rule 609(a).

---

[5] *United States v. Perkins*, 287 F. App'x 342 (5th Cir. 2008) (per curiam), is not to the contrary. That unpublished case noted that prohibiting a police officer from wearing a uniform "has not been directly interpreted to be an exclusion of evidence . . . ." *Id.* at 350.

Second, the Court grants the request to exclude the 2015 drug-possession conviction. Under Rule 609(a), that conviction is admissible to attack Anthony's character for truthfulness, subject to Rule 403. But the Court excludes the conviction under Rule 403. Anthony's 2015 conviction for drug possession has little probative value as to his character for truthfulness. *See, e.g.*, *United States v. Lopez*, 979 F.2d 1024, 1033 (5th Cir. 1992) ("[P]ossession of marihuana is not an act that indicates a witness's character for truthfulness or untruthfulness.").[6] Because Anthony's 2015 conviction "provides minimal probative impeachment value . . . and poses significant risk of prejudicing or confusing the jury," the Court excludes it under Rule 403. *Tate v. Union Oil Co. of Cal.*, 968 F. Supp. 308, 311 (E.D. La. 1997).

Third, the Court denies Anthony's blanket request to exclude all "prior arrests, prior calls, prior investigations, or the fact that [Anthony] was known to Pearl officers." [110] at 6. The Court cannot say that *all* such evidence is "clearly inadmissible on all potential grounds." *White*, 2023 WL 2703612, at *1 (cleaned up). Indeed, some such evidence could go to the reasonableness of Defendants' use of force (on the one hand) and Defendants' potential motivation to resort to violence (on the other). So the Court will defer ruling until trial, when "questions of foundation, relevancy, and potential prejudice can be resolved in proper context." *Id.* (cleaned up).

---

[6] That is especially so because the jury will hear at least some evidence about Anthony's drug use, as discussed below. *See* Fed. R. Evid. 403 advisory committee's note ("The availability of other means of proof may . . . be an appropriate factor.").

8

Fourth, the Court denies Anthony's blanket request to exclude all specific bad acts before the two-day period at issue (e.g., "hiding from police" and "fleeing on foot from a police officer"). [110] at 6. Again, *some* such evidence may well be admissible. *White*, 2023 WL 2703612, at *1 (cleaned up); *see also, e.g.*, [106-1] at 31:53–32:22. So the Court will again defer ruling until trial. *White*, 2023 WL 2703612, at *1.

Finally, the Court denies Anthony's blanket request to exclude all specific bad acts during the two-day period at issue. Some such evidence is plainly admissible (e.g., evading police and talking with Lang on the phone). *See* [106-1] at 2:02–2:57, 31:53–32:22. So the Court will again defer ruling until trial. *White*, 2023 WL 2703612, at *1.

At trial, this case will remain focused on whether Defendants used unconstitutional force and, if so, what damages will make Anthony whole. The Court will give both sides a fair trial. So, on objection, the Court will exclude bad-acts evidence whose probative value does not justify receiving it into evidence. *See* Fed. R. Evid. 401–04.

3. Saucier's Bodycam Video

Anthony also moves to exclude "all but 10:32–11:16 of Officer [James] Saucier's body worn camera video" under Rules 401, 403, and 404. [110] at 8–9; *see also id.* at 7 ("Saucier was one of the five officers involved in [Anthony's] arrest."). Defendants respond: "If any of the body cam is admitted, the whole body cam should be admitted." [115] at 6.

The Court denies that motion.

Starting with Rule 401, the whole video is relevant. The first part of the video is probative of (1) whether Anthony resisted arrest at the alleged victim's home and had to be taken to the ground[7] and (2) whether Defendants assaulted Anthony *because* he had been evading police.[8] The second part of the video is probative of (1) whether the arrest that had just occurred off-camera injured Anthony[9] and (2) whether officers' state of mind made Defendants more likely to resort to violence against an alleged repeat offender, given their knowledge of Anthony's alleged abuse and professional experiences with domestic violence.[10] So the whole video is probative as to central issues here.

Turning to "unfair prejudice" under Rule 403, the Court finds none in the first part of the video. Given the nature of this case, jurors will inevitably know that Anthony had been evading police. *See* [106-1] at 31:53–32:22. As for the last part of the video, the Court acknowledges that there is danger of unfair prejudice:

- Officers mention that Anthony had been to jail before and was violating a no-contact order. [106-3] at 14:20–15:25.
- Officers and the alleged victim discussed an incident in October 2021 where Anthony allegedly hit her with a glass bowl, leaving a scar on her neck. *See*

---

[7] *See* Saucier Bodycam [106-3] at 1:45–10:28.

[8] *See* [106-3] at 3:48–3:54 (Saucier: "Go ahead, get in the closet, like you were last time—or the attic.").

[9] *See* [106-3] at 11:16–12:07 (showing bedroom where arrest had just occurred and alleged victim's post-arrest behavior).

[10] *See* [106-3] at 17:18–18:07 (Saucier: "You know how many years I've been policing? Six and a half. You know how many people I've seen die from domestic? I can't even count on my fingers and toes. . . . And it's been like this: Keep coming back, keep coming back, keep coming back. And, you know, it's hard for me to deal with 'cause I have to take that home with me, knowing that, you know, I stood there and talked with this lady and begged this lady to leave this guy. I can't make you leave him. . . . Right now, you already made your decision up in your mind that you're gonna stay with him, you're gonna be with him, you love him, you think he loves you, so good luck. I'm done.").

10

    *id.* at 15:47–16:05. Officers responded that Anthony "damn near killed" her, called him a "piece of shit" (and her "less of one"), and wondered aloud how he was "not in prison." *Id.* at 16:05–16:50.

- Saucier told her: "Do you know how this ends? You don't? It ends in you dying. He's gonna kill you. One day it's gonna go too far. I mean, he almost did it there. . . . It might be an accident, but he's still gonna be beating you." *Id.* at 17:01–17:15. Another arresting officer, Naomi Villareal, added: "And you're gonna be dead." *Id.* at 17:16–17:17.

But after reviewing the video many times, the Court cannot say that the danger of unfair prejudice "substantially outweigh[s]" the probative value discussed above. Fed. R. Evid. 403. Given Anthony's own version of events, jurors will inevitably know that police knew about Anthony's alleged domestic violence. *See* [114-1] at 13–14 ("When you get out, don't go back . . . . But you will because I know you love her. . . . Now I'm going to hit you. . . . Are you going to take it like a man or like a bitch?").[11] And although officers' discussion about domestic violence going "too far" is quite prejudicial, it is also quite probative of Defendants' potential motivation to resort to violence. The Court thus concludes that none of the video is excludable on "unfair prejudice" grounds, and it will exercise its discretion to admit any portion of the video that the parties wish to play. That said, the Court will issue an appropriate limiting instruction upon request.

    As for "waste of time" and "undue delay" under Rule 403, the Court declines to exclude any portion of the relatively short video on those grounds.

---

[11] What's more, the unfair prejudice in the last part of the video is mitigated by (1) an officer's threat to charge the alleged victim with "filing a false police report," [106-3] at 12:42–12:44; and (2) a mention that a judge dropped the prior charge, *id.* at 14:40–14:50.

11

And as for Rule 404, the video is not being used to "show that on a particular occasion [Anthony] acted in accordance with [his] character." Fed. R. Evid. 404(b)(1). Again, the Court will issue an appropriate limiting instruction upon request.

    4. Adverse Witnesses

Anthony further moves for permission to call four officers as "witness[es] identified with an adverse party." [110] at 9 (cleaned up); Fed. R. Evid. 611(c)(2). He explains that "[Tyler] Lents, Saucier, and Villareal were Defendants' fellow officers and were directly involved in [Anthony's] arrest and were present at the police station when [he allegedly] was assaulted." [110] at 9. Billy Hudson, the internal-affairs investigator who investigated the alleged incident, "was also a fellow officer of the Defendants and is still employed by the City of Pearl." *Id.*; Hudson Dep. [99-1] at 2–3. Defendants respond that the motion is premature because "Anthony offers nothing but speculation that any, much less all, of these witnesses" are "identified with" Defendants. [115] at 7 (cleaned up).

The Court grants that motion. Indeed, a "classic example of a witness identified with an adverse party is a police officer called as a witness in a [Section] 1983 trial involving an incident in which he or fellow officers were involved." *Williams v. Boley*, No. 4:21-CV-68, 2023 WL 4564595, at *3 (S.D. Ind. July 17, 2023) (cleaned up). The video footage confirms that Lents, Saucier, and Villareal participated in Anthony's arrest and were at the station when the alleged incident occurred. [106-1]; Villareal Bodycam [106-2]; [106-3]. And Hudson was the

department's internal-affairs investigator who investigated the alleged incident. [99-1] at 2–3.[12] The Court will allow leading questions of these four officers. Fed. R. Evid. 611(c)(2).

    5. Expert Impeachment

Anthony next moves to exclude certain evidence against his medical expert. [110] at 10. Specifically, he moves to exclude the expert's "controversial views on COVID [and] on the 2020 election" under Rules 401 and 403. *Id.* at 11. Defendants respond that the expert's "views go to his credibility" but do not address Anthony's unfair-prejudice argument. [115] at 9.

The Court grants that motion. The expert's inflammatory views have little (if any) probative value as to his evaluation of Anthony's medical condition. And introducing those inflammatory views would result in an "undue tendency to suggest decision on an improper basis." Fed. R. Evid. 403 advisory committee's note. Defendants do not argue otherwise.

    6. Villareal's Bodycam Video

Anthony also moves to exclude "all but 10:09–10:36 of Officer Villareal's body worn camera video." [110] at 12. Again, Defendants respond: "If any of the body cam is admitted, the whole body cam should be admitted." [115] at 6.

---

[12] "While admitting to missing important details in his investigation, Lt. Hudson stated in his deposition that 'people say officers do things all the time' and that in his investigation, he 'may have made a mistake' in omitting important evidence regarding [Anthony's] complaints of injuries while he was being transported to the Rankin County Jail by Defendant Welker." Pl.'s Resp. Mot. Summ. J. [99] at 2 (quoting [99-1] at 2–3).

13

The Court denies that motion for essentially the same reasons discussed above. *See supra* pp. 9–12 (declining to exclude any portion of Saucier's substantively similar video). As above, the Court will exercise its discretion to admit any portion of the video that the parties wish to play. That said, the Court will issue an appropriate limiting instruction upon request.

7. Drug Use and Rehabilitation

Anthony next moves to "exclude evidence of [his] drug use and rehab confinements" under Rules 401, 403, and 404. *See* [110] at 12. Defendants respond that drug-use evidence may be relevant to Anthony's alleged physical injuries and emotional distress. [115] at 8–9.

The Court denies that motion as an overbroad request for a blanket ruling. The Court cannot say that *all* drug-use testimony is "clearly inadmissible on all potential grounds." *White*, 2023 WL 2703612, at *1 (cleaned up). So it will defer ruling until trial, when "questions of foundation, relevancy, and potential prejudice can be resolved in proper context." *Id.* (cleaned up).

8. Arguments About General Police Work

Finally, Anthony moves to "exclude arguments regarding general police work to appeal to bias, passion, prejudice, or sympathy." [110] at 13. Anthony argues that "[i]f the jury believes" his version of events, there is no place for "arguments that police officers have difficult or dangerous jobs." *Id.* Defendants respond that there is another side to the story: "Welker testified that Anthony lunged toward him in the bathroom with Welker's gun exposed . . . ." [115] at 10. So, Defendants say, certain

14

general-police-work arguments may be permissible. *See id.* (citing *Cepero v. Bonkavich*, No. 2:11-CV-1421, 2022 WL 445035, at *2 (D. Nev. Feb. 14, 2022)).

The Court grants in part and denies in part that motion. The Court adopts the balance struck in cases like *Cepero*. *See* 2022 WL 445035, at *2; *see also, e.g.*, *Jones v. City of Chicago*, No. 14-CV-4023, 2017 WL 413613, at *8 (N.D. Ill. Jan. 31, 2017). Defendants may make arguments about the "course of conduct they took in this case and the reasonableness of such conduct," as informed by their prior professional experiences. *Cepero*, 2022 WL 445035, at *2 (cleaned up).[13] But "arguments about the general dangers of police work will not be permitted." *Id.*

B. Defendants' [108] Motions in Limine

    1. Specific Amount of Noneconomic or Punitive Damages

First, Defendants argue that Anthony "should not be permitted to suggest to the jury a specific amount of noneconomic and/or punitive damages." [109] at 2 (citing Fed. R. Civ. P. 26(a)(1)). Anthony responds that he should be allowed to suggest an amount of noneconomic damages because (1) Rule 26 does not require a noneconomic-damages computation, (2) any Rule 26 violation was substantially justified, and (3) any Rule 26 violation was harmless. [113] at 1–4. Anthony's response does not address punitive damages. *See id.*

The Court grants in part and denies in part that motion.

---

[13] "That being said, the Court will entertain objections at trial should Defendants' arguments become gratuitous or otherwise violate the Federal Rules of Evidence." *Owens v. Ellison*, No. 13-CV-7568, 2017 WL 1151046, at *5 (N.D. Ill. Mar. 28, 2017).

15

The Court grants as unopposed the request to preclude Anthony from suggesting a specific amount of punitive damages.

The Court denies the request to preclude Anthony from suggesting a specific amount of noneconomic damages. That is so for three reasons. First, the Fifth Circuit has hinted that noneconomic damages "may not be amenable to the kind of calculation disclosure contemplated by Rule 26(a)(1)[]," as those damages "are necessarily vague." *Williams v. Trader Publ'g Co.*, 218 F.3d 481, 486 n.3 (5th Cir. 2000) (per curiam) (addressing emotional-distress damages); *see also, e.g.*, *Fisher v. Seton Fam. of Hosps.*, No. 1:18-CV-1108, 2020 WL 2475823, at *2 (W.D. Tex. May 13, 2020).[14] Second, any Rule 26 violation was substantially justified, given the lack of binding precedent requiring a noneconomic-damages computation (and Defendants' decision to wait until the eve of trial to address this issue). [113] at 3–4. And third, any Rule 26 violation was harmless, especially because Anthony advised Defendants that he would not seek more than $2 million. [109] at 2. So the Court will not prevent Anthony from suggesting a specific amount of noneconomic damages.

The Court adds one caveat. Any party suggesting a noneconomic-damages amount "must admonish the jury along the following lines: the argument offering a calculation of non-economic damages is not evidence, but simply argument that the

---

[14] The authorities that Defendants cite do not explain why failure to provide a noneconomic-damages computation (which the Fifth Circuit suggests is unnecessary) should bar a plaintiff from suggesting a specific amount of damages to the jury. *See* [109] at 2–3.

jury is free to accept or reject." *Aidini v. Costco Wholesale Corp.*, No. 2:15-CV-505, 2017 WL 10775083, at *1 (D. Nev. Apr. 10, 2017).

### 2. Punitive Damages Against Lang

Defendants also move to exclude "[t]he issue of punitive damages against Defendant Lang . . . ." [109] at 3. They argue that, even if Lang slammed Anthony's head into a brick wall, that "cannot possibly" warrant punitive damages. *Id.* at 4.

The Court denies that motion for two reasons. First, it is procedurally improper. Lang "did not seek a partial summary judgment as to these damages, and attempting to do so now in a motion in limine is improper." *Owens v. Shelter Mut. Ins. Co.*, No. 3:23-CV-173, 2024 WL 2625992, at *2 (S.D. Miss. May 24, 2024) (cleaned up); *see also, e.g., id.* at *1–2 (collecting cases). Second, in any event, a jury "may award punitive damages in a [Section] 1983 action when an official's conduct is motivated by evil intent or demonstrates reckless or callous indifference to a person's constitutional rights." *Holmes v. Reddoch*, 117 F.4th 309, 320 (5th Cir. 2024) (cleaned up). Slamming someone's head into a brick wall meets that standard. *Longoria ex rel. Longoria v. Wilson*, 730 F.2d 300, 305–06 (5th Cir. 1984) (upholding punitive-damages award based on "forceful blow to the face that knocked [the plaintiff] into a brick wall").

### 3. Other Police Incidents

Defendants next seek to exclude "[a]ny mention of other police incidents, including mention of the Goon Squad, Michael Green, etc. . . . ." [109] at 4. In response, Anthony "concedes that no evidence of specific instances of police

17

misconduct unrelated to [his] claims . . . will be introduced," but he seeks guidance on addressing this issue in voir dire. [113] at 5.

The Court grants in part and denies in part that motion.

The Court grants as unopposed the request to exclude *evidence* of other police incidents.

The Court denies the request to exclude any mention of other police incidents during voir dire. Instead, the Court stakes out a middle ground. "Counsel and the Court may refer to the issue of police misconduct during voir dire without identifying specific instances in order to elicit potential juror bias." *C.R. v. City of Antioch*, No. 3:16-CV-3742, 2019 WL 9094114, at *2 (N.D. Cal. Feb. 15, 2019). "Counsel and the Court may also follow up on any mention by jurors of particular instances of police misconduct." *Id.*

4. Unrelated Misconduct

Defendants further move to exclude "[a]ny evidence or argument regarding alleged misconduct unrelated to the claims in this case . . . ." [109] at 6. In response, Anthony "concedes that there will be no evidence offered of unrelated misconduct on the part of the Defendants," unless "Defendants open the door to admissibility by bolstering the[ir] record[s]." [113] at 6.

The Court grants that motion as unopposed, subject to Anthony's caveat.

5. Policy and Procedure Violations

Finally, Defendants move to exclude "[a]ny mention of alleged Pearl Police Department policy and procedure violations," such as "failure to have body camera

18

on or lack of professionalism," under Rules 401 and 403. [109] at 7. Anthony responds that "evidence that Defendants Lang and Welker, as well as Officer Lents, did not have their body cameras on, despite Pearl Police Department policy requiring the cameras to be on, when they entered the . . . home to arrest . . . Anthony is certainly relevant . . . ." [113] at 6.

The Court grants in part and denies in part that motion.

The Court grants as unopposed the request to exclude non-body-camera "policy and procedure violations." [109] at 7.

The Court denies the request to exclude the fact that all three officers who arrested Anthony failed to activate their body cameras. That evidence is relevant, as "failure to activate can be a factor in assessing an officer's credibility . . . ." *United States v. Garcia*, 554 F. Supp. 3d 421, 431 (E.D.N.Y. 2021). And the jury will have to sort out whether officers took Anthony to the ground, causing (at least some of) his injuries. [115] at 4. As for Rule 403, any prejudice would not be "unfair"; the officers should have activated their cameras, and they will be able to explain why they did not. *See United States v. Jones*, No. 23-12028, 2024 WL 3666192, at *3 (11th Cir. Aug. 6, 2024) (per curiam) (noting that officer explained "why he did not turn on his body camera," and "credibility determinations are left to the jury").

IV. Conclusion

The Court has considered all arguments. Those not addressed would not have changed the outcome. For the stated reasons, the Court GRANTS IN PART and DENIES IN PART Anthony's [106] and Defendants' [108] Motions in Limine.

The parties shall inform all their witnesses of the Court's in limine rulings to avoid violating the Court's order.

SO ORDERED, this 19th day of March, 2025.

s/ *Kristi H. Johnson*<br>UNITED STATES DISTRICT JUDGE