```
 1                    UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                           NORTHERN DIVISION

 3


 4    JIMMY ANTHONY                                        PLAINTIFF

 5    VERSUS                 CIVIL ACTION NO. 3:23-CV-00132-KHJ-MTP

 6    JONATHON WELKER AND JACOB LANG                      DEFENDANTS

 7


 8

 9                        JURY TRIAL TRANSCRIPT,
                            APRIL 22, 2025,
10                           VOLUME 1 OF 4

11            BEFORE THE HONORABLE KRISTI H. JOHNSON,
            UNITED STATES DISTRICT COURT JUDGE, AND A JURY,
12                     THAD COCHRAN COURTHOUSE,
                        JACKSON, MISSISSIPPI

13


14    APPEARANCES:

15
      FOR THE PLAINTIFF:        JAMES B. LEES, JR., ESQ.
16                              BRANDON L. FLECHAS, ESQ.

17
      FOR THE DEFENDANTS:       W. THOMAS SILER, JR., ESQ.
18                              MALLORY K. BLAND, ESQ.

19

20

21

      REPORTED BY:
22
          CANDICE S. CRANE, RPR, RCR, CCR #1781
23        OFFICIAL COURT REPORTER
          501 E. Court Street, Suite 2.500
24        Jackson, Mississippi 39201
          Telephone:  (601)608-4187
25        E-mail:  Candice_Crane@mssd.uscourts.gov
```

**TABLE OF CONTENTS**

Style and appearances.................................  1

Joint Exhibits 1-7 entered...........................  5

OPENING STATEMENTS:

    By Mr. Lees......................................  6

    By Mr. Siler..................................... 19

WITNESS:  JIMMY ANTHONY

    Direct by Mr. Lees............................... 35

    Plaintiff's Exhibit 10 entered................... 63

    Cross by Mr. Siler............................... 74

    Redirect by Mr. Lees............................108

WITNESS:  BRANDIS QUICK

    Direct by Mr. Lees..............................110

    Cross by Mr. Siler..............................122

    Defendants' Exhibit 1 entered...................125

    Redirect by Mr. Lees............................127

Certificate of Court Reporter.........................132

1          **IN OPEN COURT, APRIL 22, 2025**

2

3                    (Jury in at 1:01 p.m.)

4          THE COURT:  All right.  You may be seated.

5          I wanted to just go over a couple of housekeeping

6     matters with y'all because I will forget these by the end of

7     the day, so I'm doing it now for my benefit more than

8     anything.  If you live 50 miles or more away from the

9     courthouse, you can get a hotel room during the trial, so

10    just keep that in mind if that's something you're interested

11    in.  Get with Donnie Dennis downstairs at the end of the

12    day, and we'll get that lined up for you.

13         Like I said, we have snacks back there.  But if you

14    do not like our snacks, feel free to bring your own snacks,

15    and we can put them back there for you to share.  It is hard

16    to get in and out of the courthouse.  If you want to bring

17    your lunch during this week and that way you just eat

18    downstairs on your lunch break, you're welcome to do that.

19    I think there's refrigerators and microwaves and other

20    things downstairs if you wish to do that.

21         The computer screens that are in front of you all, as

22    the attorneys put up whether it be videos or evidence on the

23    Elmo, they will come up on the screens in front of you.

24    Technology is great as long as it's working.  Sometimes it

25    doesn't work.  If at any point -- now, sometimes there are

 1    going to be exhibits you can't see until I admit it into

 2    evidence, and then it will be displayed.  But if at any

 3    point you think you should be seeing something and you're

 4    not seeing something, just raise your hand or get Officer

 5    LuAllen's attention, and we'll check in to it, because

 6    sometimes our screens will go out.

 7         Like I said, we'll take afternoon breaks probably

 8    about an hour and a half or so in, we'll take a 15-minute

 9    break.  If you need a break before then, that's perfectly

10    fine.  We want you to be comfortable.  Slip a note to

11    Officer LuAllen or try to get his attention or try to get my

12    attention, and we will give you a break if you need a break.

13         This courtroom gets really hot and then it gets

14    really cold.  I see you.  So do dress in layers, that way if

15    you get cold, you can bundle up.  If you get hot, you can

16    take it off.  If you get too cold, let us know, and we'll

17    try to adjust the air.

18         I'm going to give you a couple more instructions, and

19    then we're going to begin with opening statements.  I will,

20    first, the parties are going to have their own exhibits, but

21    they also have joint exhibits.  So these are exhibits that

22    the parties agree they both want to use and they both think

23    should be admitted into evidence, and you will see those at

24    some point during trial.  But just for the sake of the

25    record, I'm going to read through what those exhibits are

1    and have them admitted:

2         Joint Exhibit 1 is booking room video/audio.

3         Joint Exhibit 2 is records from UMMC.

4         Joint Exhibit 3 is a police incident report.

5         Joint Exhibit 4 is Merit Health Rankin records.

6         Joint Exhibit 5 is Welker rear-facing transport

7    video.

8         Joint Exhibit 6 is Villareal body camera recording.

9         And Joint Exhibit 7 is Saucier body camera recording,

10   and those exhibits will be admitted.

11              (Joint Exhibits 1-7 entered.)

12        THE COURT:  All right.  The trial will now begin.

13   First, each side may make an opening statement.  An opening

14   statement is neither evidence nor argument.  It is an

15   outline of what that party intends to prove, and it's

16   offered to help you follow the evidence.

17        Next, the plaintiff will present his witnesses, and

18   the defendants may cross-examine them.  Then the defendants

19   will present their witnesses, and the plaintiff may

20   cross-examine them.

21        After all the evidence is in, the Court will give you

22   instructions on the law, and the parties will present their

23   closing arguments to summarize and interpret the evidence

24   for you.  You will then retire to deliberate on your

25   verdict.  Keep an open mind during the entire trial.  Do not

1    decide the case until you have heard all of the evidence, my

2    instructions, and closing arguments.

3           It is now time for opening statements.

4           MR. LEES:  May it please the Court?

5           THE COURT:  Yes, sir.  You may proceed.

6           MR. LEES:  Thank you.

7           Good afternoon.  Can you bring up the first slide?

8    I've got just a few PowerPoint slides with some bullet

9    points on them with some facts.  You should have them on

10   your screen here in a second.

11          So we're going to be talking about April the 30th,

12   2022, about five -- or three years ago, in the morning hours

13   shortly after 9:00 a.m. in the City of Pearl, which is about

14   three miles or so here from town.  And our client over

15   there, Mr. Anthony, on April the 30th, 2022, shortly after

16   9:00 a.m. was taken into custody by the Pearl Police

17   Department.  Okay, next please.

18          His health status at that time, he didn't have any

19   injuries.  He didn't suffer from any trauma.  He didn't have

20   any medical problems related to this case.  Next, we're

21   going to be talking about a scene, a specific scene, which

22   is going to be the Pearl Police Department in Pearl, and

23   more specifically, we're going to be talking first about the

24   booking area in the police department.  When you're taken

25   into custody and you go into a police station, usually

1     there's some area where they process you.  Your photograph

2     is taken, you know, with a number, they do the fingerprint

3     thing, so that's the booking area.

4          So in this particular case, Mr. Anthony is taken to

5     the Pearl Police Department after he's taken into custody.

6     He's taken into the booking area.  Shortly after he's in the

7     booking area, he is removed from the booking area by a

8     police officer for about 14 minutes, and he's taken

9     somewhere else in the building.

10          He is then returned to the booking area, and a very

11     short time later, he is taken out of the police department,

12     put in a police car, and transported to the Rankin County

13     Jail.  Total time at the police department was less than one

14     hour.

15          He gets to the Rankin County Jail, driven there in a

16     patrol car by a Pearl Police officer.  When he arrives at

17     the Rankin County Jail, he is in distress.  After a short

18     period of time at the Rankin County Jail, he collapses,

19     paramedics are called.  He is transported by ambulance from

20     the Rankin County Jail to a local medical facility, and once

21     they see him and examine him, he is transferred from there

22     to a trauma hospital, the University of Mississippi Medical

23     Center.

24          I've put here because some of the words are kind of

25     big, and we're going to have a doctor come tomorrow to

1    explain what these things are.  But when he arrived at the

2    University of Mississippi Medical Center, he was diagnosed

3    with severe traumatic injuries.  When I say "severe," I mean

4    the kind that will kill you if they're not treated

5    immediately.  He was suffering from a hemothorax, which is

6    an accumulation of blood in the space around the lungs.  He

7    was suffering from multiple left-sided rib fractures.  He

8    was suffering from what they call a "mediastinal hematoma;"

9    this is an accumulation of blood and fluid in your chest

10   cavity around your heart.  It starts compressing on your

11   heart and interfering with your heart's function; that's

12   caused from blunt-force trauma by the way.  He had a

13   punctured lung and a head injury.

14        So one of the questions for you as we go through this

15   trial is as follows.  We know, or we will show through the

16   evidence, that he came into the custody of the police on the

17   morning of April 30th with no injuries.  He was in their

18   custody for a little less than an hour.  He leaves the

19   custody of the police department with life-threatening

20   traumatic injuries, which necessitated an ambulance to a

21   medical facility followed immediately by a transfer to a

22   trauma center.  And the question:  What happened at that

23   police department during that hour?

24        The claim in this case is under -- and this is

25   technical.  The judge will give you all the law, I assure

1    you, at the end of the case.  It's a claim under the

2    Fourteenth Amendment to the United States Constitution --

3        MR. SILER:  Your Honor, let me impose an objection.

4    This is opening statement about what the facts are suppose

5    to prove, not to get into the law which the Court will

6    instruct the jurors on later.  And I object to counsel going

7    into all these legal issues at this particular point in

8    time.

9        THE COURT:  Okay.  I'm going to overrule the

10   objection.  Keep in mind as I stated earlier, argument from

11   counsel or statements from counsel is not evidence, and I

12   will instruct you on the law at the end of this case.

13       You may proceed, Mr. Lees.

14       MR. LEES:  Thank you, Your Honor.

15       Under the Fourteenth Amendment, Americans have a

16   guaranteed right to be free from excessive force when in

17   police custody, and the judge will define for you

18   specifically what "excessive force" is at the conclusion of

19   the trial.  I believe that instruction will be unreasonable,

20   unnecessary, and excessive to the need that caused the

21   injury.  Essentially, I'll put that in English:  In the

22   United States of America, we do not beat up people in

23   custody.

24       So what happened?  Mr. Anthony, when they arrived at

25   the Pearl Police Department, was removed from the booking

1 area to an area of the police department that didn't have

2 any cameras, working cameras or otherwise or microphones.

3 His head was slammed into a wall by Jacob Lang, who at that

4 time was a police officer on the Pearl Police Department.

5     He was punched and beaten over and over and over

6 again after Officer Welker, putting on a pair of gloves,

7 took him into the bathroom and beat him.

8     Why are we here?  Next slide please.  Both of these

9 Officers, as is their right, deny they beat Mr. Anthony.

10 Both of the defendants deny they used excessive force on

11 Mr. Anthony.  Both of these defendants deny they violated

12 his constitutional right to be free from excessive force,

13 and that, ultimately, is what you're going to have to decide

14 in this case.  You can turn that off.

15     I want to briefly give you a few of the background

16 details that I hope will help you process some of the

17 information as it comes in in this case.  So as I told you

18 in that slide, it's the morning of April 30th, 2022, shortly

19 after 9:00 a.m., and the Pearl Police Department, by and

20 through their officers, go to the home in Pearl of Brandi

21 Quick and Mr. Anthony.  They're living together in a home in

22 Pearl.

23     The purpose of the officers going that morning was to

24 execute what they call "a warrantless arrest" and take

25 Mr. Anthony into custody for an alleged misdemeanor under

1   Mississippi state law.  The day before -- now, this is the

2   morning of April 30th.  Going back to the day before, April

3   the 29th, okay, in the afternoon.  I believe the evidence

4   will show you that Ms. Quick, who was intoxicated that

5   afternoon, had called the police.  She had alleged that she

6   had been assaulted by her Mr. Anthony, and she was claiming

7   domestic assault.

8          The police appropriately responded that afternoon to

9   the address.  They found Ms. Quick to be there.  She was, I

10  believe the police will acknowledge, intoxicated.  She was

11  not in any way injured.  She didn't require any medical

12  attention.  Mr. Anthony was not there at the home.

13         Officer Jacob Lang managed to call Mr. Anthony on a

14  neighbor's telephone to talk to him, and obviously Officer

15  Lang was asking Mr. Anthony to come back to the property.

16  Mr. Anthony apparently said something to the effect, no,

17  she's drunk; I'm not coming back until she sobers up.

18         Over the course of an hour there, Brandi Quick did

19  start to sober up.  She tells the police before they leave

20  she's not pressing charges.  She doesn't want to press any

21  charges, and the police leave.  That's the day before, which

22  was a Friday.

23         Was that obviously inconvenient for the police? Sure.

24  Was it a hassle?  Absolutely, no question.

25         Later that day, by the way, after Ms. Quick sobers

1    up, she picks up Mr. Anthony.  Together they go visit her

2    grandfather for a period of time.  They go out that night to

3    a bar owned by one of their friends.  They played pool that

4    night on a Friday night.  Everything's fine.  They go home

5    together that night, and they go to bed in their home Friday

6    night.

7         Saturday morning, back to the morning of April the

8    30th, the Pearl Police Department, as is their right under

9    Mississippi law, decided they were going to go back to that

10   house and arrest Mr. Anthony.  So they went to the house

11   with multiple officers.  They knocked at the door; no one

12   answered.  One or more of the officers jumped a fence, got

13   into the yard, and made entry into the house through a

14   bedroom window.

15        They took -- Mr. Anthony was in bed with Brandi in

16   the bedroom.  They took him into custody.  They handcuffed

17   him.  They removed him from the house.  They put him in a

18   patrol car.  Mr. Anthony did not suffer any injuries during

19   his arrest, had no complaints, other than Officer Lang

20   bumped his head when he was putting him into the patrol car.

21   Otherwise, Mr. Anthony is now in handcuffs in the custody of

22   the Pearl Police Department under arrest for a misdemeanor,

23   all lawful.

24        Let me just say in conclusion on this arrest,

25   normally based on the Pearl Police Department policies and

1    procedures, we would be able to watch on the police

2    officers' body cams, right, the officers going in the window

3    and taking Mr. Anthony into custody.  So obviously we asked

4    for that video.  We would like to see those videos.  There's

5    apparently three officers that did that.

6         There is no video.  Despite their policies and

7    procedures that when they interact with the public, they are

8    required to turn their body cameras on, so there can be a

9    record.  Two of the officers apparently were not even

10   wearing body cams, and the third officer that day, Officer

11   Welker right over there, turned his off.

12        The uninjured Mr. Anthony in handcuffs in the police

13   car taken to the Pearl Police Department, so now we're back

14   to the story at the scene, which is the police department.

15   He is taken into the booking room, as I told you earlier, of

16   the police department.  This area of the police department

17   is an area which has cameras recording all the time and

18   microphones, so that anything that happens in this area and

19   the adjoining areas is captured on video, which stays on

20   there for, you know, at least a week or two weeks.  In case

21   anything happens, the police are protected because there's

22   video and audio.  People in custody who allege things were

23   done bad are protected as well.

24        There is a video of the booking area, so we do have

25   that.  It is one of the exhibits the judge just indicated is

1    admitted in this case, and you'll have an opportunity as we

2    go through the trial to watch it.  With respect to the

3    microphone, so we can actually hear what was said, the Pearl

4    Police Department informed us that for some unknown reason,

5    the microphone in the booking area that day, which is

6    supposed to be on and working, was not working, and they

7    don't know why.

8         Fortunately, however, there is an adjacent cell to

9    the booking area.  They're holding cells for prisoners, and

10   in those cells, they have voice-activated microphones.  And

11   through the help of the IT people at the police department,

12   we were able to get the voice-activated microphone recording

13   from one of those cells, which does pick up the audio,

14   albeit with kind of an echo.  So the clarity is not super

15   great, but it's audible, from the booking area.  So you'll

16   see that and hear that.

17        As I said earlier, when they came into the booking

18   room, the police officers removed the handcuffs from

19   Mr. Anthony.  Mr. Anthony, by the way, you will see was in

20   his underwear.  He was not given the opportunity to put any

21   clothes on before he was handcuffed and removed from his

22   home, so he's in a pair of boxer shorts, no shirt, no shoes.

23        Officer Lang has now an uncuffed Mr. Anthony in front

24   of him.  I'll respectfully suggest to you when you watch the

25   video, you will see a docile, completely compliant Jimmy

1    Anthony not doing a thing to threaten or insult Jacob Lang.

2    I will represent to you that I believe what you will hear

3    when the audio is played for Mr. Lang talking with Jimmy

4    Anthony is as follows, and I am going to do some

5    abbreviating with my statements to you.  I apologize in

6    advance.

7           But I believe the evidence will show that Officer

8    Lang, with his face about that close to Jimmy Anthony, said

9    "Let me tell you one GD thing.  Let me tell you one mother

10   effing thing.  Look at me when I'm talking to you.  Let me

11   tell you one GD thing.  I gave you an effing opportunity

12   yesterday, did I not?  I talked to you on the effing phone

13   for ten GD minutes giving you an effing chance, and you

14   didn't effing take it, not once.  I gave you the chance to

15   come talk to me but you didn't, and what did I tell you was

16   going to happen?  What did I tell you?  I want to know, what

17   did I tell you was going to happen?  That I was going to

18   effing find you, did I not?  You're a dumb mother effer, and

19   call your effing lawyer on this one."

20          He didn't just scream at him and curse at him.  He

21   pushed him, grabbed his hair.  All the time Mr. Anthony was

22   docile and compliant.

23          You'll see on that video Officer Welker starting to

24   put on a pair of gloves and motioning for Jimmy to come with

25   him.  You'll see Mr. Anthony go with Officer Welker around

1    the corner out of the booking area to a hallway that's

2    adjacent to the booking area.  A hallway that has cameras

3    and microphones that are supposed to be recording what

4    occurs in that public area, again, to protect both the

5    police and any American citizen in custody.

6         We were told by the Pearl Police Department, you

7    know, we discovered that the video for the hallway and the

8    microphones weren't working that morning.  Don't know why.

9    So we don't have video or audio of the hallway.

10        Mr. Lang, Officer Lang leaves the booking area, goes

11   into the hallway, and as he goes by Mr. Anthony takes his

12   head and slams it into the wall.

13        Officer Welker comes into the hallway and takes

14   Mr. Anthony into the bathroom, has his gloves on now.  Tells

15   Mr. Anthony something to the effect that you're going to

16   take this like a man and begins, ladies and gentlemen, to

17   beat the heck out of Mr. Anthony.  And I'm not talking about

18   two, three, four, five, eight, ten, 15, I'm talking about

19   well over 20 slamming his fists into his ribs and his chest.

20        Fourteen minutes Mr. Anthony was out of that booking

21   area, and then he's brought back into the booking area,

22   again, still no handcuffs, goes over to a side and kind of

23   sits down.  And I believe that you'll see and hear from the

24   video Mr. Anthony starting to complain that he feels like

25   he's having a heart attack.

1        The police began to taunt him, "Feel like you're

2  having a heart attack, Jimmy?  How does that feel like,

3  Jimmy?"

4        Officer Lang will treat you to a singing rendition,

5  because he decides to sing at that time.  The lyrics being,

6  "He got beat, because he run from the police."

7        Finally, you will see and hear on that video Officer

8  Jonathon Welker --

9        THE COURT:  Five-minute warning, Mr. Lees.

10        MR. LEES:  -- with Jimmy now in the booking area,

11  "Look at me in my eyes.  If you think that hurt earlier,

12  then shut the F up."

13        He's taken to Rankin County Jail, he collapses,

14  broken ribs, chest cavity is filled with blood; he's got

15  tubes, drains, the whole nine yards.

16        Jimmy Dean Anthony and Brandi Quick both completed

17  the eighth grade.  If they want, they can -- there's drug

18  use with this guy.  Probably not the kind of people you want

19  to invite over for dinner.

20        But this is the United States of America, and I would

21  respectfully say to you now, as I will at the conclusion of

22  this case, we are judged not how we treat the best of us,

23  but how we treat the worst of us.  What happened in this

24  case is inexcusable.  The evidence is clear, and at the

25  conclusion, I am going to ask you to hold those two people

1    accountable for what they did.

2         THE COURT:  All right.  Thank you, Mr. Lees.

3         Mr. Siler.

4         MR. SILER:  Your Honor, can we approach the bench

5    just for a --

6         THE COURT:  You may.

7                    (BEFORE THE BENCH)

8         MR. SILER:  I just want to make sure before I get

9    started and don't put my foot in my mouth that -- has enough

10   been said now that I can say that he's been in and out of

11   that jail, he's well known, been there lots of times?

12        Since there's been talk about drugs, can I get into

13   all of that at this juncture?

14        THE COURT:  You just threw a lot of things at me.

15   Can we take those one at a time?

16        MR. SILER:  Sure.  Let's start with the fact he's

17   been in that jail many times; that she, his girlfriend, has

18   called them many times about him to come get him; and that

19   he's well known to police, and he runs every time they come

20   over there, can we get into that?

21        THE COURT:  So my thought is that you can get into

22   the fact there have been many calls.  You can say that the

23   police are familiar with Mr. Anthony because of these calls.

24   I don't want to say that he's been arrested many times at

25   this stage right now.  But I think the fact that there have

1   been a number of calls related to Ms. Quick that the police

2   have been involved in, and they are familiar with him I

3   think is fair right now.

4          MR. SILER:  Okay.  All right.  What about the fact

5   that he's a drug addict?

6          THE COURT:  I think that's fine.

7          MR. SILER:  I can get into that?

8          THE COURT:  Yes.  Yes.  I mean, I think that

9   ultimately it will go to emotional distress, and I think the

10  fact he struggled with an addiction is relevant.

11         MR. SILER:  So just stay out of the arrests and jail?

12         THE COURT:  Well, yeah, so the -- I think that,

13  again, I don't want to get into the specifics of all this

14  mess, but I think at least now until I have heard more

15  information.  But I think it is fair game to talk about the

16  Pearl PD are familiar with Mr. Anthony, there have been

17  however many number of calls from that residence they've had

18  to respond to related to the interpersonal relationship

19  between Anthony and Quick.

20         MR. SILER:  Okay.  I think I can do that.

21         THE COURT:  Okay.  All right.  Thanks.

22         MR. SILER:  Thank you.

23                        (IN OPEN COURT)

24         THE COURT:  All right.  Mr. Siler, you may proceed.

25         MR. SILER:  Thank you, Your Honor.

1         Good afternoon, ladies and gentlemen.  I know it's

2    been a long day already, and you're tired of hearing lawyers

3    talk.  But you'll have to put up with that for the next

4    couple of days.

5         Wow, why are we here wasting your time if that's all

6    there is to this case and this man was treated this way?  I

7    promise you I wouldn't be here wasting your time.  There's

8    two sides to every story, sometimes more than two, but as

9    the judge said, it's important to keep an open mind to

10   listen to both sides and to understand that there are two

11   sides to this.  We would not be here if there weren't, and

12   we want to be here.

13        We want to be here defending ourselves, because

14   somebody like the plaintiff can say anything he wants.  And

15   if there's no proof of it, then he can get away with saying

16   it, and in the end, they're just going to come in here and

17   ask you for a big bunch of money.  That's what this case is

18   going to be about, to get you to award him a lot of money.

19        Now, let me tell you our side of this story and how

20   it goes.  First of all, it's very important to understand

21   who our defendants are, who are clients are, because you're

22   going to see them, as Mr. Lees said, in a video.  And it's

23   going to be important to be able to see to understand who

24   they are and what they're doing.  A couple of reasons for

25   this, one is that the longest video, the one that you'll see

1    the most of, is a fishbowl view.  You're looking at it from

2    the top of the ceiling.  And sometimes it's hard to know who

3    is who, because you're not down at floor level looking at

4    somebody's face and being able to tell easily who is who in

5    these things.  So it's important to know.

6        Now, the easy way of telling these two gentlemen

7    apart is that Mr. Welker, sitting right there at the end,

8    and I go to the same barber, so we're pretty easy to spot in

9    the video looking down -- down.

10       Mr. Lang, who is sitting right next to him and next

11   to Ms. Bland, obviously goes to a little different barber,

12   and you can -- you can at least tell the differences between

13   the two of them by that.

14       Now, the unfortunate part of it is that there's other

15   people that will be in there, too, who also go to Mr. Lang's

16   barber.  And so sometimes it's kind of hard to keep up with

17   who's who since you're looking at them from down.  We'll do

18   the best we can to show all this.

19       You know, technology is great until it doesn't work,

20   and then it becomes a pain.  And its -- that just happens.

21   Anybody in here who deals with technology knows how that

22   works, and it seems like it always fails to work at the most

23   important time.  And Mr. Lees is correct that there is --

24   that the microphone in the booking area with the fishbowl

25   camera view was not working that day.  We did not know the

1    camera, or rather the microphone, was not working that day.

2    We found out about it later.  And when we did, we got it

3    repaired.

4         There is, however, as he mentioned, a microphone in a

5    holding cell, and you'll see them on -- on this video

6    adjacent to the booking room, and as long as its not -- he

7    said it's voice activated; it's actually motion activated.

8    So long as somebody's walking by that door, you can hear a

9    lot of what goes on in the jail.  It's unclear, it's people

10   talking over one another.  It's an echoey kind of room.

11   Sometimes you can't hear it real clearly, but you get a

12   sense of what's going on and what's being said.

13        And then there is a hallway out there that he was,

14   the plaintiff, was taken out into at some point.  And

15   Mr. Welker will tell you he took him out into it, because he

16   had indicated to him he needed to go to the bathroom.  So

17   they took him out into the hall.  There's a bathroom in the

18   hall.

19        There is generally a camera and a microphone out in

20   that hallway, but that particular day -- and who knows how

21   long before that -- it had not been working.  The officers

22   didn't know that.  They assumed the camera worked and the

23   camera was fine.  But, again, when they go back to start

24   pulling all this and they start looking at it, and they

25   determine it had been out for some time.  They had to get it

1    fixed and get it repaired.  But they didn't know it was out.

2         There was no camera at all in the bathroom, because

3    nobody puts cameras in private spaces like that.  There's no

4    cameras in the bathroom.  So anything that happened in there

5    is not going to be on video, because there's not one in

6    there anywhere.  So that's kind of the -- the technical

7    side, I suppose, of what's going on at this particular -- at

8    this particular time.

9         Now, you're going to hear, and Mr. Lees has already

10   alluded to it, Officer Lang make a lot of tough comments, a

11   lot of tough comments, and he'll own them.  He'll tell you,

12   yeah, I made them; I was -- I was mad at him, frustrated

13   with him, and I made all those statements.  And he'll tell

14   you looking back on it, it was not my finest moment as a

15   police officer.  It was unprofessional and, you know, I've

16   learned something from this.  But he made a lot of tough

17   comments; many of them fairly close to what Mr. Lees told

18   you a minute ago.

19        Mr. Welker, though, you'll see doesn't say anything.

20   He's cool, calm, nothing's going on with Mr. Welker at all

21   in this whole sequence of events at the booking room at that

22   particular time.

23        Later on in the process before he leaves, there's

24   some words exchanged between Welker and the plaintiff, and

25   Welker uses, again, language he owns.  But he'll say, you

1    know, again, not my finest moment, not my most professional

2    use of language in the -- in the process.

3          But, look, we all know that when you're police

4    officers, you're dealing with people on the streets and

5    you're dealing with people that you have to be careful about

6    and careful with, you've got to be tough with them.  It's

7    not Sunday School.  They don't -- they don't talk to them

8    nicely.  It's not their job to be nice.  It's not their job

9    to make people think, okay, it's good to come into the jail

10   where you're going to be treated really good.  We're going

11   to give you milk and cookies in there.  That's not at all

12   what you want police officers doing out there, so you

13   should -- nobody should expect that they're going to be

14   nice.

15         But, now, let's back up, and let's talk about how

16   this all came about and what happened.  The plaintiff lives

17   with his girlfriend -- or did at the time.  I don't know

18   what their situation is now -- an individual by the name of

19   Brandis Quick in Ms. Quick's house, and they lived together

20   there for -- I don't know.  We'll have to ask him, but, you

21   know, maybe as much as a couple of years.  He lives in her

22   house, lives there rent free, stays there all the time.

23         She frequently calls the police complaining about him

24   and about him hurting her.  They come by all the time.  They

25   know this address by heart.  They will tell you that they

1    deal with him all the time.  He will tell you that she has

2    called the police at least 25 times before on him, and he'll

3    also tell you that he always runs every time that the police

4    show up.  And then what happens is, she drops the charges,

5    and things never go anywhere from there.  And this

6    continually happens over and over and over again, so he's

7    well known by all the folks there.

8         You'll also learn during the course of this, and

9    Mr. Lees says he doesn't have any health problems, he's got

10   several health problems, not the least of which he's a

11   methamphetamine addict.  And she's an addict of some kind,

12   it may just be alcohol, but it may be whisky or it may be

13   other things, too.  And they're going to put her on the

14   stand, and we can ask her about all that.

15        But these -- these folks, they don't work, they --

16   they sit in that house.  They get in fights and call the

17   police, and everybody knows they're there.  And this is --

18   this is what goes on time and time again.

19        So on Saturday, April -- I'm sorry -- on Friday,

20   April the 29th she calls, another one of her calls, and they

21   send several people down there, because they know he's going

22   to run.  The only thing you can do is kind of get the house

23   surrounded and try to keep him hemmed in before he leaves.

24        So they go down there in response to her call and

25   he's -- you know, he takes off and he's gone by the time

1   they get there.  You'll see her, you know, an ambulance did

2   respond.  Despite what Mr. Lees said, an ambulance came by

3   and they -- she decided she didn't want any assistance from

4   the ambulance, so the ambulance left.  And she will tell you

5   that he strangled her, and you'll see in writing where she

6   wrote it down that he strangled me.

7          All right.  So that happens.  He's gone.  They

8   can't -- there's nothing they can do.  Although it's

9   interesting, they do go to a neighbor's house, and the

10  neighbor calls him, calls the plaintiff on the phone, gets

11  him on the phone, and she gives the phone to the police and

12  they start talking to him.  And they start talking to him

13  trying to get him to come in and not make them have to go

14  look for him and bring him in and Mr. -- and I think both

15  Officers Welker and Lang talked to him that day and tried to

16  get him to come in.

17         Now, Officer Welker is one of the -- he was a

18  relatively new officer.  He had been there, like, a couple

19  of years.  He will tell you that he had heard -- because of

20  the reputation of the plaintiff have heard about him there

21  in the police department, had never had any dealings with

22  him before.  He'd never personally seen him, met him, tried

23  to arrest him, didn't have any dealings with him; but he

24  tried to talk him into coming in that afternoon and giving

25  himself up.

1          Well, Mr. Anthony, the plaintiff, said no, so then

2     Officer Lang gets on the phone and tries to talk him into

3     coming in and giving himself up, so they don't have to go

4     chase him and keep coming around trying to find him.  And

5     the plaintiff again says, no, I'm not coming in.  And so

6     that sort of ends the deal on that day, and they go off that

7     night and go to partying and come back in and go to sleep.

8          Well, they the next morning decided -- because they

9     had the right to do this under state law, they come back to

10    do an arrest for what he had been -- about what the

11    complaint had been yesterday.  And you'll also hear there's

12    a no contact order by the court out there that said he

13    couldn't have contact with Ms. Quick, although he was

14    sleeping in the bed with her that night.

15         And so they come in on Saturday morning with four or

16    five different officers, kind of get the house surrounded,

17    and they -- they -- it takes them a long time, and you'll

18    see how all this goes down because there were cameras on.

19    There were some officers didn't have their cameras on.

20    Again, technology works until its --

21         THE REPORTER:  Slow down just a little bit for me.

22         MR. SILER:  Okay.  Sorry.

23         Technology works until it doesn't, and then, you

24    know, they'll -- if you don't have them on, you don't have

25    them on.  And -- but some of the cameras did work, and they

1  get him.  They finally have to kind of go in through the

2  back of the house and get him.  Of course, he runs from them

3  so much, they can't let him go and go put on clothes and all

4  this.  They take him and put handcuffs on him.  Have to put

5  him on the ground once, maybe even twice, at that point to

6  get the handcuffs on him and get him to the jail.

7      Now, then you'll see what happens at the jail,

8  because you'll have the video there in the booking room.

9  There will not be any video -- as we've already said, both

10  Mr. Lees and I have said -- out in the area of that hallway,

11  and there's no video of the -- of the bathroom.  And I'll

12  tell you that what -- what comes out of this is this.  He

13  alleges that Mr. Lang did one thing to him, which was as

14  Mr. Lees said slammed his head against the wall in the

15  hallway.  The thing is, nobody sees that.  Mr. Lang will

16  tell you it didn't happen.  I did not slam his head into the

17  hall -- into the wall.

18      And nobody sees it, so what do you come down with?

19  One person's word against another.  You've got the plaintiff

20  saying one thing, and Mr. Lang says another thing.  And

21  nobody else saw it.

22      What happens in the bathroom, Mr. Welker will tell

23  you, was that he took him to the bathroom, so he could use

24  the bathroom.  He -- I believe Mr. Lees continually says he

25  put gloves on.  He put those little blue rubber gloves you

1    see surgeon -- surgical gloves, he put them -- he put those

2    on his hands to go in with him just in case, you know, he

3    had something he was trying to get rid of in the toilet, and

4    he was going to be there and be prepared to deal with it.

5         So they go into the bathroom, and Mr. Welker will

6    tell you it's a relatively small bathroom.  It's -- I don't

7    know -- five, six feet square with one -- it's one toilet

8    and basin altogether.  And -- and he'll tell you I went in

9    there, told him to use the bathroom.  I turned my back, so

10   he could have a little bit of privacy.  And I told him when

11   he got through to stand up and put his hands on the wall.

12        And he said, well, after I turned my back for a few

13   seconds, I heard something behind me that made me jump,

14   because I could feel somebody was too close to me.  And they

15   were on my gun side, because Mr. Welker will tell you he had

16   his gun on his right side.  And when he -- when I felt him

17   too close to me, I turned immediately, and I took my hand

18   and I slammed it against his chest.  And he's going to tell

19   you it was right here.  Slammed it right -- right kind of

20   below the armpit right down there on his chest.

21        Again, nobody sees it except Mr. Welker and the

22   plaintiff.  So on both of these occasions, it's one person's

23   word against another's.

24        Now, Mr. Lees has talked about how many times that

25   his client claims that he was struck by Mr. Welker in the

1    bathroom, and he said it was 20 or more.  Well, Mr. -- well,

2    his client said in his deposition, if he testifies the same

3    way there that he did -- here that he did in the deposition,

4    that Mr. Welker hit him 30 times -- 30 times, and he'll tell

5    you he hit him 30 times in the upper chest, upper-left chest

6    and behind in his back.  He said he had him turned where he

7    was -- I was perpendicular to him with the left side of my

8    body toward Mr. Welker, and he just started hitting me and

9    hit me 30 times up here.

10            I asked him, did he hit you lower than that?  Nope.

11            Did he hit you under your armpit down in here

12    anywhere?  Nope.  He just hit me up there 30 times.  30

13    times, he said, until we both were out of -- he was out of

14    breath and he just swung so many times and hit me so hard.

15            Well, a couple things about this.  One is that when

16    you see the video and you see him bring him back into

17    this -- to the booking area after he had been in the

18    bathroom, after he was supposedly beat up and hit 30 times,

19    take a close look at what you're -- what you're seeing when

20    he comes back in.  He walks back in nonchalantly.  The

21    officer's nonchalant.  You don't see a mark on him.

22            Now, you think about that.  He hit me 30 -- a grown

23    man, a police officer hits me 30 times, and I don't have a

24    mark.  I don't have a bruise.  I don't have anything

25    indicating -- even just red spots.  We all know if you hit

1    somebody -- he didn't have a shirt on.  Anything to suggest

2    that he had been hit 30 times?  Nothing.

3         He's in that room for another -- I don't know -- ten,

4    15, 20 minutes and never says a word about being hit.  Never

5    says anything about you guys are beating me up.  Never

6    says -- just nothing happens, and then they go off and he

7    goes out.

8         Now, people can say anything they want to.  Oh, man,

9    my chest is killing me; I'm about to go.  And they can fall

10   out and fake it, and they'll tell you that people do that

11   all the time in the jail.  They call it "jailitis."  When

12   somebody knows they're going to jail, the next thing they

13   start doing is claiming they're having a heart attack, and

14   then, you know, they're gone.

15        They do it because they don't want to go to jail, and

16   frankly, they do it a lot of times because a lot of times

17   they can get out of jail.  Rather than go pay their medical

18   bills, they will just send them out, so they can go to the

19   hospital by themselves.  It just -- it goes on all the time.

20   People can say anything they want to.

21        So nobody was, you know, really thinking he was

22   any -- having any serious issues when he was taken over to

23   Rankin County.  Now, when he gets over there, he starts

24   again claiming he's having -- I think he says he's having a

25   heart attack.  We know he wasn't having a heart attack.

1    Nobody's ever diagnosed him as having a heart attack.

2         Mr. Lees says he's got all these terrible, serious,

3    horrible injuries.  What he's got -- and multiple rib

4    fractures and all these kind of things.  It's going to be

5    really interesting.  Pay attention when we're questioning

6    his doctor and what these -- what these medical records

7    really say.  Not what they tell you it says, not what the

8    doctor says this is what I think happened, but what they

9    really say.  I think you're going to be interested in how --

10   how all that turns out.

11        But it turns out they have to wind up putting a stent

12   down -- down here to bleed off, you know, the fluid and the

13   blood.  There -- there is a blood vessel that breaks in here

14   that starts to pull fluid into the cavities between your

15   lungs and your ribcage.  And so they -- they bled all that

16   off, and it goes on.

17        Did he have a hematoma or a knot or something on his

18   head?  He has -- they do say somewhere along the way, there

19   was a knot on the left parietal scalp, so we'll get the

20   doctor to tell us -- tell us where that is on his head.  But

21   a knot is -- and I don't mean to be too light about it.

22        Police officers have a right to use force.  They have

23   a right to use force to protect themselves to do things that

24   keep themselves from getting hurt.  They just want to go

25   home at night like everybody else does.  But they've got the

1    right to use some force, and when they feel necessary to do

2    it, they -- they can do it.

3         In the end, nothing is going to be able to take away

4    from the fact of this:  That it's one person's word against

5    another.  And we look forward to having the opportunity to

6    tell our side of the case, to refute the allegations that he

7    is making about what happened.

8         In the end when they ask you to give them, you know,

9    12 gazillion dollars with nothing other than pulling a

10   number out of the air, we're going to tell you that that's

11   the same -- I mean, their case, their damages case is no

12   better than their liability case.  They don't have one.

13   They can't prove anything.

14        Now, he was injured.  No question.  And it certainly

15   could have come from that trauma blunt -- traumatic blow to

16   his chest from Officer Welker when he thought somebody was

17   getting too close to him, close to his gun.  But that's not

18   excessive force, and we're -- we're anxious to be able to

19   prove our case to you over the next few days.  So please, as

20   you listen to all this, keep an open mind until we have the

21   opportunity to put on our case until you hear these officers

22   tell about what happened and how things went.

23        Thank you.

24        THE COURT:  Thank you, Mr. Siler.

25        All right.  Who does the plaintiff call as their

1    first witness?

2        MR. LEES:  We call the plaintiff, Mr. Anthony.

3        THE COURT:  All right.  Mr. Anthony, if you will come

4    over to the witness box for me, please.

5        Would you move that podium back for me.  Just wait

6    one second, we're going to get it resituated, and we'll put

7    that microphone back, Mr. Lees, so you can use the

8    microphone.

9        MR. FLECHAS:  Your Honor, would you mind if I asked

10   the courtroom deputy a question briefly?

11       THE COURT:  You may.

12     (Whereupon, Jimmy Anthony was placed under oath.)

13       THE COURT:  All right.  Mr. Anthony, if you'll be

14   seated for me.  If you will, pull that microphone close to

15   you, and you've been in this morning and see how important

16   it is for us to be able to hear and for you to talk loudly

17   and slowly and clearly.  Okay?

18       THE WITNESS:  Yes, ma'am.

19       THE COURT:  Another rule of the road is make sure

20   that Mr. Lees or the attorney for the defendant finishes

21   their question before you respond.  Sometimes you can

22   anticipate where they're going, and you may want to respond.

23   But make sure they're finished and then you respond, so

24   Ms. Crane can take down everything.  Okay?

25       THE WITNESS:  Yes, ma'am.

1      THE COURT:  All right.  You may proceed, Mr. Lees.

2      MR. LEES:  Thank you.

3                        **JIMMY ANTHONY,**

4           **having been first duly sworn, was examined**

5   **and testified as follows...**

6                   **DIRECT EXAMINATION**

7   **BY MR. LEES:**

8   Q.    Would you tell the ladies and gentlemen of the jury

9   your name, please, sir?

10  A.    My name is Jimmy Anthony.

11  Q.    Okay.  How old are you, Mr. Anthony?

12  A.    I'm 52.

13  Q.    And where do you reside?

14  A.    I've been staying at a motel.

15  Q.    Okay.  Are you currently at Brandi's sister's house,

16  too?

17  A.    At my sisters.

18  Q.    Your sister, I'm sorry.  I apologize, your sister's

19  house.  Before that back in 2022, where were you living in

20  April of 2022?

21  A.    At Brandi's, Ms. Quicks.

22  Q.    And where was that located?

23  A.    1648 Ravenwood Lane, Pearl.

24  Q.    Prior to -- before this happened that day on

25  April 30th, how long had you and Brandi been living there

1   together, approximately?

2   A.      Prior to that, about a year.

3   Q.      All right.  I want to direct your attention -- well,

4   first of all, how far did you go in school, Mr. Anthony?

5   A.      I completed the sixth grade.

6   Q.      Which grade?

7   A.      The sixth.

8   Q.      Okay.  Do you have any other schooling other than

9   that?

10  A.      Nothing besides construction work, sir.  No, sir, no

11  schooling.

12  Q.      All right.  So I want to go to the morning of April

13  the 30th, 2022.  Where were you that morning at about

14  9:00 a.m.?

15  A.      I was in the bed in Brandi's and our bedroom.

16  Q.      And was that at the house you just told them you were

17  living in in Pearl?

18  A.      Yes, sir.

19  Q.      Okay.  And could you tell us as best you remember,

20  and I'm going to interrupt you occasionally as you go along,

21  what happened at that house on the morning of April 30th,

22  2022?

23  A.      Yes, sir.  We were in the bed asleep, and we heard

24  something outside and woke up from them knocking on the

25  door.  And I heard something being drug across the concrete

1   outside of our bedroom, and then shortly after that, there

2   was an officer that come through the window.  And then two

3   other officers followed him, and they asked me to get out of

4   bed -- told me to get out of bed.  So I got out of bed, and

5   they handcuffed me and took me to jail.

6   Q.     All right.  You were placed under arrest; is that

7   correct?

8   A.     That's correct.

9   Q.     How were you removed from the house, by what method,

10   front door, back door?

11   A.     Front door -- front door.

12   Q.     Front door.  And when you were taken out the front

13   door, were you in handcuffs?

14   A.     I was.

15   Q.     Had you been injured or harmed in any way during the

16   arrest?

17   A.     No, sir.

18   Q.     When you were taken out the front door of the house

19   in handcuffs, where were you taken?

20   A.     I was taken to the Pearl Police Station.

21   Q.     Okay.  But, first, were you taken to a car --

22   A.     Oh, yes, sir, to the police car.

23   Q.     All right.  And where were you put in the police car,

24   front seat, back seat?

25   A.     Back seat.

JIMMY ANTHONY - DIRECT

1  Q.    Okay.  Did a police officer drive you to the Pearl

2  Police Department?

3  A.    Yes, sir.

4  Q.    Do you remember which officer drove you there?

5  A.    That was Officer Lang.

6  Q.    Okay.  In any way on your way to the police

7  department, were you in any way harmed or injured?

8  A.    No, sir.

9  Q.    When you arrived at the Pearl Police Department, tell

10 us, initially, what happened when you got there.

11 A.    Okay.  We got in the booking area, I was unhandcuffed

12 and pushed or slapped and cussed really bad and --

13 Q.    Let me stop.  Who took you into the booking area?

14 A.    Officer Lang.

15 Q.    Do you see Officer Lang here in the courtroom --

16 A.    I do.

17 Q.    -- today?

18       Would you point him out, please?

19 A.    He's right there.

20       MR. LEES:  Let the record reflect that the witness is

21 identifying Jacob Lang at counsel table, please.

22       THE COURT:  The record will so reflect.

23       MR. LEES:  Thank you.

24 BY MR. LEES:

25 Q.    How long were you in the booking area before Officer

1   Lang removed your handcuffs?

2   A.    We come through the door and he -- it wasn't but just

3   probably -- I don't know -- 20 seconds maybe.  I don't know

4   exactly, but it wasn't long.

5   Q.    Now, you had indicated he touched you or cussed at

6   you; is that correct?

7   A.    Yes, sir.

8   Q.    At any time prior to him starting that behavior, did

9   you do anything, touch him, provoke him, say something to

10  insult him, do anything to him at all that you can recall?

11  A.    No, sir.

12  Q.    And what's your best recollection of what your

13  interaction was with Jacob Lang over that next couple of

14  minutes in the booking room?

15  A.    He bring me down through there cussing me, because I

16  didn't come back to the house that day.

17  Q.    Okay.

18  A.    Yes, sir.

19  Q.    Did he touch you?

20  A.    Well, he slapped me.

21  Q.    Okay.  When you say he slapped you, could you

22  demonstrate what exactly it was he did to you?

23  A.    Yeah.  Just kind of like -- like that, just a slap.

24  Q.    And where did his hand make contact with you?

25  A.    Somewhere up in this area.

JIMMY ANTHONY - DIRECT

1          MR. LEES:  All right.  Your Honor, at this time I

2   believe we have, by joint agreement, introduced Joint

3   Exhibit 1, which is the video clip from the booking cell.

4   And with your permission, I'm going to ask Brandon to bring

5   that up, and I'm going to play those first couple of minutes

6   of the video.

7          And what I'd ask you to do is just wait until the

8   video stops, and then I'm going to ask you some questions

9   about what we just saw.  Fair enough?

10          THE WITNESS:  Yes, sir.

11          MR. LEES:  All right.  So --

12          THE COURT:  Hold on before you play.  If anybody

13   needs to move seats to get closer to a screen when

14   anything's on the screen, you're welcome to.  You're not

15   stuck in the seats you're in if you need to move any.

16          All right.  You may proceed, Mr. Lees.

17          MR. LEES:  All right.  We're going to start the

18   video.  Brandon, if you can, please.

19                    (Video playing in open court.)

20   BY MR. LEES:

21   Q.     Let's stop the video now for a moment.  Do you see

22   yourself in the video now --

23   A.     Yes.

24   Q.     -- Mr. Anthony?

25   A.     Yes, sir.

JIMMY ANTHONY - DIRECT

1  Q.      Are you the one without the shirt on?

2  A.      Yes, sir.

3  Q.      Okay.  Who is the officer standing right next to you

4  at that point?

5  A.      Officer Lang is right behind, yes, sir.

6  Q.      Okay.  And who is the officer -- play it a little bit

7  further, please, if you can, Brandon.

8          And who is the officer coming in the door now, if you

9  know?

10 A.      Officer Welker.

11 Q.      Do you see Officer Welker here in the courtroom?

12 A.      I do.

13 Q.      Would you point to him, please?

14 A.      (Indicating).

15         MR. LEES:  Let the record reflect, Your Honor, if you

16 would please that the witness has indicated Jonathon Welker

17 at counsel table as that individual.

18         THE COURT:  The record will so reflect.

19         MR. LEES:  Thank you.  Let's continue the video,

20 please.

21                  (Video playing in open court.)

22 BY MR. LEES:

23 Q.      Let's stop the video for a moment.  For those on the

24 jury that that might be hard to hear, they will get an

25 opportunity to listen to it a few more times as the trial

1   goes on.

2        Do you remember some of the things, specifically, he

3   said to you during that sequence?

4   A.    I do.

5   Q.    Tell us what you remember.

6   A.    Well, when he was asking me, "What'd I tell you?

7   What'd I tell you?"  He told me it was going to be worse

8   later if I didn't come in.

9   Q.    Again, you're standing there, did you ever say

10  anything back to him?

11  A.    Nothing besides yes, sir.

12  Q.    Ever touch him?

13  A.    No, sir.

14  Q.    Ever do anything at all that you can recall that

15  would have provoked him to be that angry?

16  A.    No, sir.

17  Q.    Before we continue with the video, what do you

18  remember next happening when you're in that booking room?

19  A.    Okay.  I was sitting there getting booked in,

20  fingerprinted, and that sort of thing, and it wasn't

21  probably a few minutes.  I don't know how long, but it

22  wasn't very long.  But Officer Welker called me to the

23  hallway.

24  Q.    Okay.  Do you recall with any specifics exactly what

25  he said to you?

JIMMY ANTHONY - DIRECT

1   A.     He said come on with me, Mr. Anthony, buddy, or

2   something like that.

3          MR. LEES:  Don't take that down.  Let me get the

4   video back up here.

5   BY MR. LEES:

6   Q.     Okay.  Did you at any time request going to the

7   bathroom?

8   A.     I did not.

9   Q.     Did you ever at any time get asked if you needed to

10  use the bathroom by Officer Welker?

11  A.     I did not.

12  Q.     When Officer Welker said what you just said, what did

13  you do?

14  A.     I did what he asked me to do.  He asked me to step

15  with him, so I got up and complied.

16  Q.     All right.

17  A.     But I didn't --

18         MR. LEES:  Just hold that thought for just a moment.

19  Let's play the video through now until where Mr. Anthony

20  leaves the booking area.  This will be clip two, Your Honor.

21              (Video playing in open court.)

22  BY MR. LEES:

23  Q.     I'll just note for the record that it appears you

24  left the booking room on this clip two at 9:07:55.  Where

25  did you go when you went around that corner?

JIMMY ANTHONY - DIRECT

1   A.      Officer Welker led me down the hallway and set me,

2   stood me in front of the bathroom, and told me to hang there

3   for a minute while he went somewhere.

4   Q.      So did he leave you alone in the hallway?

5   A.      He did.

6   Q.      You were uncuffed?

7   A.      Yes, sir.

8   Q.      Do you know where Officer Welker went?

9   A.      I do not.

10  Q.      Okay.  When was the next time you had any interaction

11  with a police officer after you were taken to that hallway?

12  A.      It wasn't probably 30 seconds, a minute possibly, and

13  Officer Lang come down the hallway, didn't say a word, put

14  his hand in my face, and slammed my head into the brick

15  wall.  And I said nothing to him, I just took it.

16  Q.      Just bear with me a minute.  We'll play the video

17  through to see that and this will be clip three.

18                  (Video playing in open court.)

19  Q.      Let me stop the video.  Do you recognize that person

20  who was just walking out of the frame?

21  A.      I'm sorry, sir.

22  Q.      Let's go back and play it again.

23  A.      Oh, yes, sir, I do.

24  Q.      Do you recognize that officer?

25  A.      Yes, sir.

JIMMY ANTHONY - DIRECT

```
 1   Q.      Who is that?

 2   A.      Officer Lang.

 3   Q.      Okay.  Let the record reflect the time index on the

 4   video now is 9:09:23.  I'm going to continue playing that

 5   video, please.

 6                   (Video playing in open court.)

 7           MR. LEES:  Stop, please.  Let the record reflect --

 8   excuse me.

 9   BY MR. LEES:

10   Q.      Can you identify the officer that's returning to the

11   booking room now in the video?

12   A.      Yes, sir.

13   Q.      Who is that?

14   A.      Officer Lang.

15   Q.      Let the record reflect on the video the time index is

16   9:12:22.  During that time that Officer Lang was not in the

17   booking room, is that the time period in which you say he

18   slammed your head against the wall?

19   A.      Yes, sir.

20   Q.      Did he stay with you in that hall that entire time?

21   A.      No, sir.

22   Q.      Do you know where he went after he slammed your head

23   into the wall?

24   A.      I do not.  He never stopped walking when he did it.

25   He just walked by and slammed my head in the wall and kept
```

1   walking.

2   Q.    Did he say anything to you when he slammed your head

3   into the wall?

4   A.    I don't -- not to my -- I don't remember him saying

5   anything.

6   Q.    Do you recall him walking back past you to get back

7   to the booking room?

8   A.    I do not.

9   Q.    Okay.  Was Officer Welker -- where was Officer

10  Welker, if you know, during that time period?

11  A.    He had went to go do something.  He -- I have no idea

12  where he went.  He was out of sight.

13  Q.    When's the next time you talked with Officer Welker?

14  A.    It wasn't -- it wasn't long after Lang had walked --

15  he left me there for a couple minutes, maybe three or four

16  minutes -- I don't know -- I guess.  And he came back and --

17  and brought me in the bathroom and --

18  Q.    Keep your voice into the mike, please.

19  A.    Oh, yes, sir, he brought me back in -- he stepped in

20  the bathroom with me, and he started putting his gloves on.

21  And he told me, he says, Mr. Anthony, he says, when you get

22  out, don't go back to Brandi's.  He said, but I know you

23  will because you love her.  He says now -- he put his gloves

24  on.  He said, now, I'm going -- I'm going to hit you.  He

25  said, are you going to take it like a man or like a B?  And

1    I didn't say nothing --

2    Q.    Like a what?

3    A.    Like a --

4    Q.    Use the word.

5    A.    Like a bitch.  I didn't comment in any kind of way,

6    because I'd never experienced anything like that.

7    Q.    That's all right.  And what happened next?

8    A.    He took his finger, his hands, and he turned me to

9    the side, and he started whaling on my chest --

10    Q.    Which --

11    A.    -- front and back.

12    Q.    Which side of you was facing Officer Welker?

13    A.    That would be this --

14    Q.    Your left side?

15    A.    Uh-huh (affirmative).

16    Q.    Okay.  And when you say he was whaling on your chest,

17    what does that mean?  Describe it.

18    A.    That means it seemed to me he was hitting me as hard

19    as he could until he was out of breath.

20    Q.    What were you doing?

21    A.    Taking it.  I'm a construction worker, sir.  I just

22    took it.  I didn't know what else to do, you know.

23    Q.    Did you fight back?

24    A.    No, sir.

25    Q.    Did you ever raise a hand to him?

JIMMY ANTHONY - DIRECT

1    A.    No, sir.

2    Q.    Did you ever say anything to him?

3    A.    No, sir.  They -- they would have beat me to death

4    legally if I would have.  No, sir.

5    Q.    How long did the beating last?

6    A.    It was pretty quick.  It probably didn't take -- I

7    don't know -- 30 or 40 seconds, maybe a minute or two.  I

8    really can't tell you, because I was right in the middle of

9    all that.  I don't know.

10   Q.    Was there anyone else in the bathroom during the time

11   Officer Welker was hitting you?

12   A.    No, sir.

13   Q.    Okay.  What happened when he finished?

14   A.    He was standing there out of breath and everything,

15   and I'm just standing there kind of traumatized like.  And

16   then Officer Saucier and Officer Lang come back into the

17   bathroom --

18   Q.    So Officer Lang --

19   A.    -- or come into the bathroom, because they hadn't

20   been in there.

21   Q.    That's right.  So we know Officer Lang.  You

22   mentioned another officer came in as well.  What was his

23   name?

24   A.    I don't know if I pronounced it right, Saucier.

25   Q.    Okay.

JIMMY ANTHONY - DIRECT

1  A.     Tall, dark-haired guy with a beard --

2  Q.     All right.

3  A.     -- really good guy.

4  Q.     What happened when those two officers came in?

5  A.     He come in and looked at me, and he says --

6  Q.     Who is "he"?

7  A.     Oh, Officer Saucier.  He looked at me, and he says,

8  now I don't have a badge on.  He said, hit me and then

9  you're going to see what it feels like to hit a real man.

10        And I said, no, sir.  No, sir, I don't want to hit

11  you.  And then that's whenever we come out the bathroom, and

12  we all walked back into the booking area.

13  Q.     Okay.  When you walked back into the booking area,

14  had they put handcuffs on you?

15  A.     No, sir.

16  Q.     So this entire time, you did not have handcuffs on

17  while you were in their custody; correct?

18  A.     Correct.

19  Q.     Did you ever actually use the bathroom in the

20  bathroom?

21  A.     No, sir.

22        MR. LEES:  Let's take a look if we can and pull up

23  the clip, Brandon, where Mr. Anthony comes back into the

24  booking area.  That will be, Your Honor, clip four of Joint

25  Exhibit 1.

```
 1              MR. FLECHAS:  No, that's clip 5.
 2                   (Video playing in open court.)
 3              MR. LEES:  Brandon is correct, it's clip five of
 4    Joint Exhibit 1.  Let's stop there for a minute.  Back that
 5    up for just a second.  Okay, stop right there.
 6    BY MR. LEES:
 7    Q.    The gentleman in the -- at the rear there that's kind
 8    of rubbing his knuckles, who is that?
 9    A.    That's Officer Welker.
10    Q.    And the gentleman right in front of him, who is that?
11    A.    That's Officer Lang.
12              MR. LEES:  Okay.  Let's continue the video, please.
13                   (Video playing in open court.)
14              MR. LEES:  Is that the end?
15              MR. FLECHAS:  That's the end.
16    BY MR. LEES:
17    Q.    Okay.  What were you feeling like at that time,
18    Mr. Anthony?
19    A.    Right then, just shook up a little bit until I sit
20    down on the bench after a couple of minutes, and then I felt
21    like there was a vice on --
22    Q.    Keep your voice directly into that mike.
23    A.    Felt like there was a vice on my heart with needles
24    just squeezing it.
25    Q.    Did you start to complain to the officers about your
```

JIMMY ANTHONY - DIRECT

1  chest?

2  A.    I did.  I grabbed my chest.  I said I think I'm

3  having a heart attack and I started -- my breathing got real

4  fast because my lung was collapsed.

5  Q.    What was -- let's start with Officer Lang.  What was

6  Officer Lang's response?

7  A.    Oh, he come running over there mocking me saying, oh,

8  you're having chest pains, huh?  Hard to breathe, how does

9  that feel?  And that sort of thing, mocking me.

10  Q.    What was Officer Welker's response?

11  A.    No, that was Officer Welker that did that.

12  Q.    That was Officer Welker's, okay.  What was Officer

13  Lang's response?

14  A.    I'm -- at that moment, I'm struggling for my life,

15  you know what I'm saying, so I really didn't see --

16  Q.    Do you remember what his response was?  Yes or no?

17  It's okay if you don't.

18  A.    I can't remember, sir.

19  Q.    Do you recall at any time during this period Officer

20  Lang singing?

21  A.    Oh, yes, sir, vaguely.

22  Q.    Huh?

23  A.    Yes, sir.

24  Q.    Do you remember what he was singing?

25  A.    Yeah, about running from the police.  Getting beat up

JIMMY ANTHONY - DIRECT

1    and -- for running from the police.

2        MR. LEES:  Brandon, could you play for us, out of

3    Joint Exhibit 1, Clip 9 of the video.  Stop it for a moment.

4    Let's get back to the beginning.  I want the time index on

5    the record first.  Is this the beginning of it?

6        MR. FLECHAS:  This is the beginning.

7        MR. LEES:  Let the record reflect we're at time index

8    9:36:49.  Go ahead and make sure the volume is up and let's

9    play this video.

10              (Video playing in open court.)

11        MR. LEES:  Okay.  Play that one more time, please,

12   from the beginning.

13              (Video playing in open court.)

14   BY MR. LEES:

15   Q.    Do you recall Officer Lang making any comments about

16   you having a heart attack?

17   A.    Officer Welker --

18   Q.    Okay.

19   A.    -- yes.

20   Q.    Let me show you Clip 10 for a moment.  Can we get

21   Clip 10, and don't start it yet until we get the time index.

22        Time index of Clip 10 of Joint Exhibit 1, 9:38:32.

23   Let's play it.  Where is Officer Lang in this video?  Can

24   you point him out?

25   A.    He's behind the desk.

1    MR. LEES:  Okay.  Let's go ahead and play it.

2         (Video playing in open court.)

3  BY MR. LEES:

4  Q.    Was anybody offering you any medical attention?

5  A.    No, sir, I got mocked.  And then when I said that I

6  felt like I was having a heart attack, I got left there

7  for -- I mean, for several -- a good five, however long it

8  was.  And then he made me walk out to the parking lot to get

9  in the police car rather than the sally port.

10        And then when we got to the jail, he got me out and

11  put me on the fender of his car and had a little talk with

12  me, and said he would much rather have met me in Destin,

13  Florida, buying me a beer than like this, rather than

14  getting me medical attention.

15  Q.    Give me just one second here to cover the clips.  Do

16  you recall a time period when Officer Welker asked you to

17  look him in the eyes?

18  A.    Vaguely, sir.

19        MR. LEES:  Let me pull up, if I can, please, clip 13.

20  Time index -- this is clip 13 of Joint Exhibit 1, time index

21  9:51:24.  Go ahead and let's play clip 13.

22         (Video playing in open court.)

23  BY MR. LEES:

24  Q.    Do you recollect him saying, "If you think that hurt

25  earlier, then shut the eff up"?

JIMMY ANTHONY - DIRECT

1   A.      Yes, sir.

2   Q.      Do you know what he was referring to when he said,

3   "if you think that hurt earlier"?

4   A.      I do.

5   Q.      Were you placed in handcuffs before you left the

6   police station?

7   A.      Yes, sir.

8   Q.      And where were you taken from the police station?

9   A.      To the Rankin County Jail.

10  Q.      Who drove you there?

11  A.      Officer Welker.

12  Q.      Okay.  At any time after you left the police station

13  and you were still in the custody of Officer Welker, did he

14  or anyone else harm you in any way?

15  A.      No, sir.

16  Q.      Tell me what happened when you got to the Rankin

17  County Jail.

18  A.      Well, after he had me sitting on the fender, the --

19  the booking officer inside the jail had to come out.  We'd

20  been out there so long, the booking officer come out and

21  brought me in.

22  Q.      That would be to the Rankin County Jail?

23  A.      Yes, sir.

24  Q.      And were you booked into the Rankin County Jail?

25  A.      I was.

JIMMY ANTHONY - DIRECT

1  Q.    Did you make any complaints at that time about how

2  you were feeling?

3  A.    Ms. Becky --

4  Q.    Yes or no?

5  A.    Oh.  Yes, sir.

6  Q.    Can you recollect what complaints, if any, you made?

7  A.    I told Ms. Becky I thought I was having a heart

8  attack, and she called medical.

9  Q.    Okay.  Did medical come to do some sort of a check on

10 you to see if, in fact, you were having a heart attack?

11 A.    They did.

12 Q.    Do you recall what, if anything, medical did to check

13 to determine whether you were having a heart attack?

14 A.    They came and took my blood pressure, and said he's

15 not having a heart attack and let me finish getting booked

16 in.

17 Q.    All right.  At some point after you were booked in,

18 did you suffer some sort of a collapse?

19 A.    I did.

20 Q.    Okay.  About how long, as best you can remember, were

21 you at the Rankin County Jail before you collapsed and

22 needed medical attention?

23 A.    Roughly about -- probably about an hour possibly.

24 Q.    Okay.  During that hour, did you have an opportunity

25 to make any phone calls?

JIMMY ANTHONY - DIRECT

1   A.      I did.

2   Q.      Who did you call?

3   A.      Brandi my --

4   Q.      And did you talk to Brandi?

5   A.      I did.

6   Q.      And were you aware that telephone calls from the jail

7   are recorded?

8   A.      Yes, sir.

9   Q.      Okay.  So that call that you made to Brandi would be

10  a recorded call; correct?

11  A.      Yes, sir.

12  Q.      All right.  Tell me where you were, specifically,

13  when you collapsed and exactly what happened.

14  A.      I -- I had climbed up on a rack, on a top rack or

15  whatever, and I laid there for a minute.  And then I got to

16  feeling worse, and so I got off the rack to go to the button

17  to let them know that I was, you know, hurting worse or

18  whatever.  And I made it about halfway -- about halfway to

19  the door, and I collapsed.

20  Q.      Okay.  Tell me what you remember from that point

21  going forward.

22  A.      Medical came in and they took me to the -- to the

23  infirmary, and they did an EKG on me.  And -- and they

24  called the captain in there.  They said that my -- the EKG

25  says left ventricle failure, and the -- the head nurse said

JIMMY ANTHONY - DIRECT

1   it could be a malfunction in the --

2        MR. SILER:  Objection --

3   Q.    That's all right.  I don't need to know what they

4   said --

5   A.    I was --

6        THE COURT:  Okay.  Hold up.  Everybody hold up.  We

7   have an objection.

8        MR. SILER:  Objection, hearsay, move to have all of

9   this testimony stricken.

10       THE COURT:  Okay.  All right.  Well, I don't think

11  anybody heard it, because we're all talking.  But hold on.

12  I'm going to sustain the objection, and just ask your

13  question a different way, Mr. Lees.

14  BY MR. LEES:

15  Q.    So they -- they checked you out, and then what

16  happened?

17  A.    They checked me out, and then they called an

18  ambulance.

19  Q.    Okay.  Were you conscious during this time?

20  A.    I was.

21  Q.    Did an ambulance come and transport you somewhere?

22  A.    Yes, sir.

23  Q.    Where did the medical personnel transport you to?

24  A.    To the -- used to be Rankin General.  They call it

25  Merit Health Rankin now, but, yes, sir.

JIMMY ANTHONY - DIRECT

 1    Q.      Were you examined there by medical professionals?

 2    A.      I was.

 3    Q.      Did they keep you there or transfer you somewhere

 4    else?

 5    A.      They transferred me to UMMC for trauma.

 6    Q.      How did you get from that medical facility to the

 7    University of Mississippi Medical Center?

 8    A.      An ambulance.

 9    Q.      When you arrived at the University of Mississippi

10    Medical Center, were you examined by medical professionals?

11    A.      I was.

12    Q.      And were you admitted to the hospital?

13    A.      Instantly.

14    Q.      And do you recall how many days you spent in that

15    hospital in total?

16    A.      I do, five days.

17    Q.      Okay.  Do you recall -- this would have been on April

18    the 30th when you went to the hospital; correct?

19    A.      Correct.

20    Q.      And do you recall the day you were discharged from

21    the hospital?

22    A.      I do.

23    Q.      And what day was that?

24    A.      May the 5th.

25    Q.      All right.  And we'll have a doctor here tomorrow to

1  discuss this, but I want you to tell the jury your

2  understanding of what was wrong with you and the reason why

3  you were hospitalized.

4  A.     Yes, sir.  I had a --

5         MR. SILER:  Objection.

6         THE COURT:  Hold on one second.

7         MR. SILER:  Objection.  This would be asking him

8  hearsay.  The only way he could know would be to repeat what

9  medical professionals told him.

10         THE COURT:  Okay.  I'm going to overrule the

11  objection.

12  BY MR. LEES:

13  Q.     Go ahead.

14  A.     I had a hematoma and pneumothorax which is --

15  Q.     What was your understanding of what a pneumothorax

16  is?  Do you know?

17  A.     I didn't have a clue at the moment, --

18  Q.     That's all right.

19  A.     -- but later on, I found out that it's a collapsed

20  lung.

21  Q.     Let me ask this.  Did they provide some sort of

22  immediate treatment to you?

23  A.     Instantly when I got to the hospital, I didn't go

24  through the emergency room.  I went straight up into a

25  hallway and went straight into the room where they did the

JIMMY ANTHONY - DIRECT

1    procedure on me and cut and put the tube in my chest.

2    Q.    And very briefly if you can, I want you to tell the

3    ladies and gentlemen of the jury what procedure they had to

4    do at that point?

5    A.    They made an incision in between my ribs up here, and

6    they shoved this device -- this thing all up in there that

7    didn't really -- it didn't fit, by gosh.  But they shoved it

8    in there anyway, and it held the drain tube in place for it

9    to drain the blood out of my chest cavity.

10   Q.    And where did it drain the blood and fluid out of

11   your chest to?

12   A.    It had -- I had, like, this box deal.  I've got a

13   picture of it.  But it had cylinders on it, and I filled it

14   up twice within that five days.

15   Q.    Do you have some photographs that were taken both at

16   the hospital and shortly after you were discharged, which

17   showed your medical condition at that time?

18   A.    I do.

19        MR. LEES:  Your Honor, just for the witness and the

20   lawyers, but not the jury because these are not admitted, I

21   would ask to show the witness Plaintiff's Exhibit 10, which

22   is a collective exhibit.  And I'm going to ask you to look

23   at some photos, if you can for a moment.

24        Okay.  Let's go to the top photo first.

25        THE COURT:  And just for the jury's sake, you

JIMMY ANTHONY - DIRECT

1   shouldn't be seeing these yet until they're admitted into

2   evidence.  So you cannot see them; correct?  Okay.

3   BY MR. LEES:

4   Q.      Do you recognize what is pictured in the top

5   photograph there, sir?

6   A.      I do.

7   Q.      What is that?

8   A.      That's my chest where they -- my ribs where they made

9   the incision.

10  Q.      And does that accurately depict the incision that was

11  made into your left chest while you were at the hospital?

12  A.      It does.

13  Q.      Let's go down to the next photograph, please.  Pull

14  back on that, so we can see it a little better, please.

15  What are we looking at here, Mr. Anthony?

16  A.      That's the tube I slept with and drug around -- that

17  box around with me every time I went to the bathroom for the

18  five days I was there.

19  Q.      Does that accurately depict what you looked like in

20  the hospital at that time?

21  A.      It does.

22  Q.      Let's go to the next photograph.  Was this a

23  photograph taken after you were released from the hospital?

24  A.      Yes, sir.

25  Q.      Does that accurately depict what you looked like

1   after you got home at some period?

2   A.    Yes, sir.

3   Q.    Next photograph.  Pull back, please.

4         Is this also a photograph of your left side?

5   A.    Yes, sir.

6   Q.    Does that accurately depict what your condition was

7   after you got home?

8   A.    Yes, sir, the day I got home.

9   Q.    Let's go to the next photograph.  Same question, was

10  this taken after you got home?

11  A.    Yes, sir.

12  Q.    Does that accurately depict what your left side

13  looked like after you got home from the hospital?

14  A.    Yes, sir.

15  Q.    Next photograph, same question.  Does that accurately

16  depict after you got home what your left side looked like

17  towards your back?

18  A.    Yes, sir.

19        MR. LEES:  Is that it, Brandon?

20        MR. FLECHAS:  Yes, sir.

21  BY MR. LEES:

22  Q.    Okay.  And all those photographs you recognized as

23  being you and accurately depicting your condition, either

24  while you were at the hospital or shortly after you were

25  discharged; is that correct?

JIMMY ANTHONY - DIRECT

 1   A.      Yes, sir.

 2          MR. LEES:  Your Honor, I'd move for the admission of

 3   collective Plaintiff's Exhibit 10.

 4          THE COURT:  Any objection?

 5          MR. SILER:  P-10, no objection, Your Honor.

 6          THE COURT:  All right.  P-10 is admitted.  You may

 7   publish it to the jury.

 8              (Plaintiff's Exhibit 10 entered.)

 9   BY MR. LEES:

10   Q.      Let's bring up the first photograph, and we'll go

11   back through this now that the jury can see, Mr. Anthony.

12   The first photograph we're looking at, again, can you tell

13   us what we're looking at?

14   A.      That's an incision that was made in between my ribs,

15   so that the drain tube could be placed in my chest.

16   Q.      Okay.  Let's go to the next photograph.  Pull back on

17   this one.  What are we looking at here, Mr. Anthony?

18   A.      That is the drain tube draining the blood out of my

19   chest cavity.

20   Q.      Okay.  Let's go to the next photograph.  What are we

21   looking at here in the next photograph?

22   A.      That's after they took the -- the -- well, after they

23   took the tube out when I was at home, that's just pictures

24   of the incision after they pulled the tube out.

25   Q.      So this is after you were released to go home;

JIMMY ANTHONY - DIRECT

1    correct?

2    A.    Correct.

3    Q.    And looking at the left side there, I see a number of

4    kind of dark or black smudges on your left side.  Can you

5    tell me what those are?

6    A.    Those are bruises.

7    Q.    Next slide, please, let's pull back.  Is this, again,

8    a picture at home taken after you got home?

9    A.    Yes, sir.

10   Q.    Next picture.  Is this a picture taken after you got

11   home?

12   A.    Yes, sir.

13   Q.    And I'm looking here -- hold on.  I'm looking here at

14   black areas toward the back of your left side, across your

15   left side, down below here in the lower level, what are

16   those?

17   A.    Those are bruises from a fist.

18   Q.    Are those all separate bruises?

19   A.    Yes, sir.

20   Q.    Did you have any of those bruises on you before you

21   were taken into the custody of the police department?

22   A.    No, sir.

23   Q.    Did you have any of these injuries before you were

24   taken to the Pearl Police Department on the morning of

25   April 30th, 2022?

1    A.    No, sir.

2    Q.    Next picture.  Is this another picture taken of you

3    at home, after you got home?

4    A.    Yes, sir.

5    Q.    Does this picture, again, depict the bruising that

6    was on your left side in your left ribs?

7    A.    Yes, sir.

8          MR. LEES:  Is that it?  Thank you.  You can take

9    those pictures down.

10   BY MR. LEES:

11   Q.    During the five days that you were in the hospital,

12   Mr. Anthony, did you have company in your room?

13   A.    I did.

14   Q.    Who?

15   A.    Brandi.

16   Q.    Brandi come to the hospital?

17   A.    She stayed by my side the whole -- the whole time.

18   Q.    She never left, did she?

19   A.    Never left.

20   Q.    Stayed and slept there in the room with you?

21   A.    Yes, sir.  We've been inseparable for the last four

22   years together.

23   Q.    Tell me just very briefly a little bit about how you

24   were feeling during your recovery process, and did you

25   eventually get back to normal or what?

JIMMY ANTHONY - DIRECT

1   A.     It was -- it was -- I mean, it was rough for a month

2   or so as far as my ribs and stuff.  But my breathing, it

3   took about four and a half months for my breathing to come

4   back so much.  You know, I didn't get it all back, but I can

5   sit here and talk to you without doing all that, so...

6   Q.     But do you, in your opinion, have some diminished

7   breathing capacity even today?

8   A.     Yes, sir.

9   Q.     Okay.  Did that hole there, did it get stitched up or

10  did they just -- how did that get --

11  A.     You know, I don't believe they could stitch it up,

12  because it had been open for a week.  After a week, they

13  can't really stitch that up.  I think what they done was

14  they put --

15  Q.     Well, don't tell me that.  Just tell me what happened

16  to it.  Did it heal up or --

17  A.     Oh, yes, sir, it healed up.

18  Q.     Is it scarred over now?

19  A.     Yes, sir, it's a scar.

20  Q.     When you came out of the hospital, where did you stay

21  during your recovery period?

22  A.     We went to Brandi's pawpaw's house.  He lived in

23  Terry, Mississippi.

24  Q.     And did you and Brandi stay at her grandfather's

25  house for a couple of months while you recovered?

JIMMY ANTHONY - DIRECT

1    A.    We did.

2    Q.    And where was his home?

3    A.    Terry, Mississippi.

4    Q.    Now, because it was raised by both of us actually,

5    both myself and counsel for the defendants, I want to

6    briefly talk about the day before you were taken into

7    custody.  Okay?

8          THE COURT:  Mr. Lees, it sounds like you're about to

9    pivot to a new topic, so this may be a good time for the

10   afternoon break.  We've been going about an hour and 45

11   minutes, and I feel like it's probably time for our court

12   reporter, at a minimum, to get a break.

13         So it's about 2:45.  Let's take about a 15-minute

14   break.  Remember, don't discuss the case.  Don't discuss

15   anything amongst yourselves that is case related, and we'll

16   have you back in here in about 15 minutes.

17         Thank you.  All rise.

18         We're rising for you all so you can leave.

19                   (Jury out at 2:44 p.m.)

20         THE COURT:  All right.  Court will be in recess for

21   15 minutes.

22         Yes, sir?

23         MR. LEES:  Yes, just housekeeping matters.  I'm

24   almost finished with the direct examination.  I suspect

25   cross-examination will be somewhat lengthy.  My next witness

JIMMY ANTHONY - DIRECT

1    will be Brandi Quick, who hopefully is here or will be here.

2         I was just wondering, then the witness after that is

3    Officer Hudson who is with the police department.  I

4    honestly don't know -- if we get all the way to 5:00, I may

5    need him, but I don't want to make him sit here so --

6         THE COURT:  Yeah, I'd say don't make him sit here.

7    If we let the jury go a little early today, that's fine.

8         MR. LEES:  All right.  So I'm going to tell Officer

9    Hudson he can leave and come back first thing in the

10   morning.

11        THE COURT:  That's fine.

12        MR. LEES:  Thank you very much.

13        THE COURT:  All right.  Yes, sir?

14        MR. SILER:  Just to that matter, I don't care when I

15   take his cross.  If they want to go to Ms. Quick or

16   Mr. Hudson, and then I can come back and do his cross either

17   late this afternoon or tomorrow.  I don't care so --

18        THE COURT:  No, and I appreciate your cooperation.

19   Let's stay on track with each witness, but I do appreciate

20   your courtesy in that respect.  But we'll go and finish with

21   Mr. Anthony, and then if we have time for Ms. Quick, we'll

22   take her today.  And if we run out of witnesses after

23   Ms. Quick, then we'll just let the jury go early.

24        All right.  Thank you all.  We'll be in recess for 15

25   minutes.

JIMMY ANTHONY - DIRECT

```
 1                    (A brief recess was taken.)

 2          MS. POWELL:  All rise.

 3          THE COURT:  Y'all may be seated.

 4          Anything to take up before we bring the jury back in?

 5          MR. LEES:  Not by the plaintiff.

 6          MR. SILER:  Not by the defendants, Your Honor.

 7          THE COURT:  All right.  Mr. Anthony can go back to

 8  the stand before we get them in here or while we get them in

 9  here.

10          All rise.

11                    (Jury in at 3:03 p.m.)

12          THE COURT:  All right.  You may be seated.

13          Okay.  Mr. Lees, you may continue.

14          MR. LEES:  Thank you.

15  BY MR. LEES:

16  Q.    Mr. Anthony, we were going to briefly turn our

17  attention to the day before, which would be Friday.  Friday

18  afternoon was there a phone call, to your knowledge, made to

19  the police that day about something that was occurring

20  between you and Brandi?

21  A.    Yes, sir.

22  Q.    Who made the call?

23  A.    Brandi.

24  Q.    Okay.  What were you and Brandi doing that day up

25  until that point?
```

JIMMY ANTHONY - DIRECT

1   A.    Okay.  We had been asleep -- well --

2   Q.    Let me ask this.  Let me put it another way.  Had you

3   or she been drinking?

4   A.    Yes.  Yes, sir.  The -- the night before this started

5   about 2:00 -- well, that morning about 2:00 in the

6   morning --

7   Q.    That's okay.

8   A.    -- we were fine when we went to sleep, and then she

9   woke me up kicking me telling me to get out of her --

10  Q.    We don't need to go into details.

11  A.    Okay.

12  Q.    We just need to know --

13  A.    She was drunk, yes, sir.

14  Q.    -- was she drinking that day?

15  A.    Yes, sir.

16  Q.    Were you drinking that day?

17  A.    No, sir.

18  Q.    Okay.  She called the police; correct?

19  A.    Yes, sir.

20  Q.    Were you there when she called the police?

21  A.    No, sir.

22  Q.    Had you all had a fight or an argument before she

23  called the police?

24  A.    I wouldn't call it no fight.  She -- I was ready to

25  go because I'm tired of her drinking --

JIMMY ANTHONY - DIRECT

1   Q.      That's okay.

2   A.      -- and calling the police --

3   Q.      You left the house --

4   A.      -- for no reason --

5           THE COURT:  Hold on one second.  Hold on one second.

6   Y'all, it's okay.  He's talking and then you're trying to

7   ask another --

8           MR. LEES:  I apologize.

9           THE COURT:  Nobody's at fault.  Just let each other

10  finish.  That way, Ms. Crane can get both sides down.

11          Try again, Mr. Lees.

12  BY MR. LEES:

13  Q.      You left the house at some point; correct?

14  A.      Yes, sir.

15  Q.      Where did you go?

16  A.      I walked to the park behind the house.

17  Q.      Okay.  What was your intent?

18  A.      Call my son and try to find somebody to come get me,

19  because I had enough.

20  Q.      Did you have a conversation with a police officer

21  over a phone?

22  A.      I did.

23  Q.      Okay.  Did you talk to one or more than one officer?

24  A.      I couldn't tell you.  I thought it was one.  I

25  thought it was Officer Welker, but I believe --

JIMMY ANTHONY - DIRECT

```
 1   Q.      That's okay.

 2   A.      -- y'all said Officer Lang.

 3   Q.      You talked to a police officer?

 4   A.      I did, yes, sir.

 5   Q.      Did the police -- what, if anything, did the officer

 6   ask you to do?

 7   A.      He asked me to come -- he said that -- his exact

 8   words were, he says, we've got Brandi's side.  I said, sir,

 9   she's drunk.  He said, I know she's drunk; we can tell.  But

10   now we need your side.

11   Q.      Did you say, no, I'm not coming back?

12   A.      No, sir, I did not.

13   Q.      What did you say?

14   A.      I said I felt a little uncomfortable coming back

15   right then.  I said, dude, I can tell you what happened over

16   the phone.  He said, nah, we can't do it like that.  I've

17   got to have you face to face.

18   Q.      Did you ultimately not go back?

19   A.      I did -- I didn't go back.

20   Q.      Later that day, did you and Brandi get back together?

21   A.      Oh, yeah, within -- as usual within about an hour,

22   she come to her senses and sobered up or whatever and got to

23   missing me and come got me.

24   Q.      About what time that day did you and Brandi get back

25   in each other's company?
```

JIMMY ANTHONY - DIRECT

1   A.     I'm going to guess about -- I could not tell you

2   exactly because I don't know exactly what time we got up --

3   Q.     I mean, morning, afternoon --

4   A.     It was the afternoon.

5   Q.     Okay.  Where did you and Brandi go?

6   A.     Went to her pawpaw's.

7   Q.     How did you get there?

8   A.     Ms. Patty.

9   Q.     Who is Ms. Patty?

10  A.     Ms. Patty Campbell is our neighbor.

11  Q.     Okay.  Does she do transportation as well --

12  A.     She does, yes, sir.

13  Q.     Okay.  And so was it Ms. Campbell that drove you and

14  Brandi to Brandi's grandfather's home?

15  A.     Yes, sir.

16  Q.     Where did you and Brandi go after you left the

17  grandfather's house?

18  A.     Well, we were coming back from pawpaws and --

19  Q.     Where did you go?

20  A.     Went to Debo's.

21  Q.     Okay.  Is Zebo's (sic) a bar your friend owned?

22  A.     Debo's, yes, it's a bar a --

23  Q.     And, generally, what did you and Brandi do there that

24  Friday night?

25  A.     We shot pool and drank a little bit.

1  Q.    And, ultimately, did you leave there and go somewhere

2  else?

3  A.    Yes, sir.

4  Q.    Where did you go?

5  A.    Back to her house.

6  Q.    And when you got back to the house, what did you do

7  when you got back to the house?

8  A.    Went in and got ready for bed and got in the bed.

9  Q.    And is that where you were when the police came the

10 next morning?

11 A.    Yes, sir.

12        MR. LEES:  That's all I have.  Thank you.  Please

13 answer defense counsel's questions.

14        THE COURT:  All right.  Thank you, Mr. Lees.

15        Mr. Siler, cross-examination.

16                      **CROSS-EXAMINATION**

17 **BY MR. SILER:**

18 Q.    Mr. Dean -- I'm sorry.  Mr. Anthony, the house you

19 were in that you were just speaking to your lawyer about was

20 the house at 1648 Ravenwood Lane in Pearl; is that correct?

21 A.    Yes, sir.

22 Q.    Okay.  And that was Brandi Quick's -- Brandis Quick's

23 house; correct?

24 A.    Yes, sir.

25 Q.    And she had inherited that house from her husband who

JIMMY ANTHONY - CROSS

1    died a few years earlier; is that correct?

2    A.    Yes, sir.

3    Q.    And you were living there with her; right?

4    A.    Yes, sir.

5    Q.    Rent free; right?

6    A.    I worked sometimes.

7    Q.    But you told me during your deposition you hadn't

8    worked in one to two years before --

9    A.    Right.

10    Q.    -- this April 29th and 30th of 2022 date; correct?

11    A.    I hadn't worked much.

12    Q.    Okay.  So you weren't paying rent during all that

13    time, were you?

14    A.    No, sir.

15    Q.    All right.  And you were -- when I asked you how

16    y'all lived -- because you said Ms. Quick didn't work

17    either; right?

18    A.    Right.

19    Q.    And I asked you how you made a living and earned

20    money, and you were living off a Social Security check

21    Ms. Quick got; correct?

22    A.    Yes, she got a Social Security check.  Yes, sir.

23    Q.    That's how y'all lived?

24    A.    That's how we survived, yes, sir.

25    Q.    You did not have a vehicle; correct?

 1   A.      Correct.

 2   Q.      All right.  And you said that -- we're talking about

 3   Ms. Quick's drinking.  Was she an alcoholic?

 4   A.      Yes, sir.

 5   Q.      What was her particular poison?

 6   A.      Vodka.

 7   Q.      Vodka.  Was she also a methamphetamine addict?

 8   A.      No, sir.

 9   Q.      Okay.  Did she take it from time to time?

10   A.      Sometime.

11   Q.      Okay.  You were a methamphetamine addict; correct?

12   A.      For years.

13   Q.      And still are; correct?

14   A.      I'm -- I'm battling it now.  I'm fighting it now.

15   For years I didn't, but, yes, sir, it's a battle every day.

16   Q.      Okay.

17   A.      Yes, sir.

18   Q.      All right.  You said in the early morning hours of

19   April 29th that you left the house, because you and

20   Ms. Quick got into an argument; correct?

21   A.      Could you repeat that, sir?

22   Q.      You said in the early morning hours of April 29th,

23   2022, you left the house at Ravenwood Lane, because you and

24   Ms. Quick got into an argument; correct?

25   A.      Yes, sir.

JIMMY ANTHONY - CROSS

1   Q.    Okay.  And -- and you told me in your deposition that

2   you were out from 2:00 a.m. until 5:00 a.m. that morning.

3   Is that your recollection of the events?

4   A.    Correct.

5   Q.    All right.  And you were walking around in the dark

6   in a park, in a neighbor's yard, various places in your

7   neighborhood and around your neighborhood; correct?

8   A.    Yes, sir.

9   Q.    Okay.  Now, you went back in the house at 5:00 a.m.

10  and crawled in the bed with Ms. Quick at that point;

11  correct?

12  A.    No, sir.  I -- I went back in the house and got in

13  the bed but not with Brandi.

14  Q.    Where did you get in the -- get in the bed?

15  A.    On the couch in the living room.

16  Q.    Okay.  Is that where you stayed the remainder of the

17  night?

18  A.    Yes, sir.

19  Q.    Okay.  But somewhere the next day, probably from what

20  I understood it was around noon, is that right, y'all woke

21  up and she was --

22  A.    Yes, sir.

23  Q.    Okay.  And at that point, did you get in another

24  argument with Ms. Quick?

25  A.    Yes, sir.

JIMMY ANTHONY - CROSS

1    Q.    Okay.  And during that argument, did you put your

2    hands on her throat and strangle her?

3    A.    I did not.  I walked by her and bumped into her, but

4    I didn't.

5    Q.    Were you aware of the fact she called the police on

6    you that morning?

7    A.    Not until I heard all the sirens.

8    Q.    What did you do when you heard the sirens?

9    A.    I told my son I had to let him go, and I called

10   Ms. Patty.

11   Q.    All right.  So does that mean you were on the

12   telephone with your son when you heard the sirens?

13   A.    (Nods head affirmatively).

14   Q.    Is that a yes?

15   A.    Yes, sir.

16   Q.    Okay.  Now, did you have your own cellphone?

17   A.    Yes, sir.

18   Q.    Okay.  How many cellphones did you and Ms. Quick have

19   at that time?

20   A.    Two.

21   Q.    So she had a cellphone and you had a cellphone?

22   A.    Correct.

23   Q.    How did you pay for this cellphone?

24   A.    She got it.  She got it on her plan.

25   Q.    So you were -- let me back up.  If you weren't at the

JIMMY ANTHONY - CROSS                                                    79

1    house when you heard the sirens, where were you?

2    A.    I was in the park -- in the park.

3    Q.    Okay.  So you were in the park and walking around the

4    neighborhood between 2:00 a.m. and 5:00 a.m.  You and

5    Ms. Quick get in a fight around noon, and you go back to the

6    park.  Is that what you're telling me?

7    A.    I walked to the park to call someone to come get me.

8    Q.    All right.  And you called your son; right?

9    A.    Yes, sir.

10   Q.    And you were talking to him when you heard the sirens

11   from the police cars --

12   A.    Yes, sir.

13   Q.    -- correct?

14   A.    Yes, sir.

15   Q.    Okay.  And so you got off the phone with your son and

16   called a neighbor; correct?

17   A.    Yes, sir.

18   Q.    And who was -- what was the neighbor's name?

19   A.    Ms. Patty Campbell.

20   Q.    Ms. Patty Campbell.  And when you called

21   Ms. Campbell, did at some point the telephone get passed to

22   the police officers, or was that later?

23   A.    It did, yes, sir.  She told me there was somebody

24   that needed to speak -- wanted to speak to me, yes, sir.

25   Q.    Okay.  All right.  And you said you thought you

JIMMY ANTHONY - CROSS

1  talked to Officer Welker, but you weren't certain whether

2  you talked to more than one officer that day?

3  A.    Yes, sir.

4  Q.    Okay.  Could you have spoken with Mr. Lang as well?

5  A.    Yes, sir.  I don't know the difference -- didn't know

6  the difference between them.  I didn't even know either one

7  of them prior to that day.

8  Q.    And you -- I think you've said it, but I want to make

9  sure it was clear in the record.  When the -- after the

10 police officers asked you to return, you refused and did not

11 return to the house; correct?

12 A.    I did not return to the house, correct, but I never

13 told them I wasn't coming.

14 Q.    You didn't tell them you weren't coming?

15 A.    No, sir.

16 Q.    You just didn't go back?

17 A.    Yes, sir.

18 Q.    Okay.  Well, how long did you stay out in the park

19 after you spoke to the police officers?

20 A.    Until I heard all the sirens --

21 Q.    Okay.

22 A.    -- probably five minutes maybe.

23 Q.    Did you see an ambulance come in?  Could you see the

24 house?

25 A.    No, sir.

JIMMY ANTHONY - CROSS

1   Q.      So you couldn't tell whether an ambulance came or

2   not?

3   A.      No, sir.

4   Q.      Okay.  All right.  So how long -- well, let me ask

5   again.  I apologize.  How long did you walk around the park

6   after you talked to the police officers?  You said until all

7   the sirens stopped?

8   A.      No, sir, I didn't.  I heard the sirens and I called

9   Ms. Patty, and I started walking out of the park.

10  Q.      Okay.  Where did you go at that point?

11  A.      I walked over towards the -- there's like a pipeline

12  right there behind the park, and I walked over there.

13  Q.      Okay.  So how long did you stay out there before you

14  went somewhere else?

15  A.      Probably -- I guess it was probably about an hour and

16  a half or so if I had to guess.

17  Q.      Were you walking around the woods?

18  A.      I was.

19  Q.      Okay.  All right.  Where did you go after that hour

20  and a half elapsed?

21  A.      Brandi, Ms. Quick, called me and asked me where I was

22  at, and I told her.  And her and Ms. Patty come and got me.

23  Q.      All right.  Now, Ms. Patty, Ms. Campbell you've

24  mentioned several times.  You and Ms. Quick did not own a

25  vehicle; correct?

 1   A.     Correct.  That's right.

 2   Q.     So the only way you could get around was to have

 3   Ms. Campbell drive you; is that right?

 4   A.     Yes, sir.

 5   Q.     Okay.  And was Ms. Campbell a driver for hire?

 6   A.     Yes, sir.

 7   Q.     Okay.  Who did she work for?

 8   A.     She worked for Lyft and Uber.

 9   Q.     Okay.  And did you pay her via Lyft and Uber when you

10   utilized her driving services?

11   A.     Brandi did and I did from time to time.

12   Q.     And so when Ms. Campbell and Ms. Quick picked you up

13   that afternoon, she then drove you from Pearl to Terry to

14   Ms. Quick's grandfather's house; is that correct?

15   A.     Yes, sir.

16   Q.     Okay.  And you stayed there for some several hours

17   before you came home, came back to the Ravenwood house that

18   night; correct?

19   A.     We had been gone for several hours.  Brandi brought

20   it to my attention that we had went to Debo's.  With all the

21   trauma and everything, some of that stuff kind of runs

22   together.  But, yes, sir, we went to her pawpaw's and then

23   went to Debo's and were back at the house later that night.

24   Q.     All right.  Are you saying Debo's?

25   A.     Yes, sir.

JIMMY ANTHONY - CROSS

1  Q.     Where is that?

2  A.     It's on Raymond Road.  It's a little pool hall.

3  Q.     Okay.  On Raymond Road.  Where on Raymond Road?

4  A.     Okay.  If you turn off Terry Road onto Raymond Road,

5  it's right there to the right.  It used to be Crickets.

6  It's been -- it's had several different names over the

7  years.

8  Q.     All right.  So how far a drive was that from her

9  grandfather's house?

10  A.     Well, her grandfather lives in -- lived in Terry,

11  that's probably, what, 20-minute, 30-minute ride or

12  something.  I'm not sure.

13  Q.     All right.  So what time in the evening was it when

14  you got to Debo's?

15  A.     I'm guessing around -- probably around 6:00.  I guess

16  6, 7, something like that.

17  Q.     All right.  So was --

18  A.     I'm not sure.

19  Q.     So was it still daylight?

20  A.     It was.

21  Q.     Now, I'm getting a little confused because a minute

22  ago, you said Ms. Quick reminded you or told you that you'd

23  gone to Debo's.  As you sit here today, do you have an

24  actual recollection of going to Debo's?

25  A.     I do.

JIMMY ANTHONY - CROSS

1  Q.    Okay.  So you can recall it was still daylight when
2  you got there; correct?
3  A.    Right about dark.
4  Q.    Right about dark, okay.  How long did you stay there?
5  A.    I guess we left there probably about 1:00, 2:00 that
6  morning.
7  Q.    Okay.
8  A.    Something like that.
9  Q.    And were you drinking alcohol that night?
10 A.    A little bit.
11 Q.    Okay.  Was Ms. Quick drinking alcohol that night?
12 A.    Yes, sir.
13 Q.    Okay.  Was she drinking the vodka that she normally
14 drinks?
15 A.    Yes, sir.
16 Q.    All right.  Were you doing any methamphetamine
17 that --
18 A.    No, sir.
19 Q.    -- that night?
20       How long had it been before that night you had last
21 done methamphetamine?
22 A.    Like I said, it's periodically here and there.  It's
23 not something that I did every day.  I used to do it every
24 day, but I don't do that anymore.  I mean, I have a problem,
25 and I'm fighting it.

1    Q.    I believe you told me you had done it three to five

2    days before that night.  Would that still be your

3    recollection?

4    A.    Yes, sir.  Yes, sir.

5    Q.    But you weren't doing it that day.  You were just

6    drinking some that night; correct?

7    A.    Yeah, a little bit.

8    Q.    And how much were you drinking?

9    A.    I only drink but a couple of beers and I'm done.

10   Anything over that makes me feel bad.

11   Q.    So you weren't drinking alcohol -- I mean, vodka

12   with Ms. --

13   A.    No, sir.

14   Q.    -- Ms. Quick?

15   A.    No, sir.  I can't drink that stuff.

16   Q.    Okay.  You were just drinking beer that evening?

17   A.    Yes, sir.

18   Q.    And you were there from 6:00 in the afternoon until

19   1:00 the next morning?

20   A.    Somewhere around that, yes, sir.

21   Q.    So then you went from Debo's at 1:00 in the morning

22   back to the 1648 Ravenwood house; is that correct?

23   A.    Yes, sir.

24   Q.    Okay.  And how did you get there?

25   A.    We called a Lyft.

JIMMY ANTHONY - CROSS

1   Q.     So you didn't use Ms. Campbell on this occasion?

2   A.     No, sir.  We wasn't going to call her at 1:00.  You

3   know, it just wouldn't be right that late.

4   Q.     So you come back from there at 1:00 in the morning,

5   and do you and Ms. Quick go to bed together at that point?

6   A.     Yes, sir.

7   Q.     All right.  So the next morning you and Ms. Quick are

8   lying in bed.  Were you still asleep when you heard the

9   police officers coming?

10  A.     Yes, sir.

11  Q.     And did you hear the police officers knocking on your

12  front door?

13  A.     At first, no, sir.  But there once by the -- we

14  eventually did, yes, sir.

15  Q.     All right.  Did they wake you up when they were

16  knocking on the door?

17  A.     Yes, sir.

18  Q.     Okay.  Did you go to the door to answer it?

19  A.     No, sir.

20  Q.     Did you hear them saying "open up, police"?

21  A.     Yes, sir, at some point I did.

22  Q.     And did you get up and go to the door to --

23  A.     No.

24  Q.     -- face them?

25  A.     No, sir.

JIMMY ANTHONY - CROSS

1  Q.    All right.  But somebody -- some police officers

2  finally came in through the window in the back of the house

3  and took you into custody; correct?

4  A.    Yes, sir.

5  Q.    All right.  And did you -- while you were doing that,

6  did you resist arrest in any way?

7  A.    No, sir, I did not.

8  Q.    Did you -- did they have to take you down to the

9  ground to get handcuffs on you?

10  A.    No, sir.

11  Q.    Did they eventually get handcuffs on you?

12  A.    They put them on me as soon as they got me out of --

13  I come out of bed, yes, sir.  They handcuffed me right

14  there.

15  Q.    But your testimony here today to this jury is they

16  didn't have to take you to the ground because you were

17  resisting --

18  A.    No, sir.

19  Q.    -- having the handcuffs put on?

20  A.    No, sir, I was not resisting.  I never resisted.

21  Q.    All right.  Did -- did you kick at any of the

22  officers?

23  A.    No, sir.  I got good sense, no, sir.

24  Q.    Now, the Pearl police officers had been to your

25  house, or been to that 1648 Ravenwood Lane house, on many

JIMMY ANTHONY - CROSS

1   occasions before April 29th and 30th of 2022; correct?

2   A.    Yes, sir.

3   Q.    Okay.  And the police came to that address on every

4   one of those occasions because they were called by

5   Ms. Quick; correct?

6   A.    Yes, sir.

7   Q.    And on every one of those occasions, she called the

8   police to come to the house because of you; correct?

9   A.    Yes, sir.

10  Q.    Okay.  And you told me during your deposition she had

11  called and the police had come at least 25 times; right?

12  A.    Yes, sir.

13  Q.    And you told me in your deposition that you were

14  never there, because you always left the house before the

15  police got there; correct?

16  A.    Yes, sir.

17  Q.    So they knew -- they were well aware of the Ravenwood

18  Lane home?  Yes?

19  A.    Yes, sir.

20  Q.    They were well aware of you?

21  A.    Yes, sir.

22  Q.    They were well aware of Ms. Quick?

23  A.    Yes, sir.

24  Q.    And they were well aware of the fact you were going

25  to run every time they came there?

JIMMY ANTHONY - CROSS

1  A.    I never ran from them, sir.  I always walked away

2  before -- when I seen her with that phone, yes, sir, I

3  walked, I left.

4  Q.    Didn't really mean to be that literal, but you always

5  left the house when you knew the police were coming?

6  A.    Yes, sir.

7  Q.    And Ms. Quick always dropped the charges every time?

8  A.    She never pressed charges.

9  Q.    She never pressed charges?

10  A.    I never -- I didn't hit her or grab her.

11  Q.    Say that again.  You never --

12  A.    I didn't.  No, sir, there was -- there's no reason to

13  press charges against me.  I didn't hit her.

14  Q.    You never hit her?

15  A.    Sir?

16  Q.    You never hit her?

17       MR. LEES:  Your Honor, I'm going to object at this

18  point and ask to approach?

19       THE COURT:  Okay.  You may.

20                     (BEFORE THE BENCH)

21       THE COURT:  Our technology's struggling.  Go ahead.

22       MR. LEES:  I believe defense counsel's had great

23  leeway, but now we sound like we're in a trial on domestic

24  assault.  First of all, as counsel knows, the government

25  presses charges, not individuals.  I didn't object at that

JIMMY ANTHONY - CROSS

 1    point, and now he seems to be cross-examining him about

 2    things that are not at issue in this trial.  I object and

 3    ask that be cut off now, and can we move to the issues in

 4    this case?

 5         THE COURT:  Okay.  Any response?

 6         MR. SILER:  Yes, Your Honor.  We -- his credibility

 7    is caught up in all of this, and the fact that he, you know,

 8    is coming -- in response to Mr. Lees' questions, he's been

 9    saying I didn't do anything to her, I was never -- you know,

10    nothing ever happened to me.  She was always drunk and doing

11    this stuff and didn't know what was going on; that goes

12    directly to his credibility and also goes to his emotional

13    distress, reputation, all these things that they're seeking

14    damages for.

15         THE COURT:  Okay.  As I have done on the motion in

16    limine ruling, I am fine with talking about the day in

17    question and what that dispute was about.  I was fine with

18    getting into that there have been calls, domestic calls.

19    But I don't want to get into specific instances beyond the

20    two days in question.

21         MR. SILER:  Okay.

22         THE COURT:  You've never hit her -- like, I don't

23    want to get into whether he ever has or ever hasn't, and

24    then we go down a trail of her coming in and us talking

25    about dates he actually did hit her and things like that.

JIMMY ANTHONY - CROSS

1    I think it's just too prejudicial, and I think it's just

2    disputable whether it's even relevant.

3            But even if it is, it's too prejudicial, so I think

4    we limit it to the days in question.  Like, you can ask him

5    what happened that day and what her claims were that day.

6    But I don't want to get into have you ever hit her and all

7    the other allegations.  Okay?

8            MR. SILER:  Okay.

9            THE COURT:  All right.  Thank y'all.

10                         (IN OPEN COURT)

11           THE COURT:  On the last question, I'm going to

12   sustain the objection, and I'll let you ask a new question,

13   Mr. Siler.

14           MR. SILER:  Thank you, Your Honor.  If the Court will

15   bear with me just one moment as I check my notes?

16           THE COURT:  Take your time.

17   BY MR. SILER:

18   Q.    All right.  Mr. Anthony, let's move on to April the

19   30th, which was the following day on -- on -- I guess it was

20   Saturday morning.  You mentioned in cross exam -- or rather

21   in direct examination by Mr. Lees that Mr. Lang, Officer

22   Lang, had come by you in the hall, and as you called it,

23   slammed your head, back of your head, against the wall; is

24   that correct?

25   A.    Yes, sir.

1    Q.    All right.  What part of your head actually hit the

2    wall?

3    A.    (Indicating).

4    Q.    Okay.  You're pointing to the back of your head.  How

5    far down were you pointing?

6    A.    Well, it's more like about right there (indicating).

7          MR. SILER:  I'm not certain how to describe that for

8    the record, Your Honor.

9          THE COURT:  Just do your best.

10         THE WITNESS:  It's kind of the top back or whatever,

11   but it's the back of my head.

12         THE COURT:  A couple -- a couple inches down from the

13   back of your head --

14         THE WITNESS:  Yes.

15         THE COURT:  -- top of your head?

16         THE WITNESS:  Yes, ma'am.

17         MR. SILER:  Thank you.  I needed that help.

18   BY MR. SILER:

19   Q.    Now, you told me in your deposition that you were not

20   injured by that slamming your head against the wall;

21   correct?

22   A.    Yeah.  I mean, it wasn't life threatening.

23   Q.    Okay.  You said there was a little knot, a small knot

24   that you could feel on the back of your head?

25   A.    I don't know if it was small, but, yes, sir, there

JIMMY ANTHONY - CROSS

1    was a knot.

2    Q.    Okay.  And you told me it surprised you more than

3    hurt you; correct?

4    A.    I was kind of traumatized during the whole thing.  I

5    really -- I was kind of numb throughout it all to be honest

6    with you.  I've never had anything like that happen to me

7    before, you know.

8    Q.    All right.  Were you treated at all for this knot on

9    the back of your head?  Did anybody ever treat you or say

10   anything was wrong with you as a result of that?

11   A.    They were more concerned with the internal bleeding I

12   had going on --

13   Q.    Okay.  So my question is:  Did anybody ever treat you

14   because of that --

15   A.    No.

16   Q.    -- knot on the back of your head?

17   A.    No, sir.

18   Q.    And you would agree with me that no one saw him slam

19   your head against the wall, other than you and Mr. Lang; is

20   that correct?

21   A.    That's correct.

22   Q.    All right.  And he only did it one time; correct?

23   A.    Correct.

24   Q.    All right.  Let's talk a little bit about what

25   occurred in the bathroom that day, and you have told the

JIMMY ANTHONY - CROSS

1    jury I think that Mr. Welker, Officer Welker, hit you on

2    the -- in the chest in that -- on that day.  But, again,

3    there was no one in that bathroom.  No one in the position

4    to see what happened other than you and Officer Lang;

5    correct?

6    A.    Welker.

7    Q.    I'm sorry.  Officer Welker?

8    A.    Yes, sir.

9    Q.    Now, you told me in your deposition that Officer

10   Welker actually took your shoulders and turned you toward

11   him; is that correct?

12   A.    Yes, sir.

13   Q.    All right.  So that your left shoulder and arm were

14   closest to Officer Welker's chest; is that correct?

15   A.    Yes, sir.

16   Q.    And then he proceeded, after he turned you like that,

17   which you would have been standing like that perpendicular

18   to him; correct?

19   A.    Yes, sir.

20   Q.    And you proceeded -- he proceeded to hit you, I think

21   you told me 30 times or more; correct?

22   A.    It was a lot, yes, sir.

23   Q.    Was it 30 or more?

24   A.    Yes, sir, it was --

25   Q.    Okay.

JIMMY ANTHONY - CROSS

1    A.      -- somewhere around there, uh-huh.  I couldn't tell

2    you exactly, but, yes, sir.

3    Q.      And you've told me that where he hit you was on the

4    upper-left chest; correct?

5    A.      My chest cavity, yes, sir.  My --

6    Q.      Upper part of the chest; correct?

7    A.      My breastplate, yes, sir.

8    Q.      And on the back around your shoulder?

9    A.      It was all up through here.  If you've ever seen

10   anyone fighting, yes, sir, it's all over the place.  It's

11   not just -- people don't hit you just in one place.  It was

12   front and back all up and down.

13   Q.      All right.  Let me get your deposition that you gave

14   me.  Do you remember giving me a deposition --

15   A.      I do.

16   Q.      -- back in 2024?

17   A.      I do.

18   Q.      All right.  Let me -- all right.  Let's make sure you

19   agree this is your deposition.  Can you see that on your

20   screen?

21   A.      Oh, yes, sir.  Yes, sir.

22   Q.      All right.  So you see there that this deposition is

23   the deposition of Jimmy Anthony taken on March 20th, 2024.

24   Do you see that?

25   A.      Yes, sir.

JIMMY ANTHONY - CROSS

1          MR. SILER:  Okay.  All right.  At this time, we'd

2    like to publish the deposition to the jury, Your Honor.

3          THE COURT:  Say that one more time.

4          MR. LEES:  What's the page number, please?

5          MR. SILER:  The page I'm looking at right at the

6    moment is 67.  We'd like to publish the deposition to the

7    jury, so they can read along.

8          THE COURT:  Okay.  Any objection?

9          MR. LEES:  No.

10          THE COURT:  Okay.  It's published.

11   BY MR. SILER:

12   Q.    All right.  Do you see there at line 3, do you see

13   where I asked you the question, did he strike you any place

14   other than your chest?

15          Your answer was, he hit me all over my chest plate up

16   here, front and back, until he was out of breath.  And it

17   says you were indicating.  Am I reading that correctly?

18   A.    Yes, sir.

19   Q.    Okay.  He's a good-size guy, but younger than I am.

20   So my next question there at line 9, All right.  So you were

21   indicating to me just now that he hit you on what I would

22   call the front part of your upper chest on the left side;

23   correct?

24          Yes, sir, front and back.

25          And back?

JIMMY ANTHONY - CROSS

1        Uh-huh.

2        All right.  Go down to line 16, Did he ever strike

3   you down lower on your chest beneath your armpit or anything

4   like that?

5        And your answer was, no, sir, it was just here and

6   back there.

7   A.    Correct.

8   Q.    So you told me he just struck you on the upper part

9   of your chest and by the shoulder blade on the back;

10  correct?

11  A.    This -- this is my upper -- this is what I consider

12  the upper part my chest right here, right there.  Not --

13  not here, but right there.

14  Q.    Okay.  But right in here --

15  A.    Yes, sir.

16  Q.    -- and on your shoulder blade in the back; correct?

17  A.    Yeah.

18  Q.    When I asked you did he -- did you -- did he ever

19  strike you down lower on your chest, beneath your armpit, or

20  anything like that, and you said "no"?

21  A.    Yes, sir, I remember that.

22  Q.    Okay.  So are you remembering it differently now or

23  you --

24  A.    No, sir.

25  Q.    -- agreeing with me this is correct?

JIMMY ANTHONY - CROSS

1    A.      No, sir, I'm not meaning differently.  This exact --

2    Q.      Now, after you and Officer Welker left the bathroom

3    and went back in the booking room, was that the point in

4    time in which you were booked?

5           MR. LEES:  Can we take the deposition down if you're

6    done with it, Counsel?

7           MR. SILER:  Fine by me.

8    A.      I am going -- I believe I was booked in when I got

9    brought in.  I believe or it could have been; I don't really

10   know.  I don't remember.

11   Q.      All right.  You don't remember when they took you and

12   got your fingerprints?

13   A.      Through all that, no, sir, I really can't tell you.

14   Q.      You don't recall when they took your photograph?

15   A.      Not exactly.  During all that trauma, I -- I couldn't

16   tell you whether it was --

17   Q.      So you don't know whether it was before or after you

18   left the bathroom?

19   A.      I don't.  At this time, I don't remember.

20          MR. SILER:  All right.  If I could, Your Honor, I'd

21   like to publish page 69 of his deposition to the jury,

22   please.

23          THE COURT:  All right.  Any objection?

24          MR. LEES:  No objection.

25          THE COURT:  All right.  You may publish.

JIMMY ANTHONY - CROSS

1    BY MR. SILER:

2    Q.     All right.  Let me start on line 4.  Do you see there

3    where I asked you the question, do you recall going through

4    the booking, the process that is, of being photographed and

5    fingerprinted and all that kind of thing?

6           And in your deposition, you said, "I do."

7           Do you see that?

8    A.     Uh-huh (affirmative).

9    Q.     And am I reading it correctly?

10   A.     Yes, sir.  Yes, sir.

11   Q.     Line 9, question, All right.  When did -- or let me

12   first ask did that happen that day with you, did they put

13   you through that process?

14          And your answer was, "Yes.  Yes, sir."

15          Do you see that?

16   A.     Yes, sir.

17   Q.     All right.  And then on line 13, I asked you when did

18   that happen in relation to you being in the hallway and the

19   bathroom?

20          And your answer at line 15 was, I believe it was

21   after I come out of the bathroom, after we came back --

22   after we come back out and came after I -- my heart, I

23   grabbed my heart and everything.  I can't remember if it was

24   before I grabbed my heart, but it was after we'd come out of

25   the bathroom.

JIMMY ANTHONY - CROSS

1          Did I read that correctly?

2    A.    I'm believing -- yes, sir.  I'm believing means I

3    wasn't sure.

4    Q.    Okay.  And as you sit here today, do you recall it

5    any differently?

6    A.    No, sir.  I'm just saying I don't remember exactly.

7    Q.    All right.  Now, you already said, I believe, that

8    when you got to the Rankin County Jail and complained about

9    the fact you thought you were having a heart attack, that

10   the people at the jail determined that you were not, in

11   fact, having a heart attack; correct?

12   A.    Yes, sir.

13   Q.    And they didn't call anybody at that point from the

14   medical outside of the jail to come get you, did they?

15   A.    No, sir.

16   Q.    Okay.  Now, you indicated to us earlier that you

17   stayed in the hospital until approximately May the 5th; is

18   that correct?

19   A.    Yes, sir.

20   Q.    Okay.  And -- and you had already hired an attorney

21   by the time you had gotten out of the hospital; is that

22   correct?

23   A.    First night there I called, yes, sir.

24   Q.    Okay.  And so who did you hire the first night you

25   were at the hospital?

JIMMY ANTHONY - CROSS

1    A.      Oh, I didn't hire anybody the first night.  I called

2    all of them, and Mr. Flechas was one of the ones that

3    responded to me.

4    Q.      Okay.

5    A.      The only one, really.

6    Q.      Okay.  Now, you've said that when you left the

7    hospital, you and Ms. Quick went to her grandfather's home

8    in Terry and stayed there for the next several weeks; is

9    that correct?

10   A.      We went to -- we went to her grandfather's house, and

11   we stayed for a couple of months, yes, sir, something like

12   that.

13   Q.      A couple months, yes, sir.

14   A.      Something like that.

15   Q.      And while you were there during this three-month

16   period, you painted his house; correct?

17   A.      I done what I could, yes, sir, to help him.  He was

18   84 years old.

19   Q.      Did you paint his house?

20   A.      Yes, sir.

21   Q.      Okay.  Did you rip up floors and repair floor joists

22   for him?

23   A.      With the help of Brandi, yes, I did.

24   Q.      Okay.  But you did it.  You did it; right?

25   A.      Yes, sir.

JIMMY ANTHONY - CROSS

1   Q.      Okay.  You put flooring down throughout his house?

2   A.      Linoleum.

3   Q.      Okay.  But you did that; correct?

4   A.      Yes, sir.

5   Q.      And you also painted the inside of his house;

6   correct?

7   A.      Yes, sir.  I'm hard headed.  I shouldn't have been

8   working, but he needed the help.

9   Q.      All right.  Let me talk just a little bit about your

10  reputation, because I think one of the items of damages

11  you're seeking here is that your reputation was harmed by

12  this event when the two officers did whatever it was they

13  did to you; correct?

14          MR. LEES:  Objection.

15          THE COURT:  Please approach.

16                      (BEFORE THE BENCH)

17          MR. LEES:  My objection is the speaking speech as to

18  what the purpose is.  I don't have any problem if you want

19  to ask him about his reputation.  It's the dissertation part

20  of it as to why.

21          THE COURT:  Okay.  I wouldn't have had us approach

22  for that objection.

23          MR. LEES:  Yeah.

24          THE COURT:  I didn't know where we were going with

25  it.

JIMMY ANTHONY - CROSS

```
 1           MR. LEES:  I didn't know if you allowed speaking
 2   objections or not.
 3           THE COURT:  No, I don't.  And certainly I don't want
 4   to have him say something he shouldn't.  Just ask the
 5   question.
 6           MR. SILER:  So was the question okay?
 7           THE COURT:  Yes.
 8                         (IN OPEN COURT)
 9           THE COURT:  All right.  Just restate your question,
10   Mr. Siler.
11   BY MR. SILER:
12   Q.    All right.  Your reputation in the community there in
13   Pearl, you had a reputation in Pearl as being a
14   methamphetamine addict; correct?
15   A.    Yes, sir.
16   Q.    Okay.  And you had particularly a reputation among
17   the Pearl Police Department because of the many number of
18   times you had contact with them or had run from them;
19   correct?
20   A.    Yes, sir.
21   Q.    Just for the purposes of me understanding, you said
22   that you now live at a hotel or at your sister's house.
23           Do you and Ms. Quick not live together anymore?
24   A.    I'm -- I'm from here to there right now, because I
25   have nowhere to live, yes, sir.
```

JIMMY ANTHONY - CROSS

1  Q.    So are you and Ms. Quick not living together anymore?

2  A.    No, sir.  We're not together right at this moment,

3  no, sir.

4  Q.    All right.  So how long has your relationship been

5  broken up?

6  A.    Well, I wouldn't really say that we've been broken

7  up.  We're just residing different places.

8  Q.    All right.  How long have you resided in a different

9  place?

10  A.    A few days.

11  Q.    Just a few days?

12  A.    Yes, sir.

13  Q.    When was the last time you lived at 1648 Ravenwood

14  Lane?

15  A.    That's been quite a few months, yes, sir, about --

16  about three months.

17  Q.    Does Ms. Quick still live at Ravenwood Lane?

18  A.    No, sir.

19  Q.    Where does she live?

20  A.    Well, she's at my sister's right now.

21  Q.    With you?

22  A.    Well, not right now because I'm here.

23  Q.    But is she living with you?

24  A.    She's staying there, yes, sir.

25  Q.    Is she living with you?

JIMMY ANTHONY - CROSS

1    A.    She's staying at my sister's, and I'm staying in a

2    motel.

3          MR. SILER:  If the Court would indulge me just a

4    moment?

5          THE COURT:  Take your time.

6          MR. SILER:  Your Honor, can we approach the bench,

7    please?

8          THE COURT:  You may.

9                    (BEFORE THE BENCH)

10          MR. SILER:  I'm basically finished with his

11    cross-examination, but I guess we've come to the point where

12    I would want to get into his arrest record, conviction

13    record and/or tender evidence about it.  And it might be a

14    little tedious because he has got a long -- I mean, he's

15    been in prison several times, and they go back a long way.

16    And we would like -- I would like to put that forward both

17    because it goes to his credibility, but more importantly, it

18    goes to all these damages that they're alleging to

19    reputation, loss of enjoyment of life, mental and emotional

20    distress, things of that nature.

21          But I know the Court has ruled on some of this.  I

22    just wanted to make sure before I gave up --

23          THE COURT:  Yeah.  And you are certainly after -- I

24    mean, I'm not going to allow you to ask him about these

25    things, but you certainly can proffer whatever questions you

JIMMY ANTHONY - CROSS

1  want to.  Like, if you want to make a record outside the

2  presence of the jury, --

3          MR. SILER:  I do.

4          THE COURT:  -- you can certainly do that.

5          MR. SILER:  I do.

6          THE COURT:  Just for my benefit now, I hear what

7  you're saying on the emotional distress.  But with respect

8  to his arrests, is that what you're saying the relevance of

9  it is, is that you want to go through all his arrests for

10  the purposes of --

11          MR. SILER:  Well, some of its convictions and then

12  some of its arrests, and he's got a lot of them.  He's got

13  several drug convictions that go back a number of years

14  where he's served time --

15          THE COURT:  Right.

16          MR. SILER:  -- in the state prison system.  And then

17  he's got -- I mean, frankly, yes, I think we should be able

18  to get into the arrests that he's had at the City of Pearl

19  and just because its -- I mean, the jury knows that they've

20  been over there all these times and that he's always run

21  from them.  But just to not tell them what happened, why

22  they were called, things like that, I just don't see that

23  being fair.  And you're not being fair to us either to be

24  able to tell the jury who this person really is.  I mean,

25  they've got him cleaned up here.  I know you know this

JIMMY ANTHONY - CROSS

1    and you know --

2        THE COURT:  No.  Well, no, what I was going to say is

3    they know that they have been -- that the police -- they've

4    heard they've been there 25 times with all these domestic

5    issues, so they are aware of that.  They are aware he's been

6    at least arrested on one occasion.

7        What I struggle with is as to why old drug offense

8    convictions go to his credibility.  I mean, I think the

9    youngest one was on the cusp of the 10-year mark, and

10   everything else was older than that.

11       MR. SILER:  Well, he had one -- the last one he had

12   was 2018 and he was -- they put him on probation for that

13   one; suspended his sentence and put him on probation.  And

14   there's currently a bench warrant out for him now, because

15   he didn't complete the terms of the probation.  And, I mean,

16   frankly, we could roll up and arrest him this afternoon on

17   that warrant that's out there.

18       But what it is is the pattern, lengthy pattern, of

19   these prison sentences, and nobody I don't think can argue

20   with a straight face that that doesn't impact his

21   credibility.  People that know somebody's been in prison

22   four or five times, that they've been in prison for

23   methamphetamine sales and possession four or five times,

24   it's going to impact his credibility.  No question.  And it

25   should, because I don't think anybody would argue that it

1    wouldn't.  And -- but I know you know this stuff about the

2    damages issues as well, but that's -- that's our --

3        THE COURT:  Okay.  I'm not going to let you get into

4    the convictions or arrests.  I will let you, though, outside

5    the presence of the jury make your record and proffer that

6    out.

7        MR. SILER:  We can do that.  Do you want to do it

8    later, now?  I mean, how do you want to do that?

9        THE COURT:  Not right now, no.  Let's keep rolling.

10       MR. SILER:  Okay.

11       THE COURT:  All right.  Thank you all.

12       MR. SILER:  Thank you.

13                    (IN OPEN COURT)

14       MR. SILER:  Your Honor, subject to our conversation

15   at the bench and things I need to do later for the record, I

16   rest my cross-examination.

17       THE COURT:  All right.  Thank you, Mr. Siler.

18       Any redirect, Mr. Lees?

19       MR. LEES:  Very briefly.

20                    **REDIRECT EXAMINATION**

21   **BY MR. LEES:**

22   Q.    You were asked a question, Mr. Anthony, about whether

23   you called a lawyer or a law firm while you were in the

24   hospital.  Do you recollect being asked that?

25   A.    Yes, sir.

JIMMY ANTHONY - REDIRECT

```
 1    Q.      And you did, did you not?

 2    A.      I did, yes, sir.

 3    Q.      Because you called to ask the lawyer to contact the

 4    police to preserve the videos in the police department;

 5    correct?

 6    A.      Yes, sir.

 7    Q.      So that a letter could be sent immediately to keep

 8    the videos, so everybody can see what happened in that

 9    police department?

10    A.      Yes, sir.

11    Q.      And as far as you know, a letter was sent to the

12    police department asking them to preserve all the videos and

13    microphones (sic) by May the 5th; correct?

14    A.      Correct.

15            MR. LEES:  Thank you.

16            THE COURT:  All right.  Mr. Anthony, you may step

17    down.  Who does the plaintiff call as its next witness?

18            MR. LEES:  Ms. Quick.

19            THE COURT:  All right.  Ms. Quick, if you'll come

20    straight forward for me, the witness box is over here.  Come

21    straight forward right over here.  When you get there, if

22    you'll place your left hand on that Bible that's in front of

23    you right there and raise your right hand, we'll have you

24    sworn in.

25            (Whereupon, Brandis Quick was placed under oath.)
```

BRANDIS QUICK - DIRECT

```
1           THE COURT:  All right.  You may be seated.

2           Ms. Quick, if you will pull that microphone close to

3    you.  Ms. Crane, who's seated in front of me, is our court

4    reporter, and she's going to take down everything you say

5    and the lawyers say.  So it's very important that you let

6    the lawyer finish his question before you respond.  Okay?

7           THE WITNESS:  Okay.

8           THE COURT:  All right.  You may proceed, Mr. Lees.

9                         BRANDIS QUICK,

10               having been first duly sworn, was examined

11    and testified as follows...

12                        DIRECT EXAMINATION

13    BY MR. LEES:

14    Q.    Good afternoon.  Would you tell the ladies and

15    gentlemen of the jury your full name, please?

16    A.    Brandis Quick.

17    Q.    And Brandis is spelled?

18    A.    B-r-a-n-d-i-s.

19    Q.    And do you go by Brandis or Brandi?

20    A.    Brandi.

21    Q.    How far did you go in school, ma'am?

22    A.    Eighth.

23    Q.    Pardon me?

24    A.    Eighth.

25    Q.    Eighth grade, okay.  And I hate to ask, how old are
```

BRANDIS QUICK - DIRECT

1    you today?

2    A.    Forty-four.

3    Q.    Forty-four, thank you.  Do you know the plaintiff in

4    this case, Mr. Anthony?

5    A.    Yes.

6    Q.    And how long approximately have you known

7    Mr. Anthony?

8    A.    Close to 14 years.

9    Q.    Okay.  Have you had a relationship with Mr. Anthony

10   where you lived together?

11   A.    Yes.

12   Q.    And approximately how many years have you lived

13   together?

14   A.    Four.

15   Q.    During the period that you were living with

16   Mr. Anthony, and that's the time period I'd like to talk

17   about, do you have or did you have a drinking problem?

18   A.    Yes.

19   Q.    And I don't mean to embarrass you, ma'am, but are you

20   an alcoholic?

21   A.    Yes.

22   Q.    Okay.  Now, I want to direct your attention, if I

23   can, back to the morning of April the 30th, 2022, and ask

24   where you were living back in April of 2022?

25   A.    In Pearl, 1648 Ravenwood Lane.

BRANDIS QUICK - DIRECT

1    Q.    Is that a house that you owned?

2    A.    Yes.

3    Q.    Was anyone living with you there at that house at

4    that time?

5    A.    Yes.

6    Q.    Who?

7    A.    Jimmy and his sister.

8    Q.    All right.  On the morning of April 30th, 2022, can

9    you tell me, as best you can remember, what occurred that

10   morning?

11   A.    Well, the cops come over to my house.  They broke in

12   to my backyard over my gate, come through my bedroom window,

13   and pulled Jimmy out the bed and took him in handcuffs from

14   there.

15   Q.    Okay.  They arrested him and took him in custody;

16   correct?

17   A.    Yes, sir.

18   Q.    Did they put handcuffs on him in the bedroom?

19   A.    Yes, sir.

20   Q.    And did they take him out of the house?

21   A.    Yes.

22   Q.    Out the window or out a door?

23   A.    Out the door.

24   Q.    Okay.  And do you know, did they take him to a car,

25   or did you see where they took him?

BRANDIS QUICK - DIRECT

1    A.    I was still in the bed with my hands up.

2    Q.    Okay.  Did you go outside that day to speak to the

3    police?

4    A.    Yes.

5    Q.    Okay.  Do you recall what officer you spoke to?

6    A.    I'm not sure of his name.

7    Q.    Okay.  All right.  When is the next time you actually

8    saw Mr. Anthony in person?

9    A.    In the hospital.

10   Q.    What hospital?

11   A.    University Hospital.

12   Q.    Would that be the University of Mississippi Medical

13   Center?

14   A.    Yes, sir.

15   Q.    And when did you see him next at that hospital?

16   A.    Later that -- that evening.

17   Q.    From the time Mr. Anthony was taken from your house

18   in handcuffs until the time you went to the hospital to see

19   him, did you talk to him in that interim period?

20   A.    Yes.

21   Q.    And how did that occur?

22   A.    He called from the jail.

23   Q.    All right.  Do you know whether or not that phone

24   call was made on a jail telephone?

25   A.    Yes.

BRANDIS QUICK - DIRECT

1    Q.    And how do you know that?

2    A.    Because he called with the thing that says the

3    recording on the line.

4    Q.    Uh-huh.  All right.  During that call, can you tell

5    me what, if anything, Mr. Anthony told you about what

6    happened at the Pearl jail or Pearl Police Department?

7    A.    Yes.  He was freaking out and he thought he was

8    having a heart attack and he thought he was dying and he was

9    scared to death.  He said help me, do something, call

10   Captain Vaughn.

11   Q.    Did he tell you what, if anything, the police had

12   done at the police department?

13   A.    Yes.

14   Q.    What did he tell you?

15   A.    They beat him --

16         MR. SILER:  Objection, hearsay.

17         THE COURT:  What's your response?

18         MR. LEES:  Consistent prior statement after he's been

19   impeached.  This is credibility.

20         THE COURT:  Once who's been impeached?

21         MR. LEES:  Pardon me?

22         THE COURT:  I'm not -- y'all approach.  I'm not

23   understanding your response, and I want to make sure I

24   understand it.

25                        (BEFORE THE BENCH)

BRANDIS QUICK - DIRECT

1      MR. LEES:  The tenor of the cross-examination plus

2  the opening statement is that Mr. Anthony is not telling the

3  truth when he said he was beaten at the police department.

4  So he is being attacked in his credibility on the

5  truthfulness of whether or not his testimony that he was

6  beaten at the police department is true or false.  Under the

7  federal rules, once that occurs on cross-examination, I'm

8  entitled to show a prior statement that is consistent with

9  his in-court testimony.

10      THE COURT:  Okay.

11      MR. LEES:  And he made that statement over the phone,

12  literally within an hour of leaving the police station, that

13  he had been beaten at the police station.

14      THE COURT:  Okay.  Hold on.  Any response to that?

15      MR. SILER:  A prior consistent statement -- I've

16  heard of prior inconsistent statements, but I don't know

17  that I've ever heard of using a prior consistent statement.

18      THE COURT:  I have.

19      MR. LEES:  This is the --

20      MR. FLECHAS:  I definitely have --

21      THE COURT:  No, you both can't handle it.  I can't

22  have y'all tag-teaming me two at a time.

23      I have heard that.

24      MR. SILER:  Well, then you know more about it than I

25  do.

BRANDIS QUICK - DIRECT

1    THE COURT:  Okay.  All right.  I am going to overrule

2    the objection on that.  I mean, it is hearsay.  But for that

3    fact that on cross-examination, it being brought out, so

4    this is a statement consistent with what he gave.

5    MR. LEES:  Thank you.

6    THE COURT:  All right.  Thank y'all.

7    MR. SILER:  Thank you, Your Honor.

8                    (IN OPEN COURT)

9    THE COURT:  You may proceed.

10   BY MR. LEES:

11   Q.    Again, the question is:  Did he tell you in that

12   phone call what happened to him at the jail or at the police

13   department?

14   A.    Yes.

15   Q.    And what did he say happened to him?

16   A.    He said they beat him.

17   Q.    Okay.  And that phone call was recorded; correct?

18   A.    Yes.

19   Q.    And that is available for anybody to listen to;

20   correct?

21   A.    Yes, sir.

22   Q.    And he made that statement literally within an hour

23   or so of leaving that police department; correct?

24   A.    Yes, sir.

25   Q.    All right.  How did you know to go to the hospital,

BRANDIS QUICK - DIRECT

1    University of Mississippi Medical Center?

2    A.    One of the nurses called me from another hospital.

3    Q.    Okay.  And do you recall about what time you got to

4    the University of Mississippi Medical Center?

5    A.    It was around 8:00, 8ish.

6    Q.    Okay.  And could you just briefly describe what or

7    how Jimmy looked when you first saw him?

8    A.    Yeah, he was bad.  He had all kinds of stuff hooked

9    up to him everywhere and a hose coming out from up under his

10   arm like a water hose draining blood out of it into a box.

11   I mean, he was just all bandaged up and black and blue and

12   everything.  It was -- it was awful.

13   Q.    Do you recall approximately how long Mr. Anthony

14   remained in the hospital?

15   A.    About a week.

16   Q.    Okay.  Did you continue to visit him?

17   A.    No, I didn't leave.  I stayed with him.  I didn't

18   want to leave him by hisself (sic).

19   Q.    How long did you stay?

20   A.    The whole time.

21   Q.    The entire time?

22   A.    Uh-huh (affirmative).

23   Q.    Where did you stay?

24   A.    In the room.  They pulled me in a chair that folded

25   out for me to sleep in.

BRANDIS QUICK - DIRECT

1    Q.    Okay.  And you stayed with him until his discharge?

2    A.    Yes, sir.

3    Q.    Where did you and Mr. Anthony go after his discharge?

4    A.    To Terry, Mississippi, to my pawpaw's house.

5    Q.    Okay.  And where does your grandfather live?

6    A.    Jack Johnson Road.

7    Q.    And how old was your grandfather?

8    A.    He was 80-something.

9    Q.    To my understanding, he passed this past January;

10   correct?

11   A.    Yes, sir.

12   Q.    All right.  And he was okay with you and Mr. Anthony

13   living there?

14   A.    Well, he didn't know him, but he -- he loved me and I

15   was his favorite granddaughter.

16   Q.    All right.

17   A.    Yeah, he took -- he just -- he didn't -- it was hard

18   to tell me no.  I pretty much got what I wanted, so, yeah,

19   he come and got us.

20   Q.    And how long did you all stay there with your papa?

21   A.    Close to a year.

22   Q.    Okay.  At least several months; right?

23   A.    Uh-huh (affirmative).

24         THE COURT:  Ms. Quick, just make sure when you're

25   saying -- say "yes" or "no," not huh-huh or uh-uh.

BRANDIS QUICK - DIRECT

```
 1              THE WITNESS:  Oh, I'm sorry.

 2              THE COURT:  It's just to make sure the court reporter

 3    picks it up, so just give a verbal response.

 4              THE WITNESS:  Okay.

 5    BY MR. LEES:

 6    Q.    All right.  Did you observe Jimmy go through the

 7    recovery process from those injuries?

 8    A.    Yes, sir.

 9    Q.    Did he have any trauma, any injuries at all when he

10    was marched out the door in handcuffs from your house the

11    morning of April 30th?

12    A.    No, sir.

13              MR. SILER:  Objection, leading.

14    A.    No, sir.

15              THE COURT:  Okay.  Don't lead.

16              MR. LEES:  I'll rephrase.

17    BY MR. LEES:

18    Q.    Let me go back very briefly, if I may, ma'am, to the

19    day before, which would be Friday, April 29th.  Okay?

20    A.    Yes.

21    Q.    Did you make a phone call to the police on that day?

22    A.    Yes, I did.

23    Q.    Do you have a memory of your call, what you were

24    doing, what you were saying?

25    A.    Not a lot.
```

BRANDIS QUICK - DIRECT

1   Q.      Why not?

2   A.      Because I was intoxicated, and I was upset, very

3   extremely upset.

4   Q.      Okay.  You don't deny making the call?

5   A.      No, sir.

6   Q.      Did the police respond to your house that day?

7   A.      Yes.

8   Q.      Okay.  Did you require any medical attention?

9   A.      No, sir.

10  Q.      What, if anything, did you tell the police as you

11  sobered up a little bit about your wishes and desires on

12  having Jimmy charged or arrested?

13  A.      Oh, I was not filing no charges on him or anything

14  like that.  I was just mad really, because he left.

15  Q.      Okay.  And you told the police that; correct?

16  A.      Yes, sir.

17  Q.      All right.  Do you remember whether or not you and

18  Mr. Anthony got back together later that day at some point?

19  A.      Oh, yes.  Yeah, immediately.

20  Q.      Okay.  Did you two go somewhere that day?

21  A.      Yes.

22  Q.      Where did you go?

23  A.      We went with a friend and went out to my pawpaw's

24  house, and then we went to Jackson.

25  Q.      Okay.  And where in Jackson did you go that evening?

BRANDIS QUICK - DIRECT

```
1   A.      To -- one of his friends works at Debo's.

2   Q.      Okay.  And is Debo's like a bar --

3   A.      Uh-huh.

4   Q.      -- pool hall?

5   A.      Yes, sir.

6   Q.      Were you drinking that night?

7   A.      Yes, sir.

8   Q.      Did you shoot pool, too?

9   A.      I don't know how.

10  Q.      Okay, got it.  Then eventually, where did you and

11  Mr. Anthony go?

12  A.      We got an Uber home about 2:00 that morning to

13  Ravenwood Lane in Pearl.

14  Q.      And when you got home, what did you and Mr. Anthony

15  do?

16  A.      We pretty much went to bed.

17  Q.      Okay.  And then it was the next morning the police

18  came to your house; is that correct?

19  A.      Yes, sir.

20          MR. LEES:  Okay.  That's it.  Thank you for coming.

21  Please answer the defense counsel's questions.

22          THE COURT:  All right.  Thank you, Mr. Lees.

23          Cross-examination, Mr. Siler.

24

25
```

1                    **CROSS-EXAMINATION**

2     **BY MR. SILER:**

3     Q.      Ms. Quick, my name is Tommy Siler.  You and I have

4     never met before today, have we?

5     A.      No, sir, I don't believe.

6     Q.      All right.  You've been with Mr. Anthony on a number

7     of occasions in which the Pearl Police have been at your

8     house; correct?

9     A.      Yes, sir.

10    Q.      Okay.  Some of them were because you called

11    complaining about Mr. Anthony; correct?

12    A.      Yes, sir.

13    Q.      And some were for other reasons; correct?

14    A.      Yes, sir.

15    Q.      Okay.  Have you lied to the Pearl Police over the

16    years about various things regarding Mr. Anthony when they

17    were at your house?

18    A.      Yes.

19    Q.      Do you recall on the morning of April the 30th, 2022,

20    speaking to a Pearl police officer after Mr. Anthony was

21    arrested and taken away in the car?

22    A.      Yes, I --

23    Q.      Okay.

24    A.      I remember talking to some -- one of them; I don't

25    remember his name.

1        MR. SILER:  Okay.  I would like, Your Honor, at this

2   point at this time to play Joint Exhibit 7, which is a

3   conversation between Ms. Quick and Officer James Saucier for

4   the City of Pearl Police Department, and I want to ask you

5   about it as we go through it.  Can we play that?

6        THE COURT:  And the jury may see this since this is

7   in evidence.

8        MR. SILER:  And, Your Honor, while she's bringing

9   this up, this is -- let me stop it real quick.  Sorry.

10              (Video playing in open court.)

11  BY MR. SILER:

12  Q.    That right there on the screen in front of you, that

13  is you; correct?

14  A.    Correct.

15  Q.    Okay.  All right.  So let's go from there.

16              (Video playing in open court.)

17  BY MR. SILER:

18  Q.    All right.  Do you recall that conversation?

19  A.    A little bit.

20  Q.    All right.  Do you recall the officer that you were

21  talking with there?

22  A.    I can't place him, but I know the voice.

23  Q.    Okay.  You know him to be a police officer with the

24  City of Pearl?

25  A.    Yes, sir.

BRANDIS QUICK - CROSS

```
 1   Q.      Now, on April 29th, 2022, when you called the police,
 2   had Mr. Anthony been strangling you before you made that
 3   call?
 4   A.      No.  He pushed me down --
 5   Q.      Okay.
 6   A.      -- on the bed to run away from me, to get away.
 7   Q.      Let me see D-1.  All right.  Ms. Quick, I'm going to
 8   show you what's been identified as Exhibit D-1, and
 9   specifically page 32 of D-1, and ask you to tell me what
10   that document is?
11           MR. SILER:  Your Honor, I don't guess we should
12   publish this to the jury just yet.
13           THE COURT:  We will not.
14   BY MR. SILER:
15   Q.      All right.  Ms. Quick, do you see that D-1 purports
16   to be a Pearl Police Department Facts and Circumstances
17   sheet?
18   A.      Yes, sir.
19   Q.      And can you see down at the bottom of that sheet, is
20   that your signature?
21   A.      Yes, very sloppy.
22   Q.      Okay.  Is -- is the handwriting on that sheet yours?
23   A.      Yes.
24   Q.      Okay.
25   A.      Unfortunately.
```

BRANDIS QUICK - CROSS

1   Q.      Okay.  All right.  And do you recall writing this

2   particular document?

3   A.      Not really.

4   Q.      Okay.  But you would agree with me that's your

5   signature at the bottom of it?

6   A.      Oh, yeah.

7   Q.      And that's all your handwriting on --

8   A.      Yes, sir.

9           MR. SILER:  At this time, Your Honor, we'd move for

10  the admission of Exhibit D-1, page 32.

11          MR. LEES:  No objection.

12          THE COURT:  Okay.  D-1, page 32, is admitted.

13          MR. SILER:  Okay.  So now we can publish it to the

14  jury.

15              (Defendants' Exhibit 1 entered.)

16  BY MR. SILER:

17  Q.      There on Exhibit D-1, you write in your handwriting

18  -- and let me read it, and you tell me if I'm reading it

19  correctly -- he jumped on me, put his hands on my neck, and

20  I couldn't breathe.

21          Do you see that?

22  A.      Yes, sir.

23  Q.      Okay.  And you wrote that in your handwriting?

24  A.      I assume I did.

25          MR. SILER:  Your Honor, if you'd bear with me just

BRANDIS QUICK - CROSS

```
 1   one moment?
 2          THE COURT:  Okay.
 3          MR. SILER:  Can we approach the bench, Your Honor?
 4          THE COURT:  You may.
 5                      (BEFORE THE BENCH)
 6          MR. SILER:  I would like, just like with Mr. Anthony,
 7   to question her about all the calls and his arrests and all
 8   that kind of thing, but as I appreciate the Court's ruling,
 9   I can't get into that.  But I just wanted to make a record
10   of it --
11          THE COURT:  That's fine.
12          MR. SILER:  -- without doing it in front of the jury.
13          THE COURT:  Sure.
14          MR. SILER:  And also letting you know that at some
15   point, I want to put all this in the record, so we'll have
16   it for the record.
17          THE COURT:  Okay.  And just so I make sure I'm clear
18   on the -- obviously not the arrests, but specific to the
19   calls, I mean, you can generally ask her if you have called
20   the police a number of times.
21          MR. SILER:  Well, I don't know that I got into --
22   well, yes, I did.  Like, I can't even --
23          THE COURT:  Are you, like, wanting to get into
24   specific calls or just the fact that she has made calls?
25   Because I think you have touched on the fact she has made
```

1   calls, and you're welcome to talk about that.  But not the

2   specifics of calls before and why she was calling --

3        MR. SILER:  Okay.

4        THE COURT:  -- beyond just that she was calling.

5        MR. SILER:  Well, let me just think about that for a

6   moment.  And then we'll end our cross-examination with the

7   understanding I can put those things in the record for --

8        THE COURT:  Yes.

9        MR. SILER:  -- our appeals purposes.

10       Okay.  Thank you.

11                      (IN OPEN COURT)

12       MR. SILER:  If the Court will indulge me just one

13  moment?

14       THE COURT:  Okay.

15       MR. SILER:  No further questions, Your Honor.

16       THE COURT:  All right.  Thank you, Mr. Siler.

17       Any redirect, Mr. Lees?

18       MR. LEES:  Yes.

19                   **REDIRECT EXAMINATION**

20  **BY MR. LEES:**

21  Q.    Ma'am, you were shown by defense counsel Joint

22  Exhibit 7, a video clip where you were standing on your

23  porch there.  Do you recall just being shown that and asked

24  questions?

25  A.    Yes.

BRANDIS QUICK - REDIRECT

1   Q.    And you were also shown a statement with your

2   handwriting on it that you wrote sometime thereafter;

3   correct?

4   A.    Yes, sir.

5   Q.    But before that on the video, do you recall what the

6   police said to you before the part of the conversation which

7   he just played?

8   A.    Just what he was saying on the video really, and I

9   really was so out of it.

10  Q.    I understand.  I'm going to play that portion which

11  wasn't played to you, and then ask you a question.

12        MR. LEES:  Brandon, play the part that precedes that

13  on the tape if you would, please.

14              (Video playing in open court.)

15  BY MR. LEES:

16  Q.    Now, do you remember what preceded you writing your

17  statement for the police?

18  A.    Yes, sir.

19  Q.    So you were making a call to the police?

20  A.    Yes, sir.

21  Q.    Being -- alleging you were the victim of domestic

22  violence?

23  A.    Yes, sir.

24        MR. SILER:  Objection to leading.

25        MR. LEES:  I'll rephrase.

BRANDIS QUICK - REDIRECT

1    BY MR. LEES:

2    Q.      How many times before you signed or wrote that

3    statement did they threaten to charge you, arrest you, or

4    put you in jail?

5    A.      More times than I can count.

6           MR. LEES:  I don't have any further questions.

7           THE COURT:  All right.  May this witness be fully and

8    finally excused?

9           MR. LEES:  Yes.

10          THE COURT:  For the defense?

11          MR. SILER:  No, I don't want her finally excused.

12          THE COURT:  Okay.  Ms. Quick, you're just still under

13   subpoena, so keep that in mind.  You may be excused for the

14   day, though.

15          THE WITNESS:  Okay.

16          THE COURT:  Do you need to approach, Mr. Flechas?

17          MR. FLECHAS:  Well, there's some question as to

18   whether they would actually put her under subpoena.

19          MR. SILER:  Yeah, we're doing one.

20          THE COURT:  Okay.  All right.  Counsel, if you'll

21   approach briefly.  I think we're about to excuse you for the

22   day, but I just want to confer with counsel first.

23                          (BEFORE THE BENCH)

24          THE COURT:  First of all, I thought she was under

25   subpoena by the defendants is why I said that.

1       MR. SILER:  And there was, yeah.

2       THE COURT:  Okay.  All right.  I am going to go ahead

3 and excuse them for the day.  My plan is to have them back

4 here at 8:45 in the morning downstairs, so we can be ready

5 at 9:00.  Does that work for everybody?

6       MR. LEES:  We will have the next witness here.

7       THE COURT:  All right, great.  Thank y'all.

8       MR. LEES:  Thank you, Judge.

9                (IN OPEN COURT)

10      THE COURT:  Okay.  We are going to go ahead and

11 excuse you all for today.  We will start back tomorrow in

12 the morning.  If you will be downstairs where you met this

13 morning in the jury assembly room at 8:45, and once

14 everybody gets there, Officer LuAllen will bring you up to

15 this room.

16      It's going to sound like groundhog day, but I have to

17 ask you these things pretty much constantly throughout the

18 trial.  But just remember the Court's instructions about not

19 doing any independent research, not talking about the case.

20 You can certainly tell your family you have been selected

21 for jury duty, and you can tell them all about it once the

22 case is over.  But please don't discuss the case or do any

23 independent research.

24      I will see you bright and early in the morning.

25 Leave your notebooks in your chairs, and the law clerks will

1    gather them and lock them up.

2          Okay.  All right.  You all have a good night and be

3    safe going home.

4          MS. POWELL:  All rise.

5                        (Jury out at 4:27 p.m.)

6          THE COURT:  Y'all may be seated.

7          If anything happens overnight where there's something

8    you think we need to take up in the morning, just send an

9    email to chamber's box copying the other side, so I have a

10   head's up.

11         And until the jury returns a verdict, this case is in

12   the parties' hands, so just keep that in mind, too.  So if

13   there are any discussions that want to continue, I don't

14   need to know about them.  But until we put it in the jury's

15   hands, it's still in your hands.

16         But thank you all.  I think we've moved efficiently

17   today, and hopefully we'll do so tomorrow as well.  So you

18   all have a good night.  And just give a couple of minutes to

19   get the jury out of here, and then you all can head out,

20   too.

21         All right.  You all have a good night.  I'll see you

22   in the morning.

23         MR. SILER:  Thank you.

24         MS. POWELL:  All rise.

25   ************************************************************

1            **CERTIFICATE OF COURT REPORTER**

2

3            I, Candice S. Crane, Official Court Reporter

4  for the United States District Court for the Southern

5  District of Mississippi, do hereby certify that the above

6  and foregoing pages contain a full, true, and correct

7  transcript of the proceedings had in the forenamed case at

8  the time and place indicated, which proceedings were

9  stenographically recorded by me to the best of my skill and

10  ability.

11            I further certify that the transcript fees and

12  format comply with those prescribed by the Court and

13  Judicial Conference of the United States.

14            THIS, the 29th day of May, 2025.

15

16        /s/ Candice S. Crane, RPR, RCR, CCR

17            Candice S. Crane, RPR, RCR, CCR #1781
               Official Court Reporter
18            United States District Court
               Candice_Crane@mssd.uscourts.gov
19

20

21

22

23

24

25