```
 1                    UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                        NORTHERN DIVISION

 3

 4   JIMMY ANTHONY                                      PLAINTIFF

 5   VERSUS              CIVIL ACTION NO. 3:23-CV-00132-KHJ-MTP

 6   JONATHON WELKER AND JACOB LANG                    DEFENDANTS

 7

 8

 9                     JURY TRIAL TRANSCRIPT,
                         APRIL 23, 2025,
10                       VOLUME 2 OF 4

11          BEFORE THE HONORABLE KRISTI H. JOHNSON,
         UNITED STATES DISTRICT COURT JUDGE, AND A JURY,
12                  THAD COCHRAN COURTHOUSE,
                     JACKSON, MISSISSIPPI
13

14
     APPEARANCES:
15
     FOR THE PLAINTIFF:        JAMES B. LEES, JR., ESQ.
16                             BRANDON L. FLECHAS, ESQ.

17
     FOR THE DEFENDANTS:       W. THOMAS SILER, JR., ESQ.
18                             MALLORY K. BLAND, ESQ.

19

20

21
     REPORTED BY:
22
         CANDICE S. CRANE, RPR, RCR, CCR #1781
23       OFFICIAL COURT REPORTER
         501 E. Court Street, Suite 2.500
24       Jackson, Mississippi 39201
         Telephone:  (601)608-4187
25       E-mail:  Candice_Crane@mssd.uscourts.gov
```

**TABLE OF CONTENTS**

Style and appearances................................. 133

Defendants' Exhibit 12 marked for ID only............. 136

Defendants' Exhibit 2 marked for ID only.............. 136

Defendants' Exhibit 21 marked for ID only............. 137

WITNESS:  BILLY HUDSON
    Direct by Mr. Lees................................. 143
    Plaintiff's Exhibit 2 entered..................... 149
    Cross by Mr. Siler................................. 177
    Redirect by Mr. Lees.............................. 188

WITNESS:  DR. CAMERON HUXFORD
    Direct by Mr. Flechas............................. 194
    Plaintiff's Exhibit 6 entered..................... 197
    Cross by Mr. Siler................................. 214
    Redirect by Mr. Flechas........................... 234

WITNESS:  JACOB LANG
    Direct by Mr. Lees................................. 248

Stipulation by Mr. Flechas........................... 274
The Plaintiff Rests.................................. 275
Motions (jury out)................................... 276
Stipulation by Mr. Siler............................. 296

WITNESS:  JACOB LANG
    Direct by Mr. Siler............................... 297
    Defendants' Exhibit 23 entered.................... 312
    Defendants' Exhibit 24 entered.................... 314
    Cross by Mr. Lees................................. 316
    Redirect by Mr. Siler............................. 322

WITNESS:  JONATHON WELKER
    Direct by Mr. Siler............................... 323
    Cross by Mr. Lees................................. 349
    Plaintiff's Exhibit 3 entered.................... 350
    Plaintiff's Exhibit 13 entered................... 368
    Redirect by Mr. Siler............................. 370

Certificate of Court Reporter........................378

1                  **IN OPEN COURT, APRIL 23, 2025**

2

3          THE COURT:  We're ready, Mr. Siler.

4          MR. SILER:  Thank you, Your Honor.

5          At this time, the defendants move or we are

6    proffering evidence that has been excluded.  This -- these

7    issues have been joined between the parties both at the

8    motion *in limine* stage and reurged by the defendants during

9    trial, and the Court has ruled.  And don't take anything I

10   say to be arguing with the Court's ruling.  I understand

11   we're just to make a record on what the proof would be.

12         I think that the most efficient way of doing it is to

13   just put the exhibits in that contains the dates of his

14   arrests and imprisonments and so forth.  He -- he's been in

15   prison, and in and out of prison, since -- the Mississippi

16   Department of Corrections prison system since 2001.  The

17   last point of sentencing to prison was in September of 2018,

18   and so I know we've got some issues with being over the

19   ten-year period and Rule 609 as well.  But because of the

20   fact that they're continuous in nature -- they're not just

21   one-offs where you have one and then have no action for a

22   few years -- we think it's important for the jury to

23   understand this individual and how it impacts on his

24   credibility.  And also that we think this goes to the

25   damages for mental and emotional distress, damage to his

1    reputation, damage to his enjoyment of life, and so we offer

2    these to prove those things.

3        The first document or the first exhibit that we would

4    proffer would be Exhibit D-12, which is the Mississippi

5    Department of Corrections file on the plaintiff, which goes

6    through in some detail.  It goes through his prison record,

7    his sentencings, things for which he was convicted, and

8    everything that they have with him.  So we would proffer

9    D-12, Your Honor.

10        THE COURT:  Okay.  D-12 will be marked for ID only.

11      (Defendants' Exhibit 12 marked for identification.)

12        MR. SILER:  The next exhibit that we would proffer

13    would be Exhibit D-2, which is the City of Pearl's record

14    with respect to the plaintiff.  It is quite voluminous and

15    goes back a number of years.  It deals with most of the

16    arrests that he has had within Rankin County.  So at this

17    time, we would proffer Exhibit D-2.

18        THE COURT:  Okay.  D-2 will be marked for ID only.

19      (Defendants' Exhibit 2 marked for identification.)

20        MR. SILER:  And finally, Your Honor, we would proffer

21    Exhibit D-21, which is the Rankin County file on Jimmy

22    Anthony and all of the arrests, convictions, everything that

23    he has been involved with in Rankin County.  So at this

24    time, we'd proffer our Exhibit D-21.

25        THE COURT:  D-21?

1           MR. SILER:  D-21, yes.

2           THE COURT:  Okay.  D-21 will be marked for ID only.

3       (Defendants' Exhibit 21 marked for identification.)

4           MR. SILER:  And, Your Honor, given the history of our

5    arguments with respect to this evidence, I'm not sure that

6    it makes -- helps anyone to go into the details.

7           Let me just mention that there are two -- at least

8    two items that have not been brought up out of respect for

9    the Court's order.  Mr. Anthony was arrested by the City of

10   Pearl on April the 16th of 2022, which was in the months

11   immediately preceding his April 30th arrest -- I'm sorry.

12   Let me back up.

13          He was arrested -- let me get my dates straight.  He

14   was arrested on 11/28/21, November 28th of 2021, and was in

15   jail for various charges in Rankin County.  He was arrested

16   by the City of Pearl on April the 16th of 2022, of course

17   which was about two weeks before he was arrested on April

18   the 30th.  So he -- and he was also arrested subsequent to

19   his April 30th, '22, arrest -- 2022 arrest.  I'm looking for

20   that date.  I'm not finding it.  But he's been in jail in

21   and around the time he was arrested on April 30th, 2022, but

22   it's all in these exhibits.  And it -- I think all that in

23   summary, probably concludes our proffer.

24          THE COURT:  On the 2018 conviction, was that drug

25   related?

1           MR. SILER:  Yes, ma'am.

2           THE COURT:  I think all the convictions are drug

3       related?

4           MR. SILER:  All the MDOC prison times were drug

5       related.

6           THE COURT:  Okay.  All right.  Thank you, Mr. Siler.

7       I am going to put a little more information on the

8       record to explain my ruling as to why I'm excluding this

9       information.  Rule 609, this is with respect to the

10      convictions.  Rule 609 governs attacking a witness's

11      character for truthfulness by evidence of a criminal

12      conviction.  Under 609(a)(1), evidence that Mr. Anthony has

13      been convicted of felony offenses is admissible but also

14      subject to Rule 403.

15          Here the Court finds that the probative value of

16      these convictions is rather minimal as to Mr. Anthony's

17      character for truthfulness.  The Fifth Circuit has reasoned

18      that drug use is not probative of truthfulness, that's *U.S.*

19      *versus McDonald*, 905 F.2d 871.

20          Possession of marijuana is an act that indicate -- is

21      not an act that indicates a witness's character for

22      truthfulness or untruthfulness, that's also Fifth Circuit,

23      *United States versus Lopez*, 979 F.2d 1024, that's a 1992

24      case.

25          Whether or not a witness has ever sold drugs is not

1    probative of his truthfulness, that's *U.S. versus Williams*,

2    822 F.2d 512.

3    For similar reasons, many District Courts throughout

4    the Fifth Circuit have held that drug-related convictions

5    have minimal probative value.  I just want to make clear to

6    the parties, too, you know, it's a unique situation here

7    where we do have these convictions and it is the plaintiff,

8    and we have these arrests and it is the plaintiff.  And so I

9    know credibility is an issue.

10    But I've been real mindful and I've been real careful

11    and I've been real deliberate in that I want both sides to

12    be able to tell their story, and I want the jury to have

13    context.  And I think we would be in a different situation

14    if you're standing before me, Mr. Siler, and there's been no

15    bad acts evidence about this plaintiff in front of the jury

16    and they think, as I think you said in a motion *in limine*,

17    that he's being portrayed as a choir boy.  And I think it's

18    quite the opposite of that.

19    So far what we have heard in the trial is that we

20    have excessive drug use.  He's admitted he's a meth addict.

21    We have evidence that he has testified that he is subject to

22    no-contact orders from Quick that he has openly admitted he

23    has violated.

24    There has been a phone call where Lang has directed

25    him to return to the premises and he -- depending on whose

1  version you believe, but Mr. Anthony says I did not return.

2  So in other words, he's admitting he ignored an order of law

3  enforcement.

4       Back to the drug use, by being a meth addict, he is

5  admitting he is engaged in illegal activity.  There's

6  evidence before the jury that there have been calls from

7  this house up to 25 times related to domestic violence.

8  There has been questioning from you where he has admitted he

9  has fled every single one of those times.

10       We had a video yesterday, Saucier -- we're all

11  guessing how to say this man's name, but a joint exhibit

12  where both parties agreed where the jury has heard evidence

13  of Ms. Quick where she has displayed scars on her neck that

14  she said were done by Mr. Anthony with an officer concluding

15  that he will kill her one day.

16       So for all of those reasons -- although there could

17  be circumstances where convictions come in or where arrests

18  come in.  I think we are to the stage of if I let that

19  information in, that whatever probative value that it has,

20  and I don't think the convictions have any beyond what

21  you're talking about with emotional distress or arguably

22  with respect to that.

23       I think that at this point, given all the evidence

24  that has already come in, it would indeed be unfairly

25  prejudicial to the defendant (sic) to do that, and so that

```
1    is why I will stand by my decision to exclude the

2    information.

3         All right.  Thank you, Mr. Siler.

4         MR. SILER:  Thank you.

5         THE COURT:  All right.  Anything that we need to take

6    up before we bring the jury in the room?  Anything from the

7    plaintiff?

8         MR. LEES:  Not by the plaintiff, Your Honor.

9         THE COURT:  All right.  Anything, Mr. Siler?

10        MR. SILER:  Not from the defendant.

11        THE COURT:  Okay.  Before we bring the jury in, who

12   is the plaintiff's first witness going to be?

13        MR. LEES:  Officer Billy Hudson of the Pearl Police

14   Department.

15        THE COURT:  Okay.  And then the doctor after that, is

16   that what you anticipate?

17        MR. LEES:  Pardon me?

18        THE COURT:  The doctor after that or not yet?

19        MR. LEES:  We'll have the doctor after that.

20        THE COURT:  Okay.  All right.  Just so I had some

21   idea.  All right.  We're ready to bring in the jury.

22        MR. SILER:  Let me get our defendants.

23        THE COURT:  Okay.  All right.  Officer LuAllen, one

24   second.  All rise.

25                       (Jury in at 9:03 a.m.)
```

1          THE COURT:  All right.  You may be seated.

2          Good morning.  So by show of hands, who recalls the

3    Court's instructions from yesterday afternoon before you

4    left?  Not doing research, not speaking to anybody about the

5    case, do y'all recall those instructions?

6          Okay.  Everybody looked at me blankly, like, we do

7    not recall any instructions.  Let's try again; it's early.

8          By show of hands, who recalls the Court's

9    instructions yesterday?  All right.  I see all hands.

10         By show of hands, who followed the Court's

11   instructions?  All right, great.

12         Who does the plaintiff call as his next witness?

13         MR. LEES:  Officer Billy Hudson of the Pearl Police

14   Department.

15         THE COURT:  Officer Hudson, if you'll come straight

16   forward for me.  The witness stand's right here.  Once you

17   get there, if you will put your left hand on that Bible

18   that's in front of you and raise your right hand, we'll have

19   you sworn in.

20         (Whereupon, Billy Hudson was placed under oath.)

21         THE COURT:  All right.  You may be seated.

22         All right.  Officer Hudson, if you will pull that

23   microphone close to you.  We have a court reporter that's

24   going to take down everything you say.  Just make sure the

25   attorneys finish their question before you respond, so she

BILLY HUDSON - DIRECT

1    can take it all down.

2           You may proceed, Mr. Lees.

3                         **BILLY HUDSON,**

4                  **having been first duly sworn, was examined**

5    **and testified as follows...**

6                    **DIRECT EXAMINATION**

7    **BY MR. LEES:**

8    Q.    Would you tell the jury, please, your name, sir?

9    A.    My name is Billy Hudson.

10   Q.    And where are you employed, sir?

11   A.    City of Pearl, Pearl Police Department.

12   Q.    In what capacity?

13   A.    I'm a captain at the Pearl Police Department.

14   Q.    And how long have you been a captain at the Pearl

15   Police Department?

16   A.    I got promoted last year.

17   Q.    Pardon me?

18   A.    I got promoted last year.

19   Q.    And how long have you been a police officer with

20   Pearl?

21   A.    Thirteen years.

22   Q.    All right.  Let me direct your attention back to

23   sometime in May or June of 2022, and ask if you, in your

24   capacity as a police officer with the Pearl Police

25   Department, were tasked with conducting an internal affairs

BILLY HUDSON - DIRECT

1   investigation regarding allegations of a beating that
2   occurred at the police department on April the 30th, 2022?
3   A.      Yes, sir.  Allegations of a brutal assault, yes, sir.
4   Q.      Okay.  Can you just explain to me the circumstances
5   under which you received that assignment and when you
6   received that assignment?
7   A.      I don't remember the exact time when, but the
8   contents was a letter from Mr. Anthony's attorneys.
9   Q.      Okay.  And that letter was sent on May the 5th, 2022;
10  is that correct?
11  A.      I don't recall.
12  Q.      Did you prepare a police -- a report of your internal
13  affairs investigations?
14  A.      Yes, sir, I did.
15  Q.      Did you bring it with you?
16  A.      No, sir.
17          MR. LEES:  Your Honor, may I approach and hand him a
18  copy of his report?
19          THE COURT:  You may.
20          MR. LEES:  Let me hand you a copy --
21          THE COURT:  Mr. Lees, wait until you get back to the
22  microphone before you speak if you will.
23          THE WITNESS:  Thank you.
24  BY MR. LEES:
25  Q.      I've handed you a document marked as Plaintiff's

BILLY HUDSON - DIRECT

1   Exhibit 2.  Could you look at that please and tell me if

2   you're familiar with that document?

3   A.     Yes, sir.

4   Q.     Okay.  And what is that document?

5   A.     This is the investigation I conducted with cover

6   sheets and my narrative.

7   Q.     And that is, in fact, your official Pearl Police

8   Department internal affairs case report relevant to the

9   allegation of a beating that occurred on April the 30th,

10  2022; is that correct?

11  A.     Yes, sir.

12  Q.     And this bears your signature; correct?

13  A.     Yes, sir.

14  Q.     And it is a police report created as part of the

15  normal business of the police department; correct?

16  A.     Yes, sir.

17  Q.     And it is an official record of the Pearl Police

18  Department; is that correct?

19  A.     Yes, sir.

20         MR. LEES:  Your Honor, at this time I'd move for the

21  admission of Plaintiff's Exhibit 2.

22         THE COURT:  Any objection?

23         MR. SILER:  Your Honor, we did object to this, and

24  perhaps we should approach the bench to talk about it.

25         THE COURT:  You may.

BILLY HUDSON - DIRECT

1                    (BEFORE THE BENCH)

2          THE COURT:  Make sure you're speaking into that.

3          MR. SILER:  All right.  Your Honor, Exhibit P-2 is

4    the internal affairs report.  In the Court's instructions --

5    or rather the Court's order on the motions *in limine*, I

6    believe the Court held the only thing that would be

7    permitted into the record were items that related to the

8    body cameras, and this is going to contain more than that.

9          THE COURT:  I think the -- I can look back, but I

10   think that had to do with policy and procedure, like

11   specifically policies and procedures violations.  So what,

12   specifically, in P-2 are you talking about?

13         MR. SILER:  Really the only thing I think of -- I

14   think is the one involving Officer Lang.  Let me see --

15   okay.  You have to go to the back of it to -- yeah,

16   specifically, go to page Bates stamp 143, and it goes into

17   Officer Lang's use of force, use of restraints, and

18   professional conduct violated canons of police ethics.  So

19   it's well beyond the camera so --

20         THE COURT:  Hold on one second; I just need to figure

21   out where we are on 143.

22         All right.  Go ahead, Mr. Lees.

23         MR. LEES:  With respect to the officer's conclusions

24   that are set forth there with respect to Lang, I have no

25   objection if the Court exercises its discretion to redact

BILLY HUDSON - DIRECT

1   that particular section of the report.  Pursuant to the

2   rules, I think if there's an objectionable part of a report,

3   the Court has the power in camera to redact.  I'm not really

4   that interested in his findings.  What I'm interested --

5   with his opinions.  I'm interested in his factual findings,

6   which is why he's up there, and most of that report contains

7   factual findings.  So if you want to redact the opinion he

8   reached with respect to Lang, I have no objection to that

9   being redacted.

10       I do intend, just so we're clear, to ask there is a

11  policy in place at the Pearl Police Department where body

12  cameras are to be on and operating at all times they're

13  interacting with the public.  And on the morning of this

14  arrest, all three officers who went into the house violated

15  that policy.

16       THE COURT:  I agree with that.

17       MR. SILER:  Yeah, and we don't have any issue with

18  that.

19       THE COURT:  Okay.

20       MR. SILER:  But going beyond that and getting into

21  policy violations, we believe the Court's going to instruct

22  the jury that policy violations don't equal constitutional

23  violations.  And so that's one of the reasons we were trying

24  to avoid confusion and issues with him getting into other

25  policy violations.

BILLY HUDSON - DIRECT

1           THE COURT:  Okay.  So is -- page 143, is that

2   specifically what you would want redacted?

3           MR. SILER:  Well, let me see.

4           THE COURT:  And is it as to A or B?

5           MR. SILER:  A and B.

6           MR. LEES:  I have no objection to, on Bates stamp 143

7   of Plaintiff's Exhibit 2, if paragraphs A and B are

8   redacted.

9           THE COURT:  Okay.  Does that resolve the issue,

10  Mr. Siler?

11          MR. SILER:  Let us look at one -- Judge, only because

12  of the confusion involved in all this, it would almost force

13  us to come in and start asking questions about it.  I think

14  the --

15          THE COURT:  Well, you're welcome to do that.

16          MR. SILER:  I know.  But the -- but the last sentence

17  of page 135 and 136, you know, get into the fact that they

18  violated standard operating procedures without any

19  explanation of what those SOPs are.

20          THE COURT:  Is part of that conclusion that they

21  violated SOPs related to the body cams?

22          MR. SILER:  I think in part, I think it is.

23          THE COURT:  Okay.  I think that that last sentence is

24  fine, because they are going to be able to get into the fact

25  they violated body cam policies.

1          MR. SILER:  All right.

2          MR. LEES:  Thank you, Your Honor.

3          THE COURT:  All right.  Do you have the ability to

4    redact that, Sharpie or otherwise, where you can take that

5    out?

6          MR. LEES:  I will.

7          THE COURT:  Okay.  Thank you, sir.

8                         (IN OPEN COURT)

9          THE COURT:  All right.  P-3 will be admitted as

10   discussed.

11         MR. LEES:  Give me one moment, please?

12         THE COURT:  Yes, sir.

13         MR. SILER:  Marked as P-2.

14         THE COURT:  What, did I say P-3?

15         MR. SILER:  Yes.

16         THE COURT:  I'm sorry.  P-2 admitted as discussed.

17                   (Plaintiff's Exhibit 2 entered.)

18         MR. SILER:  Your Honor, before this is published to

19   the jury, could we see what it's going to look like?

20   Mr. Lees did the best he could to redact the --

21         THE COURT:  I can make a copy, too, to hide the

22   redaction, but we can.

23         MR. SILER:  Okay.

24         THE COURT:  Shone, if you'll display it without the

25   jury seeing it.  And if not, we can run and make a copy.

1        MR. LEES:  I'm really not going to talk about that

2   page, anyway, so --

3        MR. SILER:  Well, if you're not going to show it to

4   them, that will make it easy.

5        THE COURT:  All right.

6   BY MR. LEES:

7   Q.    All right.  Officer, let's get back.  Just explain to

8   me the circumstances under which you received this

9   assignment, who gave it to you, where were you when it was

10  given to you, et cetera?

11  A.    I was in the assistant chief at that time's office

12  when they handed me that letter.

13  Q.    Okay.  And, again, if you need to refer to your

14  report, please do so.  I'm looking at Bates stamp 140 of the

15  document, which is really page 1 of your report, and it

16  says -- if you look at that page, what does the date appear

17  to be for the date that you were called in the assistant

18  chief's office according to your report?

19  A.    June 8th, 2022.

20  Q.    June 8th, are you sure that's correct?

21  A.    Yes, sir.

22  Q.    The reason I ask is if you were called in on

23  June 8th, if you'll flip to the very first page of that

24  document.  All right.  Go to the very first page of the

25  document.  Your signature is on the report; correct?

1    A.      Yes, sir, it is.

2    Q.      And what date did you sign it?

3    A.      5/25 of 2022.

4    Q.      So you signed the report on May 25th, 2022, but you

5    didn't get assigned it until June, that's why I'm

6    suggesting --

7    A.      Yes, sir, I must have just -- it must be a typo.  I

8    must have made a mistake.  I got confused.

9    Q.      So can you tell us what actual day it was that you

10   received your assignment to do the internal affairs

11   investigations?

12   A.      I don't recall.

13   Q.      Do you have any notes or anything?

14   A.      No, sir.

15   Q.      Do you know you were called in after the police

16   department received the letter from the attorney on May 5th;

17   correct?

18   A.      Yes, sir.

19   Q.      Do you know whether it was shortly thereafter, weeks

20   after?

21   A.      I don't recall.  I mean, I'm not sure.  The letter

22   didn't come to me.

23   Q.      If you go back to Bates stamp 140 of your report for

24   a moment, which is page 1 of your report.  If you go up to

25   the top of it, it says "date received."  Do you see that

BILLY HUDSON - DIRECT

1    section?

2    A.    Yes, sir.

3    Q.    That -- what is being received?  What's the date

4    there?

5    A.    So that's the day -- if my memory serves, that's the

6    day I started the investigation.

7    Q.    That's the day you started the investigation?

8    A.    Yes, sir.  This down here, June 8th must have just

9    been an accidental typo.

10    Q.    So June 8th is a typo.  And up at the top of that

11    page -- let me just -- can I put -- I'm going to show this

12    page here just so we're clear.

13        All right.  So up here, the date received, that's the

14    date you started the investigation?

15    A.    Honestly, sir, I really can't remember.  But that's

16    the date that's -- 5/25/2022 is the date that appears there

17    on the page, yes, sir.

18    Q.    Okay.  And then what day did you complete your

19    investigation?

20    A.    I don't recall, sir.

21    Q.    What date did you sign the report?

22    A.    5/25 of 2022.

23    Q.    So did you sign -- did you do an investigation,

24    prepare a report, and sign the report all on the same day

25    that you received the investigation assignment?

BILLY HUDSON - DIRECT

1    A.    No, sir, because I get what you're saying.  I'm not

2    sure, sir.  There's just an accidental typo there, so 5/25

3    must have been when I completed the assignment.  I don't

4    recall the date I got the -- the assignment, no, sir.

5    Q.    I don't want to put words in your mouth --

6    A.    Yes, sir, I understand what you're doing.

7    Q.    Is it possible if you made a typo, the typo was when

8    you put June 8th, it should have been May 8th?

9    A.    Sir, I don't recall.

10    Q.    All right.  Do you know how many days or weeks you

11    spent investigating the complaint?  And I believe the

12    complaint was of a brutal beating in the bathroom at the

13    police department on April 30th; right?

14    A.    Yes, sir.

15    Q.    That was -- that was -- okay.  Can you tell me how

16    many days or weeks you spent investigating that allegation?

17    A.    It was a couple of weeks, yes, sir.

18    Q.    A couple weeks, all right.  Fair enough.

19          So in the course of your investigation, did you

20    determine what video and audio evidence existed of any of

21    the facts or circumstances relevant to your investigation?

22    A.    Yes, sir.

23    Q.    Okay.  And let me get one thing out of the way first.

24    There is a Pearl Police Department policy, a written rule,

25    that says when police officers interact with the public,

BILLY HUDSON - DIRECT

1    they're to have their body cameras on and recording;

2    correct?

3    A.    Yes, sir.

4    Q.    Okay.  All right.  There's no hesitation about that.

5    It's a written rule; right?

6    A.    Yes, sir.  I was making sure I understood your

7    question.

8    Q.    Okay.  All right.  And so, for example, on the

9    morning of April 30th, there were a number of police

10   officers who got together and drove to a particular house in

11   Pearl to take Mr. Anthony into custody; correct?

12   A.    Yes, sir.

13   Q.    All right.  And so they knew as they headed there to

14   that residence, they were going to arrest a citizen,

15   Mr. Anthony; right?

16   A.    Yes, sir.

17   Q.    All right.  All of those officers are equipped with

18   body cameras; correct?

19   A.    Yes, sir.

20   Q.    And they are policing the streets of Pearl pursuant

21   to a rule that says when they interact with the public, body

22   cameras on and recording; correct?

23   A.    Yes, sir.

24   Q.    Your investigation showed that three officers went

25   through a window of that house that morning to take

1    Mr. Anthony in custody; correct?

2    A.    Yes, sir.

3    Q.    How many of them followed the rule and had their body

4    cameras on and recording?

5    A.    None of them.

6    Q.    None of them, zero.  How is that even possible in a

7    police department in the year 2022?

8    A.    I'm not sure, sir.  Should have had it on.

9    Q.    When you conducted your interviews, what did you

10   learn as to the reason why those body cameras were not on?

11   A.    The one I remember offhand, Officer Welker when he

12   explained to me -- because he had it on when he first got

13   there.  In the commission of them getting over the fence and

14   securing the back of the residence, he broke a fence board.

15   It could be seen on video.

16        When I asked him about that, because you can see him

17   messing with his watch, and he told me he was trying to

18   timestamp it.

19   Q.    In other words, he turned it off?

20   A.    Well, when we were trained on the body cameras, there

21   is a way you can timestamp things, and that was in training.

22   So in the commission of him trying to timestamp it, it

23   turned off.

24   Q.    Right before he went in the window to arrest

25   Mr. Anthony; correct?

1    A.    Yes, sir.

2    Q.    What about Officer Lang, he was one of the three

3    officers that went through the window; correct?

4    A.    Yes, sir, he was.

5    Q.    When you interviewed Officer Lang, what was his

6    reason for not having a body camera on and recording?

7    A.    I didn't interview Officer Lang.

8    Q.    What?

9    A.    He was -- he was no longer an employee with the Pearl

10   Police Department.

11   Q.    Okay.  But you never interviewed him?

12   A.    No, sir.

13   Q.    Ever?

14   A.    No, sir.

15   Q.    So you don't know why he didn't have his body camera

16   on?

17   A.    No, sir, he just didn't.

18   Q.    Who was the third officer?

19   A.    Officer Lents.

20   Q.    Did you talk to Lents?

21   A.    Yes, sir.

22   Q.    What was the reason why he didn't have his body

23   camera on?

24   A.    I don't recall his statement.

25   Q.    Would you agree with me that one of the main purposes

BILLY HUDSON - DIRECT

1   of being given this assignment was to determine what

2   factually occurred relevant to the allegations that were

3   contained in that letter of May 5th?

4   A.    The facts, yes.

5   Q.    All right.  So let's begin with the building, the

6   police department.  The Pearl Police Department is equipped

7   with cameras and microphones to record and cover all the

8   areas in the police department where members of the public

9   could be taken or be in that police department at any given

10  time; correct?

11  A.    Yes, sir.

12  Q.    And on May 5th, there was a letter sent to the police

13  department, five days after the alleged beating, requesting

14  that all such evidence, videos, audios, be preserved;

15  correct?

16  A.    Yes, sir.

17  Q.    All right.  Members of the public would have no idea

18  where cameras are or microphones.  That's not a matter of

19  public record anywhere, is it?

20  A.    It's not a -- I'm not sure if it's public record or

21  not, but they can be seen above you if you're walking

22  around.

23  Q.    So in the booking room, there is a system in place

24  that is designed to capture on video everything that occurs

25  in the booking room; correct?

BILLY HUDSON - DIRECT

1  A.     Yes, sir.

2  Q.     And there is a system in place that is designed to

3  capture everything that is said there through microphones in

4  the booking room; correct?

5  A.     If working, yes.

6  Q.     If working, you're correct.  If working?

7  A.     Yes.

8  Q.     And is there some reason why the police department

9  would not want microphones to be working?

10  A.     No, sir.  We want them working.

11  Q.     Great.  So when you received your request to get the

12  audio and the video from the booking room, did you find the

13  video?

14  A.     Yes, sir.

15  Q.     And we have that video I'll represent to you, and did

16  you find the audio?

17  A.     No, sir.  It wasn't working.

18  Q.     Okay.  And you discovered in the course of your

19  investigation it wasn't working because?

20  A.     I'm not sure.  It just wasn't working.  It's

21  attached -- when you download the video from the system,

22  it's got the audio already attached to it, and the audio

23  never came through.

24  Q.     Okay.  So you conducted an investigation, I assume,

25  to figure out why it was not working; right?

BILLY HUDSON - DIRECT

1    A.    I wouldn't say an investigation.  I reported it to

2    the IT department and the IT director.  The IT department at

3    the City of Pearl handles all of our IT, all the working,

4    all the videos, the computers, the cameras, that's what they

5    do.

6    Q.    Right.  And I just -- in the course of your

7    investigation working with IT people or whatever, did you

8    find out whether or not it had been tampered with?

9    A.    No, sir.  It was never reported to me that it was

10   tampered with.

11   Q.    Was it reported to you that it wasn't tampered with?

12   A.    No, sir.

13   Q.    Well, what explanation did you finally get from IT as

14   to why the audio on that day wasn't working?

15   A.    The only report that I got from IT, that it was going

16   to be fixed.

17   Q.    Fortunately somebody discovered that there is a

18   sound-activated microphone in some adjoining cell off of the

19   booking room, which did capture audio from that day; is that

20   correct?

21   A.    Yes, sir, that's correct.

22   Q.    And so that everyone's clear, when we're now looking

23   at the booking video and listening to the audio, that is

24   audio coming from a sound-activated microphone somewhere

25   other than the booking area; correct?

BILLY HUDSON - DIRECT

1   A.     No, sir, from the cell room right beside the booking

2   area that's in the same room.

3   Q.     All right.  Let's go to the hallway off of the

4   booking area.  You're familiar with where that hallway is,

5   that there's an allegation something occurred in the hallway

6   in this case?

7   A.     Yes, sir.

8   Q.     All right.  So that hallway also has cameras and

9   microphones to record whatever happens in the hallway;

10  correct?

11  A.     Yes, sir.

12  Q.     All right.  So in your investigation, you went to

13  pull the audio and video from the hallway pursuant to the

14  request you received on May 5th; correct?

15  A.     Yes, sir.

16  Q.     And what did you find?

17  A.     The camera was not working.

18  Q.     Why wasn't that camera working?

19  A.     I'm not sure.  It was reported to IT that it wasn't.

20  Q.     What about audio?

21  A.     It didn't have either one pull up when I tried to

22  download the video.

23  Q.     Okay.  In the course of your investigation, whether

24  with IT people or anyone else, what did you determine was

25  the reason why there was no video or audio being recorded in

BILLY HUDSON - DIRECT

1  that hallway on the morning of April 30th?

2  A.    I didn't investigate why the camera wasn't working.

3  Q.    Do you know --

4  A.    I just reported that it wasn't working.

5  Q.    Do you have any evidence, one way or another, as to

6  whether it was tampered with?

7  A.    Sir, I get what you're trying to do.

8  Q.    Pardon me?

9  A.    No.  I'm sorry, sir.

10  Q.    I'm sorry; I didn't hear what you said.  What did you

11  just say?

12  A.    I said that I see what you're -- what you're asking

13  and what you're trying to do.

14  Q.    What do you think I'm trying to do?

15  A.    Excuse me, I misspoke.

16  Q.    No, you didn't.  What do you think I'm trying to do?

17  A.    It just appears that you're trying to say that I

18  didn't investigate why -- I didn't look into why the cameras

19  weren't working when I'm -- when all I had to do is report

20  it to the IT department, and they investigate or look into

21  that and/or fix that problem.

22  Q.    Okay.  Fair enough.  So what did the IT investigation

23  conclude?

24  A.    They -- I don't know if they did an investigation or

25  not.  I know that they fixed the said cameras and

BILLY HUDSON - DIRECT

1   microphones.

2   Q.    All right.  So we'll shortcut this.  We have no audio

3   and no video of the hallway from the morning of April 30th;

4   correct?

5   A.    Yes, sir, that's correct.

6   Q.    And there is no possible way that either Mr. Anthony

7   or his attorneys would have known that when they sent the

8   letter requesting you to preserve it, would they?

9   A.    No, sir, they wouldn't have known that.

10  Q.    Let's talk about the bathroom of the police

11  department.  The bathroom of the police department is the

12  one area in the police department that doesn't have any

13  cameras or microphones; correct?

14  A.    Correct.

15  Q.    The police officers who work there know that, don't

16  they?

17  A.    Sir, I think it's common knowledge that cameras are

18  not allowed in any bathroom.

19  Q.    As a result of receiving the letter from the lawyers

20  on May the 5th regarding an allegation that a brutal assault

21  occurred, before you conducted your interviews, did you

22  determine what, if any, injuries Mr. Anthony had suffered

23  which he alleged was caused by being beaten?

24  A.    No, sir.

25  Q.    When did you learn what the extent of his injuries

1   were?

2   A.      In the deposition.

3   Q.      The deposition taken years later?

4   A.      Yes, sir.

5   Q.      You didn't think it was important before you went and

6   interviewed officers to know what the actual injuries were

7   that the victim was claiming he suffered as a result of a

8   beating?

9   A.      It may have been important, yes, sir.

10  Q.      But you didn't get that information because?

11  A.      I didn't know it existed.

12  Q.      You didn't know that if somebody was alleging they

13  were brutally beaten in the police department, they may have

14  some injuries?

15  A.      They could have had injuries, yes.

16  Q.      And if they could have, you don't think knowing that

17  might be important before you interviewed any of the

18  officers allegedly involved?

19  A.      But I didn't know he was injured.

20  Q.      Because you never asked?

21  A.      Didn't know to ask for -- didn't know he was injured.

22  Q.      How many total interviews did you conduct as part of

23  this internal affairs investigation to try to get to the

24  bottom of whether or not an American citizen was severely

25  beaten in the bathroom of your police department on

1   April 30th?

2   A.      Two.

3   Q.      How many?

4   A.      Two.

5   Q.      Two.  Do we have the transcripts of those two

6   interviews?

7   A.      No, sir.

8   Q.      Why not?

9   A.      It was just a verbal interview.

10  Q.      Pardon me?

11  A.      It was a verbal interview.

12  Q.      Can you keep your mouth a little closer or pull the

13  microphone.  Well, that's why in a verbal interview, you

14  press the button on the recording machine; right?

15  A.      Yes, sir.

16          MR. SILER:  Objection, Your Honor.  He's just arguing

17  with the witness.

18          MR. LEES:  I'll rephrase the question.

19  BY MR. LEES:

20  Q.      Did you record the interviews?

21  A.      No, sir.

22  Q.      Did you take notes of the interviews?

23  A.      No, sir.

24  Q.      If you didn't record the interviews and you didn't

25  take notes, how in the world were you ever going to prepare

BILLY HUDSON - DIRECT

1    a report or testify at some later date as to what the

2    interview consisted of?

3    A.    That's a good question.

4    Q.    Pardon me?

5    A.    That's a good question.  In that interview --

6    Q.    Yeah, it is a good question.  Do you have an answer?

7    A.    Yes, sir.  In that interview -- the two interviews

8    that I conducted, neither two officers ever told me anything

9    that led me to believe that a brutal assault took place for

10   me to take further action and look further into it.

11   Q.    Okay.  The two officers that are alleged to have

12   participated in causing harm were Officer Lang; right?

13   A.    Yes, sir.

14   Q.    He's one of them.  And Officer Welker; correct?

15   A.    Yes, sir.

16   Q.    So those were or were not the two officers you

17   interviewed?

18   A.    No, sir, only one of them.

19   Q.    Okay.  And, again, you've mentioned this before.  The

20   reason why you didn't ever interview Jacob Lang is because?

21   A.    He was no longer an employee.

22   Q.    And how did that prevent you from interviewing him?

23   A.    I've never interviewed an employee -- or never

24   interviewed an -- or somebody that was no longer an employee

25   in an internal affair matter.

BILLY HUDSON - DIRECT

1    Q.    That's your policy or the police department policy?

2    A.    I don't know -- I don't know if it's written in

3    policy or not, sir.

4    Q.    So you interviewed Officer Welker; correct?

5    A.    Yes, sir.

6    Q.    You did -- just so we're clear, you did not record

7    that interview; correct?

8    A.    No, sir.

9    Q.    You did not take notes of that interview; correct?

10   A.    No, sir.

11   Q.    Who was the other officer you interviewed?

12   A.    Tyler Lents, Sergeant Lents.

13   Q.    And Sergeant Lents was not part of any accusation of

14   beating or causing harm at the police department, was he?

15   A.    No, sir.  But he was on the scene, and he was the

16   supervisor for that day.

17   Q.    You were deposed on February the 15th, 2024.  Do you

18   recollect approximately?

19   A.    The date sounds accurate, yes, sir.

20   Q.    All right.  It was a little less than two years after

21   you did your investigation; right?

22   A.    Yes, sir.

23   Q.    All right.  And as of the deposition, given that

24   there was no recording of the interview with Welker, there

25   was no notes of the interview with Welker, you told people

1    that you only had a small recollection of your conversation

2    with Welker.  Do you remember?

3    A.    Yes, sir.

4    Q.    A small recollection.  So essentially, you needed to

5    rely on whatever you put in your report, made back in May,

6    to tell us what Welker did or did not tell you during that

7    interview.  Fair enough?

8    A.    Yes, sir.

9    Q.    All right.  Page Bates stamp 142 of Plaintiff's

10   Exhibit 2, I'm going to put the bottom of this up here.

11   This is from your report created in or about May of 2022;

12   correct?

13   A.    Excuse me, sir.  I'm sorry.

14   Q.    It's page 4 of your report.

15   A.    Oh, page 4, okay.

16   Q.    Bottom of page 4 --

17         MR. SILER:  Actually it's the bottom of page 3.

18   BY MR. LEES:

19   Q.    I'm sorry.  Bottom of page 3, are you with me now?

20   A.    Yes, sir.

21   Q.    Okay.  "Officer Jacob Lang and Officer Jonathon

22   Welker escort Mr. Anthony into the booking room."  Did that

23   fact come from your observation of the booking video?

24   A.    If I remember correctly, Officer Lang walks him in,

25   and Officer Welker walks in right behind him.

1   Q.      Okay.  Your next sentence says, "Officer Jacob Lang

2   engages in conversation with Mr. Anthony."  Correct?

3   A.      Yes, sir.

4   Q.      And that's factually what you determined from

5   watching the video?

6   A.      From the video, if I remember correctly, Officer Lang

7   was cursing at Mr. Anthony.

8   Q.      And where is that in your report?

9   A.      That's my testimony right now.

10  Q.      Yeah.  But my question is, what you wrote at the time

11  was "Officer Jacob Lang engages in conversation with

12  Mr. Anthony."  Correct?

13  A.      Yes, sir, that's what it says.

14  Q.      And was that the factual conclusion you reached based

15  on watching the video?

16  A.      Yes, sir, that was a conversation.

17  Q.      Okay.  Anywhere in here do you note that he touched,

18  pushed, grabbed hair, cursed, swore, screamed, any of that

19  in your report?

20          MR. LEES:  Let me stop for a minute and let's

21  approach.

22                      (BEFORE THE BENCH)

23          MR. LEES:  Here's the problem with this witness.  I

24  agreed to the redaction he requested.  Okay.  In order to

25  answer this question, the only place he has in his report

BILLY HUDSON - DIRECT

1    where he notes there was pushing, pulling hair, and

2    everything is the portion of the report he asked to be

3    redacted.  So the witness, if he adheres to the ruling,

4    can't reference it, and that is in the report.  He finally

5    puts that in.

6        And I don't want to deprive your client of the

7    ability to fully answer the question, but I know you asked

8    that it be redacted.

9        THE COURT:  It's completely up to you.  I mean --

10       MR. SILER:  I think where it's gone and him getting

11   into what he's gotten in to -- and I let him, so I didn't

12   object to it.  I don't -- you know, how he's phrasing

13   questions, we don't have any choice except to get into all

14   that, so we might as well put the unredacted document in.

15       THE COURT:  Okay.  Do you have an unredacted one now

16   that you've just Sharpie'd your other one?

17       MR. LEES:  We'll get one, yes.

18       THE COURT:  All right.  Thank y'all.

19                   (IN OPEN COURT)

20       MR. LEES:  I'm going to take this page here.  This is

21   an unredacted of this.

22       THE WITNESS:  Okay.

23       MR. LEES:  I'm substituting this page for this page.

24       Your Honor, let the record reflect I am substituting

25   a new Bates stamp page 143 for the previous Bates stamp page

1    143.

2         THE COURT:  Thank you, Mr. Lees.

3    BY MR. LEES:

4    Q.    All right.  Back to my question, did you, anywhere in

5    that report, actually note the cursing, screaming, pushing,

6    hair pulling, whatever?

7    A.    Yes, sir, page 4A.

8    Q.    Okay.  And was that based upon your review of the

9    video?

10   A.    Correct.

11   Q.    Okay.

12   A.    And also notated in last page 5, Officer Lang pushing

13   Mr. Welker -- I mean, Mr. Anthony.

14   Q.    Okay.

15   A.    He didn't push Welker.  I'm sorry.

16   Q.    Let's go for a moment, if we can, back to the one

17   that's up on the screen here.  We're again at Bates stamp

18   142.  It's paragraph four on page 3 of your report.  You

19   have that in front of you, and it's on your screen in front

20   of you.

21        The next sentence says, "Shortly after Officer

22   Jonathon Welker can be seen escorting Mr. Anthony to the

23   bathroom."

24        I take it that comes from your review of the video?

25   A.    Honestly I don't recall at this time.  I can't

BILLY HUDSON - DIRECT

1    remember.

2    Q.    Okay. "Officer Jonathon Welker explained to me that

3    he did ask Mr. Anthony if needed to use the bathroom, and

4    Mr. Anthony explained he did."

5         What is the source of that factual statement in your

6    report?

7    A.    So if I remember watching the video, it seemed that

8    it took longer than expected on a normal booking process, so

9    that added that extra time when he made that statement.  It

10   made -- oh, oops, excuse me.

11        It made sense to me when -- if he said he needed to

12   use the bathroom, they took him to the bathroom.

13   Q.    What -- what seemed to you to be extra time over and

14   above the normal procedures?

15   A.    I think the video was 40-something minutes.

16   Q.    And that's longer than normal; right?

17   A.    Not necessarily.

18   Q.    Well, when you made the statement just now that part

19   of your rationale here was something seemed to take longer,

20   what was it you were referencing?

21   A.    Just that if that got brought up, that made sense

22   that he needed -- if he said he needed to use the bathroom

23   and they took him to the bathroom, that would put them back

24   there in that area.

25   Q.    Because the bathroom visit was way longer than

1   normal, wasn't it?

2   A.      Not necessarily.

3   Q.      You say all this can be seen on the booking room

4   camera.  You can't see or hear anybody -- Mr. Anthony asking

5   if he could use the bathroom, can you?

6   A.      What I was referencing was them walking back there to

7   that area.  It can be seen on the booking room camera that

8   they walked back there --

9   Q.      We're --

10  A.      -- and turned that corner.

11  Q.      Well, you have Officer Welker explained to me that he

12  asked Anthony if he needed to use the bathroom.  Was that in

13  the course of you interviewing Welker?

14  A.      Yes, sir.

15  Q.      Okay.  So right now in this paragraph, you're

16  actually putting into this paragraph what Officer Welker

17  told you in your interview; right?

18  A.      Yes, sir.

19  Q.      Got it.  Thank you.  So let's see what else you put

20  in there about what Officer Welker told you.  Let's come up

21  here to the bottom of page 3, where we were before.  That's

22  what we just said, all this can be seen on the booking room.

23          Now, we come up here to the top of the next page.

24  Okay.  So it says, "All this can be seen on the booking room

25  camera.  Note booking room camera audio was not working on

BILLY HUDSON - DIRECT

1    this date.  Audio used is from booking room cell two.  Also

2    camera labeled court holding hall was not working on this

3    date."

4         I've read that accurately; right?

5    A.    Yes, sir.

6    Q.    Now, continuing to see what else you've put in this

7    report based upon your interview with Welker.  You then say,

8    "Mr. Anthony and Officer Jonathon Welker walked back into

9    the booking room and officers continue the booking process."

10   Correct?

11   A.    Yes, sir.

12   Q.    Anything else there regarding your interview with

13   Welker --

14   A.    No, sir.

15   Q.    -- as to what happened in the bathroom?

16   A.    No, sir, not in my narrative.

17        THE COURT:  Well, hold on.  What was that last

18   statement?  I missed it.  What did you say?

19        THE WITNESS:  No, ma'am, not in my narrative.

20        THE COURT:  Okay.

21   BY MR. LEES:

22   Q.    So you had a complaint that Officer Welker brutally

23   beat a person in custody in the bathroom; right?

24   A.    Yes, sir.

25   Q.    You interviewed Officer Welker regarding that

1   allegation; correct?

2   A.      Correct.

3   Q.      You didn't record it, and you didn't take notes of

4   it.  But you wrote a report?

5   A.      Yes, sir.

6   Q.      Is this the entire content of what you put in your

7   report as to what Welker told you happened in the bathroom?

8   A.      No, sir.

9   Q.      Okay.  Show me where else in the report it tells me

10  what Welker told you happened in the bathroom?

11  A.      It's not in there.

12  Q.      Well, that's what I just asked you.

13  A.      Oh, I misunderstood your question.

14  Q.      Is there anything else you put in the report about

15  what Welker told you happened in the bathroom?

16  A.      No, sir.

17  Q.      Why?

18  A.      Because I couldn't validate the claim.  And here

19  after the fact reading it, it shouldn't have been in the

20  report.

21  Q.      What should have been in the report?

22  A.      So -- so for the jury, when I did the --

23  Q.      What should have been in the report?

24          MR. SILER:  Excuse me.  He's explaining his answer,

25  Your Honor.

BILLY HUDSON - DIRECT

1          MR. LEES:  Well, I didn't --

2          THE COURT:  Hold on.  Let's let him respond.

3          THE WITNESS:  So, jury, when I did this report and

4    got assigned this internal affair investigation, this was

5    one of the first ones I ever did, and I was trying to figure

6    out how to work internal affairs investigations.  And it was

7    explained to me by another investigator at the Pearl Police

8    Department how they're supposed to be conducted.

9          So within that process, I'm trying to also understand

10   how to work internal affairs investigations, because to me,

11   they -- they still are to this day a little confusing.

12         My -- my experience with investigations is narcotics.

13   I was a narcotics investigator for years and working in --

14   narcotic cases are a little bit different, especially when

15   it comes to this.

16         What was explained to me when I did this

17   investigation, and as I was doing the investigation getting

18   assistance from another investigator, was if officers or

19   somebody tells you something, even if they write it down, if

20   you can't prove it to be fact, it's not relevant to our

21   investigation.  We only can look at things that are fact.

22         If you can't -- if you can't find fact to what

23   they're saying, then it's not -- it's not relevant.  And

24   that's how it was explained to me, and that's still how I

25   understand it to this day.  So telling you right now, that

1    shouldn't have been -- since he told me that and I couldn't

2    validate everything he was saying, it shouldn't have been in

3    my narrative.  The only thing that goes in the narrative is

4    what can be 100 percent fact.

5          And, yes, there are some things in here, just like

6    this paragraph here, that I wasn't able to validate as fact,

7    but it's in the narrative.

8    BY MR. LEES:

9    Q.    Did you go to a police academy?

10   A.    Yes, sir.

11   Q.    So you were trained through a police academy here in

12   Mississippi?

13   A.    Yes, sir.

14   Q.    And just so I'm clear, you're telling me that if

15   there's an accusation against a police officer that he

16   severely beat a prisoner and you go interview the officer to

17   get his side of the story, you don't record it, you don't

18   take notes, and you don't put in your report what he tells

19   you happened?

20   A.    Not necessarily.

21   Q.    Well, what is necessary to be put in the report?

22         If you don't record it and you don't take notes and

23   you don't put in your report what the officer's version is

24   he tells you in the interview, how does anybody, in reading

25   the report, know what happened?

BILLY HUDSON - CROSS

1    A.    He didn't tell me anything that would validate the --

2    the complaint.

3    MR. LEES:  You know, Officer Hudson, thank you very

4    much.  I don't have any further questions.

5    THE COURT:  Any questions, Mr. Siler?

6    MR. SILER:  Yes, Your Honor.

7                        **CROSS-EXAMINATION**

8    **BY MR. SILER:**

9    Q.    Officer Hudson, let's start with that last round of

10    questions, and if you would -- you've said to the jury a

11    moment ago that you only would put in your report, for the

12    most part or generally speaking, what you could validate as

13    being truthful.

14    When you say that, what -- what do you mean by what

15    you could validate?

16    A.    What I could actually see from video.  Something

17    that's hard fact, not based off what people say.

18    Q.    Why wouldn't you base it on what people say?

19    A.    Because we still have to validate those words,

20    because they're just words without fact.

21    Q.    All right.  And so is -- are parts of this report

22    validated by the video that you watched?

23    A.    Yes, sir.

24    Q.    Okay.  And did you include those parts of what you

25    could validate in the report?

1    A.    One more time, sir?

2    Q.    For example, you on the report -- all right.  I'm

3    going to refer you back to exhibit, I believe it's P-2, and

4    specifically down at the bottom of the report page 4.  It's

5    Bates stamped as Defendant 00143.

6        And in your findings there, are all the facts that

7    you put in the findings what you considered to have been

8    validated, in one form or another, other than by an officer

9    just telling you what happened?

10   A.    Yes, sir.

11   Q.    All right.  And how were these facts validated?

12   A.    Mostly through video.

13   Q.    And we'll give the jury a little time to read that.

14       And the last sentence of that report reads that, "At

15   this time, it is undetermined of the allegations of

16   excessive force due to no camera footage."  Correct?

17   A.    Yes, sir.

18   Q.    And that's because there was no camera in the

19   bathroom; --

20   A.    Correct.

21   Q.    -- correct?

22       And there was no working camera in the hallway;

23   correct?

24   A.    Correct.

25   Q.    Okay.  And what you saw of physical contact between

BILLY HUDSON - CROSS

1  Officer Lang and Mr. Anthony in the booking area was, in

2  fact, noted in here by you, because you could validate it;

3  correct?

4  A.    Correct.

5  Q.    All right.  Now, after you issued this report, did

6  you find that any of the officers had violated police

7  policy?

8  A.    Yes, sir.

9  Q.    Okay.  And can you tell the jury what your findings

10  were in that regard?

11  A.    Yes, sir.  Officer Welker violated his body cam

12  footage policy, or he violated the policy of the body cam

13  footage.  And Officer Lang violated his code of conduct

14  policy by the Pearl Police Department and his body cam

15  footage.

16  Q.    All right.  Did Officer Lang violate any other

17  policy?

18  A.    Yes, sir, use of force.

19  Q.    Okay.

20  A.    He did violate our use-of-force policy.

21  Q.    And you validated that by the camera -- videocamera

22  footage in the booking area?

23  A.    Yes, sir.

24  Q.    Okay.  And did he violate any -- anything else in the

25  policies in your opinion?

BILLY HUDSON - CROSS

1   A.      Yes, sir, our unprofessional -- our code of conduct

2   and unprofessional but --

3   Q.      And what did he do that violated the code of conduct

4   regarding professionalism?

5   A.      His cursing, shouting, and pushing Mr. Anthony.

6   Q.      Okay.  And all that was noted in your -- in your

7   report?

8   A.      Yes, sir.

9   Q.      And all that's in P-2, correct, Exhibit P-2?

10  A.      Yes, sir.

11  Q.      Okay.  Now, you -- it's been mentioned a number of

12  times that you or the police department received a letter

13  from Mr. Anthony's attorney that was -- that, essentially,

14  made a complaint about how Mr. Anthony was treated and

15  asking the police department to gather all the video and

16  audio footage they could; correct?

17  A.      Yes, sir.

18  Q.      All right.  And in that letter, did the attorneys say

19  anything about Mr. Anthony being injured or having any

20  medical attention or treatment?

21  A.      No, sir, nothing about medical records or treatment.

22  Q.      Did he say anything in that letter about Mr. Anthony

23  having his head shoved into a wall by Mr. Lang?

24  A.      No, sir.

25  Q.      Okay.  Did you know that Mr. Anthony had gone to the

BILLY HUDSON - CROSS

1  hospital at that point in time?

2  A.    No, sir, I did not.

3  Q.    Okay.  When did you learn that he had gone to a

4  hospital?

5  A.    At the deposition.

6  Q.    Okay.  In this case?

7  A.    Yes, sir, in this case.

8  Q.    Okay.  Which was approximately two years after you

9  wrote all these reports; correct?

10  A.    Correct.

11  Q.    Now, you are a police officer at the City of Pearl;

12  correct?

13  A.    Yes, sir.

14  Q.    And you were back in the spring of 2022; correct?

15  A.    Yes, sir.

16  Q.    All right.  Did you, as a police officer in the City

17  of Pearl, have any idea whatsoever that the microphone

18  wasn't working in the booking room camera?

19  A.    No, sir, not until I tried to pull the video from

20  this case.

21  Q.    Okay.  Are police officers generally informed by

22  anybody that the technology equipment is not working in the

23  police station?

24  A.    No, sir.  There's a -- there's only a select handful

25  of people that even have access to the cameras to even know

1    if it will be working or not.

2    Q.    All right.  Do you know how long that the microphone

3    had not been working in the booking area?

4    A.    No, sir.

5    Q.    All right.  Did you know that that hallway camera at

6    the police department was not working in April of 2022?

7    A.    No, sir, not until this case.

8    Q.    All right.  Do you know how long that camera had been

9    inoperable?

10   A.    No, sir.

11   Q.    And when you learned that in pulling this

12   information, you reported it to your IT department; correct?

13   A.    Correct.

14   Q.    And -- and they took it from there in either

15   repairing it or moving on, but they didn't get back with you

16   about anything about it; right?

17   A.    No, sir.

18   Q.    Okay.  Did you have any suspicious that any of that

19   equipment had been tampered with?

20   A.    No, sir.

21   Q.    Would you know how to tamper with a microphone or

22   camera to make it inoperable in that police station?

23   A.    No, sir.

24   Q.    Now, another thing I think is worth talking about

25   with respect to the audio and video, who was it that

BILLY HUDSON - CROSS

1    discovered there was video -- I'm sorry -- an audio

2    recording from that holding cell next to the booking area?

3    A.    I did.

4    Q.    All right.  And how did you do that?

5    A.    From a previous case, I remembered that they audio

6    recorded as well, so I knew that was one of the three

7    closest rooms to the immediate room to at least be able to

8    hear what went on in there.

9    Q.    All right.  Now, you said a minute ago in response to

10   questions by Mr. Lees that the audio in that booking cell

11   was motivated by I think sound.  Was it sound or motion

12   activated?

13   A.    If my memory serves, they're motion-activated

14   cameras.

15   Q.    Okay.  So if somebody walked by the cell door, the

16   microphone would kick in?

17   A.    Correct.

18   Q.    Okay.  Now, did you have the ability to put the sound

19   from the audio in the holding cell together with the video

20   in the booking room?

21   A.    I don't understand your question.

22   Q.    Okay.  You had audio from the holding cell; correct?

23   A.    Yes.

24   Q.    Okay.  You had the video from the camera in the

25   booking room without audio; correct?

1    A.      Correct.

2    Q.      Okay.  Were you able, technologically, to put those

3    together, so you could listen to the audio and watch the

4    video together?

5    A.      No, sir.  I had to watch one video at a time.  So I

6    had to watch one, and when I was done watching it, watch

7    another one.  And if I heard something, I was having to

8    minimize and constantly pull up video and audio on two

9    different screens at two different times.

10   Q.      All right.  Was it difficult to hear what was going

11   on in the booking room as you were doing it that way?

12   A.      Yes, sir, it was.

13   Q.      Okay.  Do you know who the arresting officer was with

14   regard to Mr. Anthony on April 30th, 2022?

15   A.      Who signed the charges?  No, sir, I'm not aware.

16   Q.      Okay.  In your review of the video, when was

17   Mr. Anthony released from booking?

18   A.      When he was transported to the Rankin County Jail.

19   Q.      Okay.  Do you know who did that?

20   A.      Officer Welker.

21   Q.      Okay.  And could you see that on the video that you

22   reviewed?

23   A.      Yes, sir, the transport vehicle -- or transport

24   video, yes, sir.

25   Q.      Well, could you also see that he, Officer Welker,

1   walked out of the --

2   A.      Correct.

3   Q.      -- booking area with Mr. Anthony on April 30th, 2022?

4   A.      Correct.  Yes, sir.

5   Q.      Okay.  And is that the point the booking was

6   completed?

7   A.      Yes, sir.

8   Q.      Now, did you also get the audio and video from

9   Mr. Welker's car, so that you could see and hear what

10  happened on the transport of Mr. Anthony from the City of

11  Pearl to the Rankin County Jail?

12  A.      Yes, sir, I did.

13  Q.      Okay.  Did you watch and listen to that?

14  A.      Yes, sir.

15  Q.      Okay.  Now, in watching the videos, both of those

16  videos, did you see any visible sign on Mr. Anthony, other

17  than what he was saying, that he was actually injured or had

18  been struck?

19  A.      No, sir, I didn't see any.

20  Q.      Okay.  You mean to tell me when you were looking at

21  him in that car on that video when they drove him over to

22  the Rankin County Jail facility, you could see no signs he

23  had been struck at any point?

24  A.      No, sir.

25  Q.      No bruises, no red spots, nothing?

1    A.    No, sir.

2    Q.    Okay.  And did you see any signs during the booking

3    video when he was coming in after he'd been out in the

4    hallway that he'd had any physical assault made upon him?

5    A.    No, sir.

6    Q.    Okay.  Did that play any role in your decisions or

7    recommendations about what should happen to Officer Welker

8    and Officer Lang?

9    A.    By not seeing?  I don't understand your question.

10   Q.    No.  The fact that you didn't see any signs of -- of

11   assault or him being struck by anybody on those videos, what

12   role did that play in your decision?

13   A.    I guess I'm misunderstanding your question, sir.

14   Q.    Okay.  What I'm trying to get to is the fact that you

15   didn't see any signs he had been hurt in those videos, was

16   that part of why you didn't feel it was validated that he

17   had been beaten?

18   A.    Oh, yes, sir.  Correct.

19   Q.    Okay.  Now, is it unusual, in your experience, for

20   arrestees to claim that they have got some injury or that

21   they're hurt or they're sick or something along those lines?

22   A.    Yes, sir.

23   Q.    Okay.  Does it happen frequently?

24   A.    Yes, sir.

25   Q.    Okay.  And do you have a term for it?  Not you

BILLY HUDSON - CROSS

1   personally, but do the police have a term for what you call

2   it when arrestees are just saying they've got something

3   wrong with them?

4   A.    I don't recall the term.  But I know if -- if you

5   make a term -- or make a claim of injury or I'm -- I don't

6   feel good or I'm hurting, typically the jail won't take you.

7   Rankin County Jail.

8   Q.    The county jail won't take you?

9   A.    Correct.

10  Q.    All right.  So is that -- do you see that in

11  prisoners trying to get out of going to jail?

12  A.    Yes, sir, I have seen that.

13        MR. SILER:  Okay.  Your Honor, if you'd indulge me

14  just one moment, I may be through.

15        THE COURT:  Okay.  Take your time.

16  BY MR. SILER:

17  Q.    At any time after you got involved in this situation,

18  Officer Hudson, did Mr. Anthony or anyone on his behalf call

19  into the jail or call you or -- I'm sorry, I'm saying

20  calling the jail.

21        Call into the police department or call you and tell

22  you or tell anyone that he had been beaten, or that he had

23  gone to the hospital for injuries he claimed to have gotten

24  in the jail?

25  A.    No, sir, not to my knowledge.

1   Q.     Okay.  One thing just to make certain everybody

2   understands.  Does the City of Pearl house arrestees in the

3   police department there in Pearl?

4   A.     No, sir.

5   Q.     All right.  What do you -- what does the city do

6   after it arrests someone that has to be retained in jail?

7   A.     They get transported to the Rankin County Detention

8   Center.

9   Q.     All right.  So you -- the City of Pearl keeps no one

10  in custody after they've been arrested; is that correct?

11  A.     That's correct.

12         MR. SILER:  Okay.  Nothing further, Your Honor.

13         THE COURT:  All right.

14         MR. SILER:  And we would, if we could, reserve the

15  right to recall him in our case on different -- if we need

16  him for different -- different testimony.

17         THE COURT:  We can take that up later.  Mr. Lees has

18  some questions, too.

19         MR. SILER:  Oh, I'm sorry.

20         THE COURT:  That's okay.

21                    **REDIRECT EXAMINATION**

22  **BY MR. LEES:**

23  Q.     Very briefly, Officer.  You say that for your

24  findings, you can only put in your findings what you can

25  validate; correct?

BILLY HUDSON - REDIRECT

1    A.    Yes.

2    Q.    Is that your testimony?  All right.  So you talk

3    about a protection order violation.  You put that in your

4    findings; correct?

5    A.    That was a hard document that existed at that time

6    from my understanding.

7    Q.    Yeah.  He was actually charged with violating a

8    no-contact order; correct?

9    A.    I don't recall at this time.

10   Q.    Well, here's my question:  Did you ever find an

11   order, a protection order or a no-contact order, that he

12   violated?

13   A.    Are you saying did I physically have it?

14   Q.    Yeah.  Did you ever see one?  Did you have one in

15   your file?

16   A.    No, sir.

17   Q.    Did you ever confirm that there was such an order

18   that he allegedly violated?

19   A.    Yes, sir, with the officer that had the order.

20   Q.    The officer.  Which officer had the order?

21   A.    If my memory serves, Officer Lents had the order or

22   saw the order.

23   Q.    So can somebody give me a copy of that, please?

24         Do you have it?

25   A.    No, sir, I don't have it.

BILLY HUDSON - REDIRECT

1   Q.      Who has it?

2   A.      The Pearl -- Pearl Police Department Court.

3   Q.      So if we have requested that from Pearl Justice

4   Court, it should have been produced, because you all have

5   it?  That's what you're telling me?

6   A.      I'm not sure.  I don't have it, no, sir.

7   Q.      But the Pearl Police Department has it; that's what

8   you said?

9   A.      I'm not sure at this time.  They should if the order

10  exists.

11  Q.      Yeah, they should if the order's good.

12          And, secondly, the last page right above your

13  signature -- I'm showing you Bates stamp 144 of Plaintiff's

14  Exhibit 2.  It's page 5 of your report.  This last sentence,

15  "At this time, it is undetermined of the allegations of

16  excessive force due to no camera footage."  Correct?

17  A.      Correct.

18  Q.      So if an American citizen alleges that they are

19  beaten in the police department and you don't have any

20  camera footage of that beating, then you could never

21  conclude that it did occur based on your policy as to how

22  you do these reports.  Fair enough?

23  A.      No, sir, based off the fact.  I'm referring to the

24  camera footage as fact.

25  Q.      Right.  But if there's no camera footage of the

BILLY HUDSON - REDIRECT

1    beating, then you can't conclude whether the beating

2    happened or not; right?

3    A.    Not if all I have is a verbal statement.

4    Q.    All right.  And that's what you put here.  You can't

5    conclude if it occurred or not, because there was no camera

6    footage; right?

7    A.    Yes, sir, as I'm referring to the camera footage as

8    the fact.

9    Q.    So if I'm an officer and I want to beat the hell out

10   of somebody, all I've got to do is take them into an area

11   where there's no cameras; right?

12        MR. SILER:  Objection to --

13        MR. LEES:  I'll rephrase the question.

14        THE COURT:  Hold on.  Hold on.  Let me rule.  I

15   sustain the objection.  You can rephrase.

16        MR. LEES:  I'll rephrase the question.

17   BY MR. LEES:

18   Q.    Every officer in that department knows there's no

19   cameras in the bathroom; right?

20   A.    Yes, sir.

21   Q.    Is there some reason why you guys didn't refer this

22   investigation out to another law enforcement agency?

23   A.    When -- when facts are found, it is reported, yes,

24   sir.

25   Q.    Did you?

1    A.    No, sir.

2          MR. LEES:  That's all.

3          THE WITNESS:  But for the record, I don't report it.

4    I don't report that.  The chief of police will report that.

5          MR. LEES:  I have no further questions.

6          THE COURT:  All right.  You may step down.  You may

7    be excused.

8          THE WITNESS:  Do you want me to leave this here?

9          THE COURT:  Yes, please.  We'll retrieve that.

10         Who does the plaintiff call as his next witness?

11         MR. LEES:  The physician, doctor.

12         THE COURT:  Okay.

13         MR. FLECHAS:  We call Dr. Cameron Huxford.

14         THE COURT:  All right.

15         MR. FLECHAS:  He's out here, if I may?

16         THE COURT:  You may.  And do you -- if you will, get

17   that exhibit while we're getting the doctor.

18         MR. LEES:  Yeah, I will.  I thought you were giving

19   me the break face.

20         THE COURT:  No.  We'll go a little bit longer and

21   then take our morning break, unless anybody needs one now.

22         Okay.  Our jurors are good, so we'll keep going.

23         MR. FLECHAS:  Your Honor, I think our witness went to

24   the bathroom.

25         THE COURT:  Okay.  All right.

1          MR. FLECHAS:  Your Honor, I apologize and ask the

2    Court's indulgence.  Because he wasn't allowed to have his

3    phone inside the building, I think he went out to make a

4    phone call.

5          THE COURT:  You can't find him?  Okay.

6          Let's go ahead and just give y'all a couple of

7    minutes.  We can take another break later if we need to, but

8    let's be in recess for about ten or 15 minutes.

9          MS. POWELL:  All rise.

10         THE COURT:  Just remember the Court's instructions.

11                   (Jury out at 10:24 a.m.)

12         THE COURT:  All right.  Court will be in recess.

13                   (A brief recess was taken.)

14         MS. POWELL:  All rise.

15         THE COURT:  You may be seated.

16         All right.  Are we ready to bring in the jury?

17         MR. FLECHAS:  Yes, Your Honor.

18         THE COURT:  And, Mr. Flechas, just for future trials,

19    if you ever do have a witness that needs their phone for

20    work or otherwise, just let the Court know ahead of time,

21    and we can make arrangements.  Every now and then we get

22    that request, and we can accommodate it.  So it's fine.

23         MR. FLECHAS:  Will do, Your Honor.  I appreciate

24    that.

25         THE COURT:  Yeah, just for future reference.

DR. CAMERON HUXFORD - DIRECT

```
1          MS. POWELL:  All rise.
2                     (Jury in at 10:37 a.m.)
3          THE COURT:  All right.  You may be seated.
4          All right.  Mr. Flechas, who do you call?
5          MR. FLECHAS:  Your Honor, now we call Dr. Cameron
6     Huxford.
7          THE COURT:  Okay.  Dr. Huxford, if you'll come
8     forward for me to the witness box.  If you will place your
9     left hand on that Bible in front of you and raise your right
10    hand to be sworn.
11      (Whereupon, Dr. Cameron Huxford was placed under oath.)
12         THE COURT:  All right.  You may be seated.  If you
13    will just pull that microphone close to you.  We have a
14    court reporter that's going to take down your testimony.
15    Make sure the attorneys have finished their questions before
16    you respond.  Okay?
17         THE WITNESS:  Yes, ma'am.
18         THE COURT:  All right.  You may proceed, Mr. Flechas.
19                     DR. CAMERON HUXFORD,
20              having been first duly sworn, was examined
21    and testified as follows...
22                     DIRECT EXAMINATION
23    BY MR. FLECHAS:
24    Q.   Dr. Huxford, would you please introduce yourself to
25    the jury and just tell them who you are.
```

DR. CAMERON HUXFORD - DIRECT

1    A.    My name's Cameron Huxford.  I'm originally from

2    Tuscaloosa, Alabama.  I went to Ole Miss.  I did all of my

3    medical training here in Jackson, and I'm a pulmonary

4    critical care physician.

5    Q.    All right.  You have some documents up there with

6    you.  Can you tell me just briefly what you have up there

7    with you?

8    A.    I have my CV, I have the report I issued on this

9    case, and then I have my handwritten notes.

10   Q.    All right.  I don't want you to just recite your CV

11   to the jury, but would you please tell us about your

12   education and work history in the field of medicine?

13   A.    As I mentioned, I did attend Ole Miss for my

14   undergraduate.  I did medical school here and graduated in

15   2002.  I did three years of internal medicine residency also

16   here, and then I did three years of pulmonary critical care

17   and sleep fellowship.

18         After that when I finished all my training in 2008, I

19   moved to Starkville, Mississippi, and practiced there until

20   2022.  And now I travel for work, and I currently do

21   pulmonary critical care and sleep in Grand Forks, North

22   Dakota.

23   Q.    Okay.  So in that experience, do you have medical

24   experience in reviewing and reading imaging and diagnosing

25   and treating traumatic injuries?

DR. CAMERON HUXFORD - DIRECT

1    A.      Yes, sir.

2    Q.      Okay.  And is that particularly traumatic injuries as

3    it relates to the chest and back and areas around the lungs?

4    A.      Yes, sir.

5    Q.      Are you board certified?

6    A.      Yes, sir.

7    Q.      What areas are you board certified in?

8    A.      Internal medicine, pulmonary medicine, critical care

9    medicine, and sleep medicine.

10          MR. FLECHAS:  Your Honor, at this time I would tender

11   Dr. Cameron Huxford as an expert, so that he can provide

12   opinions in the areas of pulmonology and critical care.

13          THE COURT:  Any objection?

14          MR. SILER:  No objection, Your Honor.

15          THE COURT:  All right.  He'll be received as an

16   expert in those fields.

17   BY MR. FLECHAS:

18   Q.      Dr. Huxford, who asked you to make a review of the

19   facts of this case and to render some medical opinions about

20   the case?

21   A.      I was introduced to this case through your partner,

22   Phillip Stroud.

23   Q.      Okay.  And did you and I speak about this, and you

24   agreed to take this on and do a review for us?

25   A.      Yes, sir.

DR. CAMERON HUXFORD - DIRECT

1  Q.    As part of that, did you review medical imaging from

2  Jimmy Anthony from April 30th, 2022?

3  A.    Yes, sir.

4       MR. FLECHAS:  Your Honor, I believe we have a

5  stipulated admissibility to Plaintiff's Exhibit P-6, medical

6  imaging of Mr. Anthony.

7       MR. SILER:  Okay.  We have no objection.

8       THE COURT:  Okay.  P-6 is admitted.

9           (Plaintiff's Exhibit 6 entered.)

10      MR. FLECHAS:  May I approach, Your Honor?

11      THE COURT:  You may.

12 BY MR. FLECHAS:

13 Q.    So, Dr. Huxford, first, I'm going to go through some

14 of these images, and I just want you to talk to the jury

15 about what these images are and what these images show.  And

16 I can indicate on here as needed if you'll direct me.

17 A.    Okay.  When we look at x-rays or CAT scans, it's kind

18 of our -- the patient's right is our left, so when you're

19 looking at this x-ray, the left side of the picture is

20 actually the patient's right lung.

21 Q.    So this would be the left lung?

22 A.    Correct, that's the left lung.

23 Q.    Okay.  What is in the -- what is this image, first of

24 all?

25 A.    It's just a routine chest x-ray.

DR. CAMERON HUXFORD - DIRECT

1   Q.    All right.  And is there anything indicated to you on
2   this image that is abnormal?
3   A.    Well, so they can -- so we can establish normal, the
4   right lung looks normal.  The lung is supposed to look
5   relatively black, because there's nothing in it.  Air --
6   x-rays penetrate the lungs, and there's really no push back
7   from the structure, so it appears black.
8         You can see the bones stand out.  The ribs and the
9   collarbone up there, they're white because the x-rays, you
10  know, don't go through those tissues as readily.  So if we
11  say the right lung is normal, and we look at the left lung,
12  specifically in the lower part of the left lung --
13  Q.    In this area here?
14  A.    Over.  But, yes, but more into the lung.
15  Q.    Okay.
16  A.    Right in there you see in that lower half of the left
17  lung, there's an appearance of a haziness that you don't see
18  on the right side.  So that suggests there's something going
19  on in that left lung.
20  Q.    So if this was your patient and you were attempting
21  to diagnose and did this x-ray, what would be your order
22  next?
23  A.    I would think there's something abnormal there.  I
24  would want to see better pictures, so I would order a CAT
25  scan or CT scan.

DR. CAMERON HUXFORD - DIRECT

```
 1   Q.      All right.

 2   A.      Yeah, go over there.  So -- sorry.

 3   Q.      What is shown on the screen right now?

 4   A.      So its similar orientation to the x-ray that we

 5   looked at.  Our left is the patient's right.  Our right side

 6   is the patient's left side.  This is a CAT scan, so it's

 7   like a slice.  Like, remember the old guillotine, it's like

 8   a slice right through you.  So the top part of the image is

 9   the chest area, the front.

10   Q.      Here?

11   A.      Yeah.  And the bottom part of the image is the back,

12   and so it's a slice right through with the head being -- if

13   you can envision the head being toward the computer and the

14   feet being toward you.  Okay?

15           So in the left chest, as we mentioned on chest x-ray,

16   there was a haziness there that -- that required more

17   imaging.  That crescent-shaped area of dark gray right there

18   that the pin is pointing at.

19   Q.      This?

20   A.      Yes.  That is abnormal, and that is fluid in the

21   chest.  It's not necessarily in the lung.  There's a space

22   between the lung and the chest wall that, normally, there's

23   nothing in there, just a little bit of fluid to help the

24   lung expand, so there's no friction.  But there is an

25   abnormal accumulation of fluid in the bottom part of the
```

DR. CAMERON HUXFORD - DIRECT

1    left lung that is between the lung and the chest.

2    Q.     So for the record, what is the medical term for what

3    we're looking at and what you're talking about?

4    A.     Well, without actually sampling the fluid or seeing

5    the fluid, the medical term would just be a pleural

6    effusion.

7    Q.     Okay.  Do you have an understanding of what the

8    diagnosis was for this?

9    A.     Well, the fluid that came out was blood, so then by

10   definition, it would be a hemothorax.  "Heme" means blood.

11   "Thorax" chest, so hemothorax blood in the chest.

12   Q.     So you said -- just like you just said, this is a

13   collection of blood in the chest; is that right?

14   A.     Correct.

15   Q.     All right.  What is this thing right here?

16   A.     Well, the bright part right there in the center,

17   that's the heart.

18   Q.     All right.

19   A.     And this was a -- so that's the heart.  Sitting on

20   top of the heart, that is abnormal, is another fluid

21   collection that is in the similar density as the fluid that

22   we already talked about in the left chest.  And so that area

23   of the center of the chest is called the mediastinum.

24   Q.     That's this area here?

25   A.     Well, it's -- it's under that.  The mediastinum

 1   contains the heart and the great vessels, so the aorta, the

 2   pulmonary arteries.  It contains the trachea where it

 3   divides to enter the right and left lung, so it's a lot

 4   going on in there.

 5          But on top of that heart, that fluid collection, that

 6   would be considered a mediastinal -- in this particular

 7   case, that's a mediastinal hematoma.  Hematoma is just an

 8   abnormal collection of blood.

 9   Q.    So a mediastinal hematoma is a collection of blood

10   around the heart; is that correct?

11   A.    Correct.  And in this particular case, we don't have

12   normal, but it's -- it's exerting a lot of pressure.  The

13   heart is not supposed to be pushed as far back toward the

14   backbone, as you can see at the bottom of the picture the

15   backbone.  The heart is not supposed to be pushed as far

16   back that way, so that fluid is -- that hematoma is exerting

17   a lot of force on the heart pushing it out of position.

18   Q.    So this fluid is actually moving his heart in his

19   chest; is that right?

20   A.    Correct, squeezing it.

21   Q.    Okay.  Would that create pressure and pain in the

22   chest?

23   A.    Yes.

24   Q.    Is there anything else of note of this image -- well,

25   first let me ask you, this image was taken on April 30th,

DR. CAMERON HUXFORD - DIRECT

1   2022, at 2:44 p.m.; is that when it was taken?

2   A.    Yes.  And just to put the size in perspective,

3   because you might not can tell much by that, but this thing

4   is -- it measured 10 centimeters by 14 centimeters, and

5   there's two-and-a-half centimeters in an inch.  So this is

6   about four-by-six inches, so it's quite a big -- quite a big

7   collection of blood.

8   Q.    Okay.  In the right lung, do you notice any

9   abnormality?

10  A.    On these pictures that we're looking at, no.

11  Q.    Okay.  And, theoretically, if this was a normal image

12  with no fluid collection, should this side be a mirror image

13  of this side?

14  A.    Correct.

15  Q.    I'm going to show you another image, and tell me what

16  you think -- tell me what this image is.

17  A.    These are different.  When we look at these CAT

18  scans, we can change the background color to look more at

19  the lungs or more at the -- what we call the mediastinal

20  structures, or in this particular case, looking more at the

21  bones.

22        And so, again, our left is the patient's right.  Our

23  right is the patient's left.  And here, right there, these

24  are ribs.  They are ribs that go all the way up.  All those

25  white things right there are ribs.

DR. CAMERON HUXFORD - DIRECT

1    Q.    What do you notice here?

2    A.    Well, if we look at the other ones that we can see in

3    this picture that are normal, we can see the bright white on

4    both ends of the rib, that's called the cortex, and that's

5    the hard part of the bone and it's not disruptive --

6    disrupted.  But the bone that you pointed to, there's a

7    disruption in the cortex, so that's a fracture.

8    Q.    Okay.

9    A.    And that's the -- should be the 11th rib.

10   Q.    The 11th rib.  And then the -- this also was taken at

11   the same time at 2:44 p.m. on April 30th, 2022?

12   A.    Correct.

13   Q.    I'll show you another image.  Would you tell the jury

14   what this image is?

15   A.    This is the 12th rib.

16   Q.    All right.

17   A.    And you can see that -- you can really see a good

18   picture there of where the cortex is disrupted, and the --

19   the ends on either side -- might want to -- okay.  The ends

20   on either side don't line up.  There's a disruption there,

21   and so that's called a displaced fracture.

22   Q.    Displaced because part of the bone is displaced from

23   the other part?

24   A.    It's moved out of proper position.

25   Q.    So, theoretically, if there was no fractured rib, it

1    should look like the mirror image over here; is that right?

2    A.    Correct.

3    Q.    So this is a -- this is a healthy unfractured rib,

4    and this is the fractured rib that has a displaced facture;

5    is that right?

6    A.    Correct.

7    Q.    Finally, can you tell the jury what we're seeing

8    here?

9    A.    Well, I told you a minute ago most -- on those scans,

10   the first scans we looked at, it was kind of a slice from

11   front to back.  This is kind of a slice from the top of your

12   head to your feet.  So you're getting -- instead of getting

13   a slice like this, you're getting a slice like this, and so

14   this shows the -- you can see it's towards the back, because

15   you have all the vertebrae lining up in the center.

16        And the right -- the right lung, our left, is black

17   like all the other ones, so that's normal.  But you can see

18   on the left, our right, the patient's left, that that fluid

19   has taken the course of gravity, and it's layered along the

20   entire back side of the patient's chest.

21   Q.    That patient being Jimmy Anthony?

22   A.    Yes.

23   Q.    Knowing that Mr. Anthony was diagnosed with rib

24   fractures, a left lung hematoma, and a hemothorax, do you

25   find those -- do you agree with those findings as they're

1   stated?

2   A.      Yes, sir.

3   Q.      Okay.  And that's based upon your review of the

4   imaging independently; is that right?

5   A.      Yes, sir.

6   Q.      All right.  In your report, you also mention that

7   imaging was run of Mr. Anthony's head.  We don't have that

8   image.  Do you have an understanding of what the finding was

9   on the CT of the head?

10          MR. SILER:  Objection.  If he doesn't have the image,

11  all he can be -- I don't know what the basis of his

12  testimony could be, so there's no -- no foundation that he

13  would have the information.

14          THE COURT:  Can you lay more foundation --

15          MR. FLECHAS:  Sure.

16          THE COURT:  -- as to how he would know.

17  BY MR. FLECHAS:

18  Q.      Well, you've had an opportunity to review the records

19  from the University of Mississippi Medical Center, have you

20  not?

21  A.      Yes, sir.

22  Q.      Okay.  Did you see in those records where it was

23  noted that Mr. Anthony had a head injury?

24  A.      I -- I read the CT head report that was done.

25  Q.      Okay.  And what did that CT head report indicate?

DR. CAMERON HUXFORD - DIRECT

1    A.      It showed a left-sided parietal hematoma.

2    Q.      Okay.  Left-sided parietal scalp hematoma; is that

3    correct?

4    A.      Correct.

5    Q.      All right.  There's earlier testimony -- and I

6    believe the area that was indicated was top back as far as

7    where this hema- -- as to where the knot on Mr. Anthony's

8    head was located.  Would that be within the area known as

9    the parietal scalp?

10   A.      Yes, sir.

11   Q.      Can you indicate for the jury what areas are covered

12   by the terminology of "parietal scalp"?

13   A.      Well, the area right above the ear is called the

14   temporal part of the skull.  The very, very back is called

15   the occipital.  But above the temporal and to the occipital,

16   this area, is the parietal.

17   Q.      Okay.  Thank you.  So is the medical imaging all you

18   reviewed?  I know you just said that you also reviewed the

19   University of Mississippi Medical records; right?

20   A.      Yes, sir.

21   Q.      Okay.  Did you also review the medical records from

22   Merit Health?

23   A.      Yes, sir.

24   Q.      Okay.  Outside of the medical imaging and medical

25   records, did you review any other documentation for facts

 1  surrounding this case?

 2  A.     Records-wise just Merit Health and UMC.

 3  Q.     Okay.  What about videos, did you review any videos?

 4  A.     Yes.

 5  Q.     Okay.  As you recall, did you review a timeline of

 6  videos from April 30th, 2022?

 7  A.     Yes, sir.

 8  Q.     Okay.  In your work as a physician, are you trained

 9  in looking for signs of physical distress as part of your

10  clinical training for examining patients?

11  A.     Yes, sir.

12  Q.     All right.  Did you review the video of Mr. Anthony

13  being brought from his house to the front yard and to the

14  police car?

15  A.     No, sir.

16  Q.     You didn't review that, the --

17  A.     In the house?

18  Q.     No.  The video in the front yard of the house before

19  he was taken to the police car?

20  A.     I didn't see that.

21  Q.     Okay.  Let me ask you this way.  In the videos that

22  you reviewed -- and you can reference your report if you

23  need to -- prior to arriving at the Pearl Police Department,

24  is there any indication that Mr. Anthony was in any physical

25  distress?

1   A.      No, sir.

2   Q.      All right.  From your review, when is the first sign

3   of distress that you saw of Mr. Anthony on the videos?

4   A.      Reading from my report, I say that he was seen

5   walking into the Pearl Police Department booking area under

6   his own power.  He was not any sign -- he was not in any

7   signs of distress, and his arms were passively at his side.

8           And further into the report -- well, the next

9   sentence, he was taken to a location off camera and

10  reappeared on camera approximately 14 minutes later.  Four

11  minutes after that, he was noticed to be using one of his

12  arms to grab his chest.

13  Q.      Now, let me stop you there.  Using an arm to grab

14  your chest, is that one of the signs that you would look for

15  and note if a patient was doing that, if you were looking

16  for signs of physical distress?

17  A.      Yes, sir.

18  Q.      Okay.  Do you recall from the video Mr. Anthony

19  complaining of any pain?

20  A.      Yes.

21  Q.      Okay.  What complaints?

22  A.      He -- he was complaining of -- of chest pain.

23  Q.      Okay.

24  A.      Multiple times he described it as he thought he was

25  having a heart attack.

DR. CAMERON HUXFORD - DIRECT

1    Q.    Okay.  And with reference to what you've already --
2    the image you've already testified to, are those complaints
3    from Mr. Anthony consistent with what someone would be
4    feeling if they had a mediastinal hematoma as seen on this
5    image?
6    A.    Yes, sir.
7    Q.    In addition to reviewing videos and imaging and
8    medical records, did you also have an opportunity to examine
9    Mr. Anthony?
10   A.    I did.
11   Q.    What did you find when you examined Mr. Anthony?
12   A.    I -- he was -- he was alive.  We talked; he described
13   that he was still having some residual symptoms from what
14   had happened.
15   Q.    Okay.  What was the residual symptom that he
16   complained of?
17   A.    Persistent shortness of breath.
18   Q.    Okay.  And did he indicate to you that he still had
19   that, but that it was getting better?
20   A.    Correct.
21   Q.    All right.  And in your report, what do you attribute
22   the lingering shortness of breath that he was experiencing
23   to?
24   A.    It's likely multiple issues:  One healing ribs, one
25   when he did have a follow-up x-ray that showed still some

DR. CAMERON HUXFORD - DIRECT

1    residual fluid in his left chest, and then also the actual

2    hematoma.  The large blood collection on top of his heart,

3    that was not removed by the doctors.  That takes a long time

4    to resolve on its own.

5    Q.    Would you anticipate any scar tissue to be left from

6    these types of issues?

7    A.    Yes.

8    Q.    Okay.  Could the scar tissue also effect the ability

9    of the lung to fully function?

10    A.    Yes.

11    Q.    All right.  After your review of the objective

12    medical evidence, do you find the objective medical evidence

13    to be consistent with the trauma as described by Jimmy

14    Anthony?

15    A.    Yes, sir.

16    Q.    Okay.  Do you have an understanding of what Jimmy

17    Anthony alleged happened?

18    A.    I do.

19    Q.    All right.  What are the allegations, as you

20    understand it, that you say are consistent with the

21    objective medical evidence?

22    A.    What I documented in the report based on what he,

23    Mr. Anthony, told me was that when he went off camera for

24    those minutes, he was taken -- it was my understanding that

25    he was taken to a bathroom and hit on -- hit upon,

1    assaulted.

2    Q.    Okay.  And assaulted in his chest and torso area?

3    A.    He said --

4          MR. SILER:  Objection, leading.

5          THE COURT:  Don't lead.

6    BY MR. FLECHAS:

7    Q.    Okay.  Assaulted to what area of his body, if you

8    know?

9    A.    He said he was -- he was -- he was hit, multiple

10   closed-fist punches to his left chest and left back.

11   Q.    All right.  Looking at this image again, do the

12   hemothorax and the left-lung hematoma connect?

13   A.    Most likely those are separate injuries.

14   Q.    Okay.  Explain to me what that indicates to you as

15   far as how they occurred?

16   A.    The rib fractures we looked at are on the back of the

17   left chest.  Those were fractured, and those would have

18   punctured -- at least punctured the lining of the lung,

19   which is called the pleura.  Quite possibly puncturing the

20   lung itself, and that disrupts -- each rib has blood vessels

21   that run with it.  Each rib has a nerve, an artery, and a

22   vein that runs with it, and if you fracture that, you can

23   disrupt the blood supply there.  And that would have led to

24   the hemothorax, which is the fluid in the bottom of the left

25   chest, and that would be a result of the punches to the back

1    area.

2    Q.    And is the area of the fractures consistent with

3    being connected to the hemothorax?

4    A.    Yes.

5    Q.    Okay.  And if Mr. Anthony testified that he was also

6    punched directly in his chest plate, would that be

7    consistent with the mediastinal hematoma?

8    A.    Yes.

9    Q.    So in your medical opinion, would that be indicative

10   of two separate applications of force?

11   A.    Yes.

12   Q.    You talked about reviewing the video from the Pearl

13   Police Department booking area; correct?

14   A.    Yes, sir.

15   Q.    All right.  Do you have an understanding -- I believe

16   you said that Mr. Anthony told you that he was taken off

17   camera to the bathroom, and that's where the assault, as he

18   described it, occurred?

19   A.    Yes, sir.

20   Q.    Were you then able, on that video, to appreciate

21   Mr. Anthony being brought back into the booking area?

22   A.    Yes, sir.

23   Q.    And I believe you already testified that within a few

24   minutes of being brought back in, that Mr. Anthony began to

25   grab his chest, and that was the first sign of distress that

DR. CAMERON HUXFORD - DIRECT

1   you saw; is that right?

2   A.    Yes, sir.

3   Q.    Is the timing of the onset of those symptoms

4   consistent with the timing of the assault as described by

5   Jimmy Anthony?

6   A.    Yes, sir.

7        MR. SILER:  Objection, Your Honor, just leading and

8   leading.

9        THE COURT:  Okay.  I'm going to overrule the

10  objection.

11  BY MR. FLECHAS:

12  Q.    Okay.  I'll ask the question again.  Seeing

13  Mr. Anthony brought back into the booking area as you saw on

14  video and then seeing Mr. Anthony begin to show the signs of

15  distress by grabbing his chest and complaining of chest

16  pain, is that timing of the onset of the symptoms consistent

17  with the assault having occurred at the time that

18  Mr. Anthony says it happened?

19  A.    Yes, sir.

20  Q.    Do you have an opinion as to whether or not -- based

21  upon your review of all of the evidence that you've seen, as

22  to whether more likely than not this assault occurred in the

23  time and manner that Jimmy Anthony described?

24  A.    Yes, sir.

25  Q.    All right.  And what is that opinion?

DR. CAMERON HUXFORD - CROSS

1   A.      That the assault caused these chest injuries.

2   Q.      Okay.  And are all of your opinions that you've

3   expressed here held to -- held by you to within a reasonable

4   degree of medical certainty?

5   A.      Yes, sir.

6           MR. FLECHAS:  All right.  Your Honor, I tender the

7   witness.

8           THE COURT:  All right.  Cross-examination, Mr. Siler.

9                       **CROSS-EXAMINATION**

10  **BY MR. SILER:**

11  Q.      Dr. Huxford, my name is Tommy Siler, and I represent

12  the two defendants, the police officers here today.  You and

13  I have not met before today, have we?

14  A.      That is correct.

15  Q.      And we've never -- I've never asked you questions

16  about anything before today; correct?

17  A.      No, sir.

18  Q.      All right.  You mentioned a few moments ago that you

19  had a number of certifications, specialties, and you said

20  that one was pulmonary critical care; is that correct?

21  A.      Yes, sir.

22  Q.      Is that one specialty or two?

23  A.      Two.

24  Q.      So you have actually certifications in both of those

25  areas?

1    A.    Yes, sir.

2    Q.    So in two of them.  And then I think you also

3    mentioned a sleep certification?

4    A.    Yes, sir.

5    Q.    And so that's a third area that you have a

6    certification in.  Do you consider yourself an expert in

7    sleep --

8    A.    Yes.

9    Q.    -- issues?

10   A.    Yes, sir.

11   Q.    Okay.  And then you also said you had certification

12   in internal medicine; correct?

13   A.    Yes, sir.

14   Q.    Okay.  And do you consider yourself an expert in

15   internal medicine?

16   A.    I don't practice internal medicine much anymore, but

17   I've kept my certificate.

18   Q.    Okay.  When's the last time you've actually practiced

19   pulmonary critical care work?

20   A.    About a week ago.

21   Q.    Do you actually do that today in your current

22   position?

23   A.    Yes, sir.

24   Q.    Okay.  And where is that that you do that?

25   A.    Currently Grand Forks, North Dakota.

1    Q.     Okay.  And how often do you work there?

2    A.     Every month.

3    Q.     Okay.  And you work other -- other places other than

4    North Dakota, too; is that right?

5    A.     I do contract work, so I have right now -- I'm

6    just -- my main clinical work is just in North Dakota.

7    Q.     Okay.  In the past -- say in the past three years,

8    have you worked at other locations?

9    A.     North Dakota; Green Bay, Wisconsin; and Coeur

10   d'Alene, Idaho.

11   Q.     Okay.  What kind of work did you do at Green Bay?

12   A.     The same type work, pulmonary critical care.

13   Q.     Okay.  And what about at Coeur d'Alene, Idaho?

14   A.     The same.

15          MR. SILER:  Okay.  One -- one second, Your Honor.

16   BY MR. SILER:

17   Q.     All right.  Now, of all those areas in which you have

18   certification, radiology is not one of them; correct?

19   A.     Correct.

20   Q.     Okay.  So you're not here telling the jury that

21   you're an expert in radiology; correct?

22   A.     As a part of my job in pulmonary critical care, I

23   look at x-rays and CAT scans every day, but I do not have a

24   certification in radiology.

25   Q.     Okay.  Now, you mentioned a moment ago that you

1    believe that the story, as told by Mr. Anthony, about his
2    assault, as you put it, was the cause of the injuries you've
3    testified to the jury about; correct?
4    A.    Yes, sir.
5    Q.    But now you didn't see any assault on Mr. Anthony in
6    any of the videos or anything that you looked at; correct?
7    A.    No, sir.
8    Q.    Okay.  Now, saying that these injuries were
9    consistent with his story doesn't mean that they couldn't be
10   consistent with other causes that might have led to the same
11   kind of injury; correct?
12   A.    That's correct.
13   Q.    Okay.  So if there -- if I ask you to assume that he
14   was struck on April 30th, '22, and was struck in the chest,
15   would these injuries be consistent with -- in ways different
16   than he described -- would these injuries be consistent with
17   being struck in other ways?
18   A.    Yes, sir.
19   Q.    Okay.  Now, I noticed you mentioned that the -- you
20   were talking about the rib fractures and where he told you
21   he had been struck.  Did he tell you exactly where he was
22   struck by the officer?
23   A.    In my report, I wrote that he said left chest and
24   left back.
25   Q.    Did he say whether it was the upper part of his chest

1    or the lower part?

2    A.    No, sir.

3    Q.    Okay.  Let's -- let me tell you that he's testified

4    here he was struck over 30 times in the upper-left front of

5    his chest, and he described it like I'm doing my hand on the

6    upper-left side of his chest, and the upper back -- his

7    upper-back portion of the chest.  And he testified he was

8    never struck lower below his armpit level on his chest.

9         All right.  So that's what he's testified to here in

10   front of this jury.  Now, where are the actual injuries that

11   occurred in his lung?  Where -- where are they?

12        Can you tell us, within his lung, are they up top,

13   the top part of the chest, or are they down in the lower

14   part?

15   A.    The hemothorax, the blood in the chest cavity, those

16   injuries were in the left lower.

17   Q.    All right.  And you mentioned he -- in your reading

18   of the images about his ribs, that -- that you saw in your

19   opinion rib fractures on rib number 11 and rib number 12.

20        Can you tell the jury where those ribs are in your

21   body?

22   A.    We have 14 ribs.  Ten through -- or excuse me -- one

23   through 12 are connected to the sternum and 13 -- in most

24   people, 13 or 14 are floating ribs but they -- as you -- the

25   number goes down, the ribs go lower, so 11 and 12 will be

1    lower down in the chest.

2    Q.    You said 14 ribs?  Everything I've read says that

3    humans have 12 ribs.

4    A.    We have two floating ribs.

5    Q.    Well, the 11 and 12, are they not the floating ribs?

6    A.    They -- I may be wrong.  They may be.

7    Q.    Okay.  And if they are the bottom ribs, the last two

8    ribs on a human being, and they're floating ribs so to

9    speak, they're at the very lowest part of your ribcage,

10    correct, the last two, lowest two ribs you've got?

11    A.    Yes, sir.

12    Q.    Okay.  And when you say they're floating, that means

13    that they're not connected with the sternum in the front

14    part of the body; correct?

15    A.    Yes, sir.

16    Q.    Okay.  So they have lots of flexibility to bend in

17    and out; right?

18    A.    Yes, sir.

19    Q.    Okay.  And they don't come all the way around to the

20    front of the chest like the other ten ribs do; correct?

21    A.    Correct.

22    Q.    Okay.  But they're definitely the lowest ribs on a

23    human being?

24    A.    Yes, sir.

25    Q.    All right.  Show us.  Stand up, if you could, show

DR. CAMERON HUXFORD - CROSS

```
 1  the jury where rib 11 and 12 would be.

 2  A.      Somewhere in this area.

 3  Q.      Okay.  So right up above your belt line, would that

 4  be right?

 5  A.      Here's my belt --

 6          THE COURT:  Make sure you're in the microphone.  I'm

 7  sorry.  It's going to be a little awkward.

 8  BY MR. SILER:

 9  Q.      Now, don't fall.

10  A.      Right here's my belt, in here.

11  Q.      Okay.  And are they there mostly to protect the liver

12  and the kidney in the back part of the body?

13  A.      Yes, sir.

14  Q.      Okay.  All right.  We'll get back to ribs here in

15  just a few minutes.

16          Now, I'm going to show you -- let me pull it up real

17  quick.  All right.  I want to show you what's been

18  introduced into the record as Joint Exhibit 4, and you can

19  see it on your monitor there.

20          And excuse me; I just need to look at one thing.  My

21  apologies.  I'm just looking at something before I show it

22  to him.

23          I'm going to go to another line of questioning,

24  Dr. Huxford.  My apologies.

25  A.      It's okay.
```

1  Q.      It -- would it be consistent with your opinion about

2  Mr. Anthony's injuries that he could have obtained those

3  injuries in the, say, 24 to 48 hours before he was arrested?

4  A.      Which injuries?

5  Q.      The injuries to his chest that caused the hemothorax.

6  A.      I do not think so.

7  Q.      All right.  Why?

8  A.      The severity of the injuries he had would have caused

9  him -- he would have developed symptoms prior.  It's an

10  acute problem or a new problem, so those symptoms would have

11  started immediately.

12  Q.      Okay.  Is that what "acute" means, that it's a new

13  problem?

14  A.      Yes, sir.

15  Q.      Okay.  What is it called when a problem is an older

16  problem?

17  A.      Chronic.

18  Q.      Okay.  Did you see anywhere in the medical files that

19  you reviewed where any medical profession -- professional

20  indicated that they observed bruises or contusions on

21  Mr. Anthony?

22  A.      From the Merit Health records on the physical exam

23  findings, it was reported as abrasions to the left-lateral

24  anterior chest, the left-lateral posterior chest, and the

25  left breast.

1   Q.    Okay.  I didn't ask about abrasions.  I asked about

2   contusions or bruises.

3   A.    Okay.

4   Q.    So did you see anything where anyone reported that he

5   had any contusions or bruises on his body?

6   A.    Those words were not used.

7   Q.    Okay.  And an abrasion is a what?  What's the

8   difference in an abrasion and a contusion?

9   A.    In layman's terms, a contusion would be more of a

10  bruise-type injury, and an abrasion is the skin is

11  disrupted; it's roughed up, scratched.

12  Q.    Okay.  So a cut.  Skin was cut or scratched or

13  something like that?

14  A.    Not a cut, but scratched.

15  Q.    Okay.  So a scratch is an abrasion, and a bruise is a

16  contusion; correct?

17  A.    Generally speaking.

18  Q.    And so getting back to my question, is there anything

19  in those records -- you've got two different hospitals, two

20  different sets of professionals that saw him -- is there

21  anything that indicates he has a contusion or a bruise?

22  A.    No, sir.

23  Q.    No, sir?

24  A.    No, sir.

25  Q.    Okay.  Thank you.  All right.  Let's get back for a

1    few minutes to -- well, let me go to this issue.

2        How about did you consider his general health in all

3    of this in your opinion as to what health issues he had,

4    what things he was aware of going on in his body, and how

5    that might have effected any of the symptoms that he showed?

6    A.    I asked him about his health, his -- his past medical

7    history, and we discussed that.  But none of those answers

8    explained his story.

9    Q.    Okay.  What health issues did he say he had?

10   A.    He had smoked and I believe -- well, he -- I mean,

11   can I talk about his -- a lot of that stuff's -- some of

12   it's not -- pertains to this.  His personal health issues,

13   am I at liberty to --

14        THE COURT:  You are.

15   A.    Okay.  Hepatitis C.

16   Q.    Okay.  So he smoked, lifelong smoker?

17   A.    I -- I don't know how long.

18   Q.    Okay.  And he had hepatitis C.  What other health

19   issues did he have?

20   A.    That is all I -- that is all I wrote or took.

21   Q.    Did he have emphysema?

22   A.    I don't know if he knew he had emphysema.  His CT

23   scan did show some evidence of that.

24   Q.    Okay.  It's actually, as I saw it described in the

25   records, was substantial emphysema; correct?

DR. CAMERON HUXFORD - CROSS

1    A.    I didn't see that word.

2    Q.    Okay.  So he had hepatitis C, he had smoking, he had

3    emphysema, and he was a methamphetamine addict.  You knew

4    that as well; correct?

5    A.    I had heard that.

6    Q.    So surely that could have some negative impact on

7    your lungs, blood vessels around the lungs, things that

8    would impact your lungs and make those organs or those

9    vessels weaker; correct?

10   A.    Generally speaking or how it relates specifically to

11   his injuries?

12   Q.    Generally speaking, let's start there.

13   A.    Generally speaking, yes.

14   Q.    Okay.  And so the hemothorax is caused by a blood

15   vessel being ruptured.  Is that basically what it is?

16   A.    There's -- yes.

17   Q.    Okay.  So would all those health concerns he had make

18   him more likely to be susceptible to those things, those

19   symptoms that he had just because of his health issues?

20   A.    No, sir.

21   Q.    Okay.  And why is that?

22   A.    You don't get a hemothorax just because you used to

23   smoke and have hepatitis.

24   Q.    Well, a hemothorax actually can be caused by a

25   variety of things, can it not?

 1    A.      Yes.

 2    Q.      It can be caused by blunt trauma; correct?

 3    A.      Yes, sir.

 4    Q.      And it can even be spontaneous; correct?

 5    A.      Rarely, unless the patient is taking blood thinners.

 6    Q.      Rarely, but it can be spontaneous; correct?

 7    A.      I don't know that I've ever seen it.

 8    Q.      Okay.  But it can be spontaneous?

 9    A.      I suppose anything's possible.

10    Q.      Well, does the medical literature indicate that a

11    hemothorax can be spontaneous?

12    A.      I have not read that.

13    Q.      Okay.  Well, let me ask you to do this.  You've got

14    your cellphone on you?

15    A.      No, sir.

16    Q.      Okay.

17    A.      That's why I was late.

18            MR. FLECHAS:  Your Honor, I'm going to object.  May

19    we approach?

20            THE COURT:  Do we have -- is there a question on the

21    table?  Let's get a question and then if we need to --

22            MR. SILER:  Well, I can and I'll go ahead and tell

23    them --

24            THE COURT:  No.  Let's go ahead and approach.

25            MR. SILER:  I was just going to -- you want to --

DR. CAMERON HUXFORD - CROSS

1          THE COURT:  Let's approach.  Yeah, let's go ahead.

2          MR. SILER:  Okay.

3                    (BEFORE THE BENCH)

4          THE COURT:  Okay.  Just go ahead.  What were --

5          MR. SILER:  Okay.  The -- the -- what I was going to

6    do, because he said he's never read that, --

7          THE COURT:  Yeah.

8          MR. SILER:  -- I was just going to get him to Google

9    "spontaneous hemothorax" and go with there is literature out

10   there that says what -- I mean, says what he says is

11   incorrect.

12         THE COURT:  Okay.  I don't want to do Google research

13   in the middle of trial.  That's how I argue with my law

14   clerks, and it's not a very effective method.  So let's not

15   do that.  Do you have something else?

16         MR. SILER:  No, that's it for the -- just for a

17   proffer, I want to say that if he did it and if he Googled

18   spontaneous hemothorax, there's plenty of literature out

19   there that says hemothorax can be spontaneous.

20         THE COURT:  Okay.

21         MR. SILER:  I just wanted that --

22         THE COURT:  Yeah, you can proffer later, not now.

23         MR. SILER:  Okay.  Well, that's all.

24         THE COURT:  Okay.

25                    (IN OPEN COURT)

DR. CAMERON HUXFORD - CROSS

1    BY MR. SILER:

2    Q.    So in your opinion, you made a number of references

3    to multiple rib fractures; correct?

4    A.    Yes, sir.

5    Q.    And that plays a role in your diagnosis or your

6    opinion?

7    A.    Yes, sir.

8    Q.    Okay.  But the only rib fractures you've seen on

9    anything are those 11th and 12th rib fractures; correct?

10    A.    Yes, sir.

11    Q.    Okay.  Do you see anywhere in your notes where

12    radiologists, who are specialist at looking at images of

13    bones, have looked repeatedly and repeatedly found that the

14    two -- the only rib fractures -- well, let me back up and

15    say it this way.

16          They find that there are no acute rib fractures.

17    That there are some acute -- subacute or chronic rib

18    fractures of the 11th and 12th ribs.  Have you seen that in

19    those records?

20    A.    Yes, sir, that was on Merit Health's records.

21    Q.    Okay.  And that was a radiologist's opinion of what

22    the fractures were; correct?

23    A.    Yes, sir.

24    Q.    Okay.  And you just told us a few minutes ago that

25    the difference between acute and chronic was that acute are

1   new fractures, and chronic are older fractures; correct?

2   A.    Yes.

3   Q.    Okay.

4   A.    Well, we described what "acute" and "chronic," those

5   words meant, not in relation to fractures.

6   Q.    Okay.  Well, what do they mean in relation to

7   fractures?

8   A.    It could be the same.  It's just that wasn't the

9   question you asked.

10  Q.    Okay.  Well, if some -- if a radiologist tells us

11  there are no acute rib fractures, doesn't that mean there

12  are no new rib fractures that they could see on an image?

13  A.    That would be what he's saying.

14  Q.    Okay.  And if he says that there are chronic rib

15  fractures or older rib fractures that he could see on 11 and

16  12, that would mean there were rib fractures that occurred

17  further -- you know, more time than two or three days ago;

18  correct?

19  A.    Yes, sir.

20  Q.    Okay.  Would the location of the strikes of someone

21  being assaulted have a relationship to where the injury

22  occurred?

23  A.    Generally speaking.

24  Q.    Okay.  And if the plaintiff claims that he was only

25  assaulted in the upper part of the chest and back, and not

1    down lower on his side, would that indicate or bring any

2    concern to you that maybe the strikes on the upper chest and

3    back weren't the cause of the hemothorax that was down much

4    lower in his body?

5    A.    No, sir.

6    Q.    Okay.  You think they could be down -- it could be

7    lower even if he was hit in the upper part of his chest and

8    back?

9    A.    The hemothorax, the blood, it's going to follow the

10   course of gravity, so wherever it comes from, the fluid's

11   going to collect in the lower part of the lung.

12   Q.    Okay.  How about a blow to the side of the chest

13   wall, would that also be consistent with the blood

14   accumulating down where it was at the lower part of the

15   lung?

16   A.    It could.

17   Q.    Now, when you reviewed the video of the booking area

18   you saw, I'm sure, where the plaintiff walked out or walked

19   back into the camera view after he claimed he had been

20   assaulted.  Did you not?

21   A.    I saw him walk back in to the field of the camera,

22   yes.

23   Q.    And could you see any bruises or contusions on his

24   body as he walked through?

25   A.    No, sir.

DR. CAMERON HUXFORD - CROSS

1   Q.      Did he walk through without any assistance?

2   A.      No assistance.

3   Q.      Okay.  Did -- did he or anyone around him look

4   anything other than nonchalant or that anything difficult

5   had gone on?

6   A.      No, sir.

7   Q.      Now, you would agree with me that someone -- it's

8   easy to fake an injury by saying, "oh, my chest hurts;"

9   correct?

10  A.      One could do that, yes, sir.

11  Q.      Do you have any experience with dealing with people

12  in jail or who have just been arrested?

13  A.      Not very often.

14  Q.      Okay.  Let's see Joint 4.  Excuse me, Dr. Huxford.

15  I'm going to take a moment to try to get myself organized

16  here.

17          THE WITNESS:  Is there any water?  Water?

18          THE COURT:  Doctor, do you need a bottle of water?

19          THE WITNESS:  Just if there's any close.

20          THE COURT:  We do.

21          THE WITNESS:  Thank you.

22  BY MR. SILER:

23  Q.      All right.  I'm going to show you a page from Joint

24  Exhibit 4 that the parties have introduced here and --

25          THE COURT:  Is there a Bates number on that,

1    Mr. Siler?

2        MR. SILER:  Yes, Your Honor, it's 1062.

3        Excuse me; I saw what I was looking for just a moment

4    ago, and now I can't find it.

5        THE COURT:  And you may have to adjust that camera a

6    little bit, so the witness can see it and the jury.

7        MR. SILER:  I may have managed to turn it off.  Let

8    me get it on here where you can see it.

9    BY MR. SILER:

10   Q.    All right.  This is a -- some physician notes,

11   physician's notes from a Dr. John Faust and Dr. Christian

12   Santos that looks like an image was -- or at least the

13   reading was performed on May the 3rd of 2022, and it is an

14   x-ray chest view.

15       Do you see where I'm looking at it?

16   A.    Yes, sir, I see this.

17   Q.    And if you go down to the part that I highlighted, it

18   reads "no acute osseous abnormality."  Do you see that?

19   A.    Yes, sir.

20   Q.    And would you tell the jury what that means?

21   A.    That phrase, in layman's speak, would mean no new

22   bone problems.

23   Q.    Thank you.  Now, let me back up and ask you as I'm

24   thinking about what you said.  You said no new bone

25   problems.  Are you suggesting what that's saying is there's

DR. CAMERON HUXFORD - CROSS

1    nothing new as compared to what we looked at yesterday, or

2    are you saying that there are no bone issues, no acute bone

3    issues?

4    A.    If you can see also on this report, it says

5    "comparison" --

6    Q.    Right.

7    A.    -- "to 5/2/22." So that's a one day later exam. So

8    in that report, it means as compared to yesterday's x-ray,

9    there's no new bone problems.

10   Q.    Okay. These are voluminous documents, and rather

11   than me trying to find the one exactly before it, let me ask

12   you this. There's no indication, either in your opinion of

13   what you've seen or any other doctor that you've seen offer

14   an opinion about his fractured ribs that indicates there's

15   any rib fracture whatsoever on Mr. Anthony when they take

16   any of these images, other than what's down on the 11th and

17   12th ribs; correct?

18   A.    Correct.

19   Q.    Now, let me go back to the issue about the hematoma.

20   In layman's terms for somebody that's not real smart like

21   me, what is a hematoma if you've got one on your head?

22   A.    Collection of blood.

23   Q.    A knot on your head?

24   A.    It could be.

25   Q.    Okay. It could be what else?

1  A.      It's just a collection of blood, that's just what it

2  is.

3  Q.      Okay.  And you said that if there was one on his left

4  parietal scalp, it could be anywhere around the upper part

5  of the skull area?

6  A.      Yes, sir.

7  Q.      Okay.  What about right here; do you see where I'm

8  pointing at?

9  A.      You're probably getting close to the -- there's a --

10 the parietal touches the occipital bone, and without looking

11 at the sutures of the skull where the bones connect, you

12 can't be absolute.

13 Q.      Sure.  Okay.  That makes sense, fair enough.  Did

14 they treat him at all for this left parietal scalp hematoma?

15 A.      Not that I read.

16         MR. SILER:  Your Honor, I may be finished with cross

17 if you'd indulge me just one moment?

18         THE COURT:  Take your time.

19 BY MR. SILER:

20 Q.      Okay.  One final area of questions, Dr. Huxford.

21 Would his health problems, his hepatitis C, his smoking, his

22 methamphetamine addiction, his emphysema, would -- would

23 that cause his recovery to be slower?

24 A.      That's possible.

25 Q.      Did you consider that in rendering your opinion?

1    A.      No, sir.

2    Q.      Did -- did you know that shortly after he left the

3    hospital that he began to paint a house, both interior and

4    exterior; that he replaced all the floors; he replaced the

5    floor joists beneath the floors?

6            Would that be consistent with an issue with his

7    recovery being slow?

8    A.      I wasn't aware that he did those things, but it's

9    possible that he could do them.

10           MR. SILER:  Okay.  At this time, Your Honor, I have

11   no more questions for Dr. Huxford.

12           THE COURT:  All right.  Thank you, Mr. Siler.

13           Any redirect, Mr. Flechas?

14           MR. FLECHAS:  Yes, Your Honor.

15                    **REDIRECT EXAMINATION**

16   **BY MR. FLECHAS:**

17   Q.      Dr. Huxford, there's a lot to unpack there.  I'm

18   going to hit it as quickly as I can.

19           First of all, one of the last things that Mr. Siler

20   asked you about was the parietal scalp hematoma.  To

21   confirm, you agree that the top back of the head is covered

22   by the parietal scalp area; is that right?

23   A.      Yes, sir.

24   Q.      All right.  And a hematoma in that area is consistent

25   with trauma to that area of the head; is that right?

DR. CAMERON HUXFORD - REDIRECT

```
 1   A.      Yes, sir.
 2   Q.      Mr. Siler asked you about this medical record, DEF
 3   1061.  What is this record?
 4           In other words, what is this a record of?  What test
 5   occurred?
 6   A.      It's a plain chest x-ray.
 7   Q.      Is this also a plain chest x-ray?
 8   A.      Yes, sir.
 9   Q.      On a plain chest x-ray, are you even able to
10   appreciate the 11th and 12th ribs?
11   A.      No.
12   Q.      Okay.  So if, in fact, there were 11th and 12th rib
13   fractures, they would not have even shown up, in your
14   opinion, on a plain chest x-ray such as the one asked --
15   that Mr. Siler asked you about?
16   A.      I can count them for you if you want to see them --
17   Q.      Okay.
18   A.      -- just so that you --
19   Q.      Just can you appreciate the 11th and 12th rib?
20   A.      No.
21   Q.      Okay.  Would you ever use that plain chest x-ray to
22   diagnose fractured 11th and 12th ribs?
23   A.      No.
24   Q.      Okay.  Mr. Siler asked you about chronic or acute in
25   terms of the rib fractures.  I'm just going to ask you very
```

1    plainly, is that a chronic rib fracture?

2          MR. SILER:  Now, I'm going to object to this.  He is

3    not a radiologist.  He said he is a pulmonologist.  This is

4    bones, not anything to do with lungs.  So I object to him

5    being able to give an opinion on that subject.

6          THE COURT:  Okay.  Overruled.

7          MR. SILER:  All right.

8    BY MR. FLECHAS:

9    Q.    Just plainly, is that a chronic rib fracture that we

10   see there?

11   A.    I say no because --

12   Q.    Why do you say no?  What is --

13   A.    No.

14         MR. SILER:  He was explaining his answer, so I want

15   him to continue.

16   BY MR. FLECHAS:

17   Q.    Why do you say no?

18   A.    When a bone starts healing, there's a callus; it's

19   called a callus.  It's similar to something you get on your

20   finger if you work with your hands.  But it's blood vessels

21   and all types of different cells that come in and try to

22   make new bone.  You don't see any evidence of any callus

23   there.  It's just a clean break.

24   Q.    Can you see clean fracture lines here?

25   A.    Yes.

DR. CAMERON HUXFORD - REDIRECT

1    Q.    And can you appreciate that this is a displaced

2    fracture?

3    A.    Yes.

4    Q.    Earlier you talked about the hemothorax, and you

5    testified that the hemothorax was consistent with the rib

6    fractures; is that correct?

7    A.    Yes, sir.

8    Q.    Okay.  Is there any way that the hemothorax as caused

9    by the rib fractures was a chronic injury?

10   A.    No, sir.

11   Q.    Why not?

12   A.    Well, in this particular case, the treatment for

13   Mr. Anthony in the hospital was that they -- at University

14   Hospital was they put a chest tube into that space, and the

15   report said that immediately, 500 CCs or more liters of

16   blood came out, a half a liter.  If that blood had been in

17   there for any amount of time --

18   Q.    Let me ask you this before you --

19   A.    Okay.

20   Q.    -- you finish that answer.

21         In order for this to be a chronic rib fracture, how

22   far before this image would this have had to have occurred?

23   Weeks?

24   A.    A chronic, yes, weeks.

25   Q.    That's how long it would take for that rib to begin

1  to heal to necessitate the term "chronic;" is that right?

2  A.    Yes.

3  Q.    All right.  So finish your answer about if -- if this

4  had happened -- if this could have happened weeks prior.

5  A.    Well, blood coagulates or clots --

6  Q.    Even blood that's bleeding out inside the body?

7  A.    Any blood.

8  Q.    Okay.

9  A.    And so if it had stayed in that area for any amount

10  of time, it would clot or coagulate, and it wouldn't come

11  out freely with a chest tube.

12  Q.    Did Mr. Anthony's blood come out freely with the

13  chest tube?

14  A.    The doctor's record said it immediately came out.

15  Q.    How much blood immediately rushed from Mr. Anthony's

16  body as soon as that chest tube was inserted?

17  A.    At least 500 milliliters, which would be a half a

18  liter.

19  Q.    Was there an indication in the record that you saw of

20  how rapidly -- let me ask you this.  Strike that for a

21  moment.

22        The images that were taken at Merit Health that Merit

23  Health interpreted and had the language in there of chronic

24  or subacute; do you recall that?

25  A.    Yes, sir.

1  Q.      Is there an indication in the University of

2  Mississippi medical records that those same images were

3  uploaded to UMMC?

4  A.      In the ER notes, there was a reference given that the

5  outside images were uploaded.

6  Q.      Okay.  And those images were uploaded and reviewed;

7  is that right?

8  A.      Yes, sir.

9  Q.      And at the trauma center UMMC, are those rib

10 fractures ever referred to as chronic or subacute?

11 A.      No, sir.

12 Q.      Instead are they just referred to as rib fractures

13 and displaced rib fractures?

14 A.      Correct.

15 Q.      Mr. Siler also asked you about a note about

16 abrasions.

17         Court's indulgence one moment.

18         All right.  I want to direct your attention to where

19 this note says "injury description".  I believe you

20 referenced this note and said this was part of an

21 examination that would have been observances by a physician

22 or medical care provider; is that right?

23 A.      Yes, sir.

24 Q.      Okay.  It says, "Abrasion sustained to left-lateral

25 anterior chest, left-lateral posterior chest, and left

DR. CAMERON HUXFORD - REDIRECT

1   breast."  Is that right?

2   A.    Yes, sir.

3   Q.    Okay.  And you -- let me ask you first:  Are the area

4   that those abrasions are notated consistent with the

5   ultimate injuries that Mr. Anthony was diagnosed with?

6   A.    Yes, sir.

7   Q.    All right.  Does it say "scratches"?

8   A.    No, sir.

9   Q.    All right.  And you had indicated -- I believe your

10  terminology was it's some disruption of the skin, and you

11  said it could be a scratch; is that right?

12  A.    Yes, sir.

13  Q.    I believe Mr. Siler kind of seized upon the word

14  "scratch".  Is an abrasion necessarily a scratch?

15  A.    No, sir.

16  Q.    Could it be a reddening of the skin?

17  A.    Yes.

18  Q.    Do bruises form immediately upon being struck?

19  A.    No, sir.

20  Q.    Mr. Anthony testified that this was a photo from the

21  hospital.  Is that what that looks like that is?

22  A.    Yes, sir.

23  Q.    All right.  Tell the jury what you see as far as just

24  his state in this photo.

25  A.    What you see is the chest tube, that's what was put

1   into his chest to drain the blood.  You cannot see where it

2   goes into the skin.  It's covered by the top bandage.  And

3   you can see red fluid in the tube.

4   Q.      Okay.  This is the fluid that, for five days, drained

5   off of Mr. Anthony while he was at UMMC; is that right?

6   A.      Yes, sir.

7   Q.      Do you, beside these bandages, note these areas?

8   A.      I see those.

9   Q.      All right.  What is that?

10  A.      Well, from -- from -- it's a discolor.  It's a

11  darkening or discoloration of the skin.  It appears to be in

12  three distinct spots.

13  Q.      Okay.  Would you call those bruises?

14  A.      They appear to be bruises.

15  Q.      Are those bruises indicative of trauma, blunt-force

16  trauma, to that area of the body?

17  A.      Yes.

18  Q.      You actually care for patients on a daily basis, is

19  that right, when you're -- when you're working?

20  A.      Yes, sir.

21  Q.      Not on your days off --

22  A.      Yes, sir.

23  Q.      Okay.  So in the course of treating patients, do you

24  have occasion to review and read imaging that's provided to

25  you of the patient's injuries?

DR. CAMERON HUXFORD - REDIRECT

1    A.    Yes, sir.

2    Q.    Okay.  Do you have occasion sometimes that if you

3    come across a radiologist's opinion that you disagree with,

4    that you talk to the radiologist about that?

5    A.    That's common.

6    Q.    Okay.  Have you, on occasion, had radiologists change

7    their reading in response to what you see in the medical

8    imaging?

9    A.    Yes, sir.

10   Q.    And, again, on the UMMC records, do any of the

11   radiology reports or the reviews of the Merit Health imaging

12   refer to those rib fractures as chronic or subacute?

13   A.    No, sir.

14   Q.    Finally, Your Honor -- or, Dr. Huxford, we talked

15   about -- Mr. Siler asked you about whether a mediastinal

16   hematoma could be spontaneous.  I believe you said anything

17   is possible.

18         All right.  Is anything likely?

19   A.    No, sir.

20   Q.    Is it more likely than not that this would have been

21   a spontaneous hematoma?

22   A.    It's unlikely that that would have been spontaneous.

23   Q.    All right.  Is it unlikely that he would have

24   suffered a spontaneous mediastinal hematoma, a spontaneous

25   rib fracture, and a spontaneous hemothorax all at the same

1   time right after being brought out of the bathroom at the

2   Pearl Police Department?

3   A.      It would be unlikely.

4   Q.      And, again, does the timing of the onset of the

5   symptoms as you observed them with Mr. Anthony grabbing his

6   chest and complaining of chest pain and fear that he was

7   having a heart attack, consistent with the timing that you

8   would expect this area of his chest to be filling with fluid

9   and affecting his heart?

10  A.      Yes, sir.

11  Q.      Based upon Mr. Siler's examination, have any of your

12  opinions changed?

13  A.      No, sir.

14  Q.      And all of your opinions are still to within a

15  reasonable degree of medical certainty?

16  A.      Yes, sir.

17  Q.      You still believe that it's more likely than not

18  these events occurred and these injuries were caused in the

19  way that Mr. Anthony described?

20  A.      Yes, sir.

21          MR. FLECHAS:  No further questions.

22          THE COURT:  All right.  May this witness be fully and

23  finally excused?

24          MR. SILER:  Your Honor, could I follow up on a few

25  things he asked?  It won't take long but just to follow up

```
 1    on a few --
 2            THE COURT:  Just approach, please.
 3                        (BEFORE THE BENCH)
 4            THE COURT:  I don't usually allow additional
 5    questions, so that's why I want to hear what it is.
 6            MR. SILER:  Okay.  Well, I wanted to make sure
 7    that -- I wanted to explore that x-ray just briefly that he
 8    put up there because I didn't -- I don't think I put an
 9    x-ray up at all during my cross.
10            MR. FLECHAS:  You put a reading of an x-ray.
11            MR. SILER:  I put a reading, but I didn't put the
12    x-ray up.  And I just wanted to make sure that -- there's
13    300 x-rays.  It's almost like he's saying there's only one
14    out there, and I wanted him to look at that.  I wanted him
15    to see what the radiologist had actually said, and -- and I
16    wanted to question him about the bruises, which that -- I
17    never put that photograph up there either.
18            THE COURT:  Yeah.  But you didn't put the photograph
19    up there, but you did ask about bruising and abrasions
20    versus contusions and all of those things.
21            MR. SILER:  I did.
22            THE COURT:  I'm not going to allow any additional
23    questioning.
24            MR. SILER:  Okay.  Any -- no additional questions?
25            THE COURT:  No.
```

```
 1          MR. SILER:  Okay.  You Honor, one of the things while
 2   we're here, we have a -- they stipulated to the fact that
 3   those fractures were subacute or chronic, that's one of the
 4   stipulations.
 5          THE COURT:  Okay.  Wait a minute.
 6          MR. FLECHAS:  If I can speak?
 7          THE COURT:  Yes.
 8          MR. FLECHAS:  We stipulated that there was a
 9   diagnosis of some, and that was based upon Ms. Bland's
10   request that we stipulate that there was a diagnosis of
11   subacute or chronic 11th and 12th rib fractures.  We never
12   stipulated that that's what he was suffering from.
13          THE COURT:  Okay.
14          MR. FLECHAS:  There was a diagnosis --
15          THE COURT:  Everybody hold your positions.
16          MS. BLAND:  Number four.
17          THE COURT:  So it does say "diagnosis" --
18          MR. FLECHAS:  Uh-huh, that's a true statement.
19          THE COURT:  And that's fine.  Okay.  Here's the
20   thing, like I said on the stipulations, when you get to your
21   case in chief, somebody needs to stand up and read the
22   stipulations into the record.  And I can instruct the jury
23   on what a stipulation means, that's fine.  But I don't think
24   that changes anything for the purposes of this witness.
25          MR. SILER:  Okay.
```

```
 1              THE COURT:  All right.  Thank y'all.

 2              MR. SILER:  Thank you.

 3                        (IN OPEN COURT)

 4              THE COURT:  All right.  Mr. Flechas, may this witness

 5    be fully and finally excused?

 6              MR. FLECHAS:  As far as the plaintiff is concerned,

 7    Your Honor, yes.

 8              THE COURT:  All right.  You may step down,

 9    Dr. Huxford.

10              MR. LEES:  Another witness?

11              THE COURT:  We're right at the lunch hour, so I think

12    this may be a good time rather than to get into another

13    witness.

14              We're coming up on noon right now.  If we can have

15    you back downstairs, let's say no later than ten after 1:00,

16    and we'll have y'all up here and ready to go by 1:15.  Does

17    that work?  Is that enough time?

18              Okay.  All right.  We will see you downstairs at ten

19    after 1:00.  Remember the Court's instructions.  Have a good

20    lunch.

21              MS. POWELL:  All rise.

22                        (Jury out at 11:58 a.m.)

23              THE COURT:  All right.  Y'all may be seated.

24              Mr. Lees, can you give me just an idea of the

25    afternoon, what that looks like.
```

```
 1        MR. LEES:  Yes.  I will have one additional witness,
 2   and then the plaintiff will rest.
 3        THE COURT:  All right.  You can sit.  Okay.  Let's
 4   plan to -- we'll take that witness.  We'll let the jury take
 5   a break after that.  I'll deal with any motions, and then
 6   we'll figure out after that what the rest of the afternoon
 7   looks like.
 8        You all know the case and the witnesses better than I
 9   do.  Does it look like tomorrow, maybe by late afternoon
10   tomorrow it could go to the jury, or are we definitely
11   running into Friday?
12        I have -- my schedule's free.  I'm just curious for
13   getting jury instructions to you all and planning purposes.
14        MR. SILER:  I would think there's a chance we could
15   get it to the jury tomorrow afternoon.
16        THE COURT:  Okay.  All right.  We'll be ready.
17        All right.  I will see you all back here and ready to
18   go by 1:15.  Thank you all.
19        MS. POWELL:  All rise.
20             (A lunch recess was taken.)
21        THE COURT:  All right.  Do we need to take up
22   anything before we bring in the jury?
23        MR. FLECHAS:  Not by the plaintiffs.
24        MR. SILER:  Not by the defendants, Your Honor.
25        THE COURT:  All right.  Bring them in.  All rise.
```

```
 1                        (Jury in at 1:22 p.m.)

 2              THE COURT:  All right.  You may be seated.

 3              Who does the plaintiff call as his next witness?

 4              MR. LEES:  The plaintiff will call Defendant Jacob

 5     Lang.

 6              THE COURT:  All right.  Mr. Lang, if you'll place

 7     your left hand on that Bible and raise your right hand,

 8     you'll be sworn.

 9              (Whereupon, Jacob Lang was placed under oath.)

10              THE COURT:  All right.  Mr. Lang, you've been able to

11     be in the courtroom and hear my instructions, but I'll

12     repeat them again.  Just make sure you speak clearly in that

13     microphone, so Ms. Crane can take down your testimony.  And

14     make sure that -- you may anticipate what the lawyers are

15     going to ask you, so you'll be inclined to answer, but just

16     let the lawyers finish before you do.  Okay?

17              THE WITNESS:  Yes, ma'am.

18              THE COURT:  All right.  You may proceed, Mr. Lees.

19              MR. LEES:  Thank you.

20                            **JACOB LANG,**

21                    **having been first duly sworn, was examined**

22     **and testified as follows...**

23                        **DIRECT EXAMINATION**

24     **BY MR. LEES:**

25     Q.    Would you tell the ladies and gentlemen your full
```

1  name, sir?

2  A.    My name is Jacob Lang.

3  Q.    Mr. Lang, you and I have never met before; correct?

4  A.    Correct.

5  Q.    And may I ask how old you are?

6  A.    Yes, sir, I'm 25 years old.

7  Q.    Okay.  So at the time these -- the subject matter of

8  this case was occurring back in late April of 2022, you

9  would have been 22, 23?

10  A.    Yes, sir.

11  Q.    And as of April the 30th, 2022, you were a police

12  officer employed by the Pearl Police Department; correct?

13  A.    Yes, sir.

14  Q.    And at all times on both April 29th and April 30th,

15  2022, you were acting in your capacity as a police officer

16  for the City of Pearl; is that correct?

17  A.    Correct.

18  Q.    Would you also agree that Jonathon Welker was also a

19  police officer employed by the Pearl Police Department on

20  those same dates?

21  A.    Yes, sir.

22  Q.    How long had you been a police officer prior to the

23  events of April the 30th, 2022?

24  A.    I graduated the police academy, I believe it was

25  November 19th of 2020.

JACOB LANG - DIRECT

1    Q.      So you would have been 20 years old, give or take?

2    A.      Twenty-one.

3    Q.      Did you work anywhere else as a police officer prior

4    to working for the City of Pearl?

5    A.      No, sir.

6    Q.      And in fairness to you because we've mentioned this

7    before, and I want to clear this up.  You're no longer a

8    police officer; correct?

9    A.      Yes, sir, I am.

10   Q.      You are a police officer?

11   A.      Yes, sir.

12   Q.      Okay.  I apologize.  As of the time of your

13   deposition, you were not a police officer; correct?

14   A.      That's correct.

15   Q.      All right.  What -- what was your last day as a

16   police officer with the City of Pearl?

17   A.      April 30th, 2022.

18   Q.      And I want to give you an opportunity, so nobody has

19   a misunderstanding, to explain the circumstances of why you

20   were no longer a police officer after April the 30th of

21   2022.

22   A.      Yes, sir.  Directed to the jury, on approximately two

23   weeks before, I turned in my two weeks' notice to the Pearl

24   Police Department due to the fact of I was going to another

25   agency as in Mississippi Highway Patrol.  So I was going to

1   have to attend the training academy which was -- if I

2   remember correctly, it was May 15th.  So I took off the --

3   or my last day was April 30th to change to go to a different

4   department.

5   Q.     Okay.  And then as of April -- I'm sorry.  As of

6   May 1st, you were no longer employed as a police officer;

7   correct?

8   A.     Yes, sir.

9   Q.     And when did you become a police officer again?

10  A.     I want to say shortly after, maybe June, mid June, or

11  end of June maybe.

12  Q.     Of 2022?

13  A.     Yes, sir.

14  Q.     Okay.  And you were deposed in 2024; is that correct?

15  A.     I believe so, yes, sir.

16  Q.     And you were not a police officer then; correct?

17  A.     I believe that's correct.

18  Q.     And where were you working at and what kind of work

19  were you doing in 2024?

20  A.     Yes, sir.  So to go back a little bit, I started

21  June, July at the Madison Police Department and proceeded up

22  to 2023 or sometime in 2023.  I stayed there, and then left

23  the Madison Police Department and got back out of law

24  enforcement.  And I was a project manager for a commercial

25  developer at the time for a short period, and that's when

1    the deposition was, when I was a project manager for a

2    commercial developer.

3    Q.     And then who hired you as a police officer and when

4    after your deposition?

5    A.     Yes, sir, August of 2024 I became a police officer.

6    Q.     Where?

7    A.     Flora Police Department.

8    Q.     And that's where you're employed now?

9    A.     Yes, sir.

10   Q.     All right.  I want to begin, if I may, to get

11   something out of the way first with the morning hours of

12   April 30th, 2022.  You were one of the officers that went

13   with other officers to the home where Jimmy Anthony and

14   Brandi Quick were living; correct?

15   A.     Correct.

16   Q.     And you and your fellow officers went there that

17   morning with the purpose and intent of arresting Mr. Anthony

18   for a misdemeanor domestic assault; is that correct?

19   A.     That's correct.

20   Q.     All right.  And can you tell us approximately how

21   many officers went together that morning to do this

22   warrantless arrest?

23   A.     Approximately, I would say maybe four.

24   Q.     Okay.  Was there any type of a meeting that occurred

25   at the police department between all the officers who were

1    going to go that morning to coordinate your efforts once you

2    got on the scene?

3    A.    Yes, sir.

4    Q.    Okay.  So it was basically a planned arrest; correct?

5    A.    Yes, sir.

6    Q.    With a meeting before you left the station to make

7    sure everybody knew what they were doing; correct?

8    A.    I can't remember if it was at the station, but we did

9    have a meeting.

10    Q.    And when you got on the scene, you were one of three

11    officers who made entry to the house through a bedroom

12    window; correct?

13    A.    That's correct.

14    Q.    And you went in through the bedroom window.  Officer

15    Welker went through the bedroom window; correct?

16    A.    Yes, sir.

17    Q.    Officer Tyler Lents went through the bedroom window;

18    correct?

19    A.    Correct.

20    Q.    It was a policy, a written rule of the Pearl Police

21    Department that when you interacted with the public, you're

22    supposed to have your body camera on and recording; correct?

23    A.    Yes, sir.

24    Q.    And since this was a preplanned trip to make the

25    arrest, all of the officers would know in advance you were

1    going to be interacting with the public; correct?

2    A.    Yes, sir.

3    Q.    But you did not have a body camera on recording;

4    correct?

5    A.    Correct.

6    Q.    Officer Lents did not have a body camera on

7    recording; correct?

8    A.    From what is stated, correct.

9    Q.    Officer Welker had a body camera on, but it was

10   turned off; correct?

11   A.    From what is stated, correct.

12   Q.    So three separate and distinct officers in a

13   preplanned trip to make an arrest of a citizen, all three

14   were in violation of the police department policy regarding

15   body cameras; correct?

16   A.    Yes, sir, that's correct.

17   Q.    Do you have an explanation for how that happened?

18   A.    Yes, sir.  I can only speak on my behalf.

19   Unfortunately that morning -- our body cameras are something

20   like a phone.  It looks like a phone that has a case that

21   goes inside our vest.  We actually charge those body cameras

22   with a cord that works with a phone as well, so we have to

23   plug them in just as a phone.  It's not like a video

24   camcorder that most use.  It's an actual phone.

25         And unfortunately that morning, I don't guess I

1    plugged my body camera up at the time, and then whenever we

2    went to retrieve Mr. Anthony under the warrantless arrest, I

3    just -- I noticed I guess I did not charge my body camera at

4    the time.

5    Q.    So you did or did not have it on?

6    A.    No, sir, I did not have it on.

7    Q.    When I say "on," was it on your vest?

8    A.    I can't recall if I had it on my vest or not.  It

9    was -- it slides inside so I just -- it's nothing I can feel

10   on the outside.  It's just the camera piece that you see.

11   Q.    So when did you realize that you were about to

12   interact with the public without a working body cam?

13   A.    I don't recall.

14   Q.    Would you agree with we that one of the purposes of

15   having a body cam on and recording is to protect the police

16   officers as well from allegations of misconduct?

17   A.    That's correct.

18   Q.    Let's see if you can agree with a few things, though.

19   When you entered the bedroom window, you saw two people

20   laying in bed; correct?

21   A.    Yes, sir.

22   Q.    You saw two people laying in bed with covers over

23   them; correct?

24   A.    That's correct.

25   Q.    You could not see any hands because of the covers;

1  correct?

2  A.    That's correct.

3  Q.    One of the officers who went through the window drew

4  a Taser; correct?

5  A.    Correct.

6  Q.    Another officer drew a weapon; correct?

7  A.    I guess -- I don't recall, though, a weapon.

8  Q.    Could you bring up Clip 2, please.  Reference

9  deposition of Mr. Lang, page 44, line 16, through 45, line

10 11.  Do you mind if I show you your deposition to refresh

11 your recollection on that?

12 A.    Yes, sir, please.  Thank you.

13                (Video playing in open court.)

14         MR. LEES:  Stop.  My apologies.  Clip 3.

15                (Video playing in open court.)

16 BY MR. LEES:

17 Q.    Stop.  Does that refresh your recollection that one

18 officer drew a Taser and one officer drew a weapon?

19 A.    Yes, sir.  Thank you for that.

20 Q.    Uh-huh.  You can take that down for the moment.

21        Is it true then that -- excuse me -- do you remember

22 which officer drew the Taser?

23 A.    No, sir, I do not.

24 Q.    Do you remember which officer drew the weapon?

25 A.    No, sir, I do not.

1    Q.    Were either one of those you?

2    A.    I don't recall.

3    Q.    Am I correct that the two people laying in the bed

4    removed the covers and showed you their hands?

5    A.    No, sir.

6          MR. LEES:  Okay.  Let's go back to the video again,

7    the same Clip 3, and start it at the beginning.  Page 43,

8    line 16 through 44, line 11.

9                     (Video playing in open court.)

10         MR. LEES:  Stop.

11   BY MR. LEES:

12   Q.    Does that refresh your recollection that they removed

13   the covers and showed you their hands?

14   A.    Yes, sir.  I believe it says that once we removed the

15   covers for them, they then showed their hands.

16         MR. LEES:  Okay.  Back it up, please, and play it one

17   more time.  I don't want to mislead anybody.  Go ahead.

18                     (Video playing in open court.)

19   BY MR. LEES:

20   Q.    Is that all true and correct testimony?

21   A.    Yes, sir.  It says -- from what I just watched, it

22   says once they removed the covers for them.

23   Q.    So when you say "when they removed," you were not

24   referring to the two people in the bed?

25   A.    No, sir.

1    Q.      Who were you referring to?

2    A.      The officers removed the covers.

3    Q.      Okay.  And then the two officers removed the covers,

4    you saw their hands, you took him into custody, you

5    handcuffed him, and that's it; correct?

6    A.      As far as to me, correct.

7    Q.      Well, this is your recollection; right?

8    A.      I didn't -- they didn't kick me or push me or

9    anything.  I can only speak on my behalf --

10   Q.      I didn't ask you anything about kicking you or

11   pushing you?

12          MR. SILER:  Objection, he's not letting the witness

13   finish his answer.

14          THE COURT:  Okay.  Let him finish.  Ask your

15   question, and them allow him an opportunity to respond.

16   BY MR. LEES:

17   Q.      Well, you can go ahead and say what you want, and

18   then I'll ask a question.

19   A.      Yes, sir.  As I was just stating that he didn't, to

20   me personally, he didn't kick or push or shove as I was

21   watching my deposition here.

22   Q.      Well, you were asked did they kick, or did they kick

23   anybody; correct?

24   A.      It was to my personally.

25   Q.      You, the officers that were there, you were asked if

1    they kicked, and you said "no."  Right?

2    A.    I'm speaking for myself, I'm not sure.

3    Q.    What do you mean you're speaking for yourself?

4          Three of you were in the room; right?

5    A.    Yes, sir.

6    Q.    You were asked if you had anything else to share with

7    the jury or anything of note happened that you wanted to

8    share about how that arrest was done, other than covers were

9    removed, they showed their hands, they put their hands

10   behind their back, or Mr. Anthony did and he was handcuffed.

11         And you said, no, you didn't have anything else to

12   share; right?

13   A.    Yes, sir.

14   Q.    Do you have anything else to share now, other than

15   that?

16   A.    No, sir.

17   Q.    Because that's truthfully what happened in that room

18   when you went in and arrested them; right?

19   A.    I don't recall.

20   Q.    What do you mean you don't know?

21         Why would -- if that's truthfully what happened when

22   you went in the room, why would you now say you don't know

23   if that's the truth?

24   A.    I -- to my knowledge, I've just -- I mean, during

25   this deposition, it was a couple of years after.  I just

JACOB LANG - DIRECT

1    don't recall exactly.

2    Q.    Is it the fact that after Officer Welker testified in

3    his deposition on the same day before you gave your

4    deposition, you called him to ask him what the deposition

5    was about?

6    A.    We didn't talk about the actual -- what was going on

7    in the deposition.

8    Q.    Did you call him --

9    A.    Yes, sir.

10   Q.    -- before your deposition?

11   A.    Yes, sir.

12   Q.    After his deposition?

13   A.    Yes, sir.

14   Q.    The truth of the matter is with all due respect,

15   Mr. Lang, Mr. Anthony didn't fight, didn't kick.  He was

16   taken into custody with no problem.  Isn't that the truth?

17   A.    I don't recall.

18   Q.    You said in your deposition that's what you recalled.

19   Why are you hesitating?

20   A.    It looks as if I hesitated in my deposition as well

21   about the answer.  I'm not sure.

22   Q.    Is it because Officer Welker who told you he has a

23   different version now?

24   A.    No, sir.  We didn't talk about this instance.

25   Q.    Oh, you didn't talk about this.  So you're not now

JACOB LANG - DIRECT

1    trying to change your story to support Officer Welker?

2    A.    No, sir.

3    Q.    Because if somebody now comes in here and tries to

4    tell this jury Mr. Anthony resisted arrest, kicked, fought

5    people, that wouldn't be true, would it?

6    A.    That's his -- that's his testimony against mine, I

7    mean.

8    Q.    That wouldn't be true testimony, though, would it,

9    based upon what you observed would it?

10   A.    He may -- he may remember more than I do.

11   Q.    Would it be true testimony?  You were there.

12   A.    Yes, sir.

13   Q.    And so it wouldn't be true, would it?

14   A.    I'm not sure.

15   Q.    Why aren't you sure?  You were there and told us

16   nothing else happened in your deposition under oath?

17   A.    Yes, sir.

18   Q.    So why wouldn't you be sure today if you were sure

19   two years ago?

20   A.    Sure two years ago about what, sir?

21   Q.    That nothing else happened, no fighting, no kicking,

22   no resisting arrest.

23   A.    Yes, sir.  I'm not sure.

24   Q.    If an individual hits a police officer, strikes a

25   police officer, kicks a police officer, that individual is

JACOB LANG - DIRECT

1  usually charged with resisting arrest; correct?

2  A.    That's correct.

3  Q.    Was Mr. Anthony ever charged with resisting arrest

4  for what happened on the morning of April 30th?

5  A.    No, sir.

6  Q.    You indicated to me, Mr. Lang, that -- excuse me --

7  Officer Lang.  You indicated to me, Officer Lang, that

8  before you were hired at the Pearl Police Department, you

9  attended a police academy; correct?

10 A.    Yes, sir.

11 Q.    And what police academy was that that you attended?

12 A.    Mississippi Law Enforcement Officer Training Academy

13 in Pearl.

14 Q.    All right.  Okay.  Is that a specific academy just

15 for Pearl, or is it broader?

16 A.    No, sir.  It's just in Pearl.  It's for multiple

17 different places all over Mississippi.

18 Q.    All right.  And in the police academy as part of your

19 standard training, you were taught when you participate in

20 an arrest, you write a police report that becomes part of

21 the full police report of the incident; correct?

22 A.    Yes, sir.

23 Q.    That is standard operating procedure for basically

24 every police department in the country; correct?

25 A.    Yes, sir.

JACOB LANG - DIRECT

```
1    Q.     Did you write a report for what happened on

2    April 30th?

3    A.     No, sir, I did not.

4    Q.     Why?

5    A.     No -- I'm not sure, sir.

6    Q.     When you say you're not sure, do you have any

7    explanation why you didn't follow the standard operating

8    procedure and write up and file a report as to what happened

9    with respect to the arrest of Mr. Anthony on the morning of

10   April 30th?

11   A.     No, sir.  It's just a mistake by myself, and I just

12   didn't write one.

13   Q.     If you had written a report as to what happened on

14   April 30th, that report would have had to include what

15   occurred at the police station later that morning, would it

16   not?

17   A.     Yes, sir.

18   Q.     And if you were of the opinion that you did not want

19   to write a report that would implicate another officer in

20   bad acts, one way to avoid doing that is simply not to file

21   a report; right?

22   A.     I speak for myself and what I know.

23   Q.     Then why didn't you speak for yourself that day and

24   write a report and file it?

25   A.     I'm not sure.  That was just a bad part on myself.
```

JACOB LANG - DIRECT

1          MR. LEES:  You can take that clip down.

2    BY MR. LEES:

3    Q.     You were the one that took Mr. Anthony to your patrol

4    car and put him in the patrol car; correct?

5    A.     Yes, sir.

6    Q.     Were you poking him with a flashlight or something

7    and taunting him on the way?

8    A.     I don't recall.

9    Q.     Were you mad at him?

10   A.     I was agitated.

11   Q.     Okay.  What did he do to you that morning that made

12   you agitated?

13   A.     It wasn't necessarily just that morning.  I mean,

14   it's just all in all the amount of times that we have to go

15   over there and deal with that one problem multiple times

16   over and over and over.  It just kind of builds up, and we

17   have to go deal with it constantly with the same two people.

18   And it just -- I just got agitated that day.

19   Q.     Does that happen frequently when you're policing?

20   A.     No, sir.

21   Q.     Was this a one-off?

22   A.     It was just I was -- I guess I was having a bad

23   morning.  It was a bad part on myself, and I own up to it.

24   And I shouldn't have done what I did.

25   Q.     Including slamming his head into the wall?

JACOB LANG - DIRECT

1   A.    I didn't slam his head against a wall.

2   Q.    When you brought him into the booking room, were you

3   out of control?

4   A.    I wouldn't say out of control.  I was -- I was acting

5   in a way I should not have.

6   Q.    But not out of control?

7   A.    No, sir.

8   Q.    Because you knew exactly what you were saying;

9   correct?

10  A.    Correct.

11  Q.    And you knew exactly what you were doing; correct?

12  A.    Yes, sir.

13  Q.    And may I ask, as a police officer who attended a

14  police academy, what was the intent or purpose of your

15  communications to Mr. Anthony that morning in the booking

16  area?

17  A.    Yes, sir.  Again, it was just not my greatest moment

18  in law enforcement.  I should not have done what I did and

19  hollered the way I did and acted unprofessional like I did.

20  I take 100 percent responsibility for what I did do.  And if

21  I could go back, I would, but at this point, I just learn

22  from my mistakes and move on.

23  Q.    All right.  And I appreciate that, and you've said it

24  a couple of times.  But that wasn't my question.

25        My question is:  What was your intent in your

JACOB LANG - DIRECT

1    communication with him?  If you were in control and you

2    weren't out of control, what was your intent by

3    communicating with this particular American citizen in

4    custody in that manner?

5    A.    Yes, sir.  I didn't really have an intent for

6    anything.  It was just a -- I guess you could say an

7    aggressive communication.

8    Q.    Just for my record, and I apologize to everybody, but

9    I need to make sure my record is correct.

10         Did you say, "Let me tell you one God damn thing"?

11   A.    Yes, sir, I did.

12   Q.    Did you say, "Let me tell you one mother-fucking

13   thing"?

14   A.    Yes, sir, I did.

15   Q.    Did you say, "Look at me when I'm talking to you"?

16   A.    Yes, sir, I did.

17   Q.    Did you say, "Let me tell you one God damn thing"?

18   A.    Yes, sir, I did.

19   Q.    Did you say, "I gave you a fucking opportunity

20   yesterday, did I not?"

21   A.    Yes, sir, I did.

22   Q.    What were you talking about?

23   A.    To come talk to us.  Come and not make us come look

24   for him and turn himself in, or come speak with us about the

25   matter.

JACOB LANG - DIRECT

1    Q.    Did you say, "I talked to you on the fucking phone
2    for ten God damn minutes giving you a fucking chance, and
3    you didn't fucking take it"?  Did you say that?
4    A.    Yes, sir.
5    Q.    Did you say, "Not once I gave you the chance to come
6    talk to me, but you didn't.  And what did I tell you was
7    going to happen?  What did I tell you?"  Did you say that?
8    A.    Yes, sir.
9    Q.    And what was going to happen to him?
10   A.    He possibly would not have went to jail, and we could
11   have figured out the issue from both sides of the party
12   (sic).
13   Q.    That's possible.
14   A.    Yes, sir.
15   Q.    Anything else possible that you were referring to
16   that was going to happen to him when you got him?
17   A.    No, sir.
18   Q.    Like taking him into the bathroom and beating him?
19   A.    No, sir.
20   Q.    That's not what you were referring to?
21   A.    No, sir.
22   Q.    "I want you to know, what did I tell you was going to
23   happen?  That I was going to fucking find you, did I not?"
24        Did you say that?
25   A.    Yes, sir.

1  Q.     Did you say, "You're a dumb mother fucker."  Correct?

2  A.     Yes, sir.

3  Q.     This is an American citizen in your custody; correct?

4  A.     That's correct.

5  Q.     And did you say, "And call your fucking lawyer on

6  this one"?

7  A.     Yes, sir.

8  Q.     What was your intent there?

9  A.     Just if he had a problem with it, I just not -- tell

10 him to call a lawyer.

11 Q.     Because you wanted him to call a lawyer?

12 A.     I'm not sure, sir.  I was just agitated and was

13 talking.

14 Q.     If you, in fact, slammed his head into a wall when

15 you went into the hallway, you would agree with me that

16 would be excessive force; correct?

17 A.     Yes, sir.

18 Q.     You would agree with me that you went into that

19 hallway; correct?

20 A.     Yes, sir.

21 Q.     What was the purpose of going into the hallway?

22 A.     If you go into that hallway, you can either go -- the

23 hallway goes either outside to where my vehicle's parked, or

24 you can go right and go into the -- either the Lieutenant

25 and Sergeants' Office, the squad room, the paperwork room.

JACOB LANG - DIRECT

1    You can go anywhere, sir.

2    Q.    All right, you can.  But my question is:  What was

3    your intent going into the hallway that morning?

4    A.    I don't recall where I was going.

5    Q.    And without a police report, there's nothing to go

6    back on to look to refresh your recollection, is there?

7    A.    That's correct.

8    Q.    If you went into that hallway, you would have went

9    right past Mr. Anthony; correct?

10   A.    I'm not sure where he was standing in the hallway.

11   Q.    You're not?

12   A.    No, sir.  I know he was standing in the hallway.  I'm

13   just not sure where.

14   Q.    How do you know he was standing in the hallway?

15   A.    I just -- I remember seeing him in the hallway.  I'm

16   just not sure where.

17   Q.    So you remember seeing him in the hallway when you

18   were in the hallway; correct?

19   A.    Correct.

20   Q.    You don't remember, however, why you were in the

21   hallway; correct?

22   A.    Correct.

23   Q.    And you certainly never pushed or slammed his head

24   into the wall; correct?

25   A.    No, sir.

```
 1   Q.    Although several minutes before, you were saying all
 2   these things to him out in the booking area; correct?
 3   A.    Yes, sir.
 4   Q.    But you weren't out of control?
 5   A.    No, sir.
 6   Q.    Is it your position that you have no knowledge about
 7   any interaction that occurred in the bathroom between
 8   Officer Welker and Mr. Anthony?
 9   A.    No, sir.
10   Q.    That is not your position?
11   A.    I don't know anything about that.
12   Q.    Okay.  Let me rephrase and make sure we're not
13   miscommunicating.  Your position is today you have no
14   knowledge about any interaction that occurred in the
15   bathroom between Welker and Mr. Anthony; correct?
16   A.    Yes, sir, that's correct.
17   Q.    You don't know anything about what happened there?
18   A.    No, sir.
19   Q.    From any source; correct?
20   A.    No, sir.
21   Q.    Is that correct?
22   A.    That's correct.
23   Q.    As far as you know, Officer Welker just took
24   Mr. Anthony to the bathroom, Mr. Anthony did his business,
25   and they came out; correct?
```

JACOB LANG - DIRECT

```
1   A.      Yes, sir.

2   Q.      And that testimony is truthful; correct?

3   A.      Yes, sir.

4   Q.      So when Mr. Anthony comes back with Welker into the

5   booking room, you're there; correct?

6   A.      Yes, sir.

7   Q.      And isn't it true you heard Welker say to Mr. Anthony

8   in your presence, "Feels like you're about to have a heart

9   attack.  What's that feel like, Jimmy?  A sharp pain in your

10  chest, did you induce any -- did you feel any trauma?  Did

11  you have any trauma induced to your body today?"

12          You heard that; right?

13  A.      Yes, sir.

14  Q.      So they come out of the bathroom.  Welker is saying,

15  when the prisoner is complaining about pain in his chest or

16  feeling like he has a heart attack, and your fellow officer

17  is talking about, "Do you feel any trauma?  Did you have any

18  trauma induced to your body today?"

19          You did what?

20  A.      I believe I was booking at the time.

21  Q.      You knew exactly what he was talking about, Officer

22  Lang, didn't you?

23  A.      No, sir.

24  Q.      You knew he was talking --

25          MR. SILER:  Objection.  He's arguing with the
```

1    witness, Your Honor, not asking questions that are relevant

2    to the case.

3         THE COURT:  Okay.  Overruled.

4    BY MR. LEES:

5    Q.    You knew that he had beaten that gentleman in the

6    bathroom, did you not?

7    A.    No, sir.

8    Q.    So when you heard him talking about any trauma

9    induced to you today, you had no idea whatsoever what he was

10   talking about?

11   A.    No, sir.

12   Q.    And because you didn't know or have any idea what he

13   was talking about, you burst out into song with the phrase,

14   "He got beat because he run from the police."  Correct?

15   A.    Correct.

16   Q.    Come on.  "He got beat," that just popped into your

17   head for no reason at all?

18   A.    I -- I mean, I guess so.

19   Q.    You guess so?

20   A.    Yes, sir, I'm not sure.  I mean, I wouldn't say that

21   happened, because I'm not sure what happened.

22   Q.    With all due respect, sir, if you're telling the

23   truth today, why in the world would you break into a song

24   about this prisoner getting beat because he ran from the

25   police?

 1   A.      I was just talking out loud.

 2   Q.      Because why?

 3   A.      I was just talking.

 4   Q.      And what was the one thing you just told me you were

 5   so angry about when he first came into the booking, it was

 6   that he had ran the day before and didn't come in; right?

 7   A.      That, and multiple other occasions.

 8   Q.      Do you have any explanation for this gentleman's

 9   injuries, other than he got the hell beat out of him in the

10   bathroom of that police department?

11           MR. SILER:  Objection to the form of the question,

12   Your Honor.

13           THE COURT:  Sustain the objection, rephrase.

14   BY MR. LEES:

15   Q.      Do you have any explanation whatsoever for how he

16   sustained these injuries while he was in the custody of the

17   Pearl Police Department?

18   A.      No, sir, I do not.

19           MR. LEES:  No further questions.

20           THE COURT:  All right.  Do you want to question now,

21   Mr. Siler?

22           MR. SILER:  No, we'd like to reserve our questioning.

23           THE COURT:  All right.  You may step down, Officer

24   Lang.

25           THE WITNESS:  Thank you.

1          MR. LEES:  Your Honor, at this time I believe

2     Mr. Flechas has some stipulations he wants to read into the

3     record.

4          THE COURT:  Okay.

5          MR. FLECHAS:  Just for the record, Your Honor --

6          THE COURT:  Before you do that, I'm going to just

7     instruct the jury as to what a stipulation is and then allow

8     you to read those, Mr. Flechas.

9          All right.  A stipulation is an agreement.  When

10    there is no dispute about certain facts, the attorneys may

11    agree or stipulate to those facts.  You must agree a

12    stipulated fact -- excuse me -- you must accept a stipulated

13    fact as evidence and treat that fact as having been proved

14    here in court.

15         All right.  You may read the stipulated facts,

16    Mr. Flechas.

17         MR. FLECHAS:  To be clear, Your Honor, I'm not

18    reading all of them, just the ones that are applicable to

19    our case in chief.

20         THE COURT:  That's fine, but be at the podium in the

21    microphone.

22         MR. FLECHAS:  I'm sorry.

23         Jimmy Anthony was taken to the Pearl Police

24    Department on April 30th, 2022, by Jacob Lang.  On

25    April 30th, 2022, Jimmy Anthony was taken to the Rankin

1    County Jail by Jonathon Welker.

2         On April 30th, 2022, Jimmy Anthony was taken by

3    ambulance from the Rankin County Jail to Merit Health Rankin

4    County.  On April 30th, 2022, Jimmy Anthony was transferred

5    to University of Mississippi Medical Center from Merit

6    Health Rankin County.

7         Defendants Lang and Welker were officers of the

8    Pearl, Mississippi, Police Department on April 30th, 2022,

9    and officers with the Pearl Police Department arrested Jimmy

10   Anthony on April 30th, 2022.

11        THE COURT:  All right.  You can do it in your case in

12   chief if there's any additional stipulations.

13        MR. SILER:  Oh, okay.

14        THE COURT:  Who does the plaintiff call as his next

15   witness?

16        MR. FLECHAS:  Your Honor, at this time the plaintiff

17   rests.

18        THE COURT:  All right.  I'm going to take up a couple

19   of matters with the attorneys that need to be outside your

20   presence.  So if you will, just step into the jury room, and

21   I'll come back and get you shortly.

22        Remember the Court's instructions.

23        MS. POWELL:  All rise.

24              (Jury out at 2:01 p.m.)

25        THE COURT:  All right.  You may be seated.

1          All right.  For purposes of the afternoon, we'll go

2     ahead, if the defense does have a motion, I'll hear that

3     now.  And then what are we looking at after the motion,

4     Mr. Siler?

5          MR. SILER:  Well, I believe our first two witnesses

6     will be our clients, and that may get us through the

7     afternoon.  If it doesn't, I'll -- we'll be giving thought

8     to where we go beyond that.

9          THE COURT:  Okay.  Sounds good.  Ms. Bland, are you

10    going to handle the motion?

11         MS. BLAND:  Yes, Your Honor.

12         THE COURT:  If you'll come to the podium for me, you

13    may proceed.

14         MS. BLAND:  May it please the Court?

15         Plaintiff's claim is brought under the Fourteenth

16    Amendment.  There is a threshold requirement for excessive

17    force claims under the Fourteenth Amendment that plaintiff

18    be a pretrial detainee.  At the time of the alleged use of

19    force here, he was not.

20         As a bit of background, the complaint pled both a

21    Fourth and Fourteenth Amendment claim.  Last Monday when

22    plaintiff's proposed jury instructions were submitted, we

23    learned for the first time that plaintiff had voluntarily

24    abandoned his Fourth Amendment claim and was proceeding only

25    under the Fourteenth Amendment under the theory that he was

1    a pretrial detainee at the time.

2         The Fifth Circuit has said there's not a bright line

3    rule for determining when a plaintiff moves from an arrestee

4    to a pretrial detainee but the --

5         THE COURT:  Slow down for me a little bit.

6         MS. BLAND:  I'm sorry.

7         THE COURT:  It's okay.

8         MS. BLAND:  But the Fifth Circuit has given some

9    guidance in the way of three factors.  One is that the

10   incidents of arrest have to be complete.  Okay, Mr. Anthony

11   may have that one.

12        The second one is that he had to have been released

13   from the arresting officer's custody.  He was not released

14   from the arresting officer's custody here until he was

15   booked and transferred to the Rankin County Jail.

16        And the third is that he has to have been in

17   detention awaiting trial for a significant period of time.

18   That obviously is not the case here.

19        A few cases that I would point the Court to on this

20   matter are *Quinn v. Webster County, Mississippi*, 2023

21   Westlaw 2731037 at page 5; that's Northern District of

22   Mississippi, March 30th, 2023.  *Harris v. Dobbins*, 2023

23   Westlaw 289994 at page 15; that's the Southern District of

24   Mississippi, April 11th, 2023.  *Groves v. Pearl*, that's a

25   decision by Judge Reeves just two months ago, 2025 Westlaw

1    662 -- sorry 662411 at page 2; Southern District of

2    Mississippi, February 28th, 2025.  And *Guiterrez v. City of*

3    *San Antonio*, 139 F.3d 441 at 452, that's a Fifth Circuit

4    case from 1998 where the Fifth Circuit vacated and rendered

5    a take-nothing verdict after finding the plaintiff was not a

6    pretrial detainee.

7         Again, the evidence here shows that Mr. Anthony had

8    not been booked, had not been released from custody, and

9    certainly had not been in detention awaiting trial for a

10   significant period of time.  He was not a pretrial detainee.

11   The Fourth Amendment does not apply -- oh, sorry -- the

12   Fourteenth Amendment does not apply, and we believe a

13   directed verdict should be entered because his claims fail

14   as a matter of law.

15        Again, just for preservation purposes in case the

16   motion isn't granted for that reason, I'll briefly talk

17   about the merits.  Plaintiff has not met his burden on

18   those.  I'll take the defendants one by one since they're

19   accused of two separate uses of force.

20        First is Officer Welker.  Mr. Anthony claims he was

21   hit in the upper chest and back 30 times until Officer

22   Welker was out of breath, but the video shows that

23   Mr. Anthony returned to the booking room without a single

24   mark on him, not a red mark, not a bruise, not out of

25   breath, not walking any different, not holding himself.

1   Officer Welker also is seen on the video returning to the

2   booking room not out of breath, calm, cool, and collected.

3        Also, the plaintiff submitted pictures that he took

4   of his injuries.  Again, he says he was struck on the upper

5   chest and upper back.  Those pictures do not show any

6   bruising or any injury in the area that Mr. Anthony claims

7   he was hit.

8        I appreciate that Mr. Welker hasn't had a chance to

9   testify.  As you know, his version of events is different.

10  But I would submit that the evidence is consistent with

11  Mr. Welker's version of events, not Mr. Anthony's.  And if

12  Mr. Welker's version of events is accepted, that is not

13  excessive force, and at minimum, he would be entitled to

14  qualified immunity.

15       As to Officer Lang, you just heard Officer Lang

16  denies it happened.  But in any event, the only injury

17  Mr. Anthony testified to is a knot on his head.  The Court

18  will remember yesterday, he pointed to the back center of

19  his head.  And I know plaintiff's counsel asked a lot of the

20  expert this morning about the parietal scalp, but the

21  medical records say it was the left parietal scalp, not the

22  center of his head.

23       And in any event, that is a di minimis injury under

24  Fifth Circuit precedent in *Westfall v. Luna*, 903 F.3d 534,

25  pages 549 through 50, Fifth Circuit 2018.  The Fifth Circuit

1    stated that, "This court has held the following types of

2    injury to be di minimis:  Abrasions, back and neck pain, and

3    contusions."

4        In that case, the court held that abrasions and

5    bruises, bloody urine, and high blood pressure were di

6    minimis.  At minimum, it is not clearly established that the

7    injury was more than di minimus, and qualified immunity

8    would apply.

9        Again, briefly emotional distress and pain and

10   suffering.  Plaintiff has testified to some nonspecific

11   trauma.  He hasn't given any testimony as to any physical

12   manifestations of emotional distress, no loss of sleep, no

13   anxiety, no fear, et cetera.

14       This is especially true as to Officer Lang, who,

15   again, is only accused of putting a bruise on his head for

16   which there was no medical treatment.  No juror could find

17   that the allegations, which of course are denied, caused

18   emotional distress.  And we also believe there's plenty of

19   evidence of preexisting emotional distress, including his

20   criminal history, his drug history, and also according to

21   Mr. Anthony, his girlfriend's frequent alcohol-induced false

22   domestic violence allegations against him that bring him in

23   frequent contact with the police.  So even if the claims are

24   not dismissed, we believe that those requests for damages

25   should be dismissed.

```
 1           Finally, quickly just to preserve the issue since
 2    it's been bifurcated I believe, we obviously do not believe
 3    this is a punitive damages case, and that plaintiff has not
 4    met his burden to send punitives to the jury.
 5           THE COURT:  All right.  Stay right there.  I've got a
 6    question about -- it's something you said with respect to
 7    Lang and speaking about di minimis injury.
 8           MS. BLAND:  Yes.
 9           THE COURT:  Is it the defendant's position that it --
10    is it your position that even if Mr. Anthony's version of
11    events as to Mr. Lang in the hallway slamming his head
12    against the wall, that even if the jury believes
13    Mr. Anthony's version of events, that the defendant is
14    entitled to qualified immunity?
15           MS. BLAND:  Yes, Your Honor.  I believe Westfall v.
16    Luna supports that position.
17           THE COURT:  Simply because of the di minimis injury?
18           MS. BLAND:  Yes, Your Honor.
19           THE COURT:  So there's not clearly established law
20    out there that if there's someone who is unarmed,
21    unresisting, and their head's slammed against the wall, that
22    that's not excessive force under clearly established law?
23           MS. BLAND:  It would depend on the injuries, I would
24    say.
25           THE COURT:  Okay.  What about with respect to Welker,
```

 1   if Mr. Anthony's version of events are believed by the jury

 2   that Mr. Welker (sic) was striked repeatedly while

 3   Mr. Anthony was unarmed and unresisting, do the defendants

 4   still believe as to that that Mr. Welker would be entitled

 5   to qualified immunity?

 6          Do you agree it's clearly established that those acts

 7   cannot happen?

 8          MS. BLAND:  Yes, Your Honor, I do.

 9          THE COURT:  Okay.  So if the jury believes those

10   facts as to Welker, then Welker would not be entitled to

11   qualified immunity?

12          MS. BLAND:  Yes, Your Honor.

13          THE COURT:  But you say as to Lang that because the

14   defendant takes the position that the injury is di minimis,

15   so for that reason alone, Lang would still be entitled to

16   qualified immunity?

17          MS. BLAND:  Yes.  If the jury so finds, I believe so.

18          THE COURT:  Okay.  All right.  Thank you, Ms. Bland.

19          MS. BLAND:  Thank you.

20          THE COURT:  Any response?

21          MR. FLECHAS:  Yes, Your Honor.  If you -- I'm happy

22   to cite law, but because I don't have this motion in

23   advance, it will take me a minute to pull it up.

24          THE COURT:  No, it's not necessary, just --

25          MR. FLECHAS:  All right.  Your Honor, I don't want to

```
 1    criticize counsel, but I want to point out something that
 2    happened that -- with the first part of Ms. Bland's motion
 3    saying we abandoned our Fourth Amendment claims.  We brought
 4    a -- this -- hopefully, the Court will agree this case falls
 5    into a little bit of a gray area between the Fourth and
 6    Fourteenth Amendments.  For that reason, our complaint
 7    clearly stated that the claims were brought under both
 8    amendments.
 9         I submitted a pretrial order to this Court on the
10    date it was due that just said we were bringing claims under
11    42 U.S.C. Section 1983 for excessive, unnecessary force
12    without specifying an amendment.  That same day, I presented
13    jury instructions.  I presented a Fourteenth Amendment jury
14    instruction, because I believed that to be the appropriate
15    amendment because he was not being arrested.
16         The Fourth Amendment jury instruction talks about an
17    arrest.  He was not in the process of an arrest when the
18    force was applied to him.
19         I assume if that pretrial order had been finalized
20    and entered without specifying an amendment, at a jury
21    instruction conference, we would have had a discussion about
22    which instruction to give the jury, Fourth or Fourteenth.
23         Instead -- and I'll be candid with the Court -- while
24    I was at my son's basketball game, I got an email on my
25    phone from Ms. Bland saying, "Hey, Brandon, looking at your
```

 1    proposed jury instruction, it looks like I've had the wrong

 2    amendment.  I've changed the PTO to stipulate claims are

 3    being brought under the 14th just to clear up any

 4    confusion."

 5         This doesn't appear to be to clear up any confusion.

 6    It appears to be for the purpose of ambushing me with this

 7    motion for a directed verdict when there was no motion for

 8    summary judgment brought, even though a Fourteenth Amendment

 9    claim was clearly brought in the original complaint.

10         THE COURT:  Okay.  I don't -- I mean, I hear you, and

11    I appreciate you making the record.  I'm not dismissing on

12    those grounds, so I don't want you to get too worked up

13    about that --

14         MR. FLECHAS:  Okay.

15         THE COURT:  -- and spend too much time on it while

16    the jury's waiting.

17         MR. FLECHAS:  All right.

18         THE COURT:  But I hear you, okay.  Move on to the

19    rest of it and we'll...

20         MR. FLECHAS:  The rest of it, Your Honor, I mean, the

21    evidence thus far has established beyond any doubt that if

22    the -- the force occurred as Mr. Anthony says, there is

23    absolutely no justification for any of that use of force by

24    Welker in the bathroom punching a nonresisting suspect in

25    custody for no reason whatsoever.

1          And Officer Lang with ramming his head against the

2    wall when he's standing there not resisting, not doing

3    anything physically threatening in any way.  And Officer

4    Lang admitted on the stand it would be excessive.

5          The case law that I'd be happy to pull up if the

6    Courts wants me to is on di minimis injury.  If a use of

7    force is clearly excessive, then the only requirement under

8    the law is that there is some harm, and the law even states

9    even purely emotional or psychological injuries apply.

10         Here we have a medical record that notes a parietal

11   scalp hematoma in the area where someone would have their

12   head hit against the wall.  We have a medical record that

13   states that he was injured, and they have no explanation for

14   how that occurred in their custody.  And we have the

15   plaintiff's testimony stating that he rammed his head into a

16   wall.

17         It's not di minimis injury if the force that resulted

18   in the injury is clearly excessive.  Under the law, any harm

19   that results from clearly excessive force beats the di

20   minimis threshold.

21         Mr. Anthony's testimony regarding the use of force

22   against him is clear, and there can't be any credible

23   argument that the injuries that resulted, as we've proven,

24   are di minimis or that the force used against him was -- was

25   not excessive in light of clearly established law.

1          THE COURT:  All right.  Thank you, Mr. Flechas.

2          Anything else, Ms. Bland?

3          MS. BLAND:  Briefly just to make my record, because I

4      understand the Court has said they're not go to -- you're

5      not going to rule on this.

6          But that is true; I emailed Mr. Flechas after he

7      submitted his proposed jury instructions.  The plaintiff is

8      master of his complaint.  He's the one that controls the

9      claims for all legal theories.  He pled a Fourth and

10     Fourteenth Amendment claim.  It's kind of unclear, I will be

11     honest.  Ever -- pretty much every complaint we see pleads

12     the Fourteenth Amendment.

13         I've never asked plaintiff's counsel why, because

14     most of the time, they're not bringing a Fourteenth

15     Amendment claim.  But I assume it's because the amendments

16     are incorporated to the states through the Fourteenth

17     Amendment, so that's what we assumed.  We always went under

18     Fourth Amendment.  They clarified they submitted a proposed

19     jury instruction they believed the Fourteenth Amendment is

20     the correct amendment, and it is not.

21         I -- I didn't trick them.  And as he said, honestly

22     if I had known that they were going under the Fourteenth

23     Amendment before last Monday, we would have filed a summary

24     judgment motion.  But their complaint said Fourth so -- and

25     the pretrial order, of course, the pleadings are amended to

1    conform to the pretrial order, and any claim left out of a

2    pretrial order is deemed waived.

3         So, again, I would urge the Court to look at the

4    cases that I cited, and I guess we will reurge this motion

5    if necessary.

6         THE COURT:  All right.  Thank you, Ms. Bland.

7         MS. BLAND:  Thank you.

8         THE COURT:  And I'm just going to --

9         MS. BLAND:  Oh, sorry.  And just for the record, the

10   doctor said that Mr. Anthony got no treatment for the head

11   injury.

12        THE COURT:  All right.  I'm just going to put just a

13   little bit of case law on the record, because we did

14   recognize that it is a unique issue.  The Fifth Circuit has

15   held that the Fourteenth Amendment's due process clause, and

16   in this particular case, I'm going to cite "govern an

17   excessive force claim arising out of the booking process."

18   That's *Stevens versus Corbel*, 842 F.2d 884, pinpoint cite

19   889, 90, note 5; it's a Fifth Circuit 1987.

20        And also *Narine versus Livingston Police Department*,

21   it's 86 F.3d 469, pinpoint cite 473, note 20; it's a Fifth

22   Circuit 1996.  "An arrestee's Fourteenth Amendment due

23   process rights are in addition to and overlap that of a

24   Fourth Amendment protection.  We simply recognize that

25   arrestees as a subset of pretrial detainees have substantive

1    due process rights under the Fourteenth Amendment."

2         Also *Valencia versus Wiggins*, which is 981 F.2d 1440,

3    pinpoint cite 1444; it's Fifth Circuit 1993.  "As the Fifth

4    Circuit protects against unreasonable seizures, it seems

5    primarily directed to the initial act of restraining an

6    individual's liberty, such as an investigatory stop or

7    arrest."

8         And separately, and as Ms. Bland notes, the

9    Fourteenth Amendment incorporates the Fourth Amendment and

10   both -- I'm sure both sides agree we'd be applying the same

11   standard no matter what.

12        For this reason and I do find that there is

13   sufficient evidence to go to the jury, I'm going to deny the

14   motion.

15        All right.  Are we ready?  Is there anything else we

16   need to take up before we bring in the jury?  Does anyone

17   need a quick break before we do that?

18        Our court reporter does, but anything to take up,

19   though, before we take the quick break?

20        MR. SILER:  Not from the defendants, Your Honor.

21        THE COURT:  Okay.  Let's take probably about ten

22   minutes, and then we'll get the jury back in.

23             (A brief recess was taken.)

24        MS. POWELL:  All rise.

25        THE COURT:  Y'all may be seated.

1        All right.  We're about to bring the jury in.  And

2   I'm going to look back at the realtime of the conversation

3   that Mr. Flechas was just relaying about -- and if you'll

4   come back to the podium for me, Mr. Flechas, just so I can

5   get my brain wrapped around this.

6        MR. FLECHAS:  Yes, Your Honor.

7        THE COURT:  And it's something the defendants can

8   obviously reurge at the close of their case.  But tell me

9   again the conversation -- so the pretrial order, it was a

10  draft pretrial order, and in the draft pretrial order, you

11  had Section 1983?

12        MR. FLECHAS:  There was no amendment specified.  It

13  just said excessive force.  You Honor, we -- I'm just making

14  a little record, we brought the claim under Fourth and

15  Fourteenth because of the gray area.  If it's an arrest, we

16  bring it under the Fourth.  But this falls into a gray area,

17  so we brought it under the Fourth and Fourteenth.

18        We submitted jury instructions.  Obviously those

19  instructions were just proposed.  We could have had a

20  discussion at any point about whether it should be a Fourth

21  Amendment instruction or a Fourteenth Amendment instruction.

22  If counsel opposite believed that it should have been a

23  Fourth Amendment instruction, they could have submitted a

24  competing Fourth Amendment instruction proposed to the

25  Court, and say, no, this should be under the Fourth

1    Amendment.

2         Instead, I was contacted and said that we're changing

3    it -- changing the language that -- in the pretrial order

4    that was already submitted to the Court to the Fourteenth

5    Amendment.  And I said I believe that to be the correct

6    amendment, that's fine.  The --

7         THE COURT:  Let me stop you just to try to refresh my

8    own recollection.  I do recall -- so the chamber's box got a

9    pretrial order draft, and then later that day, we got a

10   revised pretrial order.

11        MR. FLECHAS:  Right.  It probably -- it was a little

12   after 8:00 that night.  I submitted mine around 5:00 p.m.

13   along with my jury instructions.

14        For the record, if there's a question as to whether

15   this claim falls under the Fourth Amendment or the

16   Fourteenth Amendment, I, at this time, make a motion under

17   Rule 15(b) to amend the pretrial order and to have a

18   discussion with Your Honor as to whether the jury should be

19   instructed on the Fourth Amendment or the Fourteenth

20   Amendment.  And as Rule 15(b) states --

21        THE COURT:  Is it good cause standard?

22        MR. FLECHAS:  It's freely given when justice so

23   requires -- let me see.  Amendments during and after trial,

24   it says, "The court should freely permit an amendment when

25   doing so will aid in presenting the merits and the objecting

1    party fails to satisfy the court that the evidence would

2    prejudice the party's action or defense on the merits.  The

3    court may grant a continuance to enable the objecting party

4    to meet the evidence."

5         Your Honor, the Supreme Court has said these two

6    causes of action are virtually indistinguishable.  It's the

7    same standard.  We've proven the case under either standard,

8    and if the appropriate remedy is to amend the pretrial order

9    to the form that I originally submitted, where we don't

10   specify an amendment; it's just an excessive force claim and

11   then we have a discussion about how the jury would be

12   instructed, I think that's the appropriate remedy.  It's not

13   throwing out a case where we've proven that a man was beaten

14   in police custody.

15        THE COURT:  Okay.  Does the defendant wish to respond

16   to the request for the amendment?

17        And, Ms. Bland, I just want to make sure because I

18   asked Mr. Flechas but I didn't -- I had more specific

19   questions and then didn't ask.  But on the -- so a version

20   of the pretrial order was sent to the Court, and then I

21   remember -- I don't remember how long after, but the same

22   day a second version was sent.

23        MS. BLAND:  Yes.

24        THE COURT:  What changes were in the second version?

25        MS. BLAND:  We added the Fourteenth Amendment to the

1    claim to specify that it was being brought under the

2    Fourteenth Amendment and put in the questions of law and

3    fact whether he was a pretrial detainee.

4         THE COURT:  All right.  You may proceed.  That's what

5    I have.

6         MS. BLAND:  Yeah.  So Mr. Flechas' email back to me

7    that night was, that is fine.  If the PTO said Fourth that

8    was an oversight on my part.  Since he was not being

9    arrested when the alleged events took place, I think the

10   Fourteenth Amendment is the appropriate amendment.

11        Again, the plaintiff is the master of his complaint.

12   He's -- he's the one that gets to pick the claims and the

13   theories.  I don't; I can only respond to what he says.

14        His proposed jury instructions let me know for the

15   first time that he believed he was a -- really for the first

16   time that he believed he was a pretrial detainee, and the

17   claim is only being brought under the Fourth Amendment.

18        There's plenty of case law that says where the

19   evidence and issues were known at the time of the submission

20   of the pretrial order, not including it waives it, and

21   amendments may be properly refused.  There's *Quick*

22   *Technologies, Inc. v. Sage Group, PLC*, 313 F.3d 338, page

23   346, Fifth Circuit 2002.

24        *Flannery v. Carol*, 676 F.2d 126, page 130, Fifth

25   Circuit 1982, that says because claim was omitted from

 1    pretrial order --

 2          THE COURT:  Slow down --

 3          MS. BLAND:  -- it's waived --

 4          THE COURT:  -- you've got to slow down.

 5          MS. BLAND:  I'm sorry; I talk fast.

 6          THE COURT:  Ms. Crane's not keeping up.

 7          MS. BLAND:  I apologize.  *Flannery v. Carol*, 676 F.2d

 8    126, page 130, Fifth Circuit 1982, that says because claim

 9    was omitted from the pretrial order, it was waived.

10          And, again, *Martin v. Lee*, 378 F.App'x 393, page 394

11    through 396, Fifth Circuit 2010.

12          And, again, in seven days, it will have been three

13    years that plaintiff has had to figure out his claim and

14    figure out the legal requirements for it.  He picked the

15    Fourteenth Amendment, and he is not a pretrial detainee

16    under the Fourteenth Amendment.

17          THE COURT:  You'd agree, in the complaint at least,

18    it was Fourth and Fourteenth?

19          MS. BLAND:  I do, and I think he waived it.  He

20    abandoned it, and waived it.

21          MR. FLECHAS:  Your Honor, can I state one more thing?

22          THE COURT:  You may.  Anything else, Ms. Bland?

23          MS. BLAND:  That is all.

24          THE COURT:  All right.  Thank you, ma'am.

25          MR. FLECHAS:  The only other thing I'll point out,

1    Your Honor, is in her email to me, because she just said

2    that she also added disputes of law over whether he was a

3    pretrial detainee after I had -- she didn't tell me she did

4    that.  She said, "Hey, Brandon, looking at your proposed

5    jury instructions, it looks like I've had the wrong

6    amendment.  I've changed the PTO to stipulate the claims are

7    being brought under the 14th just to clear up any confusion.

8    I know you already sent it to the Court, but I can send a

9    revised version.  Are you okay with that?"

10         She didn't tell me she was doing anything other than

11   putting Fourteenth Amendment in the claims, not that she was

12   adding disputes of law over whether he was a pretrial

13   detainee.  So, again, that was a misrepresentation.

14         THE COURT:  Well, I don't want to get into that.

15         MR. FLECHAS:  Yeah.

16         THE COURT:  Okay.  All right.

17         MS. BLAND:  Can I just respond briefly?  A copy --

18         THE COURT:  You need to come to the podium if you

19   want to respond.  Okay?

20         MS. BLAND:  A copy of that pretrial order was

21   attached to the email.

22         THE COURT:  Okay.  Like I said, I've had a little bit

23   of time just to think on this, and the complaint did have

24   Fourth Amendment and Fourteenth Amendment.  There are

25   occasions where it is appropriate to amend a pretrial order

1    under 15(b), and I am going to allow that here.  I mean, the

2    standard is for amendments to be freely given when justice

3    so requires, and so I am going to allow amendment here.

4    Amendment to the pretrial order here, and then we can hash

5    out probably tomorrow what exactly the jury instructions

6    should be and how the jury should be instructed.  But I

7    will -- we will amend the pretrial order, at least for the

8    purposes of our record here, to reflect the Fourteenth

9    Amendment and Fourth Amendment.

10        All right.  Anything else we need to take up before

11   we bring in the jury?

12        MR. FLECHAS:  Not from the plaintiff, Your Honor.

13        THE COURT:  Mr. Siler?

14        MR. SILER:  I was just going to say that in order to

15   do it before I forget it, we might read the stipulations

16   that weren't read earlier, but we can do that when they come

17   in.

18        THE COURT:  Okay.  That's perfectly fine.  And unless

19   you want me to -- do you want me to reread the definition of

20   a stipulation, I can do that to the jury to remind them what

21   it is, or I can just say the defendant also has some agreed

22   upon facts.  It's up to you, Mr. Siler.  It's a short

23   instruction.

24        MR. SILER:  Yeah.  Why don't you read it again.  It

25   gives it a little more official --

```
1              THE COURT:  Okay.  I'll do it.

2         All right.  Let's bring in the jury.

3              MS. POWELL:  All rise.

4                        (Jury in at 2:45 p.m.)

5              THE COURT:  All right.  You may be seated.

6         All right.  As you know, the plaintiff has now

7    rested, and so now the defendant has the opportunity -- or

8    defendants have the opportunity to present their case.

9         I'm going to read just one more time the definition

10   of what a stipulation is, because Mr. Siler has a couple of

11   stipulations from the defendant.

12        Again, a stipulation is an agreement.  When there's

13   no dispute about certain facts, the attorney may agree or

14   stipulate to those facts, and you must accept a stipulated

15   fact as evidence and treat that fact as having been proven

16   here in court.

17        So, Mr. Siler, if you will read your stipulations

18   that you have that you and the plaintiff have agreed upon.

19             MR. SILER:  Thank you, Your Honor.

20        On April 30th, 2022, Jimmy Anthony was diagnosed with

21   a mediastinal hematoma, a hemothorax, subacute or chronic

22   posterior left 11th and 12th fractured ribs, and a small

23   left parietal scalp hematoma.

24        Jimmy Anthony is not seeking damages for medical

25   expenses or lost wages.  Jimmy Anthony did not receive
```

1  treatment for emotional distress, and that concludes the

2  stipulations, Your Honor.

3      THE COURT:  All right.  Thank you, Mr. Siler.  And

4  Mr. Siler, who does the defendants call as their first

5  witness?

6      MR. SILER:  The defendants call Jacob Lang.

7      THE COURT:  All right.  All right.  Mr. Lang, you

8  were placed under oath earlier, so you're still under oath.

9                        **JACOB LANG,**

10           **having been first duly sworn, was examined**

11  **and testified as follows...**

12                    **DIRECT EXAMINATION**

13  **BY MR. SILER:**

14  Q.    All right.  Good afternoon, Mr. Lang.

15        We'll start back with your history with -- with Pearl

16  and won't go back all the way through it.  But the last day

17  you worked for the Pearl Police Department was the same day

18  that you arrested Mr. Anthony, April 30th, 2022; correct?

19  A.    Yes, sir.

20  Q.    All right.  What -- tell the jury, if you would, what

21  your interaction and experience with Mr. Anthony had been

22  prior to April 30th, 2022.

23  A.    Yes, sir.  Once -- once that address, 1648 Ravenwood

24  Lane, comes across, we know exactly where its at, who it's

25  involving, everything about that address.  We know what

1    we're going to.  Nine times out of ten, it's going to be

2    domestic related, and each time we go, it's involving

3    Mr. Anthony and Ms. Quick.

4         So we -- I believe 14 days before, if I remember

5    correctly, I actually went to the house and arrested

6    Mr. Anthony prior to this case we're talking about today.

7    So we know exactly what we're dealing with each time we go

8    over there, which is very frequently.

9    Q.    And -- and does Mr. Anthony, generally, evade arrest

10   or evade attempts by officers to take him into custody when

11   you go over there?

12   A.    Yes, sir.

13   Q.    And has that been your personal experience with him?

14   A.    Yes, sir.

15   Q.    Okay.  So you were, as you stated earlier, aggravated

16   that day when he did not come in to submit to arrest;

17   correct?

18   A.    Yes, sir, I was.

19   Q.    All right.  Now, he said -- I think Mr. Anthony said

20   in his cross-examination that he spoke with Mr. Welker on

21   the phone on April 29th.  Were you over -- you were over at

22   that house on April 29th as well; correct?

23   A.    Yes, sir.

24   Q.    All right.  Did -- did you speak with Mr. Anthony or

25   was it Mr. Welker or was it both of you?

1    A.    Nah, I'll -- I'll speak for myself.  I know that I

2    spoke with him on the phone.

3    Q.    Okay.  When you say you speak for yourself, does that

4    mean you just don't remember?

5    A.    I don't remember if Welker spoke with him or not, but

6    I know I did.

7    Q.    Okay.  And -- and tell us again what it was you told

8    him when you talked to him on the phone on April 29th?

9    A.    I told him to, basically, let us know where he's at,

10   come talk to us, and it wouldn't be as bad as if we had to

11   come find him as in charges and, et cetera.

12   Q.    All right.  Mr. Lees asked you about writing a report

13   following the situation on April the 30th, and you told him

14   you had not written a report; correct?

15   A.    Correct.

16   Q.    Okay.  Again, your last day at work; correct?

17   A.    Correct.

18   Q.    Other than you being agitated with Mr. Anthony and

19   him again evading efforts to place him under arrest, did you

20   have any reason to believe anything was going to come out of

21   this situation that would have been important for you to

22   write a report?

23   A.    No, sir.

24   Q.    Okay.  When you write reports, do you put every

25   single detail that occurs in the report?

1    A.      No, sir.

2    Q.      Okay.  What do you put in reports when you write

3    them?

4    A.      The facts.

5    Q.      All right.  But you don't put every single detail of

6    the facts, do you?

7    A.      No, sir.

8    Q.      All right.  Well, tell me how you make a decision

9    about what to put in a report and what not to?

10   A.      So the arrest, leading up to the arrest, we would on

11   the way -- like as in this case, on the way to the house,

12   making contact with them, who I'm speaking with,

13   transporting him to the police department.

14           I wouldn't talk about I left a room, walked down this

15   hallway, took a left.  I wouldn't do any of the stuff that's

16   not -- doesn't matter.

17   Q.      Okay.  Had you known this was going to result in this

18   lawsuit, you being here several years later, would you have

19   written a report?

20   A.      Absolutely.

21   Q.      All right.  Mr. Lees also asked you earlier something

22   about the fact that there was a prearrest meeting, and that

23   there were several officers involved in effecting this

24   arrest on the morning of April 30th, 2022.  Why was that?

25   A.      The reason for that was due to the fact of each time

JACOB LANG - DIRECT

1  Ms. Quick calls the police for this matter, he's going to be
2  gone from the house most time.  He's not going to be there.
3  So at this moment, we planned to meet up or have a meeting
4  about this to go to the residence and try to get the house,
5  I guess you could say surrounded.  That way when we did make
6  contact, we wanted to make sure he did not leave the
7  residence or try to attempt to flee the residence, as he
8  usually does each time we come.
9  Q.    All right.  You were -- you also testified earlier
10  about the events as you recall them that occurred that day,
11  and you mentioned that you had gone in the back window along
12  with two other officers; correct?
13  A.    Correct.
14  Q.    All right.  When -- after you had taken Mr. Anthony
15  into custody and had handcuffs on him and had him under
16  control, what did you do at that point?
17  A.    I know --
18  Q.    Don't guess if you don't know --
19  A.    I know we just left the house and went out the front
20  door, --
21  Q.    Okay.
22  A.    -- that's the only part I really know about it.
23  Q.    Did you take Mr. Anthony out the front door?
24  A.    I don't recall.
25  Q.    Okay.  Did you transport Mr. Anthony to the Pearl

JACOB LANG - DIRECT

1    Police Department for booking?

2    A.    Yes, sir.

3    Q.    Okay.  All right.  Now, Mr. Lees went with you --

4    with it through you in some detail about your behavior in

5    the booking room and the things, some of the things, that

6    you said to Mr. Anthony.  And I believe you've indicated

7    that that wasn't your proudest moment; correct?

8    A.    That's correct.

9    Q.    All right.  Just had a new daughter?

10   A.    Yes, sir.

11   Q.    How old is she?

12   A.    A month and a week.

13   Q.    And would you be embarrassed if she watched that

14   particular film?

15   A.    Absolutely.

16   Q.    All right.  Now, I know you said it again, but I'm

17   giving you another chance to say it to this jury now.  Did

18   you push or slam Mr. Anthony's head against the wall in that

19   hallway?

20   A.    No, I did not.

21   Q.    Were you aware of what had transpired in any way

22   between Mr. Welker and Mr. Anthony in the bathroom that day?

23   A.    No, sir, I do not (sic).

24   Q.    Now, the hallway upon which the bathroom is located

25   in the jail by the booking area, can you tell the jury --

1    the jury has seen the eye-in-the-sky view, the fishbowl view

2    down in the booking room, and you can see there are four

3    booking rooms on the left side of that photograph.

4           Where does that hallway run?

5    A.    That hallway that connects with the bathroom, you

6    can -- if you leave the booking room and walk up to it, if

7    you take a left, you can exit the building to the sally

8    port, or there's more holding rooms, which is usually

9    typically used for court, holding prisoners for court.

10          Or you can go right and you can go into the -- the

11   lieutenants' rooms, the sergeants' rooms, the squad room,

12   the paperwork room, et cetera.

13   Q.    Now, does that hallway run right behind those booking

14   rooms you can see in the video?

15   A.    Correct.

16   Q.    The hallway itself, is it one of the kind of hallways

17   that you can -- that echoes and you can hear everything?

18   How would you describe it?

19   A.    It's definitely loud back there, yes, sir.

20   Q.    Okay.  Can anybody hear anything going on in that

21   hallway?

22   A.    If you're in the booking room, you can hear it.

23   Q.    All right.  Can you hear -- how well can you hear

24   what goes on in that bathroom?

25   A.    If you're in the booking room area or the hallway or

1    something, you can definitely hear in there.

2    Q.    Okay.  Now, there has been testimony about the fact

3    that there was a camera that was in that hallway area.  Were

4    you aware of the fact that a camera was there?

5    A.    Absolutely.

6    Q.    Were you aware of the fact that it had a microphone?

7    A.    Absolutely.

8    Q.    Okay.  What did you know about whether that camera

9    was working on that particular day on April 30th, 2022?

10    A.    I thought as if it worked as any other ones would,

11    and I was not aware of the camera not working or the

12    microphone.

13    Q.    Okay.  Would you have -- or do you have the

14    expertise, the technical knowledge, and know how to do

15    anything to that camera or that microphone if you wanted to?

16    A.    No, sir.

17    Q.    Okay.  Did you do anything to that camera or that

18    microphone?

19    A.    No, sir.

20    Q.    So you didn't know that the camera was not working.

21    You did not know the microphone was not working, and you

22    didn't do anything to sabotage or put it in that condition;

23    correct?

24    A.    No, sir.

25    Q.    Now, you've said that you were back in the law

1    enforcement profession; is that correct?

2    A.    Yes, sir.

3    Q.    Okay.  And you said you were with the City of

4    Florence Police Department.  Is that what you said?

5    A.    No, sir.  Flora, F-l-o-r-a.

6    Q.    Okay.  My apologies.

7         MR. SILER:  Excuse me, Your Honor, I'm just trying to

8    make sure I've asked him all the questions I want to ask

9    him.  If the Court will indulge me just one moment?

10        THE COURT:  Take your time.

11   BY MR. SILER:

12   Q.    All right.  We -- there was some testimony about this

13   no contact or protection order, and you said that you had

14   not actually physically seen the order itself.

15        I'm going to show you two pages of exhibit -- what's

16   been -- or what we'll introduce for identification as

17   Exhibit D-1.

18        MR. SILER:  So, Your Honor, this doesn't need to be

19   published to the jury at this point.

20   BY MR. SILER:

21   Q.    All right.  And I'm looking specifically at page

22   Bates stamp defendant's 6.  You'll see that down at the

23   bottom there.  And this looks to be the Pearl Police

24   Department -- or a Pearl Police Department arrest report

25   dated April 30th, 2022, for Jimmy Anthony, Sr.

JACOB LANG - DIRECT

1              Is that, in fact, what that is?

2    A.     Yes, sir.

3    Q.     Okay.  And --

4              THE COURT:  Mr. Siler, for my benefit, can you tell

5    me -- and you may have said this, and I apologize if you

6    have.  What's the Bates number?

7              MR. SILER:  Six, Defendant's 6 on D-1.

8              THE COURT:  Okay.  I'm with you.

9              MR. SILER:  All right.  Your Honor, at this time we'd

10   move for the admission of Exhibit D-1, page 6, as

11   Defendant's D-1B.  I think we already have A in.

12             MR. LEES:  Can I just see the exhibit for a moment,

13   please?

14             MR. SILER:  Sure.

15             THE COURT:  And you only have a page of D-1 in.  You

16   only have page 32 of D-1 in.

17             MR. SILER:  Right.  I think that was D -- well, it

18   was D-1, so maybe this would be D-1A instead of trying to

19   put the whole thing in.

20             THE COURT:  We could actually put it at D-23 to put

21   at the end of your list if you want.

22             MR. SILER:  Okay.

23             THE COURT:  However you'd like to do it.

24             MR. SILER:  That's fine.  D-23 is fine.  That's 6.

25   Did I foul that up?

JACOB LANG - DIRECT

1          THE COURT:  No.  No, I'm just making sure Ms. Powell

2     and I are on the same page.

3          MR. SILER:  Okay.

4          THE COURT:  Are we just doing the page 6?

5          MR. SILER:  Yes.  Because this had been subject to

6     some of the motions, the whole document, so I was just

7     trying to put in certain pages.

8          THE COURT:  So he's just asking about page 6 of D-1.

9          MR. LEES:  Bates stamp 6.

10         THE COURT:  Yes.

11         MR. SILER:  Correct.

12         MR. LEES:  And if I just may ask, who created page 6?

13         MR. SILER:  You mean who put the stamp on it?

14         MR. LEES:  No.  Who actually created the document?

15         THE COURT:  Counsel, approach for me, please.

16                         (BEFORE THE BENCH)

17         THE COURT:  I didn't want to ask all this in front of

18    the jury.

19         MR. LEES:  Yeah, I'm just --

20         THE COURT:  So you're asking Mr. Siler --

21         MR. LEES:  -- I'm asking who is the author of page 6?

22         MR. SILER:  Well, the truth is I don't know.  But the

23    thing is that there's no authenticity objection to this

24    exhibit, so we don't need anybody to testify to this.  As

25    long as it's relevant, it should go in.

1         MR. LEES:  But I'm just trying to figure out in the

2    context of the rest of it, you do not know who put this

3    information on this piece of paper?

4         MR. SILER:  I don't, but it appears to have been

5    Ms. Villareal.

6         MR. LEES:  And that's another police officer?

7         MR. SILER:  Uh-huh.

8         MR. LEES:  And do you -- if you know, did she put

9    these things on here?

10        MR. SILER:  I don't know.  I'd just be guessing.

11        THE COURT:  Well, so I'm going to go ahead and

12   speculate as well.  It says the report's made by is all I

13   can say.

14        MR. LEES:  Yeah.  So just while we're up here and I

15   don't want to cause any problem, Hudson said this protection

16   order or this no contact order was at the Pearl Police

17   Department.  Brandon has been asking for that.  No one has

18   ever produced an order.

19        Is there an order that you have?

20        MR. SILER:  Not that I know of, but I don't -- all

21   I'm saying they don't --

22        MR. LEES:  Because our client says there was no order

23   in place at the time.  And I just -- if you're putting in

24   violation of a protection order and you don't have a valid

25   protection order, I think that's going to lead me to have to

1    keep pointing that out.

2        THE COURT:  Well, I've looked into this issue only

3    just preparing for trial, and my recollection of

4    Mr. Anthony's deposition as to whether one existed or not,

5    he was under the belief that one existed.  Because his

6    deposition testimony was there was a protective order.  He

7    also testified in this courtroom that he believed there was

8    a protective order that he was in violation of -- that he

9    believed when he was going back to the house, he was in

10   violation of a protective order that was in place.

11       MR. LEES:  And where my head is, I listened to the

12   tape recording he made to Brandi at the Rankin County Jail

13   before he collapsed, when he discussed can you get the order

14   to show it's no longer in force, or words to that effect, in

15   the phone conversation that he had on that day.

16       And I understand two years later, he may have said

17   something different.  But on that day, there's a tape

18   recording where he clearly is under the impression there was

19   no protection order, and so from my perspective, he said at

20   that time there wasn't.  At his deposition, he did, so I

21   kept saying can somebody please show me the order.

22       THE COURT:  And I hear you, but let's talk about this

23   document here.

24       MR. LEES:  All right.

25       THE COURT:  Where are we on this document?  He's

JACOB LANG - DIRECT

1    moved it --

2           MR. LEES:  I don't know --

3           THE COURT:  -- and the objection is relevance?

4           MR. LEES:  I don't know yet.  Could I just ask what

5    is the purpose for you introducing this document?

6           MR. SILER:  Because you've raised it so many times

7    about having questions about the protective order, so we're

8    trying to show that there were -- even though I don't have

9    it, that they were --

10          THE COURT:  And you can still say --

11          MR. LEES:  And look at -- I'm sorry.

12          THE COURT:  No, it's okay.

13          MR. SILER:  Look at page 11, because that will be the

14   next one we go to.  We can do a little bit while we're here.

15          MS. BLAND:  This is a warrant signed by the judge on

16   May 3rd, 2022.

17          MR. LEES:  Signed when?

18          MS. BLAND:  Signed by the judge --

19          MR. SILER:  Right there.

20          MS. BLAND:  -- for a violation of a protection order.

21          MR. LEES:  Is this -- is this the order of the judge

22   that you're referring to?

23          MR. SILER:  I don't know.  I'm just telling you

24   that's the page we have that we're --

25          MR. LEES:  And nobody knows -- nobody knows -- you go

JACOB LANG - DIRECT

```
1    ahead, and then I'll ask whatever I need to ask.  How is
2    that?
3           THE COURT:  Let's back up.  So we're on page 6?
4           MR. SILER:  Yes.
5           MR. LEES:  Yeah.
6           MR. SILER:  The first page.
7           THE COURT:  The first page, I'm going to make this
8    D-23 and put it at the end of your exhibit list.
9           MR. SILER:  Okay.
10          THE COURT:  Do you have any objection as to this
11   document?
12          MR. LEES:  I do not, because it is apparently a
13   record created by the police department in the course of
14   their business, so I do not.
15          THE COURT:  All right.  Is this your next --
16          MR. SILER:  Wait, I'm sorry.  You said you don't have
17   a copy of it?
18          THE COURT:  He said he doesn't have an objection --
19          MR. SILER:  Oh, I'm sorry.
20          THE COURT:  -- to the document.
21          MR. SILER:  I'm sorry.  I got you.
22          THE COURT:  So that's going to be D-23.  This is
23   going to be your next exhibit?
24          MR. SILER:  Yes.
25          THE COURT:  Do you have any objection to this?
```

1        MR. LEES:  Yes, I do have an objection to that.  That

2   appears to have been created by somebody other than the

3   police department; correct?

4        MR. SILER:  Well, y'all have already stipulated that

5   it -- I mean, y'all have already said you don't have any

6   objection to it.

7        MR. LEES:  All right.  If he's stipulated, then no

8   objection.

9        THE COURT:  Okay.  All right.

10                    (IN OPEN COURT)

11        THE COURT:  All right.  Okay.  We're going to make a

12  document that's coming from D-1, which is document Bates

13  number 6, we're going to now make that D-23.  I'm going to

14  hand you that, so you can get the description to add to it.

15        MR. SILER:  So is that going to be the original?

16        THE COURT:  It will not be.  I'm just giving her that

17  to do the description.  So D-23 is admitted, so you can

18  publish that to the jury.

19             (Defendants' Exhibit 23 entered.)

20  BY MR. SILER:

21  Q.    All right.  Officer Lang, I'm now showing you what's

22  been admitted into evidence as Exhibit D-23, and can you

23  tell the jury what this is and how police officers would use

24  this information?

25  A.    Yes, sir.  So this is an arrest report for the City

JACOB LANG - DIRECT

1    of Pearl.  Every time someone is arrested and booked into

2    the City of Pearl, this sheet is printed off and documented

3    and all the information of the arrestee is put into this

4    system that we can pull up for -- I mean, we can type in his

5    name and find all the arrestee reports for a certain person.

6    Q.    All right.  Who created this report?

7    A.    Arresting Officer Noami Villareal.

8    Q.    All right.  You said Noami.  Can you spell that for

9    us?

10   A.    N-o-a-m-i.

11   Q.    And Villareal, could you spell that for us?

12   A.    V-i-l-l-a-r-e-a-l.

13   Q.    Okay.  Do you recognize that as Officer Villareal's

14   signature?

15   A.    Can you just push it down just a little bit?

16   Q.    I'm sorry.

17   A.    Yes, sir.

18   Q.    And when did -- when did she create this report,

19   according to this?

20   A.    4/30.  Well, April 30th at 9:00 in the morning.

21   Q.    All right.  Do police officers often get the actual

22   copies of orders, like this protection order, before arrests

23   are made?

24   A.    No, sir.

25   Q.    All right.  What do you go on as a police officer

1    when you make the arrest?

2    A.    It's a verbal -- verbal by the judge.

3         MR. SILER:  All right.  I'm going to change to

4    another page, Your Honor, but it's going to be Defendant's

5    Bates stamp page 11 on Exhibit D-1.

6         THE COURT:  All right.  And the plaintiff has no

7    objection to that, and we're going to make that D-24.  And

8    so D-24 is admitted.

9         MR. SILER:  All right.

10            (Defendants' Exhibit 24 entered.)

11   BY MR. SILER:

12   Q.    All right.  Now, if you would -- let's see if I can

13   get this far enough up to read more of it.  That may get it

14   to a point where you can't read it well.  We'll try that and

15   see.

16         What is Exhibit D-24?

17   A.    It's an affidavit for a violation of a protection

18   order for Jimmy Dean Anthony.

19   Q.    All right.  And who filled out the affidavit?

20   A.    Noami Villareal.

21   Q.    Okay.  Is that her name that appears down there under

22   the date of May the 3rd, 2022?

23   A.    Yes, sir.

24   Q.    Okay.  And over there on the signature line that's

25   for Pearl Municipal Court Judge, do you recognize that

1    signature?

2    A.    I can't read it.

3    Q.    Okay.  Now, out of curiosity, the certificate of

4    service says April 30th, 2022, but Ms. Villareal's affidavit

5    seems to be dated May the 3rd of 2022.  What -- do you know

6    the reason for that?

7    A.    No, sir.  That's going to be where the judge

8    witnesses it, that's the judge.  Down below where she -- the

9    certificate of service is what she signed.  The judge signs

10   the witness my hand on the day that he signs the affidavit,

11   which we print off.

12   Q.    Okay.  So the May 3rd date is the date the judge

13   signed it; is that correct?

14   A.    That's correct.

15   Q.    All right.  Thank you.

16         MR. LEES:  And what exhibit is that one?

17         MR. SILER:  D-24.

18         MR. LEES:  D-24?

19         MR. SILER:  D-24.  If the Court will indulge me just

20   one moment?

21         THE COURT:  Okay.

22         MR. SILER:  I tender the witness, Your Honor.

23         THE COURT:  All right.  Any questions, Mr. Lees?

24         MR. LEES:  Briefly.  Could I have the hard copies of

25   those last two exhibits?

```
 1              THE COURT:  Mr. Siler, have you marked those?

 2              MR. SILER:  We're marking them right now, Your Honor.

 3              THE COURT:  Okay.  No rush.

 4                          CROSS-EXAMINATION

 5   BY MR. LEES:

 6   Q.    What time did you guys go to the home of Ms. Quick

 7   and Mr. Anthony on April 30th?

 8   A.    I just remember it being the morning hour sometime.

 9   Q.    Well, there should be a -- there's a dispatch log

10   where, you know, the dispatch goes.  Do you know, based upon

11   the records, what time you got to the house, and what time

12   you returned to the station?

13   A.    Yes, sir.

14   Q.    And what time did you get to the house, and what time

15   did you return to the station?

16   A.    It's on the dispatch logs.  I don't have it in front

17   of me to see.  I don't want to give you the wrong answer.

18              MR. LEES:  Are the dispatch logs contained in that

19   exhibit, or that big document you just had, Counsel?  Can I

20   see that for a minute?

21              MR. FLECHAS:  May I approach, Your Honor?

22              THE COURT:  You may.

23              MR. LEES:  May I approach the witness, Your Honor?

24              THE COURT:  You may.

25   BY MR. LEES:
```

1    Q.    This apparently --

2    A.    Thank you.

3    Q.    -- I'm handing you the joint exhibit for the dispatch

4    logs, so that you can refresh your recollection.  What does

5    the dispatch log show as the time you all arrived at the

6    Quick residence on the morning of April 30th?

7    A.    Yes, sir.  This is the -- for April 29th.

8    Q.    I understand, but that's all the dispatch logs we've

9    been provided.  Do you know what the dispatch logs show for

10   the 30th?

11   A.    No, sir.

12   Q.    There would be dispatch logs showing when the

13   officers arrived at the scene and are out of the car, et

14   cetera, et cetera; correct?

15   A.    Yes, sir.

16   Q.    Have you ever seen such a dispatch log for that

17   morning?

18   A.    I have not, no, sir, not to my knowledge.

19   Q.    Was one ever created?

20   A.    I'm not sure, sir.

21   Q.    I'm going to put up on the Elmo here D-23 for a

22   moment.  At the top, it says the arrest date and time was

23   April 30th, 2022, at 9:00 a.m.; correct?

24   A.    Yes, sir.

25   Q.    And at the bottom, it says the report was made on

JACOB LANG - CROSS

1  April the 30th at 9:00 a.m.; correct?

2  A.    Correct.

3  Q.    So was the report made before or after you all went

4  to do the arrest?

5  A.    I didn't -- this isn't my paperwork.

6  Q.    Well, you were just asked about it.  Remember?

7  A.    Yes, sir.

8  Q.    I thought you said you were familiar with it?

9  A.    I'm familiar with it, but I didn't write -- that's

10  not my signature, date, or time.

11  Q.    Arrest type, it says "on view arrest."  Correct?

12  A.    Correct.

13  Q.    What does that mean in police lingo?

14  A.    The arrest date, time?

15  Q.    What -- the arrest type, it says "on view arrest"

16  right there.  Do you see that?

17        On arrest type, "on view arrest."  I'm just asking

18  you in police lingo, what does that mean?

19  A.    Oh, I'm -- I'm not sure.  It's been a few years since

20  I've used this.  It's different, like, I guess you could say

21  police report systems that's used.  So I'm not -- it's been

22  a few years since I've used this report system, so I don't

23  remember.

24  Q.    So -- and I'll stop belaboring the point on this

25  document after this.  Where it says "violation of a

319

```
 1    protection order," do you know whether this document was
 2    created before or after the police went to the residence to
 3    make an arrest that morning?
 4    A.     This arrest report was for the day of the arrest.
 5    Q.     Right.  But my question is:  Was this document
 6    prepared and signed before or after you guys went to the
 7    house to arrest Mr. Anthony?
 8    A.     It was after he was arrested.
 9    Q.     It was after he was arrested, which would mean that
10    if it was signed on April 30th at 9:00 a.m., it would
11    have -- you would have already gone there, arrested him, and
12    come back; right?
13    A.     Right.
14    Q.     And with respect to violation of a protection order,
15    have you ever seen the protection order that this is
16    referencing?
17    A.     No, sir.  I just know it's usually a verbal by the
18    judge.
19    Q.     Do you know which judge is the basis for this charge?
20    A.     I believe it's Judge Redfern.
21    Q.     Okay.  And so that judge had, according to you, a
22    valid protection order in place for April 30th.  That's your
23    testimony?
24    A.     To my knowledge, yes, sir.
25    Q.     And how do you all know that a judge has a verbal
```

1   order, so that you can arrest somebody based on a verbal

2   order?  Where did you all get that information from?

3   A.     I mean, the judge comes in, I believe a couple days a

4   week, regarding certain incidents.  So, I mean, he told us.

5   Q.     Let me just discuss for a moment D-24.  This is

6   signed by a municipal court judge; correct?

7   A.     Correct.

8   Q.     And you're saying that "witness my hand this 3rd day

9   of May" is when the judge signed it, and not the affiant,

10  Officer Villareal; correct?

11  A.     Yes, sir.

12  Q.     And so this says "warrant served this 30th day of

13  April 2022 at 9:00 a.m." Correct?

14  A.     Correct.

15  Q.     So you had a warrant that you were going to serve

16  that morning; correct?

17  A.     It was -- it was verbal by the judge.

18  Q.     Wait, the warrant was verbal?

19  A.     Just the protection -- the protection order.

20  Q.     No.  We're talking about this says at the top

21  "warrant."  Correct?

22  A.     Correct.

23  Q.     It says, "To any lawful officer, this is to command

24  you to forthwith take the body of Jimmy Dean Anthony, Sr."

25         Correct?

JACOB LANG - CROSS

```
 1   A.      Correct.

 2   Q.      That's a warrant to go arrest somebody; correct?

 3   A.      That's just the warrant number.

 4   Q.      Is this, in fact, a signed warrant from a judge

 5   authorizing you to take Mr. Anthony into custody?

 6   A.      Correct.

 7   Q.      Did you have this before you went to take him into

 8   custody?

 9   A.      Not a paper copy.

10   Q.      Did you have an oral order from a judge prior to

11   going to take him into custody?

12   A.      Correct, yes, sir.

13   Q.      And how do you know that?

14   A.      The judge told us.

15   Q.      Told you?

16   A.      Told one of the officers that day.  I'm not sure

17   which one but it was --

18   Q.      How do you know a judge told another officer, were

19   you there?

20   A.      We -- during our meeting that morning that we went on

21   the 30th, it was put in -- it was -- we already knew about

22   the order.

23   Q.      So why was it then reduced to paper later?

24   A.      I don't recall.  I'm not sure.

25           MR. LEES:  I don't have any further questions.  Thank
```

 1    you.

 2              THE COURT:  All right.  Any redirect?

 3                        **REDIRECT EXAMINATION**

 4    **BY MR. SILER:**

 5    Q.    The arrest on Saturday morning, April 30th, 2022, as

 6    I appreciate it, was a warrantless arrest; correct?

 7    A.    Correct.

 8    Q.    And is there a state statute that permits an arrest

 9    to take place without a warrant in domestic relations

10    situations?

11    A.    Yes, sir.

12    Q.    And was that what you were going after that morning?

13    A.    Yes, sir.

14    Q.    Okay.  And then this warrant signed by the judge on

15    May the 3rd followed up what you had already been told in a

16    meeting with your superior officer, that you had permission

17    from the judge to also arrest him on the protection order

18    aspect of this; correct?

19    A.    Correct.

20              MR. SILER:  Okay.  All right.  That concludes my

21    questioning of this witness, Your Honor.

22              THE COURT:  All right.  You may step down.

23              All right.  Mr. Siler, who does the defendants call

24    as their next witness?

25              MR. SILER:  The defendants call Jonathon Welker.

1      (Whereupon, Jonathon Welker was placed under oath.)

2           THE COURT:  All right.  You may be seated, and,

3   Mr. Welker, you've heard my instructions.  Just make sure

4   you pull that microphone close and don't talk over the

5   attorneys.  Okay?

6           THE WITNESS:  Yes, ma'am.

7           THE COURT:  All right.  You may proceed, Mr. Siler.

8                         **JONATHON WELKER,**

9           **having been first duly sworn, was examined**

10  **and testified as follows...**

11                       **DIRECT EXAMINATION**

12  **BY MR. SILER:**

13  Q.     All right.  For the record, Mr. Welker, would you

14  state your name and address?

15  A.     My name is Jonathon Welker.  I live at 1426 Monterey

16  Road.

17  Q.     In which town?

18  A.     Florence.

19  Q.     Florence, Mississippi.  Where are you currently

20  employed?

21  A.     Capitol Police Department.

22  Q.     In Jackson?

23  A.     Yes, sir.

24  Q.     Okay.  And how long have you been employed with

25  Capitol Police Department?

JONATHON WELKER - DIRECT

1   A.    Coming up on a year, roughly a year now.

2   Q.    All right.  Where were you employed immediately

3   before going to work with the Capitol Police Department?

4   A.    Pearl Police Department.

5   Q.    All right.  And how long were you employed at the

6   Pearl Police Department?

7   A.    So I started in 2020.  So 2020 to 2024, four years

8   from patrolman to detective, investigator.

9   Q.    All right.  And that was your highest rank at the

10  Pearl Police Department, an investigator?

11  A.    Yes, sir, I was a detective.

12  Q.    All right.  Well, how long had you been a detective

13  at the Pearl Police Department?

14  A.    Roughly a year, I believe.

15  Q.    All right.  And prior to being a detective, what was

16  your rank?

17  A.    I was on Flex, which is a street-crimes unit.  We

18  dealt with -- it was the street-crimes unit that you've

19  probably seen.  It's the guys that go out and they're more

20  of, like, an upbeat patrol.  They deal with guns, narcotics,

21  human trafficking, that kind of business.

22  Q.    All right.  How long were you in that Flex position?

23  A.    I don't know the specific dates, but I'd argue six

24  months to a year.

25  Q.    All right.  What was your rank or position before you

JONATHON WELKER - DIRECT

1    were in the Flex position?

2    A.      Patrolman.

3    Q.      All right.  When did -- was your job at the Pearl

4    Police Department the first job you had in law enforcement?

5    A.      No, sir.  I was at Rankin County Jail roughly nine

6    months prior.  The -- I was at -- I started my law

7    enforcement career when I came back from Virginia, and I

8    started at the jail and then moved on to Pearl when they

9    said they would send me to the academy.

10   Q.      All right.  What was your role in the jail there?

11   A.      I did a lot of things, even everything from the

12   medical offer -- medical officer of the walker (sic) and

13   then I was a central tower guy, basically, pushing the

14   buttons in the jail, floorwalker, anything they needed me to

15   do, help book people in.  I kind of was a multitool in the

16   jail, wherever they needed me.

17   Q.      Had you gone to the law enforcement training academy

18   prior to going to work with the City of Pearl?

19   A.      Yes, sir.

20   Q.      Who sent you there?

21   A.      Pearl Police Department.

22   Q.      All right.  They sent you through the training

23   academy before you went to work with them?

24   A.      Oh, no, sir.  I was actually on the street, if you

25   will, prior to the academy.  I was only there for a few

1    months.  I was sworn in by the chief, and then I went to the

2    academy.  And then I came out as a police officer that was,

3    you know, through the state.

4    Q.    All right.  When did you graduate from the law

5    enforcement training academy?

6    A.    We were the first COVID class and I think -- I don't

7    recall off the top of my head.  I can try to find the answer

8    for you, --

9    Q.    That's fine.

10   A.    -- but I believe it was around -- I think it was July

11   or August timeframe.

12   Q.    Of what year?

13   A.    2020.

14   Q.    All right.  So how old were you at the time you went

15   to work for the Pearl Police Department?

16   A.    I was 24 years old.

17   Q.    All right.  How old are you today?

18   A.    I'm 30.  My birthday is in December, so...

19   Q.    All right.  Let me -- let's go right to the incident.

20         Well, let me ask you another question before --

21   before we get there.  Before April 30th -- or let me say it

22   another way.  Before April 29th of 2022, had you had any

23   personal connection or interaction with Jimmy Anthony?

24   A.    No, sir.

25   Q.    Had you ever seen him before?

JONATHON WELKER - DIRECT

1    A.    No, sir.

2    Q.    Okay.

3    A.    I've heard of him, but I -- I've never dealt with him

4    personally, no.

5    Q.    So when you went over to his house on the morning

6    of -- or afternoon I guess, of April the 29th, 2022, you'd

7    never had any dealings with Mr. Anthony before at all?

8    A.    No, sir.

9    Q.    Okay.  Did you actually speak to Mr. Anthony that

10   afternoon on a telephone?

11   A.    I don't recall.  If anything, I would have said

12   something along the lines of, hey, just turn yourself in.

13   It's better if you --

14   Q.    But if you don't recall, just you don't recall --

15   A.    No, I don't --

16   Q.    -- if you spoke to him or not?

17   A.    I don't distinctly remember, no, sir.

18   Q.    Okay.  Now, let's go to April the 30th.  We've seen a

19   bit -- bits and pieces of the video that was taken that

20   morning in the booking room, and at some point, we see you

21   walk out of the booking room with Mr. Anthony.

22         Do you recall seeing that?

23   A.    Yes, sir, I do.

24   Q.    Okay.  Now, as you were walking out or shortly before

25   you walked out, you looked to be putting something on your

JONATHON WELKER - DIRECT

1    hands.  Do you recall that?

2    A.    Yes, sir, I do.

3    Q.    Okay.  And what was it you were putting on your

4    hands?

5    A.    Gloves.

6    Q.    What kind of gloves?

7    A.    Medical gloves.  Like, the blue nitrile gloves you

8    would see in, like, a surgeon's office if you would or,

9    like, a doctor's office.

10   Q.    Latex gloves?

11   A.    Yes, sir.

12   Q.    And why were you putting latex gloves on before you

13   took him outside of the booking room?

14   A.    For predominantly to protect my skin if I were to

15   come in contact with any bodily fluids or if I were to come

16   in contact with anything else.  But with going to the

17   latrine or going to the bathroom -- not the latrine.

18         Going to the bathroom, if there was something to be

19   expelled into the toilet that didn't need to be, I would

20   have to get my hand in there and get it out, narcotics

21   possibly.  I would have to retrieve it, right, and I'm not

22   going to let my bare hand deal with that, so...

23   Q.    So is that something you always do when an arrestee

24   is going to the bathroom?

25   A.    Yes, sir, that and just in general germs.  I mean,

1   any time I've dealt with any sort of medical call on the

2   side of the road, any time I've dealt with anyone in the

3   jail, even today, I put gloves on.  If they're not medical

4   gloves, there is some sort of protection on my hands.

5   Q.    Okay.  And is there a box of those latex medical

6   gloves in the booking room at the Pearl Police Department?

7   A.    Yes, sir, just for that reason.

8   Q.    Okay.  Now, why did you take Mr. Anthony out of the

9   booking room that morning?

10  A.    To go to the bathroom.

11  Q.    All right.  Had he asked you or told you he needed to

12  go to the bathroom?

13  A.    Yes, sir.  From my recollection, yes, he had

14  mentioned it at some point.

15  Q.    Do you recall where you were when he said that to

16  you?

17  A.    I do not.

18  Q.    Okay.  Were you with him at some point before the two

19  of you walked into the booking room?

20  A.    Yes, sir.

21  Q.    Okay.  Did you walk in the booking room with

22  Mr. Anthony and Mr. Lang?

23  A.    I believe the video, from my memory, is I walked

24  behind them --

25  Q.    Okay.

JONATHON WELKER - DIRECT

1    A.       -- but this is three years ago now.

2    Q.       All right.  Were you talking with Mr. Anthony outside

3    of the booking room before you walked in that morning?

4    A.       Yes, sir.

5    Q.       Okay.  But you don't recall where, physically, you

6    were when he mentioned something to you about going to the

7    bathroom; correct?

8    A.       No, sir.

9    Q.       Now, when you and your fellow officers -- well, you

10   were one of the officers that went into the window in the

11   back of the 1648 Ravenwood Lane home to arrest Mr. Anthony

12   on the morning of April 30th, 2022; correct?

13   A.       Yes, sir.

14   Q.       Okay.  And earlier I know there was some -- some back

15   and forth about people having a Taser drawn or potentially a

16   weapon drawn.  Do you recall anybody having Tasers or

17   weapons drawn when you went in that room that afternoon or

18   that morning?

19   A.       I don't recall that, no, sir.

20   Q.       Did you have your weapon drawn?

21   A.       No, sir.  I don't remember.

22   Q.       You don't recall one way or the other?

23   A.       I don't recall either way or the other.

24   Q.       How about your Taser, do you recall whether you had

25   your Taser drawn?

JONATHON WELKER - DIRECT

1    A.      I don't recall that either.

2    Q.      Okay.  Do you maintain a Taser or keep a Taser?

3    A.      Yes, sir.

4    Q.      Okay.  All right.  We're going to come back to that,

5    because I want to go back to the bathroom first.  I know I'm

6    jumping around, and I apologize for that.

7            Okay.  Tell me what happens after you and Mr. Anthony

8    walk around the corner in that booking room and go off

9    camera?

10   A.      So the bathroom is to the left.  We went to the

11   bathroom, I opened the door, made sure no one was in there,

12   closed it.  It was a normal routine thing to have someone

13   who is a known or habitual drug offender be searched prior

14   before he has to go utilize the latrine.

15           So in the jail, the same thing I would do anywhere

16   else.  If you're going to be in custody and then be

17   transported to the jail to make sure you didn't have

18   anything on your person or possibly in your person, you

19   would do a squat and cough, if that makes sense.

20           I -- I remember him -- I ordered him on the wall,

21   said, hey, put your hands on the wall.  He removed his

22   boxers, squat and coughed, turn around, squat-and-cough,

23   utilized the latrine.  And then as I sat there, my back was

24   turned towards him, right.  It wasn't completely, but it was

25   enough.

JONATHON WELKER - DIRECT

1          This is prior to the rule that the Pearl Police

2     Department came up with of not having a gun in the booking

3     room.  And so my gun was on, and as he was moving -- so he

4     utilized the latrine.  He stood up, pulled his boxers up --

5     Q.     Well, let me ask you before you go further with that.

6            Which side of your body was your gun on?

7     A.     The right.

8     Q.     Okay.  Now, go ahead.

9     A.     So as I'm sitting here, he's -- the bathroom's

10    relatively small.  He's a few feet away from me, and I'm

11    trying to give him some privacy.  I don't want to turn my

12    back completely.  I definitely don't want to sit here and

13    watch him, so I'm trying to give some respect.

14           And I remember him -- I told him to get on the wall

15    when he was done, and he didn't.  And the next thing I know,

16    he's right here.  And he made a very fast movement, and it

17    surprised me.  So I reared back, and when I did that, I have

18    to -- sorry -- when I dropped my right hand to protect my

19    gun, I came back up, and I struck him here with an open hand

20    and I pushed him up into the wall.

21           And at that time, I cursed at him and basically

22    lectured him and told him, you are too old for this.  What

23    are you doing?  You're like my pawpaw's age.  This is

24    ridiculous.  You're done.  We're over it.  We're good.

25    We'll never talk about it again.  You're over this, stop

JONATHON WELKER - DIRECT

1    doing this.  And then we ended up turned around and left and
2    went back into the booking room.
3    Q.    All right.  You showed the jury just a moment ago
4    where you struck him with your hand, but for the record so
5    we can try to describe it, it looked to me like you had --
6    you were using your right hand; correct?
7    A.    Yes, sir.
8    Q.    Okay.  And show me again where you struck him.
9    A.    Here.
10   Q.    So you struck him below the armpit?
11   A.    Yes, I struck him below the armpit.  And, like, the
12   angle that I was at, because when I took that half-crescent
13   step back and I hit him, I pushed him into the wall.
14        The object was to just get him off me and create that
15   distance.  And so when I pushed him off of me, I had
16   extended my arm and pulled it back, so it was really here, I
17   guess if you would, right under his peck.
18   Q.    All right.  Was a little adrenaline flowing at the
19   time?
20   A.    Oh, yes, sir.  Yeah, my gun was just exposed to an
21   inmate.
22   Q.    How hard did you strike him?  Can you describe that?
23   A.    I struck him hard enough to get him off of me.  He
24   kind of -- he kind of stopped, and he looked at me and I
25   looked at him.  And I just -- I started cussing at him.  I

1  shouldn't have, but I did.

2  Q.    All right.  And so you were using foul language when

3  you talked to him; right?

4  A.    Oh, yes, sir.

5  Q.    Okay.  And did he say anything back to you?

6  A.    I mean, he had some words for me, too.  I don't

7  remember all that I said.  I don't remember everything he

8  said to me.  Like, there's no way, from three years ago, I'm

9  going to remember what I told the guy in the bathroom.

10  Q.    All right.  Was he cussing you at the time?  Do you

11  recall that even though you don't require -- I mean, don't

12  recall the exact words?

13  A.    Oh, yeah.

14  Q.    So you were both cussing each other; is that right?

15  A.    Oh, yeah.

16  Q.    Okay.  So how long did this go on?

17  A.    No more than maybe a minute or so, a few minutes max.

18  I mean, it was over with.

19  Q.    When it was -- you say it was over with, did both you

20  and Mr. Anthony calm down at that point?

21  A.    Uh-huh.

22  Q.    Is that a yes?

23  A.    Yes, sir.  Sorry.

24  Q.    How long was it after you struck him on his left side

25  before you and he returned to the booking room?

1   A.      Probably several minutes.  I left -- I just -- I

2   don't remember where I went.  I mean, it was -- I have no

3   idea.

4   Q.      Okay.  What did you do with Mr. Anthony at that point

5   you left?

6   A.      Well, see, where the hallway was, if you can see

7   inside the hallway, you can see him there.  I would have

8   just left.

9   Q.      You --

10  A.      What do you mean?

11  Q.      Were you still at the bathroom?  Did you leave him in

12  the bathroom when you walked away?

13  A.      Oh, yes, sir.  Well, he -- he would have came, too.

14  But, yeah, he would have stayed right there in the cusp of

15  the bathroom and the hallway if that makes sense.

16  Q.      Yes.  So -- but you don't recall where you went --

17  A.      No, sir.

18  Q.      -- at that point?

19  A.      There's no telling.  I could have gone to the car.  I

20  could have gone to squad.  I could have gone to the gym and

21  gotten water.  There's no telling.

22  Q.      Okay.  Were -- was it troubling to you to leave

23  somebody like him alone in that hallway?

24  A.      What do you mean?

25  Q.      Well, you walked off.  Was there anybody else in the

JONATHON WELKER - DIRECT

1    hallway with him when you left him?

2    A.     I don't recall, sir.

3    Q.     Okay.  Well, would it trouble you to leave him in the

4    hall unsupervised?

5    A.     No, sir, not necessarily.

6    Q.     Why?

7    A.     Well, everything had calmed down.  I mean, it was --

8    it wasn't a heated aggressive anything.  Everything has just

9    relaxed and chilled.

10   Q.     All right.  Where could he go from that hallway?

11   What -- I mean, realistically could he have gone anywhere?

12   A.     Back to the bathroom and back into booking.

13   Q.     Okay.  Could he have gone out down that hall either

14   way and gone anywhere?

15   A.     Oh, no, sir.  You have to have a key fob.  So once

16   you enter the sterile facility where the booking room is or

17   that little -- you know, that little pivot hallway, you have

18   to have a key fob with you in order to go into the actual PD

19   or back into the sally port.

20   Q.     So he couldn't go anywhere, other than in that hall

21   and back to the bathroom; is that correct?

22   A.     Oh, no, sir.  I mean, he'd be secure in that area.

23   Q.     Okay.  Were you aware that day that there was a

24   camera in that hallway?

25   A.     Well, I knew there were cameras in the PD, yes, sir.

1   Q.    Okay.  Did you realize or did you know there was a

2   microphone in that camera in that hallway?

3   A.    I would have had no idea if there was a microphone or

4   not.  I mean, you can see the cameras.  They're pretty

5   obvious.

6   Q.    Did you know whether or not that camera was working

7   in that hallway that day?

8   A.    No, sir.  There's no way I could have known.

9   Q.    Okay.  All right.  Do you have the technological

10  skills, ability, know how to do anything with that camera?

11  A.    No, sir.

12  Q.    All right.  Let's go back to April -- I'm sorry -- to

13  the house when you came in the window, and, again, I

14  apologize for jumping around.

15        When you came in the window of that 1648 Ravenwood

16  Lane house on that Saturday morning, April the 30th, how

17  many people went into that -- through that window into the

18  house with you?

19  A.    I believe there were two more that went with me.

20  Q.    Okay.  And who were they?

21  A.    Officer Lang and Sergeant Lents.

22  Q.    Okay.  Did you or any other officers make an effort

23  to get them or get him to come to the front door of the

24  house before y'all went through the back window?

25  A.    Yes, sir.

JONATHON WELKER - DIRECT

```
 1   Q.      Okay.  Do you remember who did?
 2   A.      I don't remember who did, because I was going to the
 3   back.  I don't know who -- who all went to the front and
 4   everything else.  I know I went to the fence and was looking
 5   over the fence.
 6   Q.      Okay.  And I'm going about this in reverse order.
 7   We'll get to that in just a second as well.  But you go into
 8   the bedroom there, and tell me what occurs when you walk in
 9   the bedroom.
10   A.      I don't remember exactly, like, play by play.  I do
11   remember there being a scuffle.  I remember -- I remember
12   getting pushed into a dresser.  I remember pinning his feet
13   to the ground, and then when we placed him in cuffs, that
14   was it.  And I got up and walked out front.
15   Q.      Did it take very long to get him under control?
16   A.      What do you mean by "long"?
17   Q.      Well, do you have any idea about how many seconds or
18   minutes it took to get him under control?
19   A.      It probably took a minute or two.
20   Q.      Okay.  Did you have any sense that -- that
21   Mr. Anthony was injured in any way as a part of that
22   situation?
23   A.      No, sir.
24   Q.      Okay.  Were you injured in any way as a part of it?
25   A.      No, sir.
```

JONATHON WELKER - DIRECT

1    Q.    Okay.  Who transported Anthony back to the Pearl

2    Police Department following taking him into custody at that

3    house that morning?

4    A.    That was Officer Lang.

5    Q.    Okay.  And did you follow Officer Lang to the police

6    department?

7    A.    Yes, sir.

8    Q.    Okay.  Tell us, if you could, just some sense of how

9    big that bathroom is that you guys were in.

10   A.    No more -- from that third monitor over to that --

11   into that podium there from the jury's standpoint.

12   Q.    So six, seven, eight feet, something along those

13   lines?

14   A.    Yeah.

15   Q.    Was it a square room or what --

16   A.    Yes, sir.

17   Q.    Okay.  What was in that room?  What -- what kind of

18   equipment was in that room?

19   A.    We have a sink and a toilet, and that's it.

20   Q.    Okay.  Were they part of one big single piece of

21   equipment?

22   A.    Yes, sir.

23   Q.    Okay.  What was it, stainless steel?

24   A.    Yes, sir.

25   Q.    Okay.  Tell me a little bit about the sound as it

1    goes around that hall and that bathroom and how loud it is.

2    A.    It's echoey, so it echoes very easily.

3    Q.    Okay.  Could people inside the booking room hear what

4    was going on in that bathroom if the door was open a little

5    bit?

6    A.    Probably so, yes, sir.

7    Q.    And -- and was the door open or was it closed when

8    you and Mr. Anthony were in there?

9    A.    It was cracked open, yes, sir.

10   Q.    Okay.  Did you see at any time Mr. Lang slam

11   Mr. Anthony's head against a wall out in the hallway?

12   A.    No, sir.

13   Q.    Did you see Mr. Lang at all with Mr. Anthony out in

14   the hallway?

15   A.    No, sir.

16   Q.    Okay.  To your knowledge, could anybody have seen

17   what transpired between you and Mr. Anthony in that

18   bathroom?

19   A.    Say that again.

20   Q.    In your judgment, opinion could anybody -- is there

21   anybody that you think could have seen what transpired

22   between you and Mr. Anthony in that bathroom?

23   A.    No, sir.

24   Q.    Were you aware of anybody standing out in the hall at

25   the time you and Mr. Anthony -- or you struck Mr. Anthony in

JONATHON WELKER - DIRECT

 1   that bathroom?

 2   A.      No, sir.

 3   Q.      All right.  There's a fair amount of testimony about

 4   you and your body cam not working that day on April 30th at

 5   the house on Ravenwood Lane.  Tell the jury, if you would,

 6   just describe to them what was going on and how that all

 7   came about that your camera was not working.

 8   A.      The cameras are operated by a watch.  The cameras are

 9   like a cellphone.  They charge like a cellphone.  You have

10   to plug it in to charge it, to download it, everything.

11   There's a watch and it's a --

12   Q.      When you say "a watch," for the record, you mean

13   literally like the one you've got on your wrist?

14   A.      Well, it's not like an actual digital watch, but it

15   was a control device of the camera itself.  So if --

16   Q.      But you wear it on your wrist?

17   A.      Yes, sir, you have to wear it on your wrist.  It's

18   not activated by hitting it or anything like that.  You have

19   to hit the button.

20           So it looks like a little cross with a big button in

21   the middle.  That big button does several things:  It turns

22   it on, can cut it off, and it can also what's called "mark

23   it," meaning if we're sitting in here and I'm wearing the

24   camera and the podium decided to just randomly fall down, I

25   could hit that big button, and it would mark that.  But if

1    you press it for too long or if you double click it, it

2    turns it off.  So with the fence, looking over the fence and

3    I broke the --

4    Q.    Let's stop there and describe that in a little more

5    detail.  You said you were looking over a fence.  Was this a

6    fence around the backyard of the 1648 Ravenwood Lane house?

7    A.    Yes, sir.

8    Q.    Okay.  And what kind of a fence was it?

9    A.    Wooden.

10   Q.    Okay.  And at some point that morning, were you on

11   the outside of that fence looking to cross over to climb

12   over it?

13   A.    Yes, sir.

14   Q.    Okay.  Tell us what happened as you were doing that.

15   A.    I pulled on it and the fence broke.  At that time, I

16   was told, hey, if anything like that happens, mark it on

17   your body camera, and I did that.  I accidentally cut it

18   off.  At that point, I tried to put it back.  Didn't think

19   twice to turn it back on.  I, at the time, didn't realize I

20   had cut it off.  It wasn't until later I realized the camera

21   wasn't even rolling.

22   Q.    All right.  Now, is there a policy at the City of

23   Pearl that officers are supposed to wear body cameras and

24   have them on when they are dealing with the public?

25   A.    Yes, sir.

JONATHON WELKER - DIRECT

1    Q.    Okay.  Is it your opinion that you should have had

2    that body camera rolling on that morning when you were in

3    the 1648 Ravenwood Lane backyard?

4    A.    Yes, sir.  There's no excuse for it.

5    Q.    Okay.  Were you eventually found to have been in

6    violation of that -- that policy?

7    A.    Yes, sir, I was.

8    Q.    Okay.  And did that come out of the internal affairs

9    investigation?

10   A.    Yes, sir.

11   Q.    Okay.  And -- and what happened to you as a result of

12   violating that policy on that morning?

13   A.    I was sat down with my lieutenant.  He was a

14   lieutenant at the time, the captain that y'all met

15   yesterday, and --

16   Q.    Are you talking about Billy Hudson?

17   A.    Yes, sir.  Sorry.  Captain Billy Hudson, and we sat

18   down for a very long chat.  And, yeah, he told me how

19   disappointed he was in that, and that was about it.  It was

20   more or less a verbal write-up if you would -- a verbal

21   counseling or a verbal write-up if you would.

22   Q.    Did that do the job?  Were you able to make certain

23   your camera was working with -- when you were with the

24   public after that verbal counseling from -- from your

25   lieutenant?

1    A.    Yes, sir.

2    Q.    Now, I think there was some comments that you made

3    toward the end of the booking process at the Pearl Police

4    Department on the morning of April 30th that you've heard

5    mentioned a number of times in -- in this case thus far.

6         Can you tell me what you remember saying to him, why

7    you said it, and what was motivating you to say what you

8    did?

9    A.    I don't remember everything I said.  I know there

10   were a lot of explicits.

11   Q.    Explicits meaning what?

12   A.    Curse words.  I own that.  That's not how I talk

13   every day.  That's not how I am as a professional.  But,

14   yes, there was one instance where I asked him -- I said

15   something to the effect of did you think that one hurt, or

16   something to the effect of that, referring to when I pushed

17   him off of me.  And then I cussed at him and told him to

18   effing look at me.

19         And at that time, I was just angry acting like a fool

20   and unprofessional.  And at that point, I put him in

21   handcuffs and transported him to Rankin.

22   Q.    All right.  So when you transported him to Rankin

23   County, where in Rankin County did you transport him?

24   A.    What do you mean?

25   Q.    Where -- where did you take him?

JONATHON WELKER - DIRECT

1    A.    Rankin County Jail.

2    Q.    Rankin County Jail.  And where -- where is that

3    located?

4    A.    In Brandon.

5    Q.    Okay.  So you drove from Pearl where you were at the

6    Pearl Police Department to the Rankin County Jail in

7    Brandon; correct?

8    A.    Yes, sir.

9    Q.    Was there anybody in the car other than you and

10   Mr. Anthony?

11   A.    No, sir.

12   Q.    Okay.  And I know you've seen -- we've got the video

13   of that, and I know you've seen that.  Did you and

14   Mr. Anthony have any back and forth or harsh words with each

15   other during that -- that drive?

16   A.    No, sir.

17   Q.    Okay.  About how long did that drive take?

18   A.    I can't recall, sir.  It would depend on the route

19   that I took.  So when you leave Old Brandon Road, you can

20   take Pearson to 20.  You can take Old Brandon to 80 to

21   Airport to 20.  It would depend on peak traffic times and

22   such.  I don't remember which route I took, so I really

23   couldn't even guesstimate.

24   Q.    Okay.

25   A.    Probably 20 minutes.

1    Q.    All right.  Tell us what happened when you arrived at

2    the Rankin County Jail with Mr. Anthony that day?

3    A.    So -- so you pull up to the jail, there's a little

4    button.  You have to push the button, and you tell the

5    person in central tower, you know, Pearl, one white male.

6         At that time, they will raise what's called "a sally

7    port," and they'll raise this little garage door.  You drive

8    your car in there, they lower it.

9         This day I had been known to get the person out of

10   the car and let them sit there on the push bumper, because

11   it's better than sitting in a hot car in the middle of

12   summer.  Because I'd have to cut my car off, because you're

13   in an enclosed environment.  So there's no need for your car

14   to be running.  So instead of letting him sit there in a car

15   that's turned off, I pulled him out, and we sat on the push

16   bumper.

17   Q.    Okay.  Could you have taken him into the jail

18   immediately after going into the sally port?

19   A.    Oh, no, sir.  They'd have to come get him.

20   Q.    All right.  So you had to wait on them to come open

21   the door; is that correct?

22   A.    Yes, sir.  There's three doors if I remember

23   correctly.  They may have changed it by now.  But at the

24   time, there were three doors that they have to walk through.

25   I can't just bring someone in the jail.  They have to come

JONATHON WELKER - DIRECT

1    get them.

2    Q.    Do you recall how long it was before someone came in

3    from the jail to let you and Mr. Anthony in the jail after

4    you'd pulled into the sally port?

5    A.    It was several minutes.

6    Q.    Okay.

7    A.    I don't know how long, but I know it was a while.

8    Q.    Did you play any role in how long it took for them to

9    come let you in?

10   A.    No, sir.  I don't have that purview.

11   Q.    All right.  Now, Mr. Anthony said, as you heard him

12   the other day testify, you made him move over to the

13   driver's side of the car -- he was, I think, sitting on the

14   passenger side -- to make him get out, and you made him move

15   to do all that.

16         Why did you want him to come out the driver's side of

17   the door?

18   A.    Don't -- not sure.  I have no idea.

19   Q.    Okay.

20   A.    I just pull him out.

21   Q.    Did you go -- did you personally go into the Rankin

22   County Jail when they finally came to let you in the door?

23   A.    No, sir.

24   Q.    Did you ever leave the sally port?

25   A.    No, sir.

JONATHON WELKER - DIRECT

1    Q.    Okay.  So what did you do when they came and opened

2    the door?

3    A.    They walk out, they swap cuffs.  I get my cuffs back.

4    And I go sit in the truck, hit my little blue lights to let

5    central tower on the little monitor see, and leave.

6    Q.    Okay.  So you don't have any idea what went on inside

7    the Rankin County Jail after Mr. -- after you handed

8    Mr. Anthony over to the people at the jail; correct?

9    A.    No, sir.  I never walked in.

10   Q.    Okay.  Do you remember which person you handed him

11   over to?

12   A.    No, sir.

13   Q.    Okay.  Did you ever see any marks, bruises, redness,

14   anything on Mr. Anthony's body at any point after you and he

15   came back from the bathroom that would indicate he had been

16   hit by anyone?

17   A.    No, sir.

18   Q.    Okay.  Now, you -- Mr. Anthony says that you turned

19   him -- took his shoulders and turned him sort of

20   perpendicular to you, and then proceeded to hit him 30 times

21   on the upper-left chest and the upper-left back portion.

22         Did you do that?

23   A.    No, sir.

24   Q.    Okay.  Did you hit him at all, other than the one

25   time you've described to us?

JONATHON WELKER - CROSS

1    A.    No, sir.

2         MR. SILER:  All right.  If the Court would indulge me

3    just one moment?  I'll tender the witness, Your Honor.

4         THE COURT:  All right.  Cross-examination, Mr. Lees.

5                    **CROSS-EXAMINATION**

6    **BY MR. LEES:**

7    Q.    Officer Welker, you and I have never met; correct?

8    A.    No, sir.

9    Q.    You just told us a remarkably detailed account of

10   what occurred in the bathroom between you and Mr. Anthony on

11   the morning of April 30th, did you not?

12   A.    Yes, sir.

13   Q.    Because you have a good memory of that event?

14   A.    Of certain details, I do.

15   Q.    You actually created a police report about both the

16   arrest of Mr. Anthony and taking him to the police station,

17   the booking, and then taking him to the Rankin County Jail;

18   correct?

19   A.    Yes, sir, I did.

20        MR. LEES:  Permission to approach the witness, Your

21   Honor?

22        THE COURT:  You may.

23   BY MR. LEES:

24   Q.    Officer, I've given you what I've marked as

25   Plaintiff's Exhibit 3 and ask you if you recognize that

JONATHON WELKER - CROSS

1    document?

2    A.    Yes, sir.

3    Q.    And could you tell us what that document is?

4    A.    This is the -- this is my arrest report and my

5    supplement.

6    Q.    Is this the police report that you created and filed

7    relevant to the events on both April 29th and April 30th?

8    A.    Yes, sir.

9    Q.    And this was a record created in the regular course

10   of the business of the Pearl Police Department; correct?

11   A.    Yes, sir.

12        MR. LEES:  Okay.  Your Honor, at this time I would

13   move for the admission of -- what's the number on there,

14   Officer?

15        THE WITNESS:  P-3.

16        MR. LEES:  Of Plaintiff's Exhibit 3.

17        THE COURT:  Okay.  Any objections?

18        MR. SILER:  No objection.

19        THE COURT:  All right.  P-3 is admitted.  You may

20   publish it to the jury.

21            (Plaintiff's Exhibit 3 entered.)

22   BY MR. LEES:

23   Q.    So apparently up here at the top, this report was

24   entered into the police records on May the 1st, 2022;

25   correct?

JONATHON WELKER - CROSS

1    A.    Yes, sir.

2    Q.    And the first paragraph, can we agree, deals with

3    what happened on April 29th; correct?

4    A.    Yes, sir.

5    Q.    All right.  I'm going to hold that for a moment.  The

6    second paragraph is what you recorded as happening on

7    April 30th; correct?

8    A.    Yes, sir.

9    Q.    So according to your testimony today, Mr. Anthony did

10   something in the bathroom that caused you to have to strike

11   him with some force; correct?

12   A.    Yes, sir.

13   Q.    Okay.  Where is that in your report?

14   A.    It's not in there.

15   Q.    Is it your testimony now today that Mr. Anthony tried

16   to go for your gun?

17   A.    Well, I don't know his intentions.  But I know that

18   when you're this close to me, and my gun was exposed, that's

19   what went through my head.  But I never asked him, if that's

20   what you're asking, sir.

21   Q.    I thought you had a chat with him.  You said you had

22   a chat with him in the bathroom after he -- what did you

23   say, he moved quickly, or he lunged toward your gun side or

24   something like that?

25   A.    Yes, sir.

JONATHON WELKER - CROSS

1    Q.    And you didn't say what the hell are you doing?

2    A.    Oh, I'm sure I cursed, yes, sir.

3    Q.    So he, according to you, and you were -- you had some

4    experience as a police officer by that point; right?

5    A.    Yes, sir.

6    Q.    So in your opinion, a person in custody lunged at

7    your gun, so that you had to physically strike him; is that

8    right?

9    A.    Well, he lunged on my gun side.  I don't -- he never

10   grabbed my gun, if that's what you're asking.

11   Q.    Well, I'm saying wherever it was he lunged, you

12   thought he was lunging at your gun side; correct?

13   A.    He did lunge at my gun side, yes, sir.

14   Q.    And you -- and because of that in order to, what,

15   protect your gun or protect you, you had to strike him with

16   a forceful blow; correct?

17   A.    Yes, sir, I hit him here (indicating).

18   Q.    And then you decided that wasn't something that

19   needed to be put in your report?

20   A.    Yes, sir.

21   Q.    Help me understand why any police officer in America

22   who had an altercation like that with a suspect wouldn't

23   include that in their report if it, in fact, happened?

24   A.    So I think I said this, even in my deposition, how

25   poor this report is, and then I would also like to say that

JONATHON WELKER - CROSS

1    at that moment, it was handled.  In my head, this was done,

2    and there was no further anything about it.

3        So, again, in the report, it stated the facts, and

4    that was it.  It wasn't until I became a detective that I

5    realized I needed to write every single thing down.

6    Q.    So the explanation you have today as to why you

7    didn't include that in your report is because you simply

8    wrote a poor report?

9    A.    Oh, sir, this is an absolutely poor report.

10   Q.    So by May the 5th, five days later, four days after

11   you filed this report, the Pearl Police Department had a

12   letter from Mr. Anthony's lawyer alleging he was brutally

13   assaulted at the police station, I think even in the

14   bathroom; correct?

15   A.    Yes, sir.  I didn't know that at the time.  I know it

16   now because you're telling me.

17   Q.    Well, there was an internal affairs investigation in

18   May; correct?

19   A.    Yes, sir.

20   Q.    The internal affairs officer was Billy Hudson;

21   correct?

22   A.    Yes, sir.

23   Q.    Billy Hudson said pursuant to that complaint, he

24   interviewed you; correct?

25   A.    Yes, sir.

1   Q.    So you certainly were aware that there had been a

2   complaint filed alleging Mr. Anthony had been brutally

3   beaten in the bathroom sometime in early May; correct?

4   A.    Yes, sir.

5   Q.    So you were aware?

6   A.    Yes, sir.

7   Q.    All right.  So you then said, whoa, I filed a report

8   that was poorly written, so let me supplement that and write

9   exactly what happened.  Did you do that?

10  A.    No, sir.

11  Q.    But police officers file supplemental reports all the

12  time; correct?

13  A.    Yes, sir.

14  Q.    You never filed a report to supplement your poor

15  report, once you knew there was an issue about police using

16  excessive force, to tell this other story?  You never did

17  that?

18  A.    Help me understand what you're asking me.

19  Q.    I'm simply asking, the story you're telling in court

20  today, Mr. Anthony lunging somehow, you having to strike him

21  and all that, having not included it in the initial report

22  because you wrote it poorly.  Now, there's an internal

23  investigation, you know that there's an allegation.

24        Why didn't you go back and file a supplemental report

25  and set out in detail what happened in the bathroom

JONATHON WELKER - CROSS

1    according to you?

2    A.    So I didn't think twice about going back and adding

3    in a supplemental report regarding all this.

4    Q.    Because you still didn't think there needed to be a

5    report as to what happened in the bathroom according to you,

6    or you didn't file a supplemental report because it never

7    happened?

8    A.    Well, neither, sir.

9    Q.    Did you attempt at the deposition, as a way to

10   explain Mr. Anthony's injuries, start to tell a story at

11   your deposition about, oh, Mr. Anthony was fighting us

12   during his arrest?  He -- he kicked me.  He was struck.

13       Do you remember that story you told in your

14   deposition?

15   A.    Yes, sir.

16   Q.    But today you said, basically, took him under control

17   in a minute, no big deal, nobody got hurt; right?

18       That was your testimony today?

19   A.    In the bathroom, yes, sir.

20   Q.    Yeah.  But at your deposition, you said -- correct me

21   if I'm wrong -- when he went to arrest us -- or when we went

22   to arrest him, he fought us; correct?

23   A.    Yes, sir.

24   Q.    Mr. Anthony actually struck you.  He kicked you;

25   correct?

1   A.      Yes, sir.  That's what I stated in my deposition.

2   Q.      But your fellow officer -- we just went through that

3   very carefully line by line, no fighting, no kicking,

4   nothing like that ever occurred according to Officer Lang.

5           Was he not being truthful?

6   A.      I'm not saying Officer Lang's not being truthful.

7   Q.      Well, then how do you explain him saying nothing like

8   that happened, and you at your deposition coming up with

9   that story?

10  A.      I remember getting kicked by Mr. Anthony, and I

11  remember being pushed into the bookshelf.  I don't remember

12  what Officer Lang was doing, where he went, and all those

13  details.

14  Q.      So is it your testimony under oath today that during

15  the arrest, Mr. Anthony fought you, and he struck you and he

16  kicked you?  Is that your testimony under oath today?

17  A.      Yes, sir, so according to my report here.

18  Q.      And did you file any type of notation with the police

19  department that you had been struck or hit during the course

20  of the arrest?

21  A.      No, sir.

22  Q.      So is it your understanding that when a uniformed

23  police officer is attacked, struck, hit by an individual

24  you're attempting to take into lawful custody, that just

25  about every police officer in America will place a charge of

JONATHON WELKER - CROSS

1    resisting arrest on that individual?

2        MR. SILER:  I'm going to object to the form of that

3    question.  He can't know what every policemen in America

4    would do.

5        THE COURT:  Sustained.  You can rephrase.

6    BY MR. LEES:

7    Q.    Did you charge him with resisting arrest?

8    A.    No, sir.

9    Q.    At the deposition when you were first asked that, you

10   told the counsel that you had, and then you were corrected

11   you had not.  Do you remember that?

12   A.    Yes, sir.

13   Q.    So if Mr. Anthony did what you say he did, and Lang

14   said he didn't, but he actually hit you and kicked you, why

15   didn't you charge him with resisting arrest?  Being a nice

16   guy, what?

17   A.    I suppose, yes, sir, I was.  He was going through

18   enough.

19   Q.    Are you right-handed or left-handed?

20   A.    Right-handed.

21   Q.    Have you done extensive training in martial arts,

22   Officer?

23   A.    Yes, sir.  Define extensive training.

24   Q.    Did you tell us at deposition you had no idea how

25   Mr. Anthony suffered the injuries that he suffered?  You had

JONATHON WELKER - CROSS

1    no idea?

2    A.    I'd have to look back at my deposition.

3         MR. LEES:  Can I have Welker Clip C, please.  It will

4    be deposition page 32, line 24 through page 33, line 1.

5              (Video playing in open court.)

6    BY MR. LEES:

7    Q.    Did I refresh your recollection?

8    A.    Yes, sir.

9    Q.    Did you, or is it your position today, that you took

10   Mr. Anthony to the bathroom to conduct a strip search?

11   A.    That's not the only reason.  It was to -- he wanted

12   to go to the bathroom.  But known narcotics users, you would

13   have them cough and squat and turn and cough and squat, and

14   make sure they didn't have anything on them before they

15   utilize the latrine.

16   Q.    So did you conduct a strip search of Mr. Anthony when

17   you were in that bathroom?

18   A.    No, sir.

19   Q.    Let me just show you page 82 of your deposition,

20   because your last answer is going to help me maybe

21   understand this.  Do you see here -- do you see here, at

22   your deposition, you were asked, "Did you actually perform

23   the strip search that you're talking about of him?"

24         And what was your answer?

25   A.    I said, "Yes, sir."

1    Q.    But I just asked you if you said a strip search, and

2    you said, no, sir.

3    A.    I must have been confused by your question because --

4    Q.    It was a very confusing question --

5          MR. SILER:  Excuse me.  He hadn't finished his

6    answer, Your Honor.

7    A.    I must have been confused by your question, sir.

8    Because I even told him that he squat and coughed, squat and

9    coughed, go to the bathroom.

10   Q.    So you're doing a strip search of somebody who's not

11   being arrested for a drug offense?  Yes?

12   A.    Yes, sir.

13   Q.    That's not in your police report, is it?

14   A.    No, sir.

15   Q.    That's a fairly invasive procedure of an American

16   citizen to force them to undergo a strip search by a police

17   officer with no witnesses to that strip search; correct?

18   A.    No, sir.

19   Q.    You don't think that's invasive?  So if you were to

20   take --

21         MR. SILER:  Objection, Your Honor.  That's not his

22   question.  His question was it was an evasive thing, and he

23   went on to condition and express a number of words

24   describing.  And then he just comes back and asked him you

25   said that's not invasive.  That's -- he's not being truthful

1    in the handling of the witness in the questions he's asking.

2         THE COURT:  Okay.  I'm going to overrule the

3    objection.

4    BY MR. LEES:

5    Q.    You don't -- I'll rephrase it very specifically.

6         Have you been trained to understand that doing a

7    strip search on an America citizen is a fairly high-level,

8    intrusive procedure?  Yes or no?

9    A.    No, sir.  I've not been trained of that as a very

10   intrusive, high-level procedure.

11   Q.    And based upon the way you were trained, you were

12   trained that it was appropriate to take an American citizen

13   into a closed area with no witnesses and conduct a strip

14   search; is that correct?

15   A.    So the bathroom wasn't closed.  But, yes, sir, for a

16   habitual drug user, before you take him to jail, as he's in

17   his boxers, you make him squat and cough, squat and cough

18   before you take him to Rankin County.

19   Q.    And that's the type of thing you do not routinely put

20   in your police reports; correct?

21   A.    Yes, sir.

22   Q.    Do you recall in the booking area an Officer Randolph

23   being there?

24   A.    No, sir.

25   Q.    Okay.  Excuse me.  Was there an officer or an

JONATHON WELKER - CROSS

1    individual named Donovan Randolph there at the police

2    station that day?

3    A.    I have no idea if he was at the police station, sir.

4    Q.    In the booking room?

5    A.    Oh.  No, sir.

6          MR. LEES:  Would you bring up clip -- yeah, Clip 7 of

7    the booking room video, please.

8                    (Video playing in open court.)

9    BY MR. LEES:

10   Q.    Let me stop there.  Who is this in the -- if you

11   could, just go around the room and tell us who's who,

12   please?

13   A.    Mr. Anthony is sitting on the bench.  I am sitting

14   there by the printer.  The black officer is Domonique

15   Harrington.  There's Officer Villareal in the corner with

16   the glasses, the female.  It appears to be Sergeant Lents in

17   the middle, and Officer Lang on the far-corner desk.

18   Q.    Okay.  I'm going to play this clip, portion of the

19   clip for just a moment and then just ask you a few questions

20   about it, Officer.

21         MR. LEES:  Can you play that clip please, Brandon?

22                    (Video playing in open court.)

23   BY MR. LEES:

24   Q.    Did you hear the one officer begin that conversation

25   with Mr. Anthony by saying, "You beat women, you don't beat

JONATHON WELKER - CROSS

1    women"?

2    A.    Yes, sir.

3    Q.    And then that's when you interjected and came over

4    and said, "Hey, Jimmy.  Jimmy, did you just shake your head

5    no?"  That's when you walked over, that's what you said;

6    correct?

7    A.    Yes, sir.

8    Q.    And then you said, "Hey, Jimmy, did you shake your

9    head no?  Yes or no?  You did shake your head no.  I saw

10   you.  What did we just talk about?"

11   A.    Yes, sir.

12   Q.    What are you referencing?

13   A.    So the conversation in the bathroom when we were

14   talking.

15   Q.    Oh, the conversation in the bathroom.  So while you

16   were strip searching Mr. Anthony, you were talking about him

17   beating women?

18   A.    No, sir.

19   Q.    Well, when?

20   A.    When we were cursing at each other.

21   Q.    And tell me how that went; I'm curious.

22   A.    I don't recall the conversation, sir, verbatim.

23   Q.    Can you at least recall some of it?

24   A.    Lots of explicits and me cussing at him.

25   Q.    Just tell me.

JONATHON WELKER - CROSS

1    A.      Well, I -- I don't know exactly what I said.  I know
2    that it involved a lot of cursing.
3    Q.      Well, tell me what you said as best you can remember
4    regarding beating women, because here you said, "What did we
5    just talk about?"
6    A.      I remember talking to him about, hey, you're getting
7    too old for this.  This is not for you.  You can do better
8    than this.  It's the same thing I told him at the sally port
9    at Rankin.
10   Q.      Okay.  Anything else you can remember about the
11   bathroom now, conversations or otherwise?
12   A.      No, sir.
13   Q.      Can we bring up, please, Clip 8.  And I'm going to
14   play Clip 8 from the booking room video and then ask you
15   some questions about it.  All right?
16              (Video playing in open court.)
17   BY MR. LEES:
18   Q.      So in that segment, would you agree you said, "What's
19   wrong, Jimmy?  Your chest sore?  What's your chest feel
20   like, Jimmy?"
21   A.      Yes, sir.
22   Q.      "What's it feel like, just describe.  It feels like
23   you're about to have a heart attack.  What's that feel like,
24   Jimmy?"  You said that; correct?
25   A.      Yes, sir.

JONATHON WELKER - CROSS

1    Q.    "A sharp pain in your chest.  Did you induce any --

2    did you feel any trauma?  Do you have any trauma induced to

3    your body today?"  You said that; right?

4    A.    Yes, sir.

5    Q.    Do you have medical training?

6    A.    Some, yes, sir.

7    Q.    All right.  So tell me how you would relate a

8    complaint from an individual about a heart attack to trauma?

9    A.    Chest tightness maybe.

10   Q.    Huh?

11   A.    It would -- it would depend on the person.  What do

12   you mean?

13   Q.    Well, I mean if somebody said "I feel like I'm having

14   a heart attack," I'm just trying to understand why you begin

15   talking about whether or not the person had some trauma

16   today induced.  Why did you say that?

17   A.    I do not know, sir.

18   Q.    It isn't because you had just beat him in the

19   bathroom and were reminding him, were you?

20   A.    No, sir.

21   Q.    Almost immediately thereafter, do you recall Officer

22   Lang breaking out into song singing, "He got beat because he

23   run from the police"?

24   A.    Yes, sir.

25   Q.    All right.  And what did you do when Officer Lang,

1    out of nowhere, started singing a song about Jimmy getting

2    beat because he run from the police?

3    A.      I don't recall.

4    Q.      Do you know or did Officer Lang ever share with you

5    why he felt compelled at that moment, after you're talking

6    about trauma being introduced, to break out into song about

7    Jimmy getting beat?

8    A.      I don't know why Officer Lang began singing.

9            MR. LEES:  Your Honor, I need to step out for a

10   minute.

11           THE COURT:  Yeah.  Yeah.  Let's take just a

12   five-minute recess.  Is that good?  Do y'all need a quick

13   break, too?  Okay.  Let's do that.  Let's take five to ten

14   minutes.  Court will be in recess.

15           MS. POWELL:  All rise.

16           THE COURT:  Remember the Court's instructions.

17                    (Jury out at 4:37 p.m.)

18           THE COURT:  All right.  Court will be in recess.

19           Officer Welker, you're under cross, so don't discuss

20   your testimony with anyone.

21           THE WITNESS:  Yes, ma'am.

22           THE COURT:  But we'll be in recess for ten minutes.

23                    (A brief recess was taken.)

24                    (Jury in at 4:48 p.m.)

25           THE COURT:  All right.  You may be seated.

1        Mr. Lees, you may proceed.

2   BY MR. LEES:

3   Q.     I just want to go over just one or two more of the

4   things that happened in the booking room, if I might,

5   Officer.

6        When it was time for you to go take Mr. Anthony to

7   the Rankin County Jail, do you recall saying, "Jimmy, guess

8   who you get to ride with?  Jimmy, come on, bud.  Let's go

9   for a ride together.  You ready, buddy?  You ready to rock

10  and roll?"

11       Do you remember that?

12  A.     Yes, sir.

13  Q.     Why are you treating him like that?

14  A.     There's no excuse.

15  Q.     What was your intent or purpose?

16  A.     I don't know.

17  Q.     You did discuss this in your direct, and I need to

18  ask it.  Right there towards the end, you said -- and you

19  can disagree if you think I'm misquoting you -- "Look at me

20  in my eyes, Jimmy.  Stop with the acting.  I don't give a

21  fuck, you understand?  Hey, please back off me, because I

22  don't give a fuck."

23       What did you mean, "Please back off me, because I

24  don't give an eff"?  What are you talking about?

25  A.     I don't know, sir, just angry.

1    Q.    It is your position in this case, even though you

2    never put anything like this in a police report, that you

3    did not beat him in that bathroom.  That's your testimony;

4    right?

5    A.    Yes, sir.

6    Q.    And yet on the video after your fellow officer starts

7    singing about you get beat if you run from the police, you

8    said, "If you think that hurt earlier, then shut the fuck

9    up."  Nobody says that unless you hurt him earlier; isn't

10   that true?

11   A.    I was referring to the hit, yes, sir.

12   Q.    That's what you were referring to, not the beating?

13   A.    The hit.  Like I told you, the beating never

14   happened.

15         MR. LEES:  Brandon tells me I need to show you one

16   more document with your permission?

17         THE COURT:  You may.

18   BY MR. LEES:

19   Q.    Let me show you what's been marked for identification

20   as Plaintiff's 13 and ask if you recognize that document?

21   A.    Yes, sir.

22   Q.    Did you -- and what is that document, by the way?

23   A.    It's an OR sheet.

24   Q.    What is an OR sheet?

25   A.    So the title, it says, "Order to Release Defendant

JONATHON WELKER - CROSS

1    for Medical Treatment."  It's basically an on your own

2    recognizance sheet.

3    Q.    Okay.  And is that a document you secured and

4    actually served on Mr. Anthony?

5    A.    Yes, sir.

6    Q.    Okay.  And what's the date of that document?

7    A.    The 30th of April, 2022.

8    Q.    The 30th of April, 2022; correct?

9    A.    Yes, sir.

10   Q.    And -- and, again, could you just explain -- is that

11   in evidence?

12        THE COURT:  It's not.

13        MR. LEES:  Could we move for the admission of that

14   exhibit, please?

15        THE COURT:  Any objection?  There's no objections in

16   the pretrial order.

17        MR. SILER:  No.  Except that our record needs to

18   reflect what the document is and what number it is.

19        THE COURT:  Okay.  P-13 is admitted.  And then you

20   can -- are you talking about the Bates number?

21        MR. SILER:  Well, it's P13, is that the number?

22        THE COURT:  P-13.

23        MR. SILER:  That's fine.

24             (Plaintiff's Exhibit 13 entered.)

25        MR. LEES:  Can I have the other copy for a moment of

JONATHON WELKER - CROSS

1    P-13 from you?

2          MR. FLECHAS:  I think she has it.

3          MR. LEES:  Oh, okay.

4          THE COURT:  You can have my copy.  We have other

5    copies up here, but not anything that's been admitted in

6    evidence.

7          MR. LEES:  We've got it up on the screen now.  Can

8    you page down?  I'm going to use this thing, the Elmo.

9          MS. POWELL:  Oh, okay.

10   BY MR. LEES:

11   Q.    And this is Plaintiff's Exhibit 13, which you have in

12   front of you; correct?

13   A.    Yes, sir.

14   Q.    And you can see, "Ordered the 30th day of April,

15   2022, by the Pearl Municipal Court."  Correct?

16   A.    Yes, sir.

17   Q.    And this was an order to release Mr. Anthony from

18   custody in order to receive medical treatment; correct?

19   A.    Yes, sir.

20   Q.    And you personally took this to the Merit Health --

21   was it a clinic or a hospital or what, Merit Health?

22   A.    Merit Health?

23   Q.    Yeah.

24   A.    It's the one off 18.  Yes, sir, it's a hospital.

25   Q.    Okay.  So you personally took this on the 30th of

JONATHON WELKER - CROSS

1    April to Merit Health to give to Mr. Anthony; correct?

2    A.    Yes, sir.

3    Q.    So before the day was even out on April 30th, you

4    knew Mr. Anthony was in the hospital receiving medical

5    treatment for something that happened to him while he was in

6    police custody; right?

7    A.    Well, I knew that he was in the hospital, yes, sir.

8    That's why I was told to bring it.

9    Q.    And that would have been before you actually wrote

10   your report the next day on May 1st; correct?

11   A.    Yes, sir.

12   Q.    And yet you still, knowing that he was in the

13   hospital immediately after you took him to the jail, you

14   still didn't put in the report what you now say happened

15   with him lunging and all that stuff.  Still didn't see the

16   need to put that in your report; right?

17   A.    Yes, sir.

18         MR. LEES:  That's all I have.  Thank you, Your Honor.

19         THE COURT:  All right.  Thank you.

20         Any redirect?

21         MR. SILER:  Yes, Your Honor.  Sorry to do it right at

22   the end of the day.

23                    **REDIRECT EXAMINATION**

24   **BY MR. SILER:**

25   Q.    All right.  Let me start by referring to P-13, which

JONATHON WELKER - REDIRECT

1    you have in front of you, which you said was the OR Report

2    that you were just talking with Mr. Lees about?

3    A.    Yes, sir.

4    Q.    Okay.  Now, did you do anything -- well, let me ask

5    you this:  How did you come to be the one to take that --

6    that over to Mr. Anthony?

7    A.    I was told to.

8    Q.    By whom?

9    A.    My sergeant on shift.

10   Q.    All right.  Did you have anything to do with

11   acquiring that report or drafting it or anything of that

12   nature?

13   A.    No, sir.

14   Q.    Okay.  It was just handed to you by your sergeant,

15   and you were instructed to go give it to Mr. Anthony; is

16   that correct?

17   A.    Yes, sir.  I was told to just drive over there, make

18   him sign it, give him the court date, and roll out.

19   Q.    Okay.  Did -- did you know why Mr. Anthony was in the

20   hospital?

21   A.    No, sir.  It's not by business.

22   Q.    Did you have any inkling that anything, any

23   interaction between you and Mr. Anthony that day was the

24   reason he was in the hospital?

25   A.    No, sir.

JONATHON WELKER - REDIRECT

1    Q.    Okay.  Now, let me -- let's talk a little bit about

2    P -- the exhibit that's been marked as P-3, or marked and in

3    the record as Exhibit P-3.  I'm going to get you to look at

4    that on the monitor, and I've highlighted a couple of

5    sentences down there.

6          And those sentences read, "As we entered the

7    residence, Mr. Anthony was instructed to place his hands

8    behind his back.  Mr. Anthony refused to comply with the

9    verbal commands given.  Mr. Anthony was then placed on the

10   ground.  Mr. Anthony attempted to stand up and placed his

11   hands under his body then above his hands" (sic).

12         This -- that was in your report, back at that time,

13   about what he did that day when you took him into custody;

14   correct?

15   A.    Yes, sir.

16   Q.    Okay.  When you're writing these reports, is it

17   humanly possible to put every single detail of what happened

18   in a particular event?

19   A.    No, sir.

20   Q.    So what do you try to pick out as the things to put

21   in a report?

22   A.    Whatever the big factors are.

23   Q.    All right.  Are there times when you write a report

24   that as things change and evolve down the road, that you

25   wish you had put something or put more detail in a report?

1    A.      All the time.

2    Q.      All right.  Do -- did you have any idea on April the

3    30th or even May the 1st of 2022, that you were going to get

4    sued and wind up in a court having to defend all this?

5    A.      No, sir.

6    Q.      All right.  There was some implications that some of

7    the testimony you've had here today was made up for this

8    trial, and I want to refer back to your deposition.  So I'm

9    going to put on the Elmo here the deposition that you gave

10    in this matter on January 25th, 2024.  Do you see that?

11    A.      Yes, sir.

12    Q.      Okay.  And this may get a little long, but it's

13    important to know and put in perspective for the jury

14    what -- what you were asked what you said.

15          MR. LEES:  May we approach?

16          THE COURT:  You may.  If you'll remove that from the

17    Elmo while y'all are approaching --

18          MR. SILER:  Okay.

19          THE COURT:  -- or bring it with you.

20                     (BEFORE THE BENCH)

21          MR. LEES:  I would ask for a proffer, because I asked

22    him about several specific statements in his deposition.  He

23    agreed he made the statements.  You, under the rules, can

24    now not get into other portions of his deposition to

25    introduce during his direct examination, so I'm trying to

JONATHON WELKER - REDIRECT

```
 1    figure out where you're going with this.
 2         MR. SILER:  Well, under the rules, I can use the
 3    deposition for any purpose that I need to use it, and we're
 4    going to do -- we're doing this to directly refute things
 5    that were brought up during his cross-examination.
 6         THE COURT:  Okay.  I didn't see the deposition, but
 7    what, specifically, are we asking about?
 8         MR. SILER:  Well, let's see.  It actually goes on for
 9    a few pages but --
10         THE COURT:  Let me just read myself.
11         MR. SILER:  Okay.  And then I'll -- there's a couple
12    other spots in here, too.
13         MR. LEES:  Yeah.  If we're going to be a while on
14    this, too -- I didn't know you had that -- I'm happy to do
15    this in the morning if that's --
16         THE COURT:  Okay.  Let's do that for the sake of the
17    jury.
18         MR. LEES:  Yeah.
19         THE COURT:  Okay.  All right.  Let's do that.
20         MR. LEES:  I'm not sure how long I'm going to be
21    without --
22         MR. SILER:  Yeah.
23         THE COURT:  I got you.
24                    (IN OPEN COURT)
25         THE COURT:  All right.  The attorneys graciously
```

1    recommended for us to break for the day since it's 5:00, and

2    I said we'll handle this matter outside your presence and

3    take up some other matters.  That way, tomorrow we move as

4    expeditiously as we did today.

5         We are moving.  We are on schedule, so I'm going to

6    go ahead and release you all for today.  Let's have the same

7    schedule tomorrow that we did today.

8         Be back downstairs, what did I say, 8:50?

9         JUROR:  8:45.

10        THE COURT:  Okay, 8:45.  I was being more generous,

11   but let's do 8:45.  And then as soon as everyone's here in

12   the morning, we'll bring you upstairs, and we'll get started

13   at 9:00.

14        Just remember the Court's instructions, because I

15   will ask you in the morning if you remember them and if you

16   followed them.  And it's to not speak about the case, don't

17   discuss it with anybody, and also don't do any independent

18   research.

19        But I have been paying attention to y'all, because

20   these chairs have a tendency to make people fall asleep.

21   Everyone has been attentive, so I appreciate that.  I know

22   it's hard sometimes, but y'all did great.

23        All right.  We'll see you all in the morning.  Y'all

24   be safe going home and have a good night.

25        MS. POWELL:  All rise.

1                (Jury out at 5:03 p.m.)

2          THE COURT:  All right.  You may be seated.

3          Let's -- the attorneys that plan to handle jury

4   instructions, we're not going to do a jury instruction

5   conference right now, so don't fear that.  But let's take

6   about a five-minute recess, and I just want to discuss some

7   issues and some things that I may need some research on

8   tonight.

9          But if you're not handling jury instructions and you

10  want to go and your clients want to go, feel free to go.

11  Again, give a couple minutes to get the jury out of here,

12  but then y'all can go.

13         Okay.  So court will be in recess for five minutes,

14  and I'll come back and we'll discuss some matters.

15         Yes, sir?

16         MR. LEES:  Before we all leave, may I just ask what

17  your plans are for tomorrow in terms of additional evidence

18  and when you think you would be done?

19         MR. SILER:  And that's a fair question, and I don't

20  know the answer right at the moment.  But it won't take us

21  too long this evening to get you an answer for that, but I

22  know we need to get together and kind of feel -- see how we

23  feel about things and who else, if anyone else, that we're

24  going to put on.

25         MR. LEES:  Do you think we're going to end before

1    noon and we will get to closing arguments and the jury will

2    get the case?

3            MR. SILER:  I do.

4            THE COURT:  Okay.  Well, that's good for our planning

5    purposes, too.

6            All right.  Let's just take a five-minute recess, and

7    then whoever wants to be here to discuss some jury

8    instruction research issues.  I at least need one attorney

9    for both sides, I'll say that.

10           We'll be back in five minutes.  Thank y'all.

11           MS. COSSAR:  All rise.

12                   (A brief recess was taken.)

13            (An off-the-record discussion was held.)

14    ****************************************************************

1            **CERTIFICATE OF COURT REPORTER**

2

3          I, Candice S. Crane, Official Court Reporter for the

4   United States District Court for the Southern District of

5   Mississippi, do hereby certify that the above and foregoing

6   pages contain a full, true, and correct transcript of the

7   proceedings had in the forenamed case at the time and place

8   indicated, which proceedings were stenographically recorded

9   by me to the best of my skill and ability.

10         I further certify that the transcript fees and format

11  comply with those prescribed by the Court and Judicial

12  Conference of the United States.

13         THIS, the 3rd day of June, 2025.

14

15              /s/ Candice S. Crane, RPR, RCR, CCR

16                     Candice S. Crane, RPR, RCR, CCR #1781
                       Official Court Reporter
17                     United States District Court
                       Candice_Crane@mssd.uscourts.gov
18

19

20

21

22

23

24

25