1      UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2             NORTHERN DIVISION

3

4  JIMMY ANTHONY                           PLAINTIFF

5  VERSUS          CIVIL ACTION NO. 3:23-CV-00132-KHJ-MTP

6  JONATHON WELKER AND JACOB LANG        DEFENDANTS

7

8

9           JURY TRIAL TRANSCRIPT,
            APRIL 24, 2025,
10          VOLUME 3 OF 4

11    BEFORE THE HONORABLE KRISTI H. JOHNSON,
  UNITED STATES DISTRICT COURT JUDGE, AND A JURY,
12        THAD COCHRAN COURTHOUSE,
         JACKSON, MISSISSIPPI

13

14
  APPEARANCES:
15
  FOR THE PLAINTIFF:      JAMES B. LEES, JR., ESQ.
16                    BRANDON L. FLECHAS, ESQ.

17
  FOR THE DEFENDANTS:     W. THOMAS SILER, JR., ESQ.
18                   MALLORY K. BLAND, ESQ.

19

20

21
  REPORTED BY:
22
     CANDICE S. CRANE, RPR, RCR, CCR #1781
23    OFFICIAL COURT REPORTER
     501 E. Court Street, Suite 2.500
24    Jackson, Mississippi 39201
     Telephone: (601)608-4187
25    E-mail: Candice_Crane@mssd.uscourts.gov

**TABLE OF CONTENTS**

Style and appearances.................................. 379

WITNESS:  JONATHON WELKER

   Continued Redirect by Mr. Siler..................... 382

The Defendants Rest.................................... 386

Motions (jury out).................................... 387

Objections to Instructions (jury out)................. 398

Jury Charge.......................................... 407

CLOSING ARGUMENTS:

   By Mr. Lees....................................... 423

   By Mr. Siler...................................... 439

   By Mr. Lees....................................... 457

Further Jury Charge................................... 461

Verdict.............................................. 466

Motions (jury out)................................... 468

Further Jury Charge.................................. 473

Certificate of Court Reporter.........................481

1          **IN OPEN COURT, APRIL 24, 2025**

2

3          THE COURT:  Good morning.  Are we ready to bring in

4    the jury?

5          MR. LEES:  Your Honor, we had approached the bench

6    prior to defense counsel continuing his redirect of

7    Mr. Welker, and we never really discussed that.  I think we

8    should discuss that before the jury comes in.

9          THE COURT:  Okay.  Good idea.

10         MR. SILER:  Your Honor, let me just say I think after

11   reflecting on it during the evening, I don't know that I

12   want to go there.  I won't go there.

13         THE COURT:  Okay.

14         MR. LEES:  So we're done with testimony?

15         MR. SILER:  No.  I'm just not going to --

16         MR. LEES:  Okay.

17         MR. SILER:  -- deal with that part of it.

18         THE COURT:  All right.  Great.  Let's bring in the

19   jury.  Thank you.

20         And I know y'all have not noticed or probably care

21   about this, but when my law clerks sit in the back, I have

22   them alternating between sides.  So we're not picking a

23   position from the jury's perspective just so y'all know.

24         MR. SILER:  Thank you for thinking about it.  I'm not

25   sure I ever would have.

1          THE COURT:  It's all I can see so --

2          MR. LEES:  Like a wedding.

3          THE COURT:  Sort of, a long wedding.

4          All rise.

5                    (Jury in at 9:00 a.m.)

6          THE COURT:  All right.  You may be seated.

7          Good morning.  By show of hands, who recalls the

8     Court's instructions from yesterday evening?  I see all

9     hands.

10          And by show of hands, who followed the Court's

11     instructions?  I see all hands.  Thank you so much.

12          All right.  Mr. Siler, you can get Officer Welker

13     back on the stand.

14          MR. SILER:  Officer Welker.

15          THE COURT:  Officer Welker, you were administered an

16     oath yesterday, so I will just remind you that you are still

17     under oath.

18          THE WITNESS:  Yes, ma'am.

19          THE COURT:  You may be seated.

20                **CONTINUED REDIRECT EXAMINATION**

21     **BY MR. SILER:**

22     Q.    Good morning, Officer Welker.  I just have a few

23     questions for you this morning.

24          All right.  You mentioned yesterday during

25     cross-examination that you had some martial arts training;

1   is that correct?

2   A.     Yes, sir.

3   Q.     Okay.  And you started to -- or you asked him to

4   define how much training you'd had.  How much training have

5   you had in martial arts?

6   A.     I've been in Brazilian Jujitsu and multi-kick boxing

7   since I was around 14, 15 when I started.  I'm a combatives

8   instructor in the military in my unit that I'm in.  I've

9   competed; I've done multiple competitions, some in other

10  countries.  So I'm a purple belt in jujitsu if you need to,

11  like, measure that somehow.  I -- I'm not sure how

12  extensive, you know.

13  Q.     All right.  That's okay.  That gives us an idea of

14  your background in it.  Have you been struck in your chest

15  in the past?

16  A.     Yes, sir.

17  Q.     Have you been taken to the ground in the past?

18  A.     Yes, sir.

19  Q.     Forcefully?

20  A.     Yes, sir.

21  Q.     Have you been hit hard in your chest by other people?

22  A.     Oh, yes, sir.

23  Q.     Okay.  Have you ever suffered any fractured ribs from

24  any of that?

25  A.     No, sir.

1  Q.     Have you ever had a hemothorax, as you now know what

2  that is?

3  A.     No, sir.

4  Q.     Okay.  You mentioned just a moment ago about your --

5  the fact that you were in the military, and I neglected to

6  ask you about that earlier.  What -- what is your military

7  service?

8  A.     Well, I'm in the Air Force.  I've been in the Air

9  National Guard since 2013.  I'm currently been in what's

10  called CRF or CR, contingency response.  I'm a technical

11  sergeant.  I have multiple airmen under me which I

12  supervise.

13         What more would you like to know?  I'm not sure

14  how --

15  Q.     That's fine.  Have you served overseas?

16  A.     I've been on multiple trips overseas, yes, sir.

17         MR. SILER:  All right.  I have no further questions

18  of the witness, Your Honor.

19         THE COURT:  All right.  You may step down, Officer.

20         All right.  Mr. Siler, who do the defendants call as

21  their next witness?

22         MR. SILER:  May we approach the bench just briefly?

23         THE COURT:  You may.

24                       (BEFORE THE BENCH)

25         MR. SILER:  We would like to show parts of two of the

```
 1   videos that are in the record without a witness.  Just let
 2   them see them.  We may stop them and run them back once or
 3   twice just for them to see the videos, because we don't know
 4   what they will do back in the jury room.  But we want to
 5   make sure they see these videos.
 6           MR. LEES:  I have no objection so long as there's no
 7   commentary by counsel --
 8           MR. SILER:  Yeah.
 9           MR. LEES:  -- to what they mean.
10           MR. SILER:  Yeah.
11           THE COURT:  Okay.  Is it --
12           MR. LEES:  They're admitted; right?
13           MR. SILER:  Right.  Right.
14           THE COURT:  That's what I was about to ask --
15           MR. SILER:  Yeah, I'm sorry.
16           THE COURT:  So they're some of the joint exhibits?
17           MR. SILER:  Uh-huh.
18           THE COURT:  Okay.  If there's no objection, that's
19   fine with me.  Just no commentary during that.  All right?
20           MR. SILER:  Okay.  That's fine.  Can we -- can we
21   explain?
22           THE COURT:  Mr. Lees --
23           MR. SILER:  Jim.
24           THE COURT:  So no commentary beyond just what the
25   video is, and you can just say what J-1 is.  Okay?
```

1          MR. SILER:  Yeah.  That's fine.

2          THE COURT:  All right.

3          MR. SILER:  Thank you.

4          THE COURT:  Thank you.

5          MR. LEES:  No play by play.

6          MR. SILER:  Right.

7                         (IN OPEN COURT)

8          MR. SILER:  All right.  Your Honor, at this time

9    we're going to show the jury a portion of Exhibit J-1, which

10   is a video clip, and I believe this is the one where they

11   are in the booking room.

12         THE COURT:  Okay.

13            (Video playing in open court.)

14         MR. SILER:  All right.  Your Honor, at this time

15   we're going to show clips from the transport of Mr. Anthony

16   to the Rankin County Sheriff's -- Rankin County Jail.

17         THE COURT:  And this is J-5?

18         MR. SILER:  J-5, yes, ma'am.

19         THE COURT:  All right.  You may proceed.

20            (Video playing in open court.)

21         MR. SILER:  All right.  Your Honor, that concludes

22   our showing of the video or videos to the jury, and at this

23   time, the defendants rest.

24         THE COURT:  All right.  Thank you, Mr. Siler.

25         All right.  You have just heard that the defendants

       1    have rested.  I now have some matters that I need to take up

       2    outside your presence, so if you will return to the jury

       3    room.  Keep in mind that you have not heard the Court's

       4    instructions, you have not heard closing arguments, so

       5    please do not begin to deliberate until you have heard those

       6    things, and you're directed by me to deliberate.

       7           So just remember the Court's instructions and retire

       8    to the jury room until I retrieve you.  Thank you.

       9           All rise.

      10                  (Jury out at 9:10 a.m.)

      11           THE COURT:  All right.  You may be seated.

      12           MR. LEES:  Just for the record, Your Honor,

      13    plaintiffs have no rebuttal evidence.

      14           THE COURT:  Oh, well, I was about to say sorry,

      15    Mr. Lees.

      16           MR. LEES:  That's okay.

      17           THE COURT:  I was working under the assumption, which

      18    it's probably not fair to assume.  But thank you.

      19           All right.  Any motions that I need to hear now, and

      20    then we'll move to working through jury instructions.

      21           Ms. Bland?

      22           MS. BLAND:  Yes, Your Honor.  At this time, I would

      23    renew our Rule 50 --

      24           THE COURT:  Keep your voice up for me.

      25           MS. BLAND:  Sorry.  At this time, we would renew our

1    Rule 50 motion for a directed verdict.  I don't want to just

2    say everything I said before, but I want to reiterate my

3    prior arguments, including the due process argument with

4    allowing the amendment and proceeding without specifying a

5    constitutional amendment.  I'd cite to *Deere & Co. v.*

6    *Johnson*, 271 F.3d 613, page 621 through 623, Fifth Circuit

7    2001.

8         Again on the evidence, the video clearly shows that

9    Mr. Anthony reentered that booking room without a mark on

10   him after he claims that he was just hit 30 times.  The

11   evidence just does not conform to Mr. Anthony's side of the

12   story.  If anything, it does to Officer Welker's, and so we

13   believe Officer Welker should be granted a direct verdict.

14        Same with Officer Lang; I know you've already heard

15   my arguments on this.  The injury that's specified in the

16   medical records says it is on the left side.  Mr. Anthony

17   pointed to the center; that does not line up.  And also any

18   injury would be de minimis under the law, so we also believe

19   Officer Lang should be granted a directed verdict.

20        Again, on the emotional distress, there's plenty of

21   evidence of preexisting emotional distress.  There is no

22   evidence of any emotional distress caused by this incident.

23   They have only proffered some nonspecific trauma; that is

24   not enough under the law.  Same with pain and suffering,

25   they haven't entered any evidence on pain and suffering.

 1          And finally, again, just to preserve the argument, we

 2     do not believe the plaintiffs have met their burden to

 3     submit punitive damages to the jury.  Thank you.

 4          THE COURT:  Ms. Bland, just to make sure I'm clear.

 5     On the pretrial order that was submitted to the Court prior

 6     to the pretrial conference, under the following claims that

 7     were listed were what the language is that has been recently

 8     submitted to the Court, claims for use of

 9     excessive/unnecessary force against the officers under

10     42 U.S.C. Section 1983.

11          We received the pretrial order right before trial

12     that had the Fourteenth Amendment in it, which we talked

13     about yesterday.  The Court is allowing an amendment to the

14     pretrial order.  Is it the defendant's position that it's

15     the Fourth Amendment that governs these claims, not the

16     Fourteenth Amendment?

17          MS. BLAND:  Yes, Your Honor, and also that the

18     plaintiff abandoned that Fourth Amendment claim.

19          THE COURT:  Abandoned it in what way?

20          MS. BLAND:  By only submitting jury instructions for

21     the Fourteenth Amendment and by agreeing to only put in the

22     pretrial order that it's the Fourteenth Amendment claim.

23          THE COURT:  Okay.  Pretrial order aside, what case

24     law do you have that supports that submission?

25          Because I get jury instructions all the time that are

1    supportive and not supportive of claims.  What case law do

2    you have that the submission of a jury instruction alone

3    somehow waives a claim?

4         MS. BLAND:  I can't cite you any case law on that.

5    And I know you heard this argument yesterday, but the

6    plaintiff is the master of his complaint.  He decides his

7    claims; I don't.  I can only respond to them.  He's

8    submitted that his claim is under the Fourteenth Amendment.

9         THE COURT:  Through a jury instruction?

10        MS. BLAND:  Yes.

11        THE COURT:  Do you agree that the complaint in this

12   case had the Fourth and Fourteenth Amendment in it?

13        MS. BLAND:  I agree that it cited the Fourteenth

14   Amendment, yes, and the Fourth.

15        THE COURT:  Okay.  All right.  Thank you, Ms. Bland.

16        MS. BLAND:  Thank you.

17        THE COURT:  Mr. Flechas, any response?

18        And then what I plan to do is after we handle this

19   motion, then we'll circulate jury instructions and give

20   counsel sufficient time to look at those.

21        MR. FLECHAS:  I'll make it really brief, Your Honor.

22        I don't want to belabor the point on the email

23   exchange and everything that occurred --

24        THE COURT:  I'm already allowing an amendment.

25        MR. FLECHAS:  Okay.  The only thing I will state,

1    just for the record in case there ever is anything that

2    comes from here, is the first pretrial order that was

3    submitted that did not specify an amendment was agreed to.

4    I submitted that to the Court after agreement.

5        Then after I submitted the jury instructions, which

6    are not a pleading.  It's the proposed instruction.  That's

7    when Ms. Bland suggested making the change.

8        It's still not clear.  I still believe that the

9    Fourteenth Amendment is the right instruction for this based

10    upon law, and even Ms. Bland's law that she cited yesterday

11    that kind of caught me flatfooted with no summary judgment

12    motion having been filed on this issue despite the fact the

13    Fourteenth Amendment claims were brought in the complaint.

14        Even that says that the Fifth Circuit law is unclear

15    on which standard would apply in this case, so it seems the

16    Court is making the correct ruling in allowing us to proceed

17    with an excessive force claim given that those two standards

18    are virtually identical whether you proceed under Fourth or

19    Fourteenth.

20        Having responded to that, I will say at this point

21    the plaintiff moves for a directed verdict.  The evidence is

22    clear that Mr. Anthony entered that police department under

23    no distress.  Left that police department, and then there is

24    video and audio timelining the decline of his health.

25        We have objective medical evidence that has been

1    entered and testified to in an unrefuted opinion by an

2    expert pulmonologist and critical care doctor, who says that

3    these are immediate, traumatic injuries.  It all adds up

4    with everything Mr. Anthony has testified to with multiple

5    blows to multiple areas causing multiple injuries.

6         And there is no circumstance, under anybody's

7    testimony, under which the -- any force resulting in the

8    amount of injury, and all of our case law states that you

9    have to look at -- one of the factors is the amount of

10   injury caused to the suspect or to the offender or detainee,

11   whatever he is in this matter, is one of the things you have

12   to consider.

13        The only argument from Welker is that he shoved him

14   against a wall.  He shoved him against a wall in such a way

15   that he broke his ribs, caused a mediastinal hematoma, and

16   caused a hemothorax.  That's excessive force under the

17   circumstances, because there's no testimony that Mr. Anthony

18   was doing anything threatening.

19        So based upon the testimony, which is unrefuted,

20   regarding ramming Mr. Anthony's head into a wall, again, on

21   the subject of de minimis injury, any injury that results

22   from clearly excessive force is enough to defeat the de

23   minimis injury standard.  I've submitted that law via e-mail

24   under the *Boyd* case, and the -- I think it's *Alexander v.*

25   *City of Round Rock* that also cites to that, "if any injury

1    results from clearly excessive force, de minimis is

2    defeated."

3          And so for those reasons, at this time, Your Honor,

4    the plaintiff would move for a directed verdict on the issue

5    of liability and would ask that the Court simply submit the

6    issue of damages to the jury.

7          THE COURT:  All right.  Thank you, Mr. Flechas.

8          Any response, Ms. Bland?

9          MS. BLAND:  Yes, Your Honor.  Start with one thing,

10   Mr. Flechas said that there was no evidence that he was --

11   that Mr. Anthony was doing anything threatening.  This

12   Officer Welker obviously testified yesterday that he

13   perceived Mr. Anthony to have approached him and gotten very

14   close to him in a threatening manner.

15         He talked about the expert and unrefuted evidence.

16   The expert also agreed those injuries could have been caused

17   in a different way.  The expert, who didn't know that there

18   were 12 ribs, also, you know, refuted the medical records

19   that say the fractures were subacute or chronic.  That's

20   from the radiologist that was actually looking at it at the

21   time, and the expert noted that that would mean they were

22   older.

23         So on that -- on the de minimis injury, again, I

24   would point the Court to *Westfall v. Luna* and its statement

25   that there are some injuries that are de minimis, which

 1    include -- sorry -- abrasions, back and neck pain, and

 2    contusions.

 3          Plaintiff has not met his burden.  We do not --

 4    again, we do not believe it should be submitted to the jury.

 5    We believe a directed verdict should be entered in our

 6    favor.  Thank you.

 7          THE COURT:  On the *Westfall v. Luna*, I know we talked

 8    about this briefly yesterday, but the finding of whether

 9    it's a de minimis injury or not, do you agree that's a

10    question of law that the Court can decide?

11          MS. BLAND:  I think there's case law saying that it

12    goes to the jury.  There's *Glenn v. City of Tyler*,

13    242 F.3d 307.

14          THE COURT:  Hold on.  One more time.

15          MS. BLAND:  242 F.3d 307 at page 314, Fifth Circuit

16    2001.

17          THE COURT:  Are you saying 32 or 42?

18          MS. BLAND:  242 F.3d 307, page 314.

19          *Patterson v. Nelson*, 2020 Westlaw 6281626 -- and I'm

20    sorry I don't have a page cite for that -- Southern District

21    of Mississippi, October 1st, 2020.  And --

22          THE COURT:  Did you email these?

23          MS. BLAND:  I did not, but I can.  I'm sorry.  I had

24    no internet at my house last night.  I was struggling on the

25    hot spot that wasn't working very well.

1          THE COURT:  All right.  Any other cases that you want

2     considered?

3          MS. BLAND:  *Elliott v. Linnell*.  If I can read my

4     writing, it's 566 (sic) F.Supp.2d 714, page 719, Eastern

5     District of Texas, 2007.

6          Also before I stop, I would also like to note the

7     factual dispute that Lang said he did not shove

8     Mr. Anthony's head into a wall, and that's all I have.

9          THE COURT:  All right.  Thank you.

10          MR. FLECHAS:  Your Honor, just based upon that last

11     question posed to defense counsel, can I draw the -- because

12     I know your clerks may be interested in this.

13          THE COURT:  Please.

14          MR. FLECHAS:  So under the -- I'm just going to --

15     it's a comment to the Fifth Circuit Pattern Jury

16     Instructions, Footnote 4.  It says, "The Fifth Circuit, like

17     many other circuits, previously included a significant

18     injury" --

19          THE COURT:  Slow down for me.

20          MR. FLECHAS:  Oh, sorry.

21          "The Fifth Circuit, like many other circuits,

22     previously included a significant injury element.  Later

23     cases required quote 'some harm' which was defined to mean

24     more than de minimis injury."

25          But in *Wilkins v. Gaddy*, the Supreme Court reversed a

1    Circuit Court decision applying the de minimis injury rule.

2    The court noted that, "While de minimis force is not

3    actionable, de minimis injury and de minimis force are

4    not -- are not coterminous.  Courts should be careful not to

5    instruct the jury using a de minimis injury standard."

6         THE COURT:  What's that pattern instruction number?

7    I know that's the notes but...

8         MR. FLECHAS:  That's under -- it's Footnote 4 under

9    Instruction 10.7.

10        THE COURT:  All right.

11        MR. FLECHAS:  Thank you, Your Honor.

12        THE COURT:  All right.  We're going to be in recess,

13   and once we get our instructions finalized based on the

14   information I've just heard, we'll circulate it, print

15   copies, and also send you emails.

16        With respect to the amended pretrial order, I have

17   not amended it yet or entered an amended version.  What I

18   intend to do is include in -- because at the end of the day,

19   it's an order that I'm signing and it's my order.  I have

20   done research with my law clerks, and we will quibble once

21   we get to the jury instruction conference as to how these

22   jurors should be instructed on the law.  But for the

23   purposes of the pretrial order, I'm going to include in it

24   the Fourth and the Fourteenth Amendment in my amended

25   version.

1          And I'll explain to you all, once we get to the jury

2    instruction conference, my rationale as to how I think we

3    should instruct this jury, and you all can make your record

4    as to whether you think those are the appropriate

5    instructions as to the excessive force claim or not.  But I

6    don't think the appropriate vehicle to argue about it is the

7    pretrial order.

8          All right.  We're going to be in recess.  Again,

9    we're going to do a little bit of cleaning up.  The law

10   clerks have stayed late last night, later than I care to

11   admit on the record, to get them in good shape for y'all.

12   So we just need a couple more minutes to finalize, and then

13   we'll circulate.

14         Mr. Siler?

15         MR. SILER:  Oh, I was just --

16         THE COURT:  Okay.

17         MR. SILER:  -- assuming you were about to dismiss us.

18         THE COURT:  No, you're fine.  You're fine.  I just

19   didn't know if you needed something.

20         Okay.  We'll do that and we'll get it to you as soon

21   as we can.  We'll be in recess until then.  Thank you all.

22         MS. POWELL:  All rise.

23                    (A recess was taken.)

24         THE COURT:  The Court has conducted a jury

25   instruction conference in my conference room, and we're now

1    going to go on the record with any outstanding objections to

2    the Court's proposed instructions that still remain.

3         So, Mr. Flechas, you may make your record.

4         MR. FLECHAS:  Your Honor, the Court has decided to

5    give a qualified immunity instruction in this case and --

6         THE COURT:  Tell me, specifically, what instruction,

7    too, just for the sake of the record.

8         MR. FLECHAS:  Sure.

9         THE COURT:  It looks like it's C-16.

10        MR. FLECHAS:  All right.

11        THE COURT:  Okay.

12        MR. FLECHAS:  Your Honor, the Court has determined

13   that it's appropriate to give Instruction C-16 to the jury,

14   which is a qualified immunity instruction.  Your Honor, the

15   vast majority of cases require that the Court decide the

16   issue of qualified immunity as a question of law and not

17   submit that question to be considered by the jury who should

18   be the determiner of fact.  I agree with that course of

19   action in the vast majority of cases, and I would argue here

20   that the issue of qualified immunity should never be

21   presented en mass to a jury.

22        I'm aware that our circuit allows it, and that that

23   change can't take place in this court at this level.

24   Instead, it would be my argument that when there are

25   disputes of fact that affect qualified immunity analysis and

 1  qualified immunity determination, that special

 2  interrogatories should be given to the jury where the jury

 3  should be allowed to answer those disputed questions of

 4  fact, and that the Court then takes those determinations of

 5  fact from the jury into account in deciding the issue of law

 6  on qualified immunity.

 7       Since, again, that can't be changed at this level, I

 8  would argue that qualified immunity is not appropriate to be

 9  given to the jury in this case, because the only alleged

10  uses of force from the plaintiff -- the only ones we're

11  arguing and that the plaintiff has testified to -- are

12  clearly and obviously excessive.  And therefore, there would

13  be no qualified immunity if the plaintiff has proven his

14  case by a preponderance of the evidence, because those uses

15  of force complained of by the plaintiff are clearly and

16  obviously excessive.

17       On that note, I would state that if the Court is

18  going to give a qualified immunity instruction in addition

19  to the clearly established law as stated, there should be a

20  statement in the vein of *Hope versus Pelzer* or *Joseph -- on*

21  *Behalf of Estate of Joseph v. Bartlett* -- that in an obvious

22  case, analogous case law is not needed because the

23  unlawfulness of the challenged conduct is sufficiently

24  clear, even though existing precedent does not address

25  similar circumstances.  And I want to ask that that be added

 1    to the qualified immunity instruction.

 2            That's all from the plaintiff, Your Honor.

 3            THE COURT:  All right.

 4            MS. BLAND:  For the defendants on C-14, we would

 5    request that the sentence be added that says, "Each

 6    defendant is entitled to a fair consideration of his own

 7    conduct and is not to be prejudiced if you find against the

 8    other officer."

 9            I believe the reasoning for that is pretty clear, but

10    just for the record, it's to, you know, reiterate to the

11    jury that each defendant can only be judged for his own

12    conduct and not the conduct of anyone else.

13            On Instruction C-16, the qualified immunity

14    instruction -- I know plaintiff's counsel admitted this, but

15    just to respond -- the Fifth Circuit does currently require

16    that qualified immunity be sent to the jury.  Such we would

17    request that the following clearly established law be added.

18            First on behalf of Officer Welker, "It is clearly

19    established that officers are not required to conduct a

20    close examination of a suspect's demeanor before acting

21    since they are often forced to make split-second judgments

22    in reaction to a tense, uncertain, and rapidly evolving

23    scene."  I may butcher this case name, but I believe it's

24    pronounced *Escarcega*, E-s-c-a-r-c-e-g-a, *v. Jordan*, 701

25    F.App'x 338, page 342, Fifth Circuit 2017.

1          "It is clearly established that officers are entitled

2    to qualified immunity even when they could have used

3    alternative means to subdue the suspect."  That's *Mullenix*

4    *v. Luna*, 136 Supreme Court 305, page 310, 2015.

5          "It is clearly established that qualified immunity

6    protects reasonable, if mistaken, judgments by law

7    enforcement."  *Anderson v. Creighton*, 483 U.S. 635, page

8    641, 1987.

9          "It is clearly established that the relevant

10   justification for the use of force is the officer's

11   reasonable perception, not whether the officer or others

12   were in actual imminent danger of harm.  This does not

13   always require that an individual be actively resisting,

14   fleeing, or attacking an officer at the precise moment force

15   is used."  *Salazar v. Molina*, 37 F.4th 278, pages 283

16   through 284, Fifth Circuit 2022.

17         As to Officer Lang, we would ask that the following

18   be added:  "It is clearly established that while a plaintiff

19   need not demonstrate a significant injury to establish his

20   excessive force claim, the injury must be more than

21   de minimis."  It's *Jordan v. Liddell*, 2017 Westlaw 4582343

22   at page 3, Southern District of Mississippi, October 13th,

23   2017, citing *Flores v. City of Palacios*, 381 F.3d 400, at

24   note 7, Fifth Circuit 2004.

25         And "It is clearly established that some injuries are

1  de minimis including abrasions, back and neck pain, and

2  contusions." *Westfall v. Luna*, 903 F.3d 534, pages 549

3  through 550, Fifth Circuit 2018.

4       And, again, just noting for the record, because the

5  qualified immunity jury instructions in the Fifth Circuit

6  are very confusing, that the -- the burden of producing

7  clearly established law is on the plaintiff.

8       That's all for the defendants.

9       THE COURT:  Okay.  Just I'm going to make sure the

10  record's clear.  Mr. Flechas, any other objections to the

11  Court's proposed jury instructions?

12       MR. FLECHAS:  No.  I do want to make clear that the

13  change that was on --

14       THE COURT:  At the time of the offense?

15       MR. FLECHAS:  -- C-15 --

16       THE COURT:  That will be made.

17       MR. FLECHAS:  -- will be made?

18       Okay.  Then no further objections, Your Honor.

19       THE COURT:  Any objections to the Verdict Form?

20       MR. FLECHAS:  No objections to the Verdict Form, Your

21  Honor, other than it submits qualified immunity to the jury.

22       THE COURT:  All right.  Ms. Bland, any other

23  objections to the Court's proposed jury instructions?

24       MS. BLAND:  Just to follow up with Mr. Flechas, as

25  long as the change on C-15 at page 11 that we spoke about

```
 1   was made --
 2        THE COURT:  That will be made.
 3        MS. BLAND:  -- no further objections.
 4        THE COURT:  All right.  Any objections to the Verdict
 5   Form?
 6        MS. BLAND:  Oh, I'm sorry.  No objections.
 7        Can I put one more thing on the record that's not
 8   about the jury instructions, but that we've talked about
 9   earlier?
10        THE COURT:  Sure.
11        MS. BLAND:  Very quickly because you've said it's not
12   a matter for the pretrial order, just note the objection to
13   the claim being under both the Fourth and Fourteenth
14   Amendment, because the plaintiff can only have one status.
15   He's either an arrestee or a pretrial detainee, so just --
16   just to get the objection on the record.
17        THE COURT:  Yeah, that's fine.  And the instructions
18   as they are right now are under the Fourth Amendment, and so
19   does the defendant agree that the jury is being properly
20   instructed under the Fourth Amendment?
21        MS. BLAND:  Yes, Your Honor, subject to my previous
22   arguments that that was waived.
23        THE COURT:  Okay.  But as instructed right now,
24   because the defendant's position is the Fourth Amendment is
25   the appropriate vehicle, is it your position that I am
```

```
1    properly instructing this jury?

2        MS. BLAND:  Yes, Your Honor.

3        THE COURT:  And, Mr. Flechas, do you agree that I am

4    properly instructing this jury?

5        MR. FLECHAS:  I believe so, Your Honor.

6        THE COURT:  All right.  Okay.  I am going to read

7    just a little bit in with respect to -- to make my record on

8    de minimis injury.

9        The quote I'm going to start with is, "Although a de

10   minimis injury is not cognizable" -- this is a quote of

11   Alexander versus City of Round Rock, cite 854 F.3d 298,

12   pinpoint cite 309.  It's a Fifth Circuit 2017 case.  And it

13   quotes, "Although a de minimis injury is not cognizable, the

14   extent of injury necessary to satisfy the injury requirement

15   is directly related to the amount of force that is

16   constitutionally permissible under the circumstances.  Any

17   force found to be objectively unreasonable necessarily

18   exceeds the de minimis threshold, and conversely objectively

19   reasonable force will result in de minimis injuries only.

20   Consequently only one injury is required to determine

21   whether an officer used excessive force in violation of the

22   Fourth Amendment.  In short, as long as a plaintiff has

23   suffered some injury, even relatively insignificant injuries

24   and purely psychological injuries will prove cognizable when

25   resulting from an officer's unreasonably excessive force."
```

1          So in other words, when an injury is de minimis, it

2     does not depend on the injury itself.  It depends on the

3     nature of the force used to inflict the injury.  If the

4     force used was objectively unreasonable, any injury would

5     not be de minimis.  A contusion would not be de minimis if

6     the force used to give the contusion was objectively

7     unreasonable under the circumstances.  But any injury

8     suffered from the use of objectively reasonable force is de

9     minimis, so I'm just making my record there.

10          All right.  We are now concluded.  We're going to

11     clean these instructions up.  There's not much to clean up.

12     We didn't change too many things.  And we will email you all

13     the final versions of the jury instructions and the final

14     Verdict Form and print you clean copies, and we'll have

15     those back when we get back for me to read to the jury at

16     12:30 and do closing arguments.  So I'll see you all back

17     here at 12:30.

18          MR. FLECHAS:  And you instruct before closing?

19          THE COURT:  I instruct before closing, that's

20     correct.

21          MR. FLECHAS:  All right.

22          THE COURT:  All right.  Thank you all.

23          MS. POWELL:  All rise.

24               (A lunch recess was taken.)

25          THE COURT:  Do we need to take up anything before we

1    bring the jury back in and I instruct them?

2         MR. SILER:  Not from the defendants, Your Honor.

3         MR. LEES:  No, ma'am.

4         THE COURT:  Okay.  Here's my thought, I'm going to

5    read through the instructions.  I don't know how long it's

6    going to take.  It's going to take a little while obviously,

7    inform them that I have given both sides 45 minutes for

8    closing, and ask after I conclude the instructions if anyone

9    would like to take a quick break before we do the hour and a

10   half; because I'd like to not take breaks between the

11   closings, and see if anybody wants to do that from the jury.

12   And if we do that, we'll just give them five or ten minutes.

13   Okay?

14        All right.  We can bring the jury in.

15                    (Jury in 12:33 p.m.)

16        THE COURT:  All right.  You may be seated.

17        All right.  Good afternoon.  I'm going to read you

18   some instructions, and then we are going to do closing

19   arguments.  So I'm going to begin with the instructions.

20   I'm going to have Ms. Cossar, she's going to display the

21   instructions to you as I read these to you.  Keep in mind I

22   am going to give you a copy of these instructions, so

23   there's no need to scratch down notes unless you just need

24   to.  I just find it easier sometimes if I read along, I can

25   understand it better, so we're going to have those displayed

1    for you.

2        Now, that you have heard all of the evidence, it is

3    my duty to give you the instructions of the Court concerning

4    the law applicable to this case.  It is your duty as jurors

5    to follow the law as I state it to you and to apply the law

6    to the facts as you find them from the evidence in the case.

7        You are not to single out one instruction alone as

8    stating the law, but you must consider the instructions as a

9    whole.  You are not to be concerned with the wisdom of any

10   rule of law stated by me.  Regardless of any opinion you may

11   have as to what the law is or ought to be, it would be a

12   violation of your sworn duty to base a verdict upon any view

13   of the law other than that given in the instructions of the

14   Court, just as it would also be a violation of your sworn

15   duty as judges of the facts to base a verdict upon anything

16   other than the evidence in this case.

17       In deciding the facts of this case, you must not be

18   swayed by sympathy, bias, prejudice, or favor as to either

19   party.  Our legal system does not permit jurors to be

20   governed by sympathy or prejudice or public opinion.  The

21   parties expect that you will carefully and impartially

22   consider all the evidence in this case, follow the law as

23   stated by the Court, and reach a just verdict regardless of

24   the consequences.

25       As stated earlier, it is your duty to determine the

1    facts, and in so doing, you must consider only the evidence

2    I have admitted in the case.  The term "evidence" includes

3    the sworn testimony of the witnesses and the exhibits

4    admitted in the record.

5         Remember that any statements, objections, or

6    arguments made by the lawyers are not evidence in the case.

7    The function of the lawyers is to point out the things that

8    are most helpful to their side of the case, and in doing so,

9    to call your attention to certain facts or inferences that

10   might otherwise escape your notice.

11        In the final analysis, however, it is your own

12   recollection and interpretation of the evidence that

13   controls in the case.  What the lawyers say is not binding

14   upon you.  So while you should consider only the evidence in

15   the case, you are permitted to draw such reasonable

16   inferences from the testimony and exhibits as you feel are

17   justified in the light of common experience.

18        In other words, you may make deductions and reach

19   conclusions which reason and common sense lead you to draw

20   from the facts that have been established by the testimony

21   and evidence.

22        Any notes that you have taken during this trial are

23   only aids to your memory; they are not evidence.  If your

24   memory differs from your notes, you should rely on your

25   memory and not on your notes.  If you have not taken notes,

1  you should rely on your independent recollection of the

2  evidence and should not be unduly influenced by the notes of

3  other jurors.  Notes are not entitled to any greater weight

4  than the recollections or impressions of each juror about

5  the testimony.

6       Also, do not assume from anything I may have done or

7  said during the trial that I have any opinion concerning any

8  of the issues in this case.  You are the sole judges of the

9  facts of this case.  Except for the instructions to you on

10  the law, you should disregard anything I may have said

11  during the trial in arriving at your own findings as to the

12  facts.

13       Now, I have said you must consider all the evidence.

14  This does not mean, however, that you must accept all the

15  evidence as true or accurate.  You are the sole judge of the

16  credibility or believability of each witness and the weight

17  to be given to his testimony.

18       In reviewing the testimony of a witness, you should

19  consideration his relationship to the parties, his manner of

20  testifying, his opportunity to observe or acquire knowledge

21  concerning the facts about which he testified, his candor

22  and fairness, and the extent to which he has been supported

23  or contradicted by other credible evidence.  You may, in

24  short, accept or reject the testimony of any witness in

25  whole or in part.

1          In determining the weight to give the testimony of a

2    witness, you should ask yourself whether there was evidence

3    tending to prove that the witness testified falsely

4    concerning some important fact, or whether there was

5    evidence that at some other time the witness said or did

6    something or failed to say or do something that was

7    different from the testimony the witness gave before you

8    during trial.

9          You should keep in mind, of course, that a simple

10   mistake by a witness does not necessarily mean the witness

11   was not telling the truth as he or she remembers it, because

12   people may forget some things or remember other things

13   inaccurately.  So if a witness has made a misstatement, you

14   need to consider whether that misstatement was an

15   intentional falsehood or simply an innocent lapse of memory.

16   And the significance of that may depend on whether it has to

17   do with an important fact or only unimportant detail.

18         Also, the weight of the evidence is not necessarily

19   determined by the number of witnesses testifying as to the

20   existence or nonexistence of any fact.  When knowledge of

21   technical subject matter may be helpful to the jury, a

22   person who has special training or experience in that

23   technical field is permitted to state his opinion on those

24   technical matters.  However, you are not required to accept

25   that opinion.  As with any other witness, it is up to you to

1    decide whether to rely on it.

2         A stipulation is an agreement.  When there is no

3    dispute about certain facts, the attorneys may agree or

4    stipulate to those facts.  You must accept a stipulated fact

5    as evidence and treat that fact as having been proven here

6    in court.

7         The fact that Plaintiff Jimmy Anthony brought this

8    lawsuit and is in court seeking damages creates no inference

9    that he is entitled to those damages.  Anyone may make a

10   claim and file a lawsuit.  The act of making a claim in a

11   lawsuit by itself does not in any way tend to establish that

12   claim and is not evidence.  The burden is on Plaintiff Jimmy

13   Anthony to establish each material element of his claim by a

14   preponderance of the evidence.

15        Defendants Jonathon Welker and Jacob Lang have no

16   duty or obligation to disprove Plaintiff Jimmy Anthony's

17   claim.  To establish by a preponderance of the evidence

18   means to prove something is more likely so than not so.

19        In determining whether any fact in issue has been

20   proved by a preponderance of the evidence, you may consider

21   the testimony of all of the witnesses regardless of who may

22   have called them, and all the exhibits received in evidence

23   regardless of who may have produced them.

24        There are two types of evidence that you may consider

25   in properly finding the truth as to the facts in this case.

1  One is direct evidence, such as testimony of an eyewitness.

2  The other is indirect or circumstantial evidence, which is

3  when a chain of circumstances indicates the existence or

4  nonexistence of certain facts.

5      The law makes no distinction between direct and

6  circumstantial evidence, but it simply requires that you

7  find the facts from a preponderance of all the evidence,

8  both direct and circumstantial.

9      If the proof fails to establish any essential part of

10  the Plaintiff Jimmy Anthony's claims by a preponderance of

11  the evidence, you should find for the defendant as to that

12  claim.

13      In rendering your decision in this case, I instruct

14  you that failing to follow or comply with an internal police

15  department procedural requirement is not a constitutional

16  violation, is not evidence of a constitutional violation,

17  and should not be considered as such in reaching your

18  decision.

19      Plaintiff Jimmy Anthony claims that defendants

20  Jonathon Welker and Jacob Lang each violated his

21  constitutional protection against the use of excessive force

22  on April 30th, 2022.  To recover damages against either

23  defendant, Plaintiff Jimmy Anthony must prove by a

24  preponderance of the evidence that the defendants' actions

25  were unconstitutional, and that the defendant is not

1    entitled to qualified immunity.

2         I will instruct you on the first constitutional

3    requirements of the claim as it applies to each defendant

4    and then on the qualified immunity defense.

5         Plaintiff Jimmy Anthony is not alleging that the

6    defendants engaged in the same actions against him.

7    Plaintiff Jimmy Anthony alleges the defendants committed

8    separate and distinct acts that violated his rights.  You

9    must consider each defendant's alleged acts separately to

10   determine whether each defendant violated Plaintiff Jimmy

11   Anthony's rights.

12        You may find that both defendants, only one

13   defendant, or neither defendant violated Plaintiff Jimmy

14   Anthony's rights.  Again, Plaintiff Jimmy Anthony must prove

15   by a preponderance of the evidence that the defendants were

16   personally involved in the excessive force about which

17   Plaintiff Jimmy Anthony complains.  Each defendant is

18   responsible only for his own conduct.  You may not hold

19   either defendant liable for what other officers did or did

20   not do.

21        If you find that a defendant was not personally

22   involved in the excessive force about which Plaintiff Jimmy

23   Anthony complains, then your verdict must be for that

24   defendant.

25        To prevail on an excessive force claim, Plaintiff

1   Jimmy Anthony must prove the following by a preponderance of

2   the evidence:

3          Number one, the defendant purposefully or knowingly

4   used force against him that was objectively unreasonable.

5          And, two, that the Plaintiff Jimmy Anthony suffered

6   some harm as a result of the defendant's use of force.  You

7   must determine what force, if any, each defendant applied to

8   Plaintiff Jimmy Anthony, and then you must determine whether

9   it was reasonable.

10          To satisfy the first element, Plaintiff Jimmy Anthony

11   must show the defendant purposefully or knowingly applied

12   force.  Mere acts of negligence or accidental use of force

13   will not violate the constitution.  However, Plaintiff Jimmy

14   Anthony need not show that the defendant intended to cause

15   harm.

16          To determine whether the force used, if any, was

17   objectively reasonable, you must carefully balance the

18   nature and quality of the intrusion on Plaintiff Jimmy

19   Anthony's right to be protected from excessive force against

20   the government's right to use some degree of physical

21   coercion or threat of coercion to protect themselves from

22   harm.  Not every push or shove, even if it may later seem

23   unnecessary in hindsight, violates the law.

24          In deciding this issue, you must pay careful

25   attention to the facts and circumstances, and you may

1  consider the following nonexclusive factors:

2      One, the relationship between the need for the use of

3  force and the amount of force used.

4      Two, the extent of Plaintiff Jimmy Anthony's injury.

5      Three, any effort made by the defendant to temper or

6  to limit the amount of force.

7      Four, the severity of the security problem at issue.

8      Five, the threat reasonably perceived by the

9  defendant.

10      And, six, whether Plaintiff Jimmy Anthony was

11  actively resisting or failing to comply with commands at the

12  time the alleged force was used.

13      The reasonableness of a particular use of force is

14  based on what a reasonable officer would do under the

15  circumstances and not on the officer's state of mind.  You

16  must decide whether a reasonable officer on the scene would

17  view the force as reasonable without the benefit of 20/20

18  hindsight.  This inquiry must take into account the fact

19  that police officers are sometimes forced to make

20  split-second decisions in circumstances that are tense,

21  uncertain, and rapidly evolving about the amount of force

22  that is necessary in a particular situation.

23      You must also account for the legitimate interests

24  that stem from the need to manage a police station,

25  appropriately deferring to policies and practices that

1    are -- in the judgment of police officers are needed to

2    preserve internal order and discipline and to maintain

3    institutional security.

4        If Plaintiff Jimmy Anthony has proved both of these

5    elements by a preponderance of the evidence for one or both

6    defendants, then you will have found that the defendant

7    violated his constitutional right to be free from excessive

8    force, and you must then consider whether the defendant is

9    entitled to qualified immunity, which is a bar to liability

10   that I will explain later.

11       If Plaintiff Jimmy Anthony failed to make this

12   showing, then the force was not unconstitutional, and your

13   verdict will be for the defendant.

14       As to each claim for which Plaintiff Jimmy Anthony

15   has proved each essential element, you must consider whether

16   the defendant is entitled to what the law calls "qualified

17   immunity."  Qualified immunity bars a defendant's liability,

18   even if he violated the plaintiff's constitutional rights.

19       Qualified immunity exists to give government

20   officials breathing room to make reasonable but mistaken

21   judgments about open legal questions.  Qualified immunity

22   provides protection from liability for all but the plainly

23   incompetent government officers or those who knowingly

24   violate the law.

25       It is Plaintiff Jimmy Anthony's burden to prove by a

 1  preponderance of the evidence that qualified immunity does

 2  not apply in this case.  Qualified immunity applies -- I

 3  think we're on the wrong page -- yeah, qualified immunity

 4  applies if a reasonable officer could have believed the use

 5  of force was lawful in light of clearly established law and

 6  the information the defendant possessed.  But a defendant is

 7  not entitled to qualified immunity if, at the time of the

 8  defendant's use of force, a reasonable officer with the same

 9  information could not have believed that his actions were

10  lawful.  Law enforcement officers are presumed to know the

11  clearly established constitutional rights of individuals

12  they encounter.

13       In this case, the clearly established law at the time

14  as relevant to Defendant Jonathon Welker was that a police

15  officer who uses constitutionally excessive force -- a

16  police officer uses constitutionally excessive force when

17  the officer repeatedly strikes an individual who is not

18  resisting or posing an immediate threat.

19       A police officer does not use constitutionally

20  excessive force when the officer strikes an individual once

21  with an open hand, because the officer reasonably, if

22  mistakenly, believes that the individual poses an immediate

23  threat.

24       In this case, the clearly established law at the time

25  as relevant to Defendant Jacob Lang was that a police

officer uses constitutionally excessive force when the
officer strikes an individual's head into a wall when that
individual is not resisting or posing an immediate threat.

A police officer does not use constitutionally
excessive force when the officer has not used any force at
all.

If after considering the scope of discretion and
responsibility generally given to law enforcement officer in
performing their duties and after considering all of the
circumstances of the case, as they would have reasonably
appeared to the defendant at the time of the use of force,
you find that Plaintiff Jimmy Anthony failed to prove that
no reasonable officer could have believed that the use of
force was lawful, then the defendant is entitled to
qualified immunity, and your verdict must be for the
defendant on that claim.

But if you find the defendant violated Plaintiff
Jimmy Anthony's constitutional rights and that the defendant
is not entitled to qualified immunity as to that claim, then
your verdict must be for the Plaintiff Jimmy Anthony on that
claim.

If Plaintiff Jimmy Anthony has proved his claim
against Defendant Jonathon Welker, Defendant Jacob Lang, or
both defendants by a preponderance of the evidence, you must
determine the damages to which Plaintiff Jimmy Anthony is

1  entitled, if any.

2      You should not interpret the fact that I am giving

3  instructions about Plaintiff Jimmy Anthony's damages as an

4  indication in any way that I believe that Plaintiff Jimmy

5  Anthony should or should not win this case.

6      It is your task, first, to decide whether either

7  defendant is liable.  I am instructing you on damages only

8  so that you will have guidance in the event you decide that

9  either defendant is liable and that Plaintiff Jimmy Anthony

10  is entitled to recover money from either defendant.

11      If you find that Defendant Jonathon Welker, Defendant

12  Jacob Lang, or both defendants are liable to Plaintiff Jimmy

13  Anthony, then you must determine an amount that is fair

14  compensation for all of Plaintiff Jimmy Anthony's damages.

15  Those damages are called compensatory damages.  The purpose

16  of compensatory damages is to make Plaintiff Jimmy Anthony

17  whole; that is, to compensate Plaintiff Jimmy Anthony for

18  the damages that he has suffered.  Compensatory damages are

19  not limited to expenses that Plaintiff Jimmy Anthony may

20  have incurred because of his injury.  If Plaintiff Jimmy

21  Anthony wins, he is entitled to compensatory damages for the

22  physical injury, pain and suffering, and mental anguish that

23  he has suffered because of a defendant's wrongful conduct.

24      You may award compensatory damages only for injuries

25  that Plaintiff Jimmy Anthony proves were proximately caused

1  by the defendant's allegedly wrongful conduct.  An act is a

2  proximate cause of a plaintiff's injuries or damages if it

3  appears from the evidence that the injury or damages was a

4  reasonably foreseeable consequence of the act or omission.

5      The damages you award must be fair compensation for

6  all of Plaintiff Jimmy Anthony's damages, no more and no

7  less.  Compensatory damages are not allowed as a punishment

8  and cannot be imposed or increased to penalize either

9  defendant.  You should not award compensatory damages for

10  speculative injuries, but only for those injuries that

11  Plaintiff Jimmy Anthony has actually suffered or that

12  Plaintiff Jimmy Anthony is reasonably likely to suffer in

13  the future.

14      If you decide to award compensatory damages, you

15  should be guided by dispassionate common sense.  Computing

16  damages may be difficult, but you must not let that

17  difficulty lead you to engage in arbitrary guesswork.  On

18  the other hand, the law does not require that Plaintiff

19  Jimmy Anthony prove the amount of his losses with

20  mathematical precision, but only with as much definiteness

21  and accuracy as the circumstances permit.

22      You must use sound discretion in fixing an award of

23  damages, drawing reasonable inferences where you find them

24  appropriate from the facts and circumstances in evidence.

25      Finally, in assessing Plaintiff Jimmy Anthony's

1    request for damages, it is important that you remember that

2    each defendant must be evaluated separately.  Plaintiff

3    Jimmy Anthony cannot be compensated twice for the same

4    injury.  You should consider the following elements of

5    damage, to the -- to the extent you find them proved by a

6    preponderance of the evidence:

7            Number one, bodily injuries.

8            Number two, past, present, and future physical pain

9    and suffering and loss of enjoyment of life.

10           And, three, past, present, and future mental anguish

11   and emotional distress.

12           In this case, Plaintiff Jimmy Anthony does not seek

13   damages for any medical bills or lost wages.

14           You may award damages for any bodily injury that

15   Plaintiff Jimmy Anthony sustained and any pain and

16   suffering, mental anguish, and/or loss of capacity for

17   enjoyment of life that Plaintiff Jimmy Anthony experienced

18   in the past or will experience in the future as a result of

19   the bodily injury.

20           No evidence of the value of intangible things, such

21   as mental or physical pain and suffering, has been or need

22   be introduced.  You are not trying to determine value, but

23   an amount that will fairly compensate Plaintiff Jimmy

24   Anthony for the damages he has suffered.  There is no exact

25   standard to fixing the compensation to be awarded for these

 1    elements of damages.  Any award that you may make -- any

 2    award that you may make must be fair in light of the

 3    evidence.

 4         To recover compensatory damages for mental and

 5    emotional distress, Plaintiff Jimmy Anthony must prove that

 6    he has suffered a specific discernible injury with no --

 7    with credible evidence.  Hurt feelings, anger, and

 8    frustration are part of life and are not the types of harm

 9    that could support a mental anguish award.  Evidence of

10    mental anguish need not be corroborated by doctors,

11    psychologists, or other witnesses, but Plaintiff Jimmy

12    Anthony must support his claims with competent evidence of

13    the nature, extent, and duration of the harm.  Damages for

14    mental or emotional distress must be based on the evidence

15    at trial.  They may not be based on speculation or sympathy.

16         Your verdict must represent the considered judgment

17    of each juror.  To reach a verdict, it is necessary that

18    each juror agree thereto.  In other words, your verdict must

19    be unanimous.  It is your duty as jurors to consult with one

20    another and to deliberate with a view of reaching an

21    agreement if you can.  Each of you must decide the case for

22    yourself, but only after an impartial consideration of all

23    the evidence in the case with your fellow jurors.  During

24    deliberations do not hesitate to reexamine your own views

25    and change your opinion, if you are convinced it is

 1  erroneous.  But do not surrender your honest conviction as

 2  to the weight or effect of the evidence solely because of

 3  the opinion of your fellow jurors, or for the mere purpose

 4  of returning a verdict.

 5       Always remember that you are not partisans.  You are

 6  judges, judges of the facts.  Your sole interest is to seek

 7  the truth from the evidence in the case.

 8       At this time, we are going to do closing arguments.

 9  I have given both sides 45 minutes per side, so we're

10  looking at an hour and a half.  Does anyone want to take

11  just a quick five-minute break before we do that?  Because I

12  don't want to break once we start arguments.

13       Does anybody want to take a five-minute break before

14  we go for an hour and a half?

15       All right.  Everybody's ready.

16       MR. LEES:  May it please the Court, counsel?

17       Good afternoon.  Thank you for bearing with me and

18  with Brandon during this trial.  Let me put the -- I'm going

19  to go over here for just a minute.  Just very briefly want

20  to go over the Verdict Form.  You're going to have questions

21  for each of the two defendants.

22       The first question for each defendant is going to be

23  whether we've proven, more likely than not by the

24  preponderance of the evidence, that that particular

25  defendant violated our client's constitutional right.  If

1  you check "no," we lose.  If you check "yes," you go to the

2  second question.

3      The second question is this issue of qualified

4  immunity, and I'll discuss it in a minute.  I just want to

5  make sure you understand, do you find that Defendant

6  Jonathon Welker's entitled to qualified immunity?  If you

7  check "yes," we lose.  If you check "no," then you would

8  have a "yes" to number 1; you would have a "no" to number 2;

9  that is a verdict for the plaintiff and against the

10 defendants, and then and only then are you permitted to go

11 on to damages.

12     It's going to be the identical thing with respect to

13 Lang.  We need a "yes" here, a "no" here, and then and only

14 then can you go to put in compensatory damage amount, if

15 any, here.

16     Okay.  So there's a part of those instructions -- and

17 I'm not going to get too technical on this, but essentially

18 I'm going to say to you this:  If Officer Lang did what he's

19 accused of doing in this case, which is slamming

20 Mr. Anthony's head against the wall, there's no debate

21 that's excessive force, that's a constitutional violation.

22     If Officer Welker took Mr. Anthony into the bathroom

23 and repeatedly beat him with his fists, I don't think

24 there's any debate that's a constitutional violation; that's

25 excessive force.  All right?

1          And if those two things happened, I'm going to

2     suggest to you there should absolutely be no debate on this

3     qualified immunity thing, because any officer who takes an

4     American citizen's head and slams it against the wall or any

5     officer that beats an American citizen with their fists

6     repeatedly would know that that was against the law, know

7     that that's a constitutional violation, and knows that is

8     not what we do in America.

9          So the question in this case really comes down to as

10    follows:  Did they do it?  Did they do what we've alleged or

11    accused them of doing?

12         And to put the question in more of a precise legal

13    term, in the jury room, the question will be do you find

14    more likely than not that they did what they're accused of

15    doing?

16         If collectively you say yes, then we've met our

17    burden on the excessive force.  But the threshold is greater

18    than 50 percent.  What generally happens, or on occasion

19    happens, is you're in the jury room, you're having your

20    debate.  One of your fellow jurors says, well, you know, I'm

21    just not sure about that.  I'm just not certain, and I would

22    hope you've now understood what Your Honor has told us.  You

23    should immediately go, I understand that you're not certain.

24    Fortunately, the standard is not certainty, it's not

25    sureness.  It's is it more likely than not?  That's the

1    guiding principle when you have your jury deliberations.

2        The case went by -- maybe not for you, but for

3    lawyers who are in this business, it went fairly quickly,

4    and I'm going to point out just a couple of things as we

5    start here that maybe got overlooked because of the speed in

6    which things progressed.  Maybe you picked up on this.

7    Maybe you didn't.  Kudos to you if you did.

8        Let's go back to Officer Billy Hudson, the gentleman

9    who conducted the internal affairs investigation, remember

10   he was up there.  He testified that he had no knowledge

11   about Mr. Anthony's injuries or that Mr. Anthony had been in

12   the hospital until he gave his deposition, which was in

13   February of 2024; right?

14       So 20, 22 months, something like that goes by, and

15   the officer in charge of the internal affairs investigation

16   does not know Mr. Anthony went to the hospital and sustained

17   the injuries which we now know he did.

18       So what did we learn yesterday?  We learned yesterday

19   that that gentleman, Officer Welker, on April 30th, 2022,

20   went where?  Do you remember?  Went to the hospital to

21   deliver the order.  He was there.

22       In fact, in the Merit records, there was originally a

23   paragraph in there about a police officer being there or in

24   custody.  Nobody from the Rankin County Jail, when they sent

25   him over there, went with him.  That was him.  So he's at

1    the hospital on April 30th within hours of the beating

2    knowing Mr. Anthony is in the hospital with the injuries.

3         In just a few short weeks, do you remember Hudson

4    says I conducted my internal affairs investigation in May.

5    The same month, because we got the letter from the lawyer

6    May 5th; right?

7         I conducted my internal affairs investigation shortly

8    after May 5th, and I interviewed Officer Welker.  About

9    what?  About an alleged beating of Mr. Anthony in the

10   bathroom.

11        And somehow as a result of that interview, Hudson

12   does not learn Mr. Anthony was put in the hospital and

13   suffered severe injuries.  How is that even possible unless

14   that guy over there never told him?  Why wouldn't he tell

15   him?

16        Why wouldn't he say, yeah, you know what, April 30th

17   just a couple hours after I dropped him off at the jail, I

18   had to go to the hospital.  The guy's in the hospital,

19   Officer Hudson.  You need to -- you've got to look into

20   this.  Hudson never knew, and the only way he could not know

21   is if you didn't tell him.

22        One other thing you might have overlooked; maybe you

23   didn't.  When Officer Welker was on the witness stand

24   yesterday, he and defense counsel made a big deal out of the

25   fact that where that bathroom is located, whatever you're

 1    doing in the bathroom could be heard out in the adjoining

 2    hallway and perhaps in other areas; right?  It's all close,

 3    so you could hear.

 4            And then Officer Welker made a point to say, and I

 5    even had the bathroom door ajar, so you should be able to

 6    hear what's going on in the bathroom in there.

 7            And I want to make sure you know our position on

 8    that:  We absolutely agree.  We absolutely agree to that.

 9            So you're saying, well, Mr. Lees, then we have video

10    and evidence here, so explain this.

11            The booking room, remember the booking room

12    microphone is inoperable.  It doesn't work.  It's the

13    microphone that records constantly.  The audio that you hear

14    on the booking room video is picked up by a mike in an

15    adjoining cell off the booking video.

16            When you're looking at that booking room video, okay,

17    where they -- at the bottom of the video is the door where

18    they originally came in; right?  It's the very first cell to

19    the left where that microphone is; that's where it is.

20            I was mistaken when we first started the case.  I

21    said at one point that that was a sound-activated microphone

22    if you remember.  I was wrong, and defense counsel corrected

23    me on it.  And he was absolutely right.  It's not a

24    sound-activated microphone.  It's a motion-activated

25    microphone.

1            What does that mean in terms of what audio we would

2     hear when Mr. Anthony was in the bathroom?

3            It means we will only hear audio that you would hear

4     in that booking room if the microphone in the adjacent cell

5     had been motion activated; right?

6            I will represent to you, on the exhibit that is in

7     evidence, for the entire 14 minutes that Mr. Anthony is in

8     the bathroom, the microphone is dead.  There is zero sound

9     on it for those 14 minutes, because nobody has walked past

10    that cell after Mr. Anthony leaves until he comes back to

11    activate the microphone.

12           I think he's correct.  I think you would hear what

13    was going on in the bathroom in the booking area, but we

14    can't hear it because the only working microphone was not

15    motion activated during those 14 minutes.

16           But we know somebody heard it, don't we?  Because

17    who's the guy that broke out into song?  We'll get to that.

18           On the issue, which is really the issue, by the

19    greater weight, by the preponderance of the evidence did

20    these two officers do what they're accused of doing?

21           Very briefly I'm going to hit the highlights for you.

22    We have evidence from a number of sources to prove that to

23    you by the preponderance of the evidence.  From Mr. Anthony

24    you hear it on the video.  Within five minutes of being

25    beaten, he's complaining of chest pain and feels like he's

 1    having a heart attack consistent with the injuries that he

 2    would have sustained and did sustain in the beating.

 3         In the video in the car, he was kind enough to play

 4    some of that video in the car.  I'm going to represent to

 5    you, at least I think, you see a man with incredibly labored

 6    breathing and having difficulty breathing in that video.

 7         When he arrives at the Rankin County Jail, the

 8    records reflect that Mr. Anthony immediately complained of

 9    being in some type of medical distress.  He made a phone

10    call before he collapsed at the Rankin County Jail, if

11    you'll recall, to Ms. Quick.  That phone call was recorded,

12    so everybody has access to it.  It is undisputed in that

13    phone call he made from the Rankin County Jail -- and we're

14    now only an hour or two at the most after he was beaten --

15    he specifically says on the phone call, "I was beaten at the

16    Pearl Police Department, and I think I'm going to die.  I'm

17    going to die.  Help me."

18         His medical injuries, as you heard from the doctor,

19    were consistent with having been beaten, and within days of

20    being in the hospital, this gentleman was on a telephone

21    getting an attorney to do what?  Not sue anybody, to get the

22    police department to preserve all the audio and video, if

23    any.  Why?  Because he knew what happened and he wanted it

24    preserved, because he believed it would show exactly what

25    happened.  He would have no clue what rooms had video, what

1    didn't, what had microphones.

2        But he got an attorney on May the 5th, five days

3    later, to contact them and say this is what my client

4    alleges happened.  This is where he said it happened.

5    Preserve that evidence.

6        What's the evidence that supports our case from

7    Officer Lang?  Officer Lang can testify all he wants that he

8    was not out of control.  I'm just going to suggest to you it

9    appeared to me you had a very young, very inexperienced

10   officer who had completely lost his composure and completely

11   lost his cool in that booking room.  That is not the way

12   police officers are trained to interact with the American

13   public.

14       Mr. Anthony, before he knew anything that was going

15   to be on videos or not, has said I was taken out of the

16   booking room and put in the hall and left standing in the

17   hall.  And Officer Lang then came into that hallway and

18   slammed my head against the wall.  And then months later

19   when the videos were produced, what did we see?

20       After Mr. Anthony was removed from the booking room,

21   okay, and went around the corner into the hallway.  During

22   that period that he was around the corner in the hallway,

23   what's the video show?  He leaves the booking room and goes

24   into that very hallway.  And when he was on the witness

25   stand, he admitted that when he went in the hallway,

1    Mr. Anthony was in the hallway.  And when I asked him where

2    were you going and what were you doing, he couldn't

3    remember.

4         What is the evidence that supports the case from

5    Officer Welker?  Officer Welker, unlike Officer Lang,

6    actually wrote a police report, which he did the following

7    day on May 1st about what happened on April 30th.  That is

8    in evidence.  I put it up on the screen, and I showed it to

9    you.  There is not a single mention in that police report of

10   anything untoward or anything that happened at all in that

11   bathroom, none, zero, nada.

12        On April 30th before he wrote the police report, he

13   had gone to the hospital, and he knew Mr. Anthony had been

14   rushed to the hospital from the Rankin County Jail within an

15   hour or so of leaving his custody.  He knew that, and he

16   wrote a police report the next day and nothing -- nothing at

17   all in there about what occurred in that bathroom.

18        Officer Hudson came and interviewed him in a couple

19   of weeks specifically about the allegation that Mr. Anthony

20   had been beaten in the bathroom by him.  And what does the

21   internal affairs investigation report, which is in evidence,

22   show that he said about that?

23        The very subject he's being interviewed on, did you

24   hear the story?  Was it in that report that he told from

25   this witness stand yesterday?  No.  None of that's there.

1          What did he say?  He said, oh, I asked him if he

2    needed to go to the bathroom; and he said yes, and I took

3    him to the bathroom.  That's the extent of the statement

4    from him to the internal affairs people in their

5    investigation when he knew what the subject matter was.

6          And now we get, well, I was going to take him to do a

7    strip search, because he's a known drug dealer.  And, oh, he

8    lunged and he -- you know, all this other crap.

9          Page 32 of his deposition, which I had to call him

10   on.  I brought up the video and showed him.  At deposition,

11   Officer Welker had no idea how Mr. Anthony could have

12   suffered these injuries -- no idea whatsoever.

13         Other than from these sources, just a few other

14   sources, medical doctor corroborates right down the line.

15   The injuries are consistent with having been punched, beaten

16   repeatedly immediately preceding the onset of the symptoms.

17         After Mr. Anthony leaves the PD, he is on video

18   constantly until he collapses and goes to the hospital.

19   He's on video in the car.  He's on video at all times in the

20   Rankin County Jail before he collapses.  Nothing happens to

21   him at all at any time during any of that period before he

22   collapses and is taken to the hospital, and then, of course,

23   we have the booking video.

24         What else do we have to support our case?  What I

25   euphemistically refer to as the confessions.  What do I mean

1  by "the confessions?"

2      I mean Officer Welker heard on that video saying,

3  "Feels like you're having a heart attack?  What's that feel

4  like, Jimmy?  A sharp pain in your chest.  Did you induce

5  any -- did you feel any trauma?  Did you have any trauma

6  induced on your body today?"

7      I asked Officer Welker, have you had any medical

8  training.  He told me, yeah.  Okay, great.  If somebody

9  complains of a heart attack, why in the world -- a heart

10  attack, pain emanating down the arm, pressure on the chest.

11  And you're on video when a guy says "I think I'm having a

12  heart attack" talking about trauma.  Trauma?  Why trauma?

13  Because you know what you just did.

14      Officer Lang -- Officer Lang on that video absolutely

15  implicates Welker.  Why?  Where in the world would you come

16  up with breaking out into song, "He got beat because he ran

17  from the police" unless you knew that gentleman had been

18  beaten?

19      He got beat because he ran from the police.  Ladies

20  and gentlemen, that's exactly what happened in this case.

21  That's exactly why Officer Lang was mad.  That's exactly why

22  the police were mad, and so he got beat because he ran from

23  the police.  And he treated us to the Broadway version of

24  the theme of this case.

25      And, finally, proving what we need to prove in this

1    case, we have Officer Welker, to me final confession, when

2    he's standing over Mr. Anthony on the video, "look in my

3    eyes" and all that.  And he looks at him and he says, "If

4    you think that hurt earlier, then shut the fuck up."

5         "If you think that hurt earlier," he knew exactly

6    what he did.  And he took lengths in his interview with

7    Hudson and in writing his reports and doing everything he

8    could to keep it under the covers.  And now he's here today,

9    as is Lang, to face you as the conscious of the community.

10         Qualified immunity; qualified immunity is what I

11   euphemistically refer to as a police officer defendant's,

12   like in this case, Hail Mary.  Qualified immunity means if a

13   reasonable police officer could have believed that the use

14   of force that was being used was lawful.  If a reasonable

15   police officer could have believed that the use of force

16   that was used, that you find was used, was lawful.

17         There is not a police officer in America, no

18   reasonable police officer, who would ever believe slamming a

19   citizen's head into a wall was lawful.  Even Lang doesn't

20   believe it because he admitted when I asked him, and he

21   said, yeah, that would be excessive force.

22         There is no police officer in America who would ever

23   believe that repeatedly punching over and over and over and

24   over again an American citizen, a defenseless American

25   citizen in custody, so as to break his ribs, puncture his

1    lungs, cause massive internal bleeding, that that was even

2    remotely lawful.  So I certainly hope you do not give much,

3    if any, attention to the Hail Mary of qualified immunity on

4    that Verdict Form.

5          Finally, I need to touch upon damages.  There are a

6    little over 8 billion people on planet earth today.  It's a

7    big place.  What is the single characteristic, the single

8    quality that gives a very, very small minority of those 8

9    billion people on this planet a guaranteed right to be free

10   from excessive force from their respective government?

11         Out of 8 billion people, what is the one thing that

12   gives this minority of those human beings on this planet a

13   guaranteed right to be free from excessive force from

14   government?  Government being, among other things, police.

15         It's being an American.  It's hitting the lottery

16   when you were born and being born here, because if you are

17   born here, you have that right.

18         Over history has that right always been adhered to,

19   enforced?  We know it hasn't.  And who has always been there

20   eventually, and sometimes it takes time to make sure it is

21   enforced?  First three words, "We the people."

22         Being a citizen of the United States of America means

23   you have that guarantee regardless of whether you are rich

24   or poor; black, white, brown, or green; educated or

25   uneducated; it is solely the fact of being an American.  All

1    Americans have that right, and when you are robbed of that

2    guarantee by the actions of government acting like Officers

3    Welker and Lang, acting as if they are some vigilantes from

4    some third-world country; when that happens, then the

5    compensation that an American citizen receives for having

6    that right robbed of them should be based on the severity of

7    the injuries, and not, again, whether you're rich or poor;

8    black or white; educated or uneducated.

9        The measure of damages in this case should be, and

10    the guiding principle that should guide you when you're back

11    into that jury room is the severity of the injuries caused

12    to a human being without regard to whether Mr. Anthony is

13    like me, or whether it happens to somebody like Brandon, or

14    whether it happens to somebody like Your Honor, the judge.

15        Rich, poor, black, white, brown, educated,

16    uneducated, it doesn't matter.  It's what happens to you

17    that counts.  And I have heard over and over again in this

18    courtroom a roundabout way to diminish the life and the

19    quality of him, because they think it's going to effect how

20    you apply the damage instruction to assessing his damages.

21        He got crushed:  Broken ribs, internal organ damage,

22    lung punctured, massive internal bleeding.  The medical

23    testimony in this case is he dies if medical attention had

24    not been rendered promptly and efficiently.

25        THE COURT:  Five-minute warning, Mr. Lees.

1          MR. LEES:  Thank you.

2          I would hope that you treat Mr. Anthony when you

3   get -- and I hope you do get to the damages without regard

4   to all of that stuff, and base your verdict as you would for

5   me or Brandon or anybody else based on the severity of his

6   damages and the severity of his injuries.

7          Counsel for the plaintiff -- I'm sorry -- counsel for

8   the defendant, in his opening statement, made some comment

9   that I was here trying this case, because I was going to ask

10  you for 12 million or 12 zillion dollars or something.  I

11  would never do that -- never do that.  That's not why I'm

12  here.

13         I do expect you, when you go to that jury room, in

14  considering the severity of the damages with respect to the

15  damages caused by Officer Welker to return a substantial

16  damage award against Officer Welker for what he did.  What

17  that amount is is up to you.  I'm not here to tell you that.

18  You figure it out.

19         I am going to suggest to you that obviously the

20  damage award for the injuries caused by Officer Lang, while

21  still substantial, should be less and significantly less

22  than the damages awards against Officer Welker.

23         But at the end of the day, what I do expect of you,

24  the eight of you acting together as the conscious of this

25  community, is to act in accordance with the principles of

1    America to uphold the law and to hold both of these officers

2    responsible for blatant violations of an American citizen's

3    constitutional rights.

4         Thank you.

5         THE COURT:  Thank you, Mr. Lees.  You've reserved

6    12 minutes for rebuttal.

7         Mr. Siler.

8         MR. SILER:  Thank you.  Thank you, Your Honor,

9    counsel.  Ladies and gentlemen of the jury, thank you for

10   your attention the past few days, and I know this has been a

11   trying thing.  I know what it's like sitting there, so I

12   appreciate you doing it.

13        I know you're tired of listening to lawyers.  You

14   don't want to sit here for an hour and a half listening to

15   people go back and forth arguing.  We see this case very

16   differently, always have.  I told you from the outset we

17   wanted to stand up here and tell you our side of the story,

18   and we've done that over the last couple of days.

19        But I have to represent my clients, and I'm going to

20   spend a few minutes talking to you about things that took

21   place and try to do it as efficiently as I can and move

22   forward.

23        I said at the outset of this case that there's a lot

24   of noise around it, what's going on.  There's lots of video

25   talk and people saying what they think, but when it gets

1    right down to it, it comes down to one person's word against

2    another's.  There is no video.  There is nothing going on

3    out there that you can look at.

4        I wasn't in that bathroom.  I wasn't in that hall.  I

5    don't know what happened.  You weren't there; obviously you

6    don't know what happened.  Plaintiffs weren't there, other

7    than Mr. Anthony, and nobody knows what happens.

8        Now, there's a lot of Monday morning quarterbacking

9    going on where somebody's sat around now for three years --

10   people that are smart and, you know, can afford to sit

11   around and see if they can dream up why certain things

12   occurred, come up with difficult bad meanings from their

13   perspective about what happened.  But in the end, nobody saw

14   anything that happened here except for these two -- well,

15   Mr. Welker, Mr. Lang, and Mr. Anthony.

16       Now, they talked just a few minutes about the

17   internal affairs investigation.  The internal affairs

18   investigator is not a human lie detector machine.  He

19   doesn't know what -- because he wasn't there either, he

20   doesn't know what's going on.

21       He didn't want to rely on anybody's version of the

22   story.  He wanted to rely on what he could see.  What he

23   could tangibly look at, and say there this was -- this is

24   what happened or that was what happened.  But as we all

25   know, there's no video.  There's no audio that's

1    particularly helpful, other than if you want to sit around

2    and think up things that seem terrible about it, and he

3    couldn't -- he didn't have that.  Just because he didn't put

4    all these things in his report that Mr. Lees refers to

5    doesn't mean they weren't told to him.  He just didn't have

6    any proof that's what actually happened.

7        If any of you -- I hope you've never been in a jail.

8    I've been in too many of them as an attorney, not as a

9    visitor or a prisoner.  But if you've been in jails, people

10   lie there all the time.  They come in and everything's

11   hurting, my heart's going, my head's hurting, my back's

12   terrible, my handcuffs are too tight; that's all they hear

13   day in and day out.  And when people say those kind of

14   things to them, that's what their -- you know, their

15   immediate thought is, you know, I've heard this all before.

16   Heard it yesterday, heard it the day before that.

17       We do know, again, Monday morning quarterbacking and

18   after the fact, all these complaints about having a heart

19   attack, he wasn't having a heart attack.  That wasn't an

20   issue in all this.  And they figured, just like with most

21   people, that they're lying to them and -- but they -- they

22   ask, they look around.  If something needs to be done,

23   they -- they take them where they need to be taken.

24       In the Rankin County Jail facility they have health

25   professionals in there, and they went there.  They -- he

1    said that the health professionals took his blood pressure.

2    They looked at him when he first got there and determined

3    that he wasn't having a heart attack as he was complaining,

4    and that there was nothing wrong with him, and they put him

5    in the jail.

6        Later as things changed and as it occurred, they --

7    they took him to Merit Health out on Highway 80 in Brandon

8    and got him checked out there, and that's where his health

9    issues started to -- to come about.

10       Keep in mind that with all this, we're not saying or

11   suggesting he didn't have an injury.  Okay?  We've never

12   said he didn't have an injury.  We've questioned their view

13   of it and what they say happened, and we'll talk about their

14   expert here in a few minutes about what he was saying.  And

15   I'll show you some other medical records that are in the

16   docket, or rather in the record, that you can look at when

17   you get back there if you want to.

18       But he was injured.  There's no question he was

19   injured.  The question here is how he was injured.  Was he

20   injured because he was hit 30 times on his shoulder, upper

21   shoulder, and upper part of his back?

22       You know, I might have even had some belief that

23   maybe he was telling the truth, Mr. Anthony, if he said he'd

24   been hit two or three times, but he said he got hit 30

25   times.  Yet the reason we played those videos back in here

this morning was I wanted you to very clearly see.  I wanted

you to see him walking back into that booking room after he

was allegedly hit 30 times, and we played it back a couple

of times so you could see it, you know, closely.

He walks through there in his own power without

assistance.  He doesn't look perturbed or red-faced, neither

do any of the officers that are coming in behind him, and

you can't see a mark on him.  There's no red spot.  There's

nothing on his chest that you see when he walks in.  And,

again, this is where he said he got hit 30 times.  There's

no mark on him whatsoever.

And then we played the transport, or at least part of

it, so, again, you can get a good view of his chest when he

was being transported over to the Rankin County Jail.  And

you get a clear view; you could see all of his tattoos.  You

could see everything he had on him, but there's no mark on

him at all.  There's no -- I mean, gosh, if you slap me or

hit me without a shirt on, there would be a mark, and

there's nothing on there at all.

And as the doctor said the other day in his

testimony, he said there's not a mention, not one word in

all of those health records -- and you'll see when you get

in there they're about that thick -- not one that says he

has a bruise or a contusion, which is the medical

terminology for a bruise on his body.  All the people that

1    saw him, all the people that dealt with him, not one person

2    writes in a record that he's got a bruise or a contusion on

3    his body.

4        Now, they show you a photograph where he has a couple

5    of bruises.  It looks like maybe three down here around some

6    tape, and these were photographs taken several days later

7    after April the 30th.  And I don't know what those bruises

8    are.  It could be from the tape.  It could be from laying on

9    that tube.  It could be all kinds of things.

10       But it also could very well be because that's where

11   Officer Welker struck him, as he said that he did.  Because,

12   remember, I asked him were you struck under your armpit

13   anywhere?  He said "no."

14       All these strikes, these 30 strikes he claims he had

15   were right up here.  But Officer Welker said when I struck

16   him with my open hand and pushed him back up against the

17   wall, I struck him right down in here.

18       Now, could Officer Welker have caused that damage

19   that was a blunt-force trauma that he put right in here on

20   his side?  Could he have caused that damage with that one --

21   one blow to go back?  I think he could.

22       Keep in mind -- and you'll hear it when I talk about

23   this in just a minute, but keep in mind that with -- with

24   his health situation, common sense tells you that his

25   interior of his body has got to be under some amount of

1    stress and strain.  I mean, he had hepatitis C.  He had

2    emphysema.  He was a lifelong smoker.  He was a

3    methamphetamine addict.  Certainly that's going to

4    deteriorate the quality of your blood vessels, the organs

5    within your body to some degree.

6         Is it going to take as much of a blunt-force blow to

7    somebody with those kind of long-term health issues as it

8    would to -- to you or me?  And I'd put to you it doesn't.

9         And, yes, he was hurt; and, yes, we did strike him

10   once in that -- in that bathroom.  But I'll put it to you

11   that our version of the events, Officer Welker's version of

12   the events is much, much more plausible than him saying he

13   got struck here and here 30 times and never, never down

14   here.

15        But if you sit around for three years and try to come

16   up with a story about how you can come to the jury and make

17   some money with it --

18        THE REPORTER:  You turned your mike off.

19        THE COURT:  Yeah, make sure that mike's on.

20        MR. SILER:  I didn't mean to turn it off.  Excuse me.

21        Mr. Lees has said several times, both in opening and

22   closing, uses the term "an American citizen."  An American

23   citizen did this, an American citizen did that, and he has

24   these rights and those rights.

25        Now, as far as I know, Mr. Anthony is an American

1   citizen, and Mr. Anthony has exercised his rights a great

2   deal.  He's exercised his rights to make choices about his

3   life, choices about the people that are around him, and a

4   lot of them have been bad choices.

5       He's -- he's -- the police in Pearl are out at his

6   house all the time because his girlfriend calls, so he's got

7   the right.  We all have rights as Americans to make

8   decisions and choices, but that doesn't mean we're going to

9   always make good decisions and choices.  And we've got to

10  live with the consequences of those decisions and choices,

11  and he's -- that's what Mr. Anthony is dealing with at the

12  moment.

13      Yeah, he's a citizen.  Yeah, he has rights like

14  everyone else, but he's not above everyone else.  And like

15  Mr. Lees, I don't want you not to award him money because he

16  doesn't -- he's poor, doesn't have any means of support;

17  that's not the point.

18      The point is how he's chosen to live his life and how

19  to do things.  He doesn't work.  He has no income.  He's

20  convinced Ms. Quick somehow or another to let him live in

21  her house for several years without paying anything.  He

22  doesn't have any income.  He lives off of her Social

23  Security check.  Yeah, he's made a lot of choices as an

24  American, as is his right, and it's his right to make those

25  choices even if they're bad ones.  And that's what he's

1    done.

2        Now, in opening Mr. Lees made the comment somewhere

3    along the way that we're governed by how we treat the least

4    of us, and I agree with that.  And he suggests that

5    Mr. Anthony is the least of us, and I'm going to suggest to

6    you that he's wrong in this case.

7        In this case, the least of us is probably Brandis

8    Quick, and we have done everything at the City of Pearl we

9    can to respond to Ms. Quick, respond to her numerous,

10   numerous calls.  We go out there every time she calls, calls

11   about him, and -- and every time she calls about him, he

12   runs and leaves before the police can get there.

13       I know the most dramatic words I've heard in this

14   case came from the video that Officer Saucier said in

15   talking to Ms. Quick on the morning of April 3rd when they

16   went in to arrest Mr. Anthony.

17                   (Video playing in open court.)

18       MR. SILER:  That's good.

19       How this ends is you dying, because he's going to

20   kill you.  And then remember he got her to show to the

21   camera, you know, the scars where he'd hit her on the side

22   of the neck.

23       They go there every time.  They try all they can to

24   help her.  They tell her and give her advice -- don't let

25   this guy come back -- and she always does.  She's the least

1    of us in this particular case.  Mr. Anthony is not.

2         Let's talk a little bit about the medical testimony,

3    and I'll add to what Mr. Lees said about the -- Mr. Lang.

4    Keep in mind this:  We've got two clients in this case, two

5    different defendants, and what they're accused of doing or

6    what the allegations of them doing are two totally separate

7    things.  One of them is he -- he claims he pushed his head

8    into the wall and put a knot on the back of his head and the

9    other one -- that's Mr. Lang.

10        Mr. Welker, he claims, is the one that hit him 30

11   times in the bathroom.  And it's important to keep that

12   distinction in your mind as you think through all this.

13        The doctor said to you that there -- no treatment was

14   given to him because of the knot on his head, and I don't

15   mean to make light of it and make fun of it.  You know, you

16   or I've had a hundred knots on my head, or most of us have,

17   from all kinds of reasons.

18        The problem here is, we don't know why that knot's on

19   his head.  It could be from all kind of things.  He was

20   running around in the woods two nights before in the dark.

21   He could have fallen in his bedroom, people do that all the

22   time.  We don't know where the knot came from.  But one

23   person's word against another's.  Mr. Lang said I did not; I

24   adamantly did not push his head against the wall.  And

25   Mr. Anthony says he did push my head against the wall.

1    Well, who do we believe?  Do we believe the great American

2    citizen Mr. Anthony?  I don't see that as being realistic at

3    all.

4         We put the doctor on the stand -- and, again, we're

5    not denying that he -- that Mr. Anthony had some injuries,

6    and we're not denying that they were serious.  They had to

7    get that stuff drained out of his chest cavity; they had to

8    put the tube in there.

9         Again, the question is how did -- how did that

10   happen, and whether it happened because Mr. Welker hit him

11   one time as he says, or did it happen because Mr. Anthony --

12   as Mr. Anthony says he hit him 30 times, and we've talked

13   about that a little while ago.

14        Their medical expert claims, oh, man he's got

15   multiple rib fractures.  He's got all these problems with

16   these fractured ribs.  Well, I will tell you that if you

17   look at the medical records, you'll find something different

18   in there.  And I'm going to show you some of them here in

19   just a second.

20        Mr. -- Dr. Huxford said that he had all these

21   specialties:  He was an internal medicine guy, he was a

22   pulmonologist, he was a sleep specialist.  He was -- I don't

23   know.  He had several things he said.  But when I asked him

24   particularly about radiology, someone who reads and

25   interprets images for a living, he said, no, I'm not a

1  radiologist, and I'm not supposed to do that.  So they bring

2  him in here to talk about ribs, and this guy doesn't even

3  know how many ribs a human being has.  I had to tell him.

4  And he said, oh, yeah, you're right, it's -- it's 12 not 14.

5  That's their expert.

6      Ladies and gentlemen, an expert will come in and tell

7  you anything the lawyers pay him to tell you, and that's

8  what this guy is -- is doing.  He's just coming in here and

9  telling you what they want him to tell you.

10      Think about this.  Joint Exhibit 4, if you want to

11  make a note of it, you don't have to, but you're welcome to

12  if you want to.  I'll give you some page numbers, which is

13  the Merit Health Rankin health records.  Go in there and

14  take a look at Bates stamp page -- let me get this where we

15  can see a little better.

16      Bates stamp page 365, I'm just going to just point to

17  some things I've got highlighted, "No acute rib fracture or

18  sternal fracture is seen."  Remember the doctor said "acute"

19  means something that's new.  Okay.  Chronic subacute, those

20  are older injuries.

21      There are subacute or chronic posterior or left 11th

22  or 12th rib fractures.  Remember those bottom ones that he

23  called "floating ribs."  There were subacute or chronic rib

24  fractures, which means they were old rib fractures.  There's

25  nothing acute in there in their findings.  He says it again

1    right here, no acute rib -- no acute fracture of sternal or

2    sternal fracture is seen.  These are subacute.  There are

3    subacute or chronic posterior 11th and 12th rib fractures.

4    Same thing down -- down at the bottom of the page, and

5    that's page 365, Bates stamp page 365.

6         Here's another one, page -- this is Joint Exhibit 4,

7    page 377, you'll see down there that this is a chest wall --

8    chest 1V comparison, and it says "none."  This is from a

9    Dr. James Sutherland.  His findings, "There is no

10   significant osseous abnormality," and the doctor said the

11   other day that means there's no bone or abnormalities in

12   that ribcage area.

13        If you look at 378, it says the same thing.  Again,

14   on page 379 of Joint Exhibit 4, Dr. Sutherland again says,

15   "No acute rib fracture or sternal fracture is seen.  There

16   are subacute or chronic posterior left 11th and 12th rib

17   fractures."  And I -- I could go on.  There's several places

18   in here that say that.  Go to page 380 -- I won't put it

19   back up.  It says the same thing.  381, 382, 383, 385, they

20   all say the same thing, and all that means these

21   professionals -- who know how many ribs people have, who are

22   not being paid to come in here and tell you just what

23   somebody wants you to hear -- they're telling you there are

24   no new rib fractures.

25        THE COURT:  You'll need that mike, Mr. Siler.

1   MR. SILER:  All right.  I told you I was going to try

2 not to go ramble on too long.  I'm sure I've bored you to

3 death already.  But let me talk about a couple more things,

4 and then I'll sit down and shut up.

5   Damages; we don't think you should find any damages

6 in this case, zero.  I don't think you should even be

7 looking at it or thinking about it.  There's a couple

8 reasons, but the biggest one is there's no proof of any

9 damages whatsoever.

10   We read you a stipulation -- I don't remember if you

11 recall it or not -- at the outset of our case in chief, I

12 guess this would have been yesterday, in which they

13 stipulated to the fact they're not seeking any medical

14 expenses.  Now, why would you do that?  You're in here

15 trying to make money or get money from us causing him

16 something going on, why wouldn't you ask for the medical

17 expenses you've incurred.

18   They also stipulated to the fact they weren't asking

19 for lost wages.  And of course, they can't because the man

20 wasn't working, and he doesn't have any lost wages.  So what

21 they've decided to do instead is just come in and say, oh,

22 we just want these things.  They didn't even tell you what

23 they wanted them for.

24   He may have said something about pain and suffering

25 or mental and emotional distress, but there's nothing in

1    this record, not one single item in this record that has to

2    do with damages -- not one.  So what they're asking you to

3    do, in a sense, is just pull a number out of the air and put

4    it down on the page.  That's not how things work.  We're not

5    here to just guess and pull numbers out of the air about

6    damages.  They haven't proven a bit of damages, so that's

7    one reason not to award any damages.

8          The second reason not to award any damages is that

9    there really are none.  Keep in mind two different

10   defendants.  Officer Lang, the shove of the head and the

11   knot on the back of the head; no medical treatment was ever

12   given for that particular situation.  He didn't -- he

13   didn't -- I mean, like I said, we've all had knots on our

14   head occasionally.  It's just part -- part of growing up and

15   part of doing things.

16         And if he had a knot on his head, it wasn't because

17   of Officer Lang, because he didn't do it.  But even if he

18   did, there's -- there's nothing from which you could

19   logically draw some inference that there's damages

20   associated with that.

21         With respect to the other one, Mr. Welker, it just as

22   easily could have been in this case that the injury that he

23   suffered was caused by exactly what Mr. Welker said:  That

24   he got too close to him.  He was too close on the gun side;

25   that he -- it startled him and he turned around and

1    adrenaline going, and he shoved him back up into that wall.

2    And that very well could have created the problem given all

3    his health issues.

4        But there -- there is nothing that was done, and as

5    the Court read those instructions to you -- you -- well, law

6    enforcement officers have the right to use force.  I mean,

7    it would be crazy not to give them that right, because

8    they've got to be able to protect themselves.  They've got

9    to be able to protect others, and they deal with the worst

10   people on earth most of the time.  So you -- they can use

11   their -- their force if they need to, and this was

12   reasonable.  There's nothing unreasonable about it.  But

13   there's no damages proved anywhere.  They just want you to

14   pull a number out of the air.

15       Ladies and gentlemen, let me -- let me suggest this

16   to you.  This is a money grab.  It is a money grab.  He is

17   coming in here to the courthouse casino, putting a quarter

18   in the slot machine, pulling -- pulling the lever, and

19   seeing if he can get eight people to agree to give him some

20   money for which they have no basis.  That's not the way

21   court systems work, and I don't think we want to send a

22   message out there from this court that we're willing just to

23   let somebody come in here and make a money grab and walk out

24   with it without them proving it.

25       Now, as the Court said on many occasions, the

1    plaintiff has the burden of proof.  They have got to hold up

2    that burden to convince you that he did -- or that things

3    happened the way he said they happened and it just --

4    there's nothing here.  There's absolutely nothing, and their

5    damages case isn't any better.  So my request to you is to

6    give him absolutely nothing.

7         Look, Mr. Anthony's made a lot of bad decisions.

8    He's -- he's -- I know some of you have struggled, or

9    struggled in the sense that you've had friends or loved ones

10   that have had addictions and knows how the whole system

11   works with those folks.  And I know that they, you know, are

12   looking for their next -- next hit, their next drink, their

13   next whatever they can find, and they won't tell you the

14   truth if they need to try to get around to it.  And it may

15   be that that's just a sickness and there's no way to deal

16   with it, but you know how it works.

17        He is not a truthful person, and I don't -- I don't

18   relish at all pointing here and saying bad things about him.

19   I just -- I have to because he's, you know, trying to sue my

20   clients, and he's trying to do it with nothing and trying to

21   get you to just pull a number out of the air.

22        Now, I'll stop with that, and I'll also mention, like

23   Mr. Lees did, just briefly about this jury interrogatory --

24   the "Verdict Form" I guess is what we're going to call it.

25   The Verdict Form and where he said that you should mark

1    Question No. 1 yes -- let's read it for a second.

2         "Do you find that Plaintiff Jimmy Anthony has proved

3    by a preponderance of the evidence that Defendant Jonathon

4    Welker violated his constitutional right to be free from

5    excessive force, as defined by the Court's instructions?"

6         We would like for you to -- to mark it "no."  Okay?

7         All right.  If you mark that "no," then your job is

8    finished with respect to Mr. Welker.  You don't have to do

9    anything further.  You don't have to get into discussions

10   and debates about qualified immunity.  You don't have to get

11   into discussions and debates about money because that, after

12   all, is what they're here for.  But if you do that, you're

13   finished with him.

14        If you do mark "yes," you can go down to Question 2

15   on the qualified immunity, and if you believe that he is

16   entitled to qualified immunity, you can -- you can mark

17   "yes" there, and you're also finished with your work.  You

18   don't have to get into discussions at all about money.

19        Once you do that, the second page is about Officer

20   Lang, and it comes to the same -- down to the same thing.

21   If you mark "no," that you don't believe that Jimmy Anthony

22   has proved that he violated his constitutional rights,

23   you're finished with him.  And all you have to do is sign

24   the bottom of the page, and you're done.  If you --  did I

25   get that one right?  Okay.

1          And then if on number -- if you do mark "yes" on

2    number 4 and go down to number 5, if you mark "yes" that

3    he's entitled to qualified immunity, once again you're

4    through with your work and your deliberations, and you can

5    go home.

6          Let's not enable Mr. Anthony here to continue making

7    bad choices, to continue dealing with Ms. Quick, the least

8    of us, the way he always has, because if we give him a lot

9    of money, that's exactly what's going to happen.

10         This did not happen the way Mr. Anthony says it

11   happened.  It happened in another way.  And sometimes the

12   story's somewhere in the middle of what both sides say it

13   is.  And I don't know, because as I said, I wasn't there.

14         But Mr. Welker and Mr. Lang, they're both young men,

15   young fathers, young parents.  They're doing their best to

16   help the least of us in the City of Pearl back at that time,

17   and we urge you to hold that they did not violate this

18   individual's constitutional rights.

19         Thank you, Your Honor.

20         THE COURT:  Thank you, Mr. Siler.

21         All right.  Twelve minutes left for rebuttal,

22   Mr. Lees.

23         MR. LEES:  Just very quickly on one or two of the

24   points raised by defense counsel.  To refresh your

25   recollection, we had a pulmonologist because the primary

1    injury was to the lungs and the internal bleeding, not

2    orthopedic injuries.  The orthopedic injury -- which it's

3    true at the Merit Health center, an x-ray person read the

4    x-ray as being subacute.  But when he got to the trama

5    center at the University of Mississippi, they recognized it

6    was acute.  That was the diagnosis, and how do you think his

7    lung got punctured?  It's from the broken ribs.

8         I mean, you know, if you want to do what he said and

9    read all the records, I would welcome you to read the

10   records which show he got beat so severely his ribs broke.

11   A broken rib punctured a lung, caused all the internal

12   bleeding and damage, which filled up his chest cavity,

13   caused the hemothorax to the lungs, and almost killed him

14   but for the medical intervention.

15        Otherwise with no broken ribs -- but, yeah, the

16   medical records are what they are.  We're not seeking

17   medical expenses, that's correct, because the medical

18   expenses are insignificant to the overall harm of the case.

19   That's not what the case is about.  The case is about

20   somebody who suffered substantial harms and their

21   substantial impact on their quality of life.

22        With respect to the comments that somehow this is a

23   money grab, I'm not going to take that personally, but I

24   didn't even ask you for a number.  I told you it was up to

25   you.  You know, and in terms of the way the American court

1    system works, in a civilization, unlike in caveman days, we

2    have created a system, like it or not, where we use

3    financial responsibility to hold people accountable, rather

4    than going out with pistols at ten feet and settling it that

5    way.

6           If you have been injured and put in a wheelchair for

7    the rest of your life, do you really care about the medical

8    bills?  Your quality of life has been substantially impacted

9    for the rest of your life, and the American justice system

10   is all about turning it over to "We the People" sitting as

11   jurors to come up with fair and reasonable compensation that

12   fairly and reasonably compensates people for the losses.

13          In this case, the loss to the quality of life;

14   meaning an individual who has sustained these kind of

15   injuries underwent pain, agonizing pain, tremendous pain for

16   a substantial period of time, and agony and suffering and

17   the loss of the quality and enjoyment of life and the

18   emotional distress that comes with knowing that you think

19   you're going to die.

20          And I have been doing this a long time, and I am

21   perfectly comfortable, with all due respect, Counsel, to

22   leaving it up to people like this to use their common sense

23   as to what is an appropriate compensation for behavior in

24   which you have characterized as them doing their best for

25   the City of Pearl.  Seriously?

1              We don't beat people in custody in America.  We are

2      judged -- and I said it before, and I'll say it again.  We

3      are judged as a country not by how we treat the best of us,

4      not how we treat the Jim Lees, the Brandons, the judge, but

5      how we treat the worst of us.

6              And I certainly did not mean to suggest or imply that

7      Mr. Anthony in any way is the worst of us.  Good Lord, in

8      this country we certainly have worse, terrible behavior

9      every day.  But every one of those people is presumed

10     innocent.  Every one of those people is to be treated in

11     accordance with the Constitution.  We have courthouses,

12     judges, we have systems in place to deal with people's

13     abhorrent behavior.

14             But you know who doesn't get to do that?  You guys

15     don't.  Nobody appointed you the judge or jury.  Nobody.

16     You were young; I get it.  I hope this has been a learning

17     lesson for you.  But you're not a judge, you're not a juror;

18     you don't beat people.

19             Do your job.  Thank you.

20             THE COURT:  All right.  I just have a couple more

21     instructions -- not as many as I had before, I promise --

22     and then you'll be able to retire.

23             Angela, if you'll go to the Elmo, please, with the

24     Verdict Form.  Put the instruction up first, please.

25             Okay.  Upon retiring to the jury room, you should

1    first select one person to act as your foreperson.  Your

2    foreperson will preside over your deliberations and will be

3    your spokesperson here in the court.  The vote of your

4    foreperson will have no greater weight than that of any

5    other juror.

6        A verdict form has been prepared for your

7    convenience.  We're going to go through the Verdict Form

8    now.  I know that you've seen it some with the counsel, but

9    I am literally going to go line by line.  I want to go

10   through this with you all.

11       It has the case parties at the top, "Verdict Form."

12   The first part of the Verdict Form applies to Defendant

13   Jonathon Welker.  The first question that you all have to

14   decide, "Do you find that Plaintiff Jimmy Anthony has proved

15   by a preponderance of the evidence that Defendant Jonathon

16   Welker violated his constitutional right to be free from

17   excessive force, as defined by the Court's instructions?

18       You will check either yes or no.

19       If you answer "yes" to Question 1, you will proceed

20   to Question 2.  If your answer is "no" as to Question 1,

21   your deliberations as to Defendant Jonathon Welker are

22   complete, and there's nothing else for you to do.

23       You'll move on to -- if you go to Question 2, you

24   will find, "Do you find that Defendant Jonathon Welker is

25   entitled to qualified immunity?"

1          You'll check yes or no.

2          If you do answer "yes" to Question 2, your

3    deliberations as to Defendant Jonathon Welker are complete.

4    If you answer "no" to Question 2, you'll go to Question 3.

5          Question 3 is, "We, the jury, find that Defendant

6    Jonathon Welker is liable to Plaintiff Jimmy Anthony for

7    compensatory damages in the amount of" and you will fill in

8    that blank.

9          All right.  The second page of the Verdict Form

10   applies to Defendant Jacob Lang.  Question 4 is, "Do you

11   find that Plaintiff Jimmy Anthony has proved by a

12   preponderance of the evidence that Defendant Jacob Lang

13   violated his constitutional right to be free from excessive

14   force, as defined by the Court's instructions?"

15         You will check yes or no.

16         If you answered "yes" to Question 4, you will then

17   proceed to Question 5.  If you answer "no" to Question 4,

18   your deliberations as to Defendant Jacob Lang are complete.

19         Number 5 is, "Do you find that Defendant Jacob Lang

20   is entitled to qualified immunity?"

21         And you'll check yes or no.

22         If you answer "yes" to Question 5, your deliberations

23   as to Defendant Jacob Lang are complete.  If you answer "no"

24   to Question 5, you proceed to Question 6.

25         And then Question 6 is, "We, the jury, find that

1  Defendant Jacob Lang is liable to Plaintiff Jimmy Anthony

2  for compensatory damages in the amount of" and then fill in

3  the blank.

4      The jury foreperson will sign and date the verdict.

5      All right.  We'll continue with the rest of the

6  instructions.  You will have the Verdict Form and all of the

7  exhibits in the jury room with you and also a copy of the

8  instructions that I read.  When you have reached a unanimous

9  agreement as to your verdict, your foreperson should fill in

10  that Verdict Form we just went through.  The foreperson

11  should sign and date it on the lines designated.

12      Nothing said in the Verdict Form is meant to suggest

13  what your verdict should be.  You alone have the

14  responsibility for deciding the verdict.

15      If, during your deliberations, you should desire to

16  deliberate with the Court, please reduce your message or

17  question to writing signed by the foreperson, and pass the

18  note to the court security officer who will bring it to my

19  attention.  I will then respond as promptly as possible,

20  either in writing or by having you return to the courtroom

21  so that I can address you verbally.  The rules of court

22  require that I consult with the attorneys before I can

23  respond to any message or question you may send.  This will

24  take some time, so please be patient.

25      I caution you, however, about any message that you

 1   might send, that you should never state or specify your

 2   numerical division at the time.  Do not send me a message

 3   telling me you are divided by a particular vote.  If you do

 4   so, I might have to declare a mistrial, which would require

 5   that the case be re-tried before another jury at

 6   considerable time and expense to all involved.

 7        When you have marked and signed your Verdict Form,

 8   knock on the door and tell the court security officer you

 9   have a verdict.  Do not tell the officer what your verdict

10   is.  He will come and tell me you have a verdict.  I will

11   bring the parties, the attorneys, and you back into the

12   courtroom, and we will go through the formality of having

13   you return the verdict.

14        All right.  Now is the time for you to retire to

15   deliberate.  We are going to gather the exhibits and bring

16   you the exhibits that have been admitted.  We are going to

17   bring you a copy of the instructions and that Verdict Form.

18   We are also going to provide you, we have a laptop that is

19   stripped down.  There's nothing on it, no way to access the

20   internet.  But it's simply the ability, for any of our

21   exhibits that are audio or video, if you wish to view them,

22   you'll be able to view them on that laptop.

23        So we'll be back shortly with that information, but

24   you may now retire to the jury room to deliberate.

25        All rise.

```
 1              (Jury out for deliberations at 2:15 p.m.)

 2         THE COURT:  All right.  Counsel, I am going to have

 3    just one attorney for each side approach to just confirm

 4    that you agree all the exhibits are in order, and we're

 5    going to put on the record that you agree all the exhibits

 6    that are properly admitted are going to the jury.

 7         So just an attorney from each side, please approach

 8    Ms. Powell and confirm that.

 9             (An off-the-record discussion was held.)

10         THE COURT:  All right.  Mr. Flechas, can you confirm

11    that all the exhibits are in order and proper to go to the

12    jury?

13         MR. FLECHAS:  They appear to be, Your Honor.

14         THE COURT:  All right.  And, Ms. Bland, can you

15    confirm the same?

16         MS. BLAND:  Yes, Your Honor.

17         THE COURT:  All right.  Thank you both.  We'll await

18    a call.

19                (A deliberation recess was taken.)

20         MS. POWELL:  All rise.

21         THE COURT:  Y'all can be seated.

22         All right.  I understand that we have a verdict, so

23    we're going to bring in the jury.

24                   (Jury in at 4:45 p.m.)

25         THE COURT:  All right.  You all may be seated.
```

1          All right.  Who is our foreperson?

2          All right.  If you'll please stand for me, I

3    understand that you all have a verdict?

4          THE FOREPERSON:  We have, Your Honor.

5          THE COURT:  And is the verdict unanimous?

6          THE FOREPERSON:  Yes, ma'am.

7          THE COURT:  All right.  If you'll pass that to the

8    court security officer for me.

9          All right.  The verdict appears to be in order.  I'm

10   going to hand it to Ms. Powell to publish.

11         MS. POWELL:  United States District Court, Southern

12   District of Mississippi, Northern Division, Jimmy Anthony

13   versus Jonathon Welker and Jacob Lang, Civil Action No.

14   3:23-CV-132-KHJ-MTP.

15         Do you find that Plaintiff Jimmy Anthony has proved

16   by a preponderance of the evidence that Defendant Jonathon

17   Welker violated his constitutional right to be free from

18   excessive force, as defined by the Court's instructions?

19         Yes.

20         Do you find that Defendant Jonathon Welker is

21   entitled to qualified immunity?

22         No.

23         We, the jury, find that Defendant Jonathon Welker is

24   liable to Plaintiff Jimmy Anthony for compensatory damages

25   in the amount of $60,000.

1          Do you find that Plaintiff Jimmy Anthony has proved

2    by a preponderance of the evidence that Defendant Jacob Lang

3    violated his constitutional right to be free from excessive

4    force, as defined by the Court's instructions?

5          Yes.

6          Do you find that Defendant Jacob Lang is entitled to

7    qualified immunity?

8          No.

9          We the jury find that Defendant Jacob Lang is liable

10   to Plaintiff Jimmy Anthony for compensatory damages in the

11   amount of $20,000.

12         THE COURT:  All right.  Is that signed and dated?

13         MS. POWELL:  Yes, ma'am.

14         THE COURT:  All right.  Do either party wish for me

15   to poll the jury?

16         MR. SILER:  Not the defendants, Your Honor.

17         MR. LEES:  No, Your Honor.

18         THE COURT:  All right.  Thank you, first of all.  I'm

19   going to have you retire to the jury room.  I need to take

20   up some technical matters, and I'll be back with you all

21   shortly.  So you all may be excused.

22         MS. POWELL:  All rise.

23                    (Jury out at 4:48 p.m.)

24         THE COURT:  All right.  You may be seated.

25         All right.  Now, that a verdict has been returned in

1    Mr. Anthony's favor, the Court wants to take up with the

2    parties the issues of punitive damages and whether a

3    punitive damages instruction is appropriate or not.

4         I will hear from both sides on whether a punitive

5    damages instruction is appropriate under these

6    circumstances, so I'll hear from the plaintiff first.

7         MR. FLECHAS:  May I argue from here, Judge?

8         THE COURT:  As long as you've got that microphone on

9    and I can hear you, that's perfectly fine.

10        MR. FLECHAS:  Okay.  Your Honor, the allegations that

11   are in this case, the only way the jury could have found

12   that excessive force was committed is if Jonathon Welker --

13   if they believed that Jonathon Welker took Jimmy Anthony

14   into a bathroom and repeatedly struck him, and that he was

15   in no way resisting or in no way a threat.

16        If there's ever a case that would result in punitive

17   damages, I believe this is it.  Same with Defendant Jacob

18   Lang, the only way that the Court could have found -- or

19   excuse me.  The only way that the jury could have found

20   excessive force is if Defendant Jacob Lang, purposefully and

21   with no cause, slammed Mr. Anthony's head against a wall

22   causing injury.  The jury did find that way.  Again, this --

23   either both of these uses of force were without any

24   justification whatsoever, and I think this is a clear case

25   where punitive damages are appropriate for consideration.

1          THE COURT:  All right.  Any response from the

2     defendant?

3          MR. SILER:  Yes, Your Honor, and I'll just make my

4     remarks from here as well.

5          THE COURT:  You just turned it off.  Turn it back on.

6          MR. SILER:  Got it on?

7          THE COURT:  Yes, sir.

8          MR. SILER:  Okay.  Good.  Your Honor, the verdict

9     amounts here indicated -- didn't indicate that the jury had

10    incredibly strong feelings about all this.  They're fairly

11    small amounts.  The -- the fact of the matter is that both

12    of the defendants told the jury or testified to the jury

13    that they, you know, were regretful of their actions,

14    particularly the ones they saw on the videos.

15         They both took the position, of course, they didn't

16    do what the plaintiff was accusing them of doing, but that

17    they, you know, were regretful of the actions about how they

18    had treated him in that booking room.  And I think that

19    under the circumstances, that it -- this jury does not -- is

20    not going to give them any more money, and that it's just

21    going to be a waste of our time.  And given the way the

22    testimony came out today, Your Honor, I'd like -- our -- our

23    motion is that the punitive damages not go to the jury.

24         THE COURT:  Okay.  Given the facts of this case,

25    given the jury's verdict, in order for the jury to reach a

1   verdict and deny the defendants' qualified immunity, they

2   would have had to believed Mr. Anthony's version of events.

3   And the Court finds under the circumstances of this case

4   that a punitive damages instruction is appropriate, and I

5   intend to give them one.

6       I am going to pass out to the attorneys the

7   instruction.  Ms. Cossar, if you will pass that out, the

8   instruction that the Court has prepared and the Verdict Form

9   that the Court has prepared with respect to punitive

10  damages.

11      Ms. Bland, during the jury instruction conference

12  touched on what the appropriate standard is.  We have not

13  put that on the record as to Ms. Bland's position that it

14  should be clear and convincing.  The Court's position is

15  that it should be preponderance of the evidence standard.

16      And, Ms. Bland, if there's any -- I know that you

17  have submitted case law.  If there's any law that you want

18  to put on the record as to why it should be a different

19  standard than what the Court has provided, you may do so.

20      I'll give everybody an opportunity to review the

21  instruction.

22      MR. LEES:  Just a question I was asking Brandon.  For

23  purposes of that portion of the proceeding on punitive

24  damages, does the plaintiff have the right to put on

25  additional evidence prior to submitting the case to the jury

1    on the issue of punitives?

2         THE COURT:  You do.  Both sides have a right to put

3    on additional evidence if they wish.  If you do that, I

4    would like some idea of what you intend to do since it is

5    getting late, and we can kind of go from there.  But I'll

6    give you time to confer --

7         MR. LEES:  Yeah, we're --

8         THE COURT:  -- to decide if you want to do that

9    but --

10        MR. LEES:  We'd like to confer for just a bit on that

11   issue if you don't mind?

12        THE COURT:  That's fine.

13        MR. LEES:  It would be my preference to let the jury

14   go and have us confer about that.  It's probably 50/50.  I

15   just need to look, have Brandon look at one area of law on

16   that, and then come back and do the punitive in the morning.

17   But I certainly leave it to your discretion; it's almost

18   5:00.

19        THE COURT:  All right.  Mr. Siler?

20        MR. SILER:  It's -- it's going to be awfully

21   difficult for us to get this to the jury at a reasonable

22   time, I would think --

23        THE COURT:  Okay.

24        MR. SILER:  -- and particularly if evidence is going

25   to be put on.  And I have been contemplating that as well,

 1    so it seems to me like it would be better to come back in

 2    the morning.

 3         THE COURT:  Okay.  Let me think on one thing, and

 4    then I'm going to hear from you on how I handle this.

 5         So the script I've used before when I have done this,

 6    but when I'm actually going to instruct them, I say "Your

 7    task as jurors has not come to an end yet in light of your

 8    verdict that was received.  So now there is a process by

 9    which the jury will be asked to determine whether punitive

10    damages should be awarded in this case."

11         I could let them know that, that way they have some

12    understanding as to why they're still here and we are not

13    releasing them.  And I can tell them that tomorrow, it's

14    possible that they may hear -- "it's possible" -- that way,

15    we leave that open -- that they may hear some evidence with

16    respect to punitive damages, and that I will instruct them

17    on the law as to punitive damages.

18         And then I will give the attorneys -- with respect to

19    argument on punitive, it's going to be ten minutes.  I'm not

20    going to allow longer than ten minutes.  That way, they know

21    it's shorter argument.  It's not going to look like today.

22         So with the understanding that I give them what --

23    why they're still here, I'm going to release them for the

24    day, bring them back in the morning where they may hear

25    additional evidence.  They will hear an instruction from me

1    on what constitutes punitive damages, and then that the

2    attorneys will argue for ten minutes.

3        Does everybody agree with that?  Is the plaintiff in

4    agreement?  I want to get that on the record.

5        MR. LEES:  The plaintiff is in agreement.

6        THE COURT:  Mr. Siler?

7        MR. SILER:  The defendants are in agreement.

8        THE COURT:  Okay.  All right.  If y'all would go

9    ahead and rise for me, I can hear them coming.

10                    (Jury in at 4:58 p.m.)

11        THE COURT:  All right.  You may be seated.

12        Okay.  Your task as jurors has not come to an end yet

13    in light of your verdict that was received.  So now there is

14    a process by which the jury will be asked to determine

15    whether punitive damages should be awarded in this case.

16        Because it is 5:00 -- there is a chance that you will

17    need to hear testimony, and also there's an additional

18    instruction that you'll hear from me.  And then the

19    attorneys will have an opportunity to make ten minutes per

20    side closing arguments, and so because of that, I am going

21    to have you come back in the morning.

22        Come back at the same time 8:45, same place, and that

23    way I'm not keeping you late tonight.  And then tomorrow,

24    again, you may or may not hear additional evidence related

25    to this particular issue of punitive damages.  You will hear

 1  a much shorter instruction from me than you heard today, and

 2  then you will hear ten minutes per side closing arguments.

 3        And so, again, I know you've reached a verdict as to

 4  liability and to damages as to compensatory, but there is

 5  additional work that you all need to do.  So I do ask that

 6  you continue to remember the Court's instructions, because I

 7  have more work for you to do tomorrow.

 8        So I do appreciate your attentiveness and your

 9  patience with us.  Y'all have been great.  And I really

10  truly do appreciate it, and the parties appreciate it, too.

11        So if you can be here downstairs at 8:45, we'll get

12  started at 9:00.  I hope you all have a good night, and I'll

13  see you all in the morning.  You may be excused.

14                  (Jury out at 5:00 p.m.)

15        THE COURT:  Okay.  You all may be seated.

16        MS. BLAND:  May I grab my notes really quick, so I'll

17  have the case law?

18        THE COURT:  You may, yeah.  I just want to go ahead

19  and let you make your record, and then I'll make my record

20  as to the standard being used.

21        MS. BLAND:  Can I do it from here?

22        THE COURT:  Yeah, as long as we can hear you in that

23  microphone, that's perfectly fine.  You can be seated and

24  pull that microphone to you, and read -- don't read too fast

25  for Ms. Crane.

1              MS. BLAND:  I'll try.

2              The defendants would submit that the correct burden

3     of proof for punitive damages is clear and convincing

4     evidence rather than a preponderance of the evidence.  The

5     case law in support of that is *Pacific Mutual Life Insurance*

6     *Co. v. Haslip*, 499 U.S. 1, 1991, where the Supreme Court

7     said that the assessment of punitive damages is under the

8     common law method.  It also cited *Smith v. Wade*, 461 U.S.

9     30, Section 19 -- sorry -- 1983, which was a Section 1983

10    case that affirmed assessment of punitive damages under the

11    common law method.

12             Further, Section 1988 provides that where there is no

13    applicable federal statute that provides the answer, the

14    common law, as modified and changed by the constitution and

15    statutes of the state in which the case is brought controls.

16    Mississippi's punitive damages standard is clear and

17    convincing.

18             The other case law that we cited in support was

19    *Grosch v. Tunica County, Mississippi*, 2009 Westlaw 161856,

20    page 2, Northern District of Mississippi, January 22nd,

21    2009.

22             *McReynolds v. Matthews*, 2018 Westlaw 279991, page 14,

23    Southern District of Mississippi, 2018.

24             And *Hollins v. Wilkinson County School District*, 2019

25    Westlaw 3769637, page 7, Southern District of Mississippi,

1  August 9th, 2019.

2       Thank you.

3       THE COURT:  All right.  Are you ready for me,

4  Candice?

5       THE REPORTER:  Yes, ma'am.

6       THE COURT:  Okay.  All right.  In support of the

7  Court providing a punitive instruction that's a

8  preponderance of the evidence standard, the Fifth Circuit

9  has previously held that a jury was "properly instructed" in

10 accordance with the punitive damages standard set forth in

11 *Smith versus Wade*, 461 U.S. 30, 1983, when a District Court

12 instructed the jury as follows:

13      But before you can find punitive damages, you must

14 find by a preponderance of the evidence that the officer not

15 only acted in an illegal manner, but that he acted in a

16 malicious and oppressive way; that his conduct was prompted

17 by ill will or spite or grudge; and that he did this with

18 extraordinary harshness or severity.

19      That's *Longoria versus Wilson*, 730 F.2d 300, 305 to

20 306, that's note 9, Fifth Circuit, 1984.

21      The Supreme Court has also noted that the due process

22 clause does not require a standard of proof higher than

23 preponderance of the evidence to award punitive damages.

24 That is *Pacific Mutual Life Insurance Company versus Haslip*,

25 499 U.S. 1, page 23, note 11, 1991.

1          Other circuits have also affirmed instructing the

2   jury to find punitive damages by a preponderance of the

3   evidence standard under federal law.  *McKinley versus*

4   *Trattles*, 732 F.2d 1320, pinpoint cite 1326, and note 2,

5   that's Seventh Circuit holding that a jury instruction on

6   punitive damages in a Section 1983 case that included a

7   preponderance of the evidence standard was accurate and

8   complete.

9          *Dang versus Cross*, 422 F.3d 800, pinpoint cite 807.

10  It's a Ninth Circuit 2005 case approving of a punitive

11  damage jury instruction in the Section 1983 context, stating

12  that, "Plaintiff has the burden of proving that punitive

13  damages should be awarded and the amount by a preponderance

14  of the evidence."

15         Also, a host of other District Courts have held that

16  under federal law, the standard of proof for punitive

17  damages in a Section 1983 case is preponderance of the

18  evidence.  Flythe, F-l-y-t-h-e, versus District of Columbia,

19  2016 Westlaw 4506965, at page 9, note 7.  It's a District of

20  Columbia 2016 case.  The preponderance standard is typically

21  applied in Section 1983 cases under federal law.

22         Also, *Green versus Montana Department of Public*

23  *Health*, 2014 Westlaw 12591835, collective cases, and then

24  finally *Stanley versus Irsa*, I-r-s-a, 2011 Westlaw 1526937,

25  Northern District of Indiana, also collective cases.

 1          All right.  Anything we need to -- have y'all had an

 2   opportunity to see the actual instruction, and is there any

 3   objections beyond what's already stated on the record as to

 4   the standard?

 5          Any objection as to how the instruction's written?

 6          I'll give you some time if y'all need to look over

 7   it; that's fine.

 8          MR. SILER:  Yes, ma'am.

 9          THE COURT:  I'll just sit right here, and let's go

10   off the record.

11             (An off-the-record discussion was held.)

12          THE COURT:  Does the plaintiff have any suggestions

13   or edits to the instruction or the Verdict Form?

14          MR. FLECHAS:  Your Honor, we've reviewed it, and I

15   think it's acceptable to the plaintiff.

16          THE COURT:  Okay.  Mr. Siler or Ms. Bland, beyond the

17   objection that's already been raised?

18          MS. BLAND:  Yes.  I know in our submission, we did

19   not include that third factor.  We had the financial

20   resources as the third factor.  I know it's the pattern, but

21   we would ask for just tonight to be able to look at case law

22   on the third and -- the third factor and bring up any issues

23   tomorrow morning, if we could?

24          I know plaintiffs said they wanted to look up that

25   third factor, too.

1        THE COURT:  Okay.  This is what I would ask, though.

2   If there are any "issues," I want case law tonight.  Like, I

3   want to be able to see it when I come in early in the

4   morning and that -- because what I don't want -- I want us

5   to be able to move expeditiously in the morning and not have

6   the jury come in and wait on us.

7        So, yes, if there's any case law that you want me to

8   see, you certainly -- or any argument you want to make,

9   include it in an email, and then I'll let you put it on the

10  record in the morning.

11       Again, my concern is just the jury.  I want to get

12  moving in the morning.

13       MS. BLAND:  Yes, Your Honor, understood.

14       THE COURT:  And, of course, that applies to both

15  sides.

16       Anything else we need to take up before in the

17  morning?  Anything you all anticipate now with respect to

18  evidence or otherwise I need to know about or anticipate and

19  be prepared for?

20       MR. SILER:  Nothing I can think of, Your Honor.  I

21  mean, we very well may put our two defendants on to talk

22  about some things, but I wouldn't think it would be very

23  long.

24       THE COURT:  Okay.  All right.  I will see you all

25  bright and early in the morning.  You all have a good night.

1          MR. SILER:  Thank you.  You, too.

2          MS. POWELL:  All rise.

3     **************************************************************

1                      **CERTIFICATE OF COURT REPORTER**

2

3        I, Candice S. Crane, Official Court Reporter for the

4   United States District Court for the Southern District of

5   Mississippi, do hereby certify that the above and foregoing

6   pages contain a full, true, and correct transcript of the

7   proceedings had in the forenamed case at the time and place

8   indicated, which proceedings were stenographically recorded

9   by me to the best of my skill and ability.

10        I further certify that the transcript fees and format

11  comply with those prescribed by the Court and Judicial

12  Conference of the United States.

13        THIS, the 6th day of June, 2025.

14

15               /s/ Candice S. Crane, RPR, RCR, CCR

16                   Candice S. Crane, RPR, RCR, CCR #1781
                         Official Court Reporter

17                   United States District Court
                         Candice_Crane@mssd.uscourts.gov

18

19

20

21

22

23

24

25