```
 1                  UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                        NORTHERN DIVISION

 3

 4   JIMMY ANTHONY                                      PLAINTIFF

 5   VERSUS              CIVIL ACTION NO. 3:23-CV-00132-KHJ-MTP

 6   JONATHON WELKER AND JACOB LANG                    DEFENDANTS

 7

 8

 9                     JURY TRIAL TRANSCRIPT,
                         APRIL 24, 2025,
10                        VOLUME 3 OF 4
     *************************************************************
11                  CLOSING ARGUMENTS EXCERPT
     *************************************************************
12

13          BEFORE THE HONORABLE KRISTI H. JOHNSON,
         UNITED STATES DISTRICT COURT JUDGE, AND A JURY,
14                   THAD COCHRAN COURTHOUSE,
                      JACKSON, MISSISSIPPI

15

16   APPEARANCES:

17   FOR THE PLAINTIFF:        JAMES B. LEES, JR., ESQ.
                               BRANDON L. FLECHAS, ESQ.
18

19   FOR THE DEFENDANTS:       W. THOMAS SILER, JR., ESQ.
                               MALLORY K. BLAND, ESQ.
20

21

     REPORTED BY:
22
         CANDICE S. CRANE, RPR, RCR, CCR #1781
23       OFFICIAL COURT REPORTER
         501 E. Court Street, Suite 2.500
24       Jackson, Mississippi  39201
         Telephone:  (601)608-4187
25       E-mail:  Candice_Crane@mssd.uscourts.gov
```

### TABLE OF CONTENTS

Style and appearances....................................  1

CLOSING ARGUMENTS:

     By Mr. Lees.........................................  3

     By Mr. Siler....................................... 18

     By Mr. Lees........................................ 37

Certificate of Court Reporter...........................41

1        **IN OPEN COURT, APRIL 24, 2025**

2

3        MR. LEES:  May it please the Court, counsel?

4        Good afternoon.  Thank you for bearing with me and

5    with Brandon during this trial.  Let me put the -- I'm going

6    to go over here for just a minute.  Just very briefly want

7    to go over the Verdict Form.  You're going to have questions

8    for each of the two defendants.

9        The first question for each defendant is going to be

10    whether we've proven, more likely than not by the

11    preponderance of the evidence, that that particular

12    defendant violated our client's constitutional right.  If

13    you check "no," we lose.  If you check "yes," you go to the

14    second question.

15        The second question is this issue of qualified

16    immunity, and I'll discuss it in a minute.  I just want to

17    make sure you understand, do you find that Defendant

18    Jonathon Welker's entitled to qualified immunity?  If you

19    check "yes," we lose.  If you check "no," then you would

20    have a "yes" to number 1; you would have a "no" to number 2;

21    that is a verdict for the plaintiff and against the

22    defendants, and then and only then are you permitted to go

23    on to damages.

24        It's going to be the identical thing with respect to

25    Lang.  We need a "yes" here, a "no" here, and then and only

 1    then can you go to put in compensatory damage amount, if

 2    any, here.

 3          Okay.  So there's a part of those instructions -- and

 4    I'm not going to get too technical on this, but essentially

 5    I'm going to say to you this:  If Officer Lang did what he's

 6    accused of doing in this case, which is slamming

 7    Mr. Anthony's head against the wall, there's no debate

 8    that's excessive force, that's a constitutional violation.

 9          If Officer Welker took Mr. Anthony into the bathroom

10    and repeatedly beat him with his fists, I don't think

11    there's any debate that's a constitutional violation; that's

12    excessive force.  All right?

13          And if those two things happened, I'm going to

14    suggest to you there should absolutely be no debate on this

15    qualified immunity thing, because any officer who takes an

16    American citizen's head and slams it against the wall or any

17    officer that beats an American citizen with their fists

18    repeatedly would know that that was against the law, know

19    that that's a constitutional violation, and knows that is

20    not what we do in America.

21          So the question in this case really comes down to as

22    follows:  Did they do it?  Did they do what we've alleged or

23    accused them of doing?

24          And to put the question in more of a precise legal

25    term, in the jury room, the question will be do you find

1  more likely than not that they did what they're accused of

2  doing?

3        If collectively you say yes, then we've met our

4  burden on the excessive force.  But the threshold is greater

5  than 50 percent.  What generally happens, or on occasion

6  happens, is you're in the jury room, you're having your

7  debate.  One of your fellow jurors says, well, you know, I'm

8  just not sure about that.  I'm just not certain, and I would

9  hope you've now understood what Your Honor has told us.  You

10  should immediately go, I understand that you're not certain.

11  Fortunately, the standard is not certainty, it's not

12  sureness.  It's is it more likely than not?  That's the

13  guiding principle when you have your jury deliberations.

14        The case went by -- maybe not for you, but for

15  lawyers who are in this business, it went fairly quickly,

16  and I'm going to point out just a couple of things as we

17  start here that maybe got overlooked because of the speed in

18  which things progressed.  Maybe you picked up on this.

19  Maybe you didn't.  Kudos to you if you did.

20        Let's go back to Officer Billy Hudson, the gentleman

21  who conducted the internal affairs investigation, remember

22  he was up there.  He testified that he had no knowledge

23  about Mr. Anthony's injuries or that Mr. Anthony had been in

24  the hospital until he gave his deposition, which was in

25  February of 2024; right?

1          So 20, 22 months, something like that goes by, and

2    the officer in charge of the internal affairs investigation

3    does not know Mr. Anthony went to the hospital and sustained

4    the injuries which we now know he did.

5          So what did we learn yesterday?  We learned yesterday

6    that that gentleman, Officer Welker, on April 30th, 2022,

7    went where?  Do you remember?  Went to the hospital to

8    deliver the order.  He was there.

9          In fact, in the Merit records, there was originally a

10   paragraph in there about a police officer being there or in

11   custody.  Nobody from the Rankin County Jail, when they sent

12   him over there, went with him.  That was him.  So he's at

13   the hospital on April 30th within hours of the beating

14   knowing Mr. Anthony is in the hospital with the injuries.

15         In just a few short weeks, do you remember Hudson

16   says I conducted my internal affairs investigation in May.

17   The same month, because we got the letter from the lawyer

18   May 5th; right?

19         I conducted my internal affairs investigation shortly

20   after May 5th, and I interviewed Officer Welker.  About

21   what?  About an alleged beating of Mr. Anthony in the

22   bathroom.

23         And somehow as a result of that interview, Hudson

24   does not learn Mr. Anthony was put in the hospital and

25   suffered severe injuries.  How is that even possible unless

1    that guy over there never told him?  Why wouldn't he tell

2    him?

3        Why wouldn't he say, yeah, you know what, April 30th

4    just a couple hours after I dropped him off at the jail, I

5    had to go to the hospital.  The guy's in the hospital,

6    Officer Hudson.  You need to -- you've got to look into

7    this.  Hudson never knew, and the only way he could not know

8    is if you didn't tell him.

9        One other thing you might have overlooked; maybe you

10   didn't.  When Officer Welker was on the witness stand

11   yesterday, he and defense counsel made a big deal out of the

12   fact that where that bathroom is located, whatever you're

13   doing in the bathroom could be heard out in the adjoining

14   hallway and perhaps in other areas; right?  It's all close,

15   so you could hear.

16       And then Officer Welker made a point to say, and I

17   even had the bathroom door ajar, so you should be able to

18   hear what's going on in the bathroom in there.

19       And I want to make sure you know our position on

20   that:  We absolutely agree.  We absolutely agree to that.

21       So you're saying, well, Mr. Lees, then we have video

22   and evidence here, so explain this.

23       The booking room, remember the booking room

24   microphone is inoperable.  It doesn't work.  It's the

25   microphone that records constantly.  The audio that you hear

1    on the booking room video is picked up by a mike in an

2    adjoining cell off the booking video.

3         When you're looking at that booking room video, okay,

4    where they -- at the bottom of the video is the door where

5    they originally came in; right?  It's the very first cell to

6    the left where that microphone is; that's where it is.

7         I was mistaken when we first started the case.  I

8    said at one point that that was a sound-activated microphone

9    if you remember.  I was wrong, and defense counsel corrected

10   me on it.  And he was absolutely right.  It's not a

11   sound-activated microphone.  It's a motion-activated

12   microphone.

13        What does that mean in terms of what audio we would

14   hear when Mr. Anthony was in the bathroom?

15        It means we will only hear audio that you would hear

16   in that booking room if the microphone in the adjacent cell

17   had been motion activated; right?

18        I will represent to you, on the exhibit that is in

19   evidence, for the entire 14 minutes that Mr. Anthony is in

20   the bathroom, the microphone is dead.  There is zero sound

21   on it for those 14 minutes, because nobody has walked past

22   that cell after Mr. Anthony leaves until he comes back to

23   activate the microphone.

24        I think he's correct.  I think you would hear what

25   was going on in the bathroom in the booking area, but we

1   can't hear it because the only working microphone was not

2   motion activated during those 14 minutes.

3         But we know somebody heard it, don't we?  Because

4   who's the guy that broke out into song?  We'll get to that.

5         On the issue, which is really the issue, by the

6   greater weight, by the preponderance of the evidence did

7   these two officers do what they're accused of doing?

8         Very briefly I'm going to hit the highlights for you.

9   We have evidence from a number of sources to prove that to

10   you by the preponderance of the evidence.  From Mr. Anthony

11   you hear it on the video.  Within five minutes of being

12   beaten, he's complaining of chest pain and feels like he's

13   having a heart attack consistent with the injuries that he

14   would have sustained and did sustain in the beating.

15         In the video in the car, he was kind enough to play

16   some of that video in the car.  I'm going to represent to

17   you, at least I think, you see a man with incredibly labored

18   breathing and having difficulty breathing in that video.

19         When he arrives at the Rankin County Jail, the

20   records reflect that Mr. Anthony immediately complained of

21   being in some type of medical distress.  He made a phone

22   call before he collapsed at the Rankin County Jail, if

23   you'll recall, to Ms. Quick.  That phone call was recorded,

24   so everybody has access to it.  It is undisputed in that

25   phone call he made from the Rankin County Jail -- and we're

1   now only an hour or two at the most after he was beaten --

2   he specifically says on the phone call, "I was beaten at the

3   Pearl Police Department, and I think I'm going to die.  I'm

4   going to die.  Help me."

5        His medical injuries, as you heard from the doctor,

6   were consistent with having been beaten, and within days of

7   being in the hospital, this gentleman was on a telephone

8   getting an attorney to do what?  Not sue anybody, to get the

9   police department to preserve all the audio and video, if

10  any.  Why?  Because he knew what happened and he wanted it

11  preserved, because he believed it would show exactly what

12  happened.  He would have no clue what rooms had video, what

13  didn't, what had microphones.

14       But he got an attorney on May the 5th, five days

15  later, to contact them and say this is what my client

16  alleges happened.  This is where he said it happened.

17  Preserve that evidence.

18       What's the evidence that supports our case from

19  Officer Lang?  Officer Lang can testify all he wants that he

20  was not out of control.  I'm just going to suggest to you it

21  appeared to me you had a very young, very inexperienced

22  officer who had completely lost his composure and completely

23  lost his cool in that booking room.  That is not the way

24  police officers are trained to interact with the American

25  public.

1    Mr. Anthony, before he knew anything that was going

2    to be on videos or not, has said I was taken out of the

3    booking room and put in the hall and left standing in the

4    hall.  And Officer Lang then came into that hallway and

5    slammed my head against the wall.  And then months later

6    when the videos were produced, what did we see?

7    After Mr. Anthony was removed from the booking room,

8    okay, and went around the corner into the hallway.  During

9    that period that he was around the corner in the hallway,

10   what's the video show?  He leaves the booking room and goes

11   into that very hallway.  And when he was on the witness

12   stand, he admitted that when he went in the hallway,

13   Mr. Anthony was in the hallway.  And when I asked him where

14   were you going and what were you doing, he couldn't

15   remember.

16   What is the evidence that supports the case from

17   Officer Welker?  Officer Welker, unlike Officer Lang,

18   actually wrote a police report, which he did the following

19   day on May 1st about what happened on April 30th.  That is

20   in evidence.  I put it up on the screen, and I showed it to

21   you.  There is not a single mention in that police report of

22   anything untoward or anything that happened at all in that

23   bathroom, none, zero, nada.

24   On April 30th before he wrote the police report, he

25   had gone to the hospital, and he knew Mr. Anthony had been

1    rushed to the hospital from the Rankin County Jail within an

2    hour or so of leaving his custody.  He knew that, and he

3    wrote a police report the next day and nothing -- nothing at

4    all in there about what occurred in that bathroom.

5         Officer Hudson came and interviewed him in a couple

6    of weeks specifically about the allegation that Mr. Anthony

7    had been beaten in the bathroom by him.  And what does the

8    internal affairs investigation report, which is in evidence,

9    show that he said about that?

10        The very subject he's being interviewed on, did you

11   hear the story?  Was it in that report that he told from

12   this witness stand yesterday?  No.  None of that's there.

13        What did he say?  He said, oh, I asked him if he

14   needed to go to the bathroom; and he said yes, and I took

15   him to the bathroom.  That's the extent of the statement

16   from him to the internal affairs people in their

17   investigation when he knew what the subject matter was.

18        And now we get, well, I was going to take him to do a

19   strip search, because he's a known drug dealer.  And, oh, he

20   lunged and he -- you know, all this other crap.

21        Page 32 of his deposition, which I had to call him

22   on.  I brought up the video and showed him.  At deposition,

23   Officer Welker had no idea how Mr. Anthony could have

24   suffered these injuries -- no idea whatsoever.

25        Other than from these sources, just a few other

1    sources, medical doctor corroborates right down the line.

2    The injuries are consistent with having been punched, beaten

3    repeatedly immediately preceding the onset of the symptoms.

4        After Mr. Anthony leaves the PD, he is on video

5    constantly until he collapses and goes to the hospital.

6    He's on video in the car.  He's on video at all times in the

7    Rankin County Jail before he collapses.  Nothing happens to

8    him at all at any time during any of that period before he

9    collapses and is taken to the hospital, and then, of course,

10    we have the booking video.

11        What else do we have to support our case?  What I

12    euphemistically refer to as the confessions.  What do I mean

13    by "the confessions?"

14        I mean Officer Welker heard on that video saying,

15    "Feels like you're having a heart attack?  What's that feel

16    like, Jimmy?  A sharp pain in your chest.  Did you induce

17    any -- did you feel any trauma?  Did you have any trauma

18    induced on your body today?"

19        I asked Officer Welker, have you had any medical

20    training.  He told me, yeah.  Okay, great.  If somebody

21    complains of a heart attack, why in the world -- a heart

22    attack, pain emanating down the arm, pressure on the chest.

23    And you're on video when a guy says "I think I'm having a

24    heart attack" talking about trauma.  Trauma?  Why trauma?

25    Because you know what you just did.

1    Officer Lang -- Officer Lang on that video absolutely

2    implicates Welker.  Why?  Where in the world would you come

3    up with breaking out into song, "He got beat because he ran

4    from the police" unless you knew that gentleman had been

5    beaten?

6        He got beat because he ran from the police.  Ladies

7    and gentlemen, that's exactly what happened in this case.

8    That's exactly why Officer Lang was mad.  That's exactly why

9    the police were mad, and so he got beat because he ran from

10    the police.  And he treated us to the Broadway version of

11    the theme of this case.

12        And, finally, proving what we need to prove in this

13    case, we have Officer Welker, to me final confession, when

14    he's standing over Mr. Anthony on the video, "look in my

15    eyes" and all that.  And he looks at him and he says, "If

16    you think that hurt earlier, then shut the fuck up."

17        "If you think that hurt earlier," he knew exactly

18    what he did.  And he took lengths in his interview with

19    Hudson and in writing his reports and doing everything he

20    could to keep it under the covers.  And now he's here today,

21    as is Lang, to face you as the conscious of the community.

22        Qualified immunity; qualified immunity is what I

23    euphemistically refer to as a police officer defendant's,

24    like in this case, Hail Mary.  Qualified immunity means if a

25    reasonable police officer could have believed that the use

1   of force that was being used was lawful.  If a reasonable

2   police officer could have believed that the use of force

3   that was used, that you find was used, was lawful.

4        There is not a police officer in America, no

5   reasonable police officer, who would ever believe slamming a

6   citizen's head into a wall was lawful.  Even Lang doesn't

7   believe it because he admitted when I asked him, and he

8   said, yeah, that would be excessive force.

9        There is no police officer in America who would ever

10  believe that repeatedly punching over and over and over and

11  over again an American citizen, a defenseless American

12  citizen in custody, so as to break his ribs, puncture his

13  lungs, cause massive internal bleeding, that that was even

14  remotely lawful.  So I certainly hope you do not give much,

15  if any, attention to the Hail Mary of qualified immunity on

16  that Verdict Form.

17       Finally, I need to touch upon damages.  There are a

18  little over 8 billion people on planet earth today.  It's a

19  big place.  What is the single characteristic, the single

20  quality that gives a very, very small minority of those 8

21  billion people on this planet a guaranteed right to be free

22  from excessive force from their respective government?

23       Out of 8 billion people, what is the one thing that

24  gives this minority of those human beings on this planet a

25  guaranteed right to be free from excessive force from

1    government?  Government being, among other things, police.

2         It's being an American.  It's hitting the lottery

3    when you were born and being born here, because if you are

4    born here, you have that right.

5         Over history has that right always been adhered to,

6    enforced?  We know it hasn't.  And who has always been there

7    eventually, and sometimes it takes time to make sure it is

8    enforced?  First three words, "We the people."

9         Being a citizen of the United States of America means

10   you have that guarantee regardless of whether you are rich

11   or poor; black, white, brown, or green; educated or

12   uneducated; it is solely the fact of being an American.  All

13   Americans have that right, and when you are robbed of that

14   guarantee by the actions of government acting like Officers

15   Welker and Lang, acting as if they are some vigilantes from

16   some third-world country; when that happens, then the

17   compensation that an American citizen receives for having

18   that right robbed of them should be based on the severity of

19   the injuries, and not, again, whether you're rich or poor;

20   black or white; educated or uneducated.

21        The measure of damages in this case should be, and

22   the guiding principle that should guide you when you're back

23   into that jury room is the severity of the injuries caused

24   to a human being without regard to whether Mr. Anthony is

25   like me, or whether it happens to somebody like Brandon, or

```
 1    whether it happens to somebody like Your Honor, the judge.
 2         Rich, poor, black, white, brown, educated,
 3    uneducated, it doesn't matter.  It's what happens to you
 4    that counts.  And I have heard over and over again in this
 5    courtroom a roundabout way to diminish the life and the
 6    quality of him, because they think it's going to effect how
 7    you apply the damage instruction to assessing his damages.
 8         He got crushed:  Broken ribs, internal organ damage,
 9    lung punctured, massive internal bleeding.  The medical
10    testimony in this case is he dies if medical attention had
11    not been rendered promptly and efficiently.
12         THE COURT:  Five-minute warning, Mr. Lees.
13         MR. LEES:  Thank you.
14         I would hope that you treat Mr. Anthony when you
15    get -- and I hope you do get to the damages without regard
16    to all of that stuff, and base your verdict as you would for
17    me or Brandon or anybody else based on the severity of his
18    damages and the severity of his injuries.
19         Counsel for the plaintiff -- I'm sorry -- counsel for
20    the defendant, in his opening statement, made some comment
21    that I was here trying this case, because I was going to ask
22    you for 12 million or 12 zillion dollars or something.  I
23    would never do that -- never do that.  That's not why I'm
24    here.
25         I do expect you, when you go to that jury room, in
```

considering the severity of the damages with respect to the
damages caused by Officer Welker to return a substantial
damage award against Officer Welker for what he did.  What
that amount is is up to you.  I'm not here to tell you that.
You figure it out.

I am going to suggest to you that obviously the
damage award for the injuries caused by Officer Lang, while
still substantial, should be less and significantly less
than the damages awards against Officer Welker.

But at the end of the day, what I do expect of you,
the eight of you acting together as the conscious of this
community, is to act in accordance with the principles of
America to uphold the law and to hold both of these officers
responsible for blatant violations of an American citizen's
constitutional rights.

Thank you.

THE COURT:  Thank you, Mr. Lees.  You've reserved
12 minutes for rebuttal.

Mr. Siler.

MR. SILER:  Thank you.  Thank you, Your Honor,
counsel.  Ladies and gentlemen of the jury, thank you for
your attention the past few days, and I know this has been a
trying thing.  I know what it's like sitting there, so I
appreciate you doing it.

I know you're tired of listening to lawyers.  You

1  don't want to sit here for an hour and a half listening to

2  people go back and forth arguing.  We see this case very

3  differently, always have.  I told you from the outset we

4  wanted to stand up here and tell you our side of the story,

5  and we've done that over the last couple of days.

6        But I have to represent my clients, and I'm going to

7  spend a few minutes talking to you about things that took

8  place and try to do it as efficiently as I can and move

9  forward.

10       I said at the outset of this case that there's a lot

11  of noise around it, what's going on.  There's lots of video

12  talk and people saying what they think, but when it gets

13  right down to it, it comes down to one person's word against

14  another's.  There is no video.  There is nothing going on

15  out there that you can look at.

16       I wasn't in that bathroom.  I wasn't in that hall.  I

17  don't know what happened.  You weren't there; obviously you

18  don't know what happened.  Plaintiffs weren't there, other

19  than Mr. Anthony, and nobody knows what happens.

20       Now, there's a lot of Monday morning quarterbacking

21  going on where somebody's sat around now for three years --

22  people that are smart and, you know, can afford to sit

23  around and see if they can dream up why certain things

24  occurred, come up with difficult bad meanings from their

25  perspective about what happened.  But in the end, nobody saw

1   anything that happened here except for these two -- well,

2   Mr. Welker, Mr. Lang, and Mr. Anthony.

3       Now, they talked just a few minutes about the

4   internal affairs investigation.  The internal affairs

5   investigator is not a human lie detector machine.  He

6   doesn't know what -- because he wasn't there either, he

7   doesn't know what's going on.

8       He didn't want to rely on anybody's version of the

9   story.  He wanted to rely on what he could see.  What he

10  could tangibly look at, and say there this was -- this is

11  what happened or that was what happened.  But as we all

12  know, there's no video.  There's no audio that's

13  particularly helpful, other than if you want to sit around

14  and think up things that seem terrible about it, and he

15  couldn't -- he didn't have that.  Just because he didn't put

16  all these things in his report that Mr. Lees refers to

17  doesn't mean they weren't told to him.  He just didn't have

18  any proof that's what actually happened.

19      If any of you -- I hope you've never been in a jail.

20  I've been in too many of them as an attorney, not as a

21  visitor or a prisoner.  But if you've been in jails, people

22  lie there all the time.  They come in and everything's

23  hurting, my heart's going, my head's hurting, my back's

24  terrible, my handcuffs are too tight; that's all they hear

25  day in and day out.  And when people say those kind of

1    things to them, that's what their -- you know, their

2    immediate thought is, you know, I've heard this all before.

3    Heard it yesterday, heard it the day before that.

4         We do know, again, Monday morning quarterbacking and

5    after the fact, all these complaints about having a heart

6    attack, he wasn't having a heart attack.  That wasn't an

7    issue in all this.  And they figured, just like with most

8    people, that they're lying to them and -- but they -- they

9    ask, they look around.  If something needs to be done,

10   they -- they take them where they need to be taken.

11        In the Rankin County Jail facility they have health

12   professionals in there, and they went there.  They -- he

13   said that the health professionals took his blood pressure.

14   They looked at him when he first got there and determined

15   that he wasn't having a heart attack as he was complaining,

16   and that there was nothing wrong with him, and they put him

17   in the jail.

18        Later as things changed and as it occurred, they --

19   they took him to Merit Health out on Highway 80 in Brandon

20   and got him checked out there, and that's where his health

21   issues started to -- to come about.

22        Keep in mind that with all this, we're not saying or

23   suggesting he didn't have an injury.  Okay?  We've never

24   said he didn't have an injury.  We've questioned their view

25   of it and what they say happened, and we'll talk about their

1    expert here in a few minutes about what he was saying.  And

2    I'll show you some other medical records that are in the

3    docket, or rather in the record, that you can look at when

4    you get back there if you want to.

5        But he was injured.  There's no question he was

6    injured.  The question here is how he was injured.  Was he

7    injured because he was hit 30 times on his shoulder, upper

8    shoulder, and upper part of his back?

9        You know, I might have even had some belief that

10   maybe he was telling the truth, Mr. Anthony, if he said he'd

11   been hit two or three times, but he said he got hit 30

12   times.  Yet the reason we played those videos back in here

13   this morning was I wanted you to very clearly see.  I wanted

14   you to see him walking back into that booking room after he

15   was allegedly hit 30 times, and we played it back a couple

16   of times so you could see it, you know, closely.

17       He walks through there in his own power without

18   assistance.  He doesn't look perturbed or red-faced, neither

19   do any of the officers that are coming in behind him, and

20   you can't see a mark on him.  There's no red spot.  There's

21   nothing on his chest that you see when he walks in.  And,

22   again, this is where he said he got hit 30 times.  There's

23   no mark on him whatsoever.

24       And then we played the transport, or at least part of

25   it, so, again, you can get a good view of his chest when he

1    was being transported over to the Rankin County Jail.  And

2    you get a clear view; you could see all of his tattoos.  You

3    could see everything he had on him, but there's no mark on

4    him at all.  There's no -- I mean, gosh, if you slap me or

5    hit me without a shirt on, there would be a mark, and

6    there's nothing on there at all.

7        And as the doctor said the other day in his

8    testimony, he said there's not a mention, not one word in

9    all of those health records -- and you'll see when you get

10   in there they're about that thick -- not one that says he

11   has a bruise or a contusion, which is the medical

12   terminology for a bruise on his body.  All the people that

13   saw him, all the people that dealt with him, not one person

14   writes in a record that he's got a bruise or a contusion on

15   his body.

16       Now, they show you a photograph where he has a couple

17   of bruises.  It looks like maybe three down here around some

18   tape, and these were photographs taken several days later

19   after April the 30th.  And I don't know what those bruises

20   are.  It could be from the tape.  It could be from laying on

21   that tube.  It could be all kinds of things.

22       But it also could very well be because that's where

23   Officer Welker struck him, as he said that he did.  Because,

24   remember, I asked him were you struck under your armpit

25   anywhere?  He said "no."

1       All these strikes, these 30 strikes he claims he had

2   were right up here.  But Officer Welker said when I struck

3   him with my open hand and pushed him back up against the

4   wall, I struck him right down in here.

5       Now, could Officer Welker have caused that damage

6   that was a blunt-force trauma that he put right in here on

7   his side?  Could he have caused that damage with that one --

8   one blow to go back?  I think he could.

9       Keep in mind -- and you'll hear it when I talk about

10  this in just a minute, but keep in mind that with -- with

11  his health situation, common sense tells you that his

12  interior of his body has got to be under some amount of

13  stress and strain.  I mean, he had hepatitis C.  He had

14  emphysema.  He was a lifelong smoker.  He was a

15  methamphetamine addict.  Certainly that's going to

16  deteriorate the quality of your blood vessels, the organs

17  within your body to some degree.

18      Is it going to take as much of a blunt-force blow to

19  somebody with those kind of long-term health issues as it

20  would to -- to you or me?  And I'd put to you it doesn't.

21      And, yes, he was hurt; and, yes, we did strike him

22  once in that -- in that bathroom.  But I'll put it to you

23  that our version of the events, Officer Welker's version of

24  the events is much, much more plausible than him saying he

25  got struck here and here 30 times and never, never down

1    here.

2        But if you sit around for three years and try to come

3    up with a story about how you can come to the jury and make

4    some money with it --

5        THE REPORTER:  You turned your mike off.

6        THE COURT:  Yeah, make sure that mike's on.

7        MR. SILER:  I didn't mean to turn it off.  Excuse me.

8        Mr. Lees has said several times, both in opening and

9    closing, uses the term "an American citizen."  An American

10   citizen did this, an American citizen did that, and he has

11   these rights and those rights.

12       Now, as far as I know, Mr. Anthony is an American

13   citizen, and Mr. Anthony has exercised his rights a great

14   deal.  He's exercised his rights to make choices about his

15   life, choices about the people that are around him, and a

16   lot of them have been bad choices.

17       He's -- he's -- the police in Pearl are out at his

18   house all the time because his girlfriend calls, so he's got

19   the right.  We all have rights as Americans to make

20   decisions and choices, but that doesn't mean we're going to

21   always make good decisions and choices.  And we've got to

22   live with the consequences of those decisions and choices,

23   and he's -- that's what Mr. Anthony is dealing with at the

24   moment.

25       Yeah, he's a citizen.  Yeah, he has rights like

1    everyone else, but he's not above everyone else.  And like

2    Mr. Lees, I don't want you not to award him money because he

3    doesn't -- he's poor, doesn't have any means of support;

4    that's not the point.

5         The point is how he's chosen to live his life and how

6    to do things.  He doesn't work.  He has no income.  He's

7    convinced Ms. Quick somehow or another to let him live in

8    her house for several years without paying anything.  He

9    doesn't have any income.  He lives off of her Social

10   Security check.  Yeah, he's made a lot of choices as an

11   American, as is his right, and it's his right to make those

12   choices even if they're bad ones.  And that's what he's

13   done.

14        Now, in opening Mr. Lees made the comment somewhere

15   along the way that we're governed by how we treat the least

16   of us, and I agree with that.  And he suggests that

17   Mr. Anthony is the least of us, and I'm going to suggest to

18   you that he's wrong in this case.

19        In this case, the least of us is probably Brandis

20   Quick, and we have done everything at the City of Pearl we

21   can to respond to Ms. Quick, respond to her numerous,

22   numerous calls.  We go out there every time she calls, calls

23   about him, and -- and every time she calls about him, he

24   runs and leaves before the police can get there.

25        I know the most dramatic words I've heard in this

1   case came from the video that Officer Saucier said in

2   talking to Ms. Quick on the morning of April 3rd when they

3   went in to arrest Mr. Anthony.

4                    (Video playing in open court.)

5       MR. SILER:  That's good.

6       How this ends is you dying, because he's going to

7   kill you.  And then remember he got her to show to the

8   camera, you know, the scars where he'd hit her on the side

9   of the neck.

10      They go there every time.  They try all they can to

11  help her.  They tell her and give her advice -- don't let

12  this guy come back -- and she always does.  She's the least

13  of us in this particular case.  Mr. Anthony is not.

14      Let's talk a little bit about the medical testimony,

15  and I'll add to what Mr. Lees said about the -- Mr. Lang.

16  Keep in mind this:  We've got two clients in this case, two

17  different defendants, and what they're accused of doing or

18  what the allegations of them doing are two totally separate

19  things.  One of them is he -- he claims he pushed his head

20  into the wall and put a knot on the back of his head and the

21  other one -- that's Mr. Lang.

22      Mr. Welker, he claims, is the one that hit him 30

23  times in the bathroom.  And it's important to keep that

24  distinction in your mind as you think through all this.

25      The doctor said to you that there -- no treatment was

1  given to him because of the knot on his head, and I don't

2  mean to make light of it and make fun of it.  You know, you

3  or I've had a hundred knots on my head, or most of us have,

4  from all kinds of reasons.

5       The problem here is, we don't know why that knot's on

6  his head.  It could be from all kind of things.  He was

7  running around in the woods two nights before in the dark.

8  He could have fallen in his bedroom, people do that all the

9  time.  We don't know where the knot came from.  But one

10 person's word against another's.  Mr. Lang said I did not; I

11 adamantly did not push his head against the wall.  And

12 Mr. Anthony says he did push my head against the wall.

13 Well, who do we believe?  Do we believe the great American

14 citizen Mr. Anthony?  I don't see that as being realistic at

15 all.

16       We put the doctor on the stand -- and, again, we're

17 not denying that he -- that Mr. Anthony had some injuries,

18 and we're not denying that they were serious.  They had to

19 get that stuff drained out of his chest cavity; they had to

20 put the tube in there.

21       Again, the question is how did -- how did that

22 happen, and whether it happened because Mr. Welker hit him

23 one time as he says, or did it happen because Mr. Anthony --

24 as Mr. Anthony says he hit him 30 times, and we've talked

25 about that a little while ago.

1      Their medical expert claims, oh, man he's got

2  multiple rib fractures.  He's got all these problems with

3  these fractured ribs.  Well, I will tell you that if you

4  look at the medical records, you'll find something different

5  in there.  And I'm going to show you some of them here in

6  just a second.

7      Mr. -- Dr. Huxford said that he had all these

8  specialties:  He was an internal medicine guy, he was a

9  pulmonologist, he was a sleep specialist.  He was -- I don't

10  know.  He had several things he said.  But when I asked him

11  particularly about radiology, someone who reads and

12  interprets images for a living, he said, no, I'm not a

13  radiologist, and I'm not supposed to do that.  So they bring

14  him in here to talk about ribs, and this guy doesn't even

15  know how many ribs a human being has.  I had to tell him.

16  And he said, oh, yeah, you're right, it's -- it's 12 not 14.

17  That's their expert.

18      Ladies and gentlemen, an expert will come in and tell

19  you anything the lawyers pay him to tell you, and that's

20  what this guy is -- is doing.  He's just coming in here and

21  telling you what they want him to tell you.

22      Think about this.  Joint Exhibit 4, if you want to

23  make a note of it, you don't have to, but you're welcome to

24  if you want to.  I'll give you some page numbers, which is

25  the Merit Health Rankin health records.  Go in there and

 1    take a look at Bates stamp page -- let me get this where we

 2    can see a little better.

 3         Bates stamp page 365, I'm just going to just point to

 4    some things I've got highlighted, "No acute rib fracture or

 5    sternal fracture is seen."  Remember the doctor said "acute"

 6    means something that's new.  Okay.  Chronic subacute, those

 7    are older injuries.

 8         There are subacute or chronic posterior or left 11th

 9    or 12th rib fractures.  Remember those bottom ones that he

10    called "floating ribs."  There were subacute or chronic rib

11    fractures, which means they were old rib fractures.  There's

12    nothing acute in there in their findings.  He says it again

13    right here, no acute rib -- no acute fracture of sternal or

14    sternal fracture is seen.  These are subacute.  There are

15    subacute or chronic posterior 11th and 12th rib fractures.

16    Same thing down -- down at the bottom of the page, and

17    that's page 365, Bates stamp page 365.

18         Here's another one, page -- this is Joint Exhibit 4,

19    page 377, you'll see down there that this is a chest wall --

20    chest 1V comparison, and it says "none."  This is from a

21    Dr. James Sutherland.  His findings, "There is no

22    significant osseous abnormality," and the doctor said the

23    other day that means there's no bone or abnormalities in

24    that ribcage area.

25         If you look at 378, it says the same thing.  Again,

1    on page 379 of Joint Exhibit 4, Dr. Sutherland again says,

2    "No acute rib fracture or sternal fracture is seen.  There

3    are subacute or chronic posterior left 11th and 12th rib

4    fractures."  And I -- I could go on.  There's several places

5    in here that say that.  Go to page 380 -- I won't put it

6    back up.  It says the same thing.  381, 382, 383, 385, they

7    all say the same thing, and all that means these

8    professionals -- who know how many ribs people have, who are

9    not being paid to come in here and tell you just what

10   somebody wants you to hear -- they're telling you there are

11   no new rib fractures.

12           THE COURT:  You'll need that mike, Mr. Siler.

13           MR. SILER:  All right.  I told you I was going to try

14   not to go ramble on too long.  I'm sure I've bored you to

15   death already.  But let me talk about a couple more things,

16   and then I'll sit down and shut up.

17           Damages; we don't think you should find any damages

18   in this case, zero.  I don't think you should even be

19   looking at it or thinking about it.  There's a couple

20   reasons, but the biggest one is there's no proof of any

21   damages whatsoever.

22           We read you a stipulation -- I don't remember if you

23   recall it or not -- at the outset of our case in chief, I

24   guess this would have been yesterday, in which they

25   stipulated to the fact they're not seeking any medical

1    expenses.  Now, why would you do that?  You're in here

2    trying to make money or get money from us causing him

3    something going on, why wouldn't you ask for the medical

4    expenses you've incurred.

5        They also stipulated to the fact they weren't asking

6    for lost wages.  And of course, they can't because the man

7    wasn't working, and he doesn't have any lost wages.  So what

8    they've decided to do instead is just come in and say, oh,

9    we just want these things.  They didn't even tell you what

10   they wanted them for.

11       He may have said something about pain and suffering

12   or mental and emotional distress, but there's nothing in

13   this record, not one single item in this record that has to

14   do with damages -- not one.  So what they're asking you to

15   do, in a sense, is just pull a number out of the air and put

16   it down on the page.  That's not how things work.  We're not

17   here to just guess and pull numbers out of the air about

18   damages.  They haven't proven a bit of damages, so that's

19   one reason not to award any damages.

20       The second reason not to award any damages is that

21   there really are none.  Keep in mind two different

22   defendants.  Officer Lang, the shove of the head and the

23   knot on the back of the head; no medical treatment was ever

24   given for that particular situation.  He didn't -- he

25   didn't -- I mean, like I said, we've all had knots on our

1  head occasionally.  It's just part -- part of growing up and

2  part of doing things.

3        And if he had a knot on his head, it wasn't because

4  of Officer Lang, because he didn't do it.  But even if he

5  did, there's -- there's nothing from which you could

6  logically draw some inference that there's damages

7  associated with that.

8        With respect to the other one, Mr. Welker, it just as

9  easily could have been in this case that the injury that he

10  suffered was caused by exactly what Mr. Welker said:  That

11  he got too close to him.  He was too close on the gun side;

12  that he -- it startled him and he turned around and

13  adrenaline going, and he shoved him back up into that wall.

14  And that very well could have created the problem given all

15  his health issues.

16        But there -- there is nothing that was done, and as

17  the Court read those instructions to you -- you -- well, law

18  enforcement officers have the right to use force.  I mean,

19  it would be crazy not to give them that right, because

20  they've got to be able to protect themselves.  They've got

21  to be able to protect others, and they deal with the worst

22  people on earth most of the time.  So you -- they can use

23  their -- their force if they need to, and this was

24  reasonable.  There's nothing unreasonable about it.  But

25  there's no damages proved anywhere.  They just want you to

1  pull a number out of the air.

2      Ladies and gentlemen, let me -- let me suggest this

3  to you.  This is a money grab.  It is a money grab.  He is

4  coming in here to the courthouse casino, putting a quarter

5  in the slot machine, pulling -- pulling the lever, and

6  seeing if he can get eight people to agree to give him some

7  money for which they have no basis.  That's not the way

8  court systems work, and I don't think we want to send a

9  message out there from this court that we're willing just to

10  let somebody come in here and make a money grab and walk out

11  with it without them proving it.

12      Now, as the Court said on many occasions, the

13  plaintiff has the burden of proof.  They have got to hold up

14  that burden to convince you that he did -- or that things

15  happened the way he said they happened and it just --

16  there's nothing here.  There's absolutely nothing, and their

17  damages case isn't any better.  So my request to you is to

18  give him absolutely nothing.

19      Look, Mr. Anthony's made a lot of bad decisions.

20  He's -- he's -- I know some of you have struggled, or

21  struggled in the sense that you've had friends or loved ones

22  that have had addictions and knows how the whole system

23  works with those folks.  And I know that they, you know, are

24  looking for their next -- next hit, their next drink, their

25  next whatever they can find, and they won't tell you the

1    truth if they need to try to get around to it.  And it may

2    be that that's just a sickness and there's no way to deal

3    with it, but you know how it works.

4         He is not a truthful person, and I don't -- I don't

5    relish at all pointing here and saying bad things about him.

6    I just -- I have to because he's, you know, trying to sue my

7    clients, and he's trying to do it with nothing and trying to

8    get you to just pull a number out of the air.

9         Now, I'll stop with that, and I'll also mention, like

10   Mr. Lees did, just briefly about this jury interrogatory --

11   the "Verdict Form" I guess is what we're going to call it.

12   The Verdict Form and where he said that you should mark

13   Question No. 1 yes -- let's read it for a second.

14        "Do you find that Plaintiff Jimmy Anthony has proved

15   by a preponderance of the evidence that Defendant Jonathon

16   Welker violated his constitutional right to be free from

17   excessive force, as defined by the Court's instructions?"

18        We would like for you to -- to mark it "no."  Okay?

19        All right.  If you mark that "no," then your job is

20   finished with respect to Mr. Welker.  You don't have to do

21   anything further.  You don't have to get into discussions

22   and debates about qualified immunity.  You don't have to get

23   into discussions and debates about money because that, after

24   all, is what they're here for.  But if you do that, you're

25   finished with him.

1    If you do mark "yes," you can go down to Question 2

2    on the qualified immunity, and if you believe that he is

3    entitled to qualified immunity, you can -- you can mark

4    "yes" there, and you're also finished with your work.  You

5    don't have to get into discussions at all about money.

6    Once you do that, the second page is about Officer

7    Lang, and it comes to the same -- down to the same thing.

8    If you mark "no," that you don't believe that Jimmy Anthony

9    has proved that he violated his constitutional rights,

10   you're finished with him.  And all you have to do is sign

11   the bottom of the page, and you're done.  If you --  did I

12   get that one right?  Okay.

13   And then if on number -- if you do mark "yes" on

14   number 4 and go down to number 5, if you mark "yes" that

15   he's entitled to qualified immunity, once again you're

16   through with your work and your deliberations, and you can

17   go home.

18   Let's not enable Mr. Anthony here to continue making

19   bad choices, to continue dealing with Ms. Quick, the least

20   of us, the way he always has, because if we give him a lot

21   of money, that's exactly what's going to happen.

22   This did not happen the way Mr. Anthony says it

23   happened.  It happened in another way.  And sometimes the

24   story's somewhere in the middle of what both sides say it

25   is.  And I don't know, because as I said, I wasn't there.

1          But Mr. Welker and Mr. Lang, they're both young men,

2   young fathers, young parents.  They're doing their best to

3   help the least of us in the City of Pearl back at that time,

4   and we urge you to hold that they did not violate this

5   individual's constitutional rights.

6          Thank you, Your Honor.

7          THE COURT:  Thank you, Mr. Siler.

8          All right.  Twelve minutes left for rebuttal,

9   Mr. Lees.

10          MR. LEES:  Just very quickly on one or two of the

11   points raised by defense counsel.  To refresh your

12   recollection, we had a pulmonologist because the primary

13   injury was to the lungs and the internal bleeding, not

14   orthopedic injuries.  The orthopedic injury -- which it's

15   true at the Merit Health center, an x-ray person read the

16   x-ray as being subacute.  But when he got to the trama

17   center at the University of Mississippi, they recognized it

18   was acute.  That was the diagnosis, and how do you think his

19   lung got punctured?  It's from the broken ribs.

20          I mean, you know, if you want to do what he said and

21   read all the records, I would welcome you to read the

22   records which show he got beat so severely his ribs broke.

23   A broken rib punctured a lung, caused all the internal

24   bleeding and damage, which filled up his chest cavity,

25   caused the hemothorax to the lungs, and almost killed him

1     but for the medical intervention.

2          Otherwise with no broken ribs -- but, yeah, the

3     medical records are what they are.  We're not seeking

4     medical expenses, that's correct, because the medical

5     expenses are insignificant to the overall harm of the case.

6     That's not what the case is about.  The case is about

7     somebody who suffered substantial harms and their

8     substantial impact on their quality of life.

9          With respect to the comments that somehow this is a

10    money grab, I'm not going to take that personally, but I

11    didn't even ask you for a number.  I told you it was up to

12    you.  You know, and in terms of the way the American court

13    system works, in a civilization, unlike in caveman days, we

14    have created a system, like it or not, where we use

15    financial responsibility to hold people accountable, rather

16    than going out with pistols at ten feet and settling it that

17    way.

18         If you have been injured and put in a wheelchair for

19    the rest of your life, do you really care about the medical

20    bills?  Your quality of life has been substantially impacted

21    for the rest of your life, and the American justice system

22    is all about turning it over to "We the People" sitting as

23    jurors to come up with fair and reasonable compensation that

24    fairly and reasonably compensates people for the losses.

25         In this case, the loss to the quality of life;

1    meaning an individual who has sustained these kind of

2    injuries underwent pain, agonizing pain, tremendous pain for

3    a substantial period of time, and agony and suffering and

4    the loss of the quality and enjoyment of life and the

5    emotional distress that comes with knowing that you think

6    you're going to die.

7         And I have been doing this a long time, and I am

8    perfectly comfortable, with all due respect, Counsel, to

9    leaving it up to people like this to use their common sense

10   as to what is an appropriate compensation for behavior in

11   which you have characterized as them doing their best for

12   the City of Pearl.  Seriously?

13        We don't beat people in custody in America.  We are

14   judged -- and I said it before, and I'll say it again.  We

15   are judged as a country not by how we treat the best of us,

16   not how we treat the Jim Lees, the Brandons, the judge, but

17   how we treat the worst of us.

18        And I certainly did not mean to suggest or imply that

19   Mr. Anthony in any way is the worst of us.  Good Lord, in

20   this country we certainly have worse, terrible behavior

21   every day.  But every one of those people is presumed

22   innocent.  Every one of those people is to be treated in

23   accordance with the Constitution.  We have courthouses,

24   judges, we have systems in place to deal with people's

25   abhorrent behavior.

1          But you know who doesn't get to do that?  You guys

2     don't.  Nobody appointed you the judge or jury.  Nobody.

3     You were young; I get it.  I hope this has been a learning

4     lesson for you.  But you're not a judge, you're not a juror;

5     you don't beat people.

6          Do your job.  Thank you.

7     ************************************************************

1    **CERTIFICATE OF COURT REPORTER**

2

3        I, Candice S. Crane, Official Court Reporter for the

4    United States District Court for the Southern District of

5    Mississippi, do hereby certify that the above and foregoing

6    pages contain a full, true, and correct transcript of the

7    proceedings had in the forenamed case at the time and place

8    indicated, which proceedings were stenographically recorded

9    by me to the best of my skill and ability.

10        I further certify that the transcript fees and format

11    comply with those prescribed by the Court and Judicial

12    Conference of the United States.

13        THIS, the 10th day of June, 2025.

14

15        /s/ Candice S. Crane, RPR, RCR, CCR

16                    Candice S. Crane, RPR, RCR, CCR #1781
                     Official Court Reporter
17                    United States District Court
                     Candice_Crane@mssd.uscourts.gov
18

19

20

21

22

23

24

25